UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————— x

PLUMBERS & STEAMFITTERS LOCAL
773 PENSION FUND, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

     vs.

DANSKE BANK A/S, THOMAS F.
BORGEN, HENRIK RAMLAU-HANSEN,
JACOB AARUP-ANDERSEN and OLE
ANDERSEN,

                  Defendants.

————————————————— x

:  Civil Action No.
:
:  <u>CLASS ACTION</u>
:
:  COMPLAINT FOR VIOLATION OF THE
:  FEDERAL SECURITIES LAWS
:
:
:
:
:
:
:
:
:
:  <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Plumbers & Steamfitters Local 773 Pension Fund ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Danske Bank A/S ("Danske Bank" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Danske Bank American Depositary Receipts ("ADRs") between January 9, 2014 and October 23, 2018, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.      During the Class Period, the Company was the largest financial institution in Denmark.  It conducted a large volume of financial business, including transactions in the fields of asset management, investment, pensions, mortgage finance, insurance, and real estate brokerage and leasing, including with customers who reside or are domiciled outside Denmark.

3.      Between at least 2012 and March 2016, due to its lax controls and its new Chief Executive Officer's drive to report outsized profits at all costs, Danske Bank was facilitating money laundering through its Estonian bank branch.  All the while, its senior executives were ignoring the outcry of Estonian financial regulators who stormed its Estonian Branch in 2014 and sent Danske Bank a scathing 340-page report that listed a multitude of violations – which the Company did not even bother to translate for three years.

4.      Though a whistleblower brought the illegal Estonian money laundering to the Company's senior executives' attention in December 2013, and Danish financial regulators had been investigating the misconduct since at least 2014, Danske Bank was intentionally less than

- 1 -

forthcoming with the Danish financial regulators investigating its misconduct and throughout the Class Period was actively concealing the extent and severity of its culpability from investors.

5.      Meanwhile, with the impact that the Company's illicit business practices had had on its previously reported financial results and the full extent of its impending regulatory culpability concealed, Danske Bank ADRs traded at artificially inflated prices, as the Company sought and obtained several corporate debt rating increases to facilitate its raising of hundreds of millions of dollars by issuing and selling bonds in the European bond markets.

6.      The Company's misconduct is now being investigated by regulators in five countries – including by the U.S. SEC, Treasury Department and Department of Justice ("DOJ") – and Danske Bank now faces billions of dollars in potential fines and penalties.  Its own recently published internal review – not started until September 2017 – found that the scandal was much larger than initially anticipated and had been facilitated by a lack of internal controls in its operations, ultimately demonstrating that more than $230 billion had flowed from Russia and other countries through Danske Bank's tiny Estonian branch – more than all the corporate profits in Russia in a year.  As the market learned the full extent of the Company's prior reliance on illicit profits and its resulting exposure to regulatory action between September 2017 and October 23, 2018, the market price of Danske Bank ADRs plummeted, erasing more than $2.54 billion in market capitalization.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5].  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.  Defendants expressly agreed to subject themselves to this Court's personal jurisdiction in connection with registering Danske Bank's ADRs for sale in the United States.

8.      Venue is proper in this District pursuant to §27 of the 1934 Act, because certain of the acts and practices complained of herein occurred in this District and because defendants expressly agreed to subject themselves to this Court's personal jurisdiction in connection with registering Danske Bank's ADRs for sale in the United States.

9.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

10.     Plaintiff Plumbers & Steamfitters Local 773 Pension Fund purchased Danske Bank ADRs as set forth in the accompanying certification, incorporated herein by reference, and has been damaged thereby.

11.     Defendant Danske Bank, headquartered in Copenhagen, Denmark, provides various personal banking, business banking, corporate and institutional, and wealth management products and services, along with mortgage finance, real-estate brokerage, foreign exchange and equity services, and also trades in fixed income products.  The Company operates 280 branches in eight countries, with operations in Denmark, Finland, Sweden, Norway, Ireland, the United Kingdom, and internationally.  Danske Bank ADRs traded in an efficient market throughout the Class Period, with its ordinary shares trading on the OMX in Copenhagen under the ticker symbol "DANSKE.CO" and its ADRs trading largely in tandem on the U.S. over-the-counter ("OTC") market under various ticker symbols such as "DNKEY."   An estimated 245 million Danske Bank ADRs are issued, outstanding and trading in the United States.  According to the investor relations portion of Danske Bank's website (visited December 12, 2018), the Company has "a sponsored level 1 ADR programme with J.P. Morgan as depositary bank," through which "[t]wo ADRs represent one ordinary Danske Bank share and are publicly traded over-the-counter (OTC) in the US."  In its

- 3 -

February 6, 2014 annual financial report (detailed below), Danske Bank noted that its shares then traded both on the OTC in the United States and on the OTX in Denmark, stating that it then "estimate[d] that shareholders outside Denmark, mainly in the UK and the US, [held] almost 48% of its share capital."

12.     Defendant Thomas F. Borgen ("Borgen") was, until he tendered his resignation on September 19, 2018, Danske Bank's Chief Executive Officer ("CEO") and a member of its Executive Board.

13.     Defendant Henrik Ramlau-Hansen ("Ramlau-Hansen") was, between 2011 and April 1, 2016, the Chief Financial Officer ("CFO") of Danske Bank.

14.     Defendant Jacob Aarup-Andersen ("Aarup-Andersen") was, between April 1, 2016 and May 2, 2018, the CFO of Danske Bank and a member of its Executive Board.

15.     Defendant Ole Andersen ("Andersen") was, until December 7, 2018, the Chairman of the Danske Bank Board of Directors (the "Board").

16.     Defendants Borgen, Ramlau-Hansen, Aarup-Andersen and Andersen are referred to herein as the "Individual Defendants."  Danske Bank and the Individual Defendants are referred to herein, collectively, as "defendants."

17.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Danske Bank.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Danske Bank ADRs was a success, as it: (i) deceived the investing public regarding Danske Bank's prospects and business; (ii) artificially inflated the price of Danske Bank ADRs; (iii) permitted Danske Bank to raise hundreds of millions of dollars issuing and selling bonds on more favorable terms due to its higher corporate debt ratings;

and (iv) caused plaintiff and other members of the Class to purchase Danske Bank ADRs at inflated prices.

## BACKGROUND

18.     Defendant Danske Bank is a Danish bank whose name literally translates into "Danish Bank." Danske Bank is the largest bank in Denmark and a major retail bank in the northern European region with over 5 million retail customers.

19.     In addition to its operations in Denmark, Finland, Sweden, Norway, Ireland and the United Kingdom, Danske Bank has branches in the Baltic states of Estonia, Latvia and Lithuania (the "Baltic Branches"). Danske Bank began operating in the Baltic states in 2008 after Finnish Sampo Bank was acquired by Danske Bank Group in 2007. Between 2010 and 2012, defendant Borgen, then head of the International Banking unit, oversaw the Baltic Branch operations.

20.     Until 2016, Danske Bank offered banking services at its Estonian branch to residents of other countries. Many of those non-resident clients were from so-called high-risk countries, with weak defenses against money laundering, including Russia, Moldova and Azerbaijan, and they used Danske Banks' Estonian branch for years to launder as much as 53 billion kroner ($8.3 billion).

21.     In December 2013, a whistleblower confidentially alerted Danske Bank that its Baltic Branches were then engaged in money laundering linked to Russia through its Estonian branch.

22.     In 2014, Denmark's Financial Supervisory Authority (the "DFSA") began investigating money-laundering linked to Russia through Danske Banks' Estonian branch. The Company concealed the existence of the ongoing DFSA investigation from investors, and when the existence of the investigation was finally disclosed, its significance was downplayed. Danske Bank also compounded its reporting problems by concealing facts learned internally from its own review of the whistleblower claims from the DFSA in connection with the DFSA's investigation.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED PRIOR TO THE CLASS PERIOD THAT REMAINED ALIVE
## AND UNCORRECTED DURING THE CLASS PERIOD

23.     On February 7, 2013, Danske Bank announced its fiscal 2012 financial results for the period ended December 31, 2012.  The Annual Report published that day ("Annual Report 2012") stated, in pertinent part, that Danske Bank's "net profit was [Danish Krone ("DKK")] 4.7 billion, up DKK 3.0 billion from the level in 2011" and "generally in line with expectations."  The Management Report included in the Annual Report 2012 attributed those results to Danske Bank's purported ongoing operational and strategic prowess rather than to money laundering, stating in pertinent part as follows:

> *The 2012 financial result for Danske Bank Group of DKK 4.7 billion, compared with DKK 1.7 billion in 2011, is in line with our expectations.  Several initiatives to improve profitability more than mitigated the effects of declining and low interest rate levels.  Our underlying cost levels are on level with those of 2011, partly as a result of the staff reduction of 1,000 FTEs, about 5% of the total. Impairments saw a declining trend throughout 2012, and although the level is still elevated, in Q4 they were at their lowest level since the financial crisis began.*

> *Danica Pension and our capital market businesses, Danske Markets and Danske Capital, performed better than expected and above the level in 2011.*

> *Our lending volume is marginally lower, reflecting partly our efforts to optimise our portfolio and strengthen the capital and liquidity ratios and partly generally lower demand for loans.  We have accommodated our customers' need for funding and overall kept our market share.*

24.     The Management Report contained a "New Strategy" section that claimed Danske Bank had adopted new operational and governance standards that would elevate Danske Bank amongst its customers and investors alike, stating in pertinent part as follows:

**New strategy**

Danske Bank launched a new strategy, New Standards, in 2012.

Considering that conditions for financial services business have changed fundamentally since the financial crisis and that we operate in a new normal, the strategy is based on a strong mission and vision to

- set new standards in financial services and

- become our customers' most trusted financial partner

With New Standards, Danske Bank will be a bank for all customers in our home markets.  We will provide market-leading advisory services and innovative digital and automated solutions for financial transactions.  Our digital and mobile platforms enable customers to do their banking business anywhere and at any time. We render our services at fair and competitive prices, and maintain a focus on balancing income and costs in all customer segments.

In January 2013, we launched a new customer programme for personal customers in Denmark to provide a simple and transparent overview of all our offerings and the benefits of using Danske Bank.  The programme will subsequently be launched in our other markets.  We have also responded to the rapid decline in the use of our branch network for transactions by reducing the number of branches. Moreover, we are opening a number of state-of-the-art advisory centres.

For our business and institutional customers, we strive to develop our product offerings and advisory services.  We aim to automate financial transactions for business customers to the greatest extent possible, thereby freeing up customers' resources for other priorities.  We will focus more on individual customer segments and develop expertise tailored to each segment.

In the capital markets area, we aim to maintain our leading position as confirmed by independent market observers.

25.    The Management Report expressly emphasized that Danske Bank's financial reporting, even if false, would lower its costs of capital by increasing its corporate debt ratings, stating in pertinent part as follows:

**Ratings and funding**

In May 2012, Danske Bank was downgraded by Moody's and Standard & Poor's.  The downgrade from Moody's was part of a general reassessment of the European financial sector.  Danish banks in particular were affected as Moody's considers Denmark's level of systemic support, even to systemically important banks, to be lower than in neighbouring countries.  The downgrades resulted in higher funding costs for Danske Bank in relation to our peers and did to a minor extent limit our access to certain wholesale funding sources.

***We have taken two major steps to enhance our access to funding and improve our ratings***.

First, in dialogue with the Danish FSA, Danske Bank agreed to accelerated compliance in 2012 with the expected EU rules on the Liquidity Coverage Ratio

- 7 -

(LCR), which will take effect gradually from 2015 to 2019, and to take other measures. It is, however, important to emphasise that Danske Bank's liquidity level remained strong throughout the year and vastly exceeded regulatory requirements.

Second, in October 2012, we completed a share issue with the aim of accelerating the achievement of a rating upgrade. Following the share issue, Standard & Poor's put Danske Bank on positive outlook, and the funding cost gap to our peer group was significantly reduced in the last quarter of 2012. Danske Bank's capital levels are strong, with a significant buffer above existing regulatory requirements. We are therefore positioned very well for the stress tests conducted by European authorities.

26.     Specifically addressing the Company's Estonian operations, the Annual Report 2012 stated in pertinent part as follows:

**Banking Activities Baltics**

At the beginning of 2007, Danske Bank acquired the Baltic activities of the Sampo Bank group. The activities form part of the business structure of Danske Bank Group and are reported under Banking Activities Baltics. With the acquisition, the Group established a presence in the Baltic markets, primarily in Estonia and, to a lesser extent, in Lithuania. The Group's operations in Latvia are very modest. The Group recognised goodwill impairment charges against the banking units in Latvia and Lithuania in 2009, reflecting the economic crisis in the Baltic countries. ***Only the goodwill allocated to the Estonian operations remains capitalised***.

27.     The Management Report further emphasized Danske Bank's then strong corporate governance and reporting strengths, claiming the Company was very transparent with investors about these matters, stating in pertinent part as follows:

**Corporate Responsibility**

As a financial institution, Danske Bank plays an important role in society through its obligation to provide well-functioning financial infrastructure as needed in a modern economy, and to support growth and economic stability. Danske Bank Group has come a long way in integrating environmental, social and ethical considerations into our business. New Standards will maintain this as a key focus area.

*             *             *

**Corporate responsibility**

Corporate responsibility remains an important part of Danske Bank Group's strategy. The Group wants to set new standards for social responsibility. This

- 8 -

applies to the areas of credit granting, investing, the environment and climate, responsible sourcing, and the Group's contribution to financial stability in society and to the economy in general. The Group considers responsible corporate governance a precondition for long-term value creation. In 2012, the Group merged its policies on corporate responsibility, the environment and responsible investing into a single Responsibility Policy.

28.     The Management Report of the Annual Report 2012, which was signed by defendant Andersen, concluded that Danske Bank would "continue to execute New Standards in 2013 and progress towards [its] 2015 ambition," stating that it then "expect[ed] 2013 to show material improvements, in comparison with 2012, and [it] expect[ed] to advance in the achievement of [its] 2015 targets."

29.     Danske Bank further claimed that its Annual Report 2012 had been "prepare[d] in accordance with the International Financial Reporting Standards (IFRSs), issued by the International Accounting Standards Board (IASB), as adopted by the EU."

30.     On February 7, 2013, Danske Bank also published a report entitled Risk Management 2012, which emphasized that the Company had put in place strong risk oversight protections that were buttressing its corporate debt ratings and thus lowering its capital costs, stating in pertinent part as follows:

> In 2012, Danske Bank Group implemented a new strategy and organisational changes. With these initiatives, the Group confirmed its role as a universal bank in the regions where it operates. The strategy entails clear segmentation choices and customer propositions based on industry-leading advisory services. The Group will bring digitalisation and automation in banking to new levels. A resolute focus on process optimisation and operational excellence is intended to significantly improve customer satisfaction and reduce costs. Combined with improved capital efficiency, this will ensure higher returns on a stable capital base. ***The risk profile is intended to be conservative***.
>
> The organisational changes included the delegation of risk management responsibilities to dedicated risk teams in the new business units: Personal Banking, Business Banking and Corporates & Institutions. In 2012, the Group made a substantial effort to clarify the risk governance processes as part of the consolidation of the new organisation. A new unit – Group Risk Management – was set up to

guide, monitor and consolidate risk management.  The unit is headed by the Group chief risk officer, who is a member of the Executive Board.

*The Group's recently launched strategy also entails an ambition to attain a better balance between earnings and risks in business activities*.  This ambition requires the enhancement of differentiated systems, processes and policies for the individual business units, a development that was in focus in 2012 and will also be so going forward.

The year 2012 also presented a difficult macroeconomic environment, with volatile markets and high impairment charges for the Group in Denmark and Ireland.  A significant part of the Group's lending book in Ireland – much of it related to commercial property – was singled out as being incompatible with the business strategy.  This portfolio was the main source of losses in Ireland, and it will be wound up or divested as soon as market conditions permit.  Until then, the portfolio will be managed so as to optimise collections.

Uncertainty about the recovery of the European and global economies continued, with massive public debt problems still unresolved and consumer confidence stubbornly low.  The sovereign debt crisis increased the divergence among European yields that began in 2011.  In this financially divided Europe, the Scandinavian countries and Germany continued to function as safe havens, where interest rates were pushed down to levels near zero and even below zero at times, whereas interest rates in Spain and Italy especially rose to previously unseen levels.  The announcement of a new bond purchase programme by the European Central Bank at its September meeting, however, succeeded in driving rates back down to the levels from the beginning of 2012 in the peripheral countries.

*Despite considerable uncertainty and high volatility, the capital markets functioned reasonably well.  Credit spreads narrowed, and strong banks – including Danske Bank – had opportunities to issue senior debt.  Investor sentiment remained fragile, though*.

*Danske Bank's ratings from external rating agencies are essential for the Group's access to capital markets*.  Despite negative actions from the agencies in the first half of 2012 due to growing concerns over general business conditions for Nordic banks, Danske Bank had reasonable access to funding and liquidity markets, albeit at higher prices than those of its main Nordic peers.

Danske Bank has taken major steps to enhance its access to funding and improve its ratings.  To accelerate the achievement of our rating targets, we issued new shares for an amount of DKK 7.1 billion in October 2012.  Shortly afterwards, Standard & Poor's changed its outlook for Danske Bank from stable to positive.

Furthermore, in dialogue with the Danish Financial Supervisory Authority (FSA), Danske Bank agreed to accelerate compliance in 2012 with the forthcoming EU rules on the Liquidity Coverage Ratio (LCR), which is expected to take effect

- 10 -

gradually from 2015 to 2019, and to take other measures.  It is, however, important to emphasise that Danske Bank's liquidity level remained strong throughout the year and vastly exceeded regulatory requirements.  At the end of 2012, the Group's LCR was 121%, and the Group therefore achieved compliance with the forthcoming rules.

The Group will continue to make considerable efforts to prepare for the massive regulatory changes that will be implemented in the financial services industry in the coming years.

Danske Bank expects that it will be designated a SIFI in Denmark and that it will be subjected to stricter requirements than Danish banks that are not designated as SIFIs.  Danske Bank's position is that any requirements placed upon SIFIs in Denmark must be based on a clear set of international standards in order to avoid distortions of competition because of local differences in the treatment of SIFIs.

31.     The statements in ¶¶23-30 above were materially false and misleading at the time they were made and/or omitted to state required material information because they failed to disclose the following adverse information that was then known to defendants or recklessly disregarded by them:

(a)     that Danske Bank's Estonian branch was then engaged in money laundering;

(b)     that Danske Bank had been overstating its historical profits by including the profits derived from its illicit Estonian operations;

(c)     that Danske Bank lacked effective internal and reporting controls; and

(d)     that, as a result of the foregoing, defendants' statements about Danske Bank's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

32.     The Class Period commences on January 9, 2014.  On that day the price of Danske Bank ADRs opened at $11.72 per share.

33.     On February 6, 2014, Danske Bank announced its fiscal 2013 financial results for the period ended December 31, 2013.  The Annual Report published that day ("Annual Report 2013")

- 11 -

stated, in pertinent part, that Danske Bank's "net profit [rose] 51% to DKK 7.1 billion, against DKK 4.7 billion in 2012 and DKK 1.7 billion in 2011" and that "Danske Bank report[ed] net profit of DKK 7.1 billion (EUR 953.7 million) for 2013." In the Annual Report 2013, defendant Borgen attributed the results to Danske Bank's purported ongoing operational and strategic prowess, rather than to the money laundering that the whistleblower had already disclosed to Danske Bank's senior executives during 2013, stating in pertinent part as follows:

> *The year 2013 was a time of progress for Danske Bank. . . . We took steps to strengthen our position in the market, accelerated the execution of our strategy and contained costs. Our financial results improved, but they were still unsatisfactory.*
>
> *We still have a way to go to realise the full potential of Danske Bank, but we are confident that we are moving in the right direction. Understanding and meeting our customers' increasingly differentiated and complex demands are key to our success. We have a strong combination of skills, expertise and innovative solutions, and we will continue to strengthen our relationship with our customers."*

34.     The Annual Report 2013 also contained a letter signed by defendants Andersen and Borgen that continued to highlight the Company's operational and strategic successes, stating that the Company's performance justified the strong financial guidance, stating in pertinent part as follows:

> The year 2013 was a year of change and progress for Danske Bank. . . . We took important steps towards executing our strategy aimed at fulfilling our vision to become the most trusted financial partner. We will continue to focus relentlessly on meeting customer needs, simplifying operations and becoming more efficient. Over the past year, we took steps to relieve customer-facing employees of administrative tasks and empower them to make decisions on the basis of their competencies and their day-to-day interaction with customers. We will accelerate these efforts in coming years, as we seek to strengthen our market position by setting new standards for advisory services.
>
> *                *                *
>
> The financial results improved significantly at most of our business units despite the challenging market environment. Net profit increased about 50% to DKK 7.1 billion, and the return on equity rose 1.4 percentage points to 5.0%. Despite the improvement, profitability is not at a satisfactory level. We remain committed to our

intermediate target of a return on equity of 9% in 2015 and our long-term target of above 12%.  We aim to be among the top three in the Nordic peer group on return on equity.

35.     The Annual Report 2013 specifically emphasized that the Company was "pleased to see evidence of increased confidence in Danske Bank as Moody's and Fitch raised their credit rating outlook for Danske Bank."

36.     Specifically addressing the Company's Estonian operations, the Annual Report 2013 stated in pertinent part as follows:

**Business Banking, Estonia**

At the beginning of 2007, Danske Bank acquired the Baltic activities of the Sampo Bank group.  The activities form part of the business structure of Danske Bank Group.  With the acquisition, the Group established a presence in the Baltic markets, primarily in Estonia and, to a lesser extent, in Lithuania.  The Group's operations in Latvia are very modest.  The Group recognised goodwill impairment charges against the banking units in Latvia and Lithuania in 2009, reflecting the economic crisis in the Baltic countries.  Only the goodwill allocated to the Estonian operations remains capitalised.  In 2013, goodwill in Banking Activities Baltics was reallocated to Business Banking Estonia as a result of the new organisational structure.

37.     The Annual Report 2013 further emphasized Danske Bank's then strong corporate governance and reporting strengths, claiming that the Company was very transparent with investors about these matters, stating in pertinent part as follows:

Corporate responsibility (CR) remains an important part of Danske Bank's strategy.  We want our customers and other stakeholders to feel confident that we manage our business with proper attention to environmental, social and governance (ESG) issues.  This applies to credit granting, investing, responsible sourcing, and our contribution to financial stability in society and the economy in general.  We consider responsible corporate governance a precondition for long-term value creation.  In 2012, Danske Bank combined its policies on corporate responsibility, the environment and responsible investing into a single Responsibility Policy.

Corporate Responsibility 2013, the statutory report on corporate responsibility issued in accordance with section 99 (a) of the Danish Financial Statements Act, is published at the same time as the annual report and is available at danskebank.com/crreport.

- 13 -

*       *       *

**Whistleblower system**

      Danske Bank wants to be an open and honest business, and we value the free flow of information.  All employees are obliged by our Code of Conduct to report suspicious behaviour through our whistleblower system.  All reports and questions are treated confidentially, and Danske Bank does not tolerate retribution against employees who report suspicious activity.  A description of the whistleblower system is available in Corporate Responsibility 2013.

**Reporting on Corporate Responsibility**

      Every year, we publish a separate report with detailed information about our CR initiatives and performance.  As part of our ongoing commitment to transparent accountability, this year's CR report was reviewed by an independent external audit firm.  Responsibility reporting comprises Corporate Responsibility 2013, CR Fact Book 2013, the Communication on Progress to the UN Global Compact (COP), and a Global Reporting Initiative (GRI G4) index.  All the reports are available at danskebank.com/responsibility.

      Danske Bank has a comprehensive portfolio of CR initiatives and projects. More information about them is available at danskebank.com/responsibility.

38.    Danske Bank further claimed that its Annual Report 2013 was "prepare[d] in accordance with the International Financial Reporting Standards (IFRSs), issued by the International Accounting Standards Board (IASB), as adopted by the EU."

39.    On April 29, 2014, Danske Bank issued a press release announcing that Standard & Poor's had raised its "long-term rating to A from A- and its short-term rating to A-1 from A-2" and had "changed the outlook for the Group's ratings from stable to negative."  The release quoted defendant Ramlau-Hansen as stating in pertinent part that "'[o]ne of [Danske Bank's] 2015 targets [was] to improve [its] ratings by at least one notch,'" adding that "'[t]he upgrade from Standard & Poor's [was] a good step forward in [the] efforts to achieve [its] strategic goals.'"

40.    On May 12, 2014, Danske Bank announced it would issue and sell bonds in the amount of DKK 3.7 billion (€500 million), which the Company announced having completed on May 13, 2014.  According to Danske Bank, the bonds had "a maturity of 12 years," with the

- 14 -

"coupon in effect until 19 May 2021 set at 2.75% p.a., with annual interest payments and an issue price of 99.893%."

41.     On November 27, 2014, Danske Bank issued a release announcing that Moody's had raised "Danske Bank Group's long-term rating to A3 from Baa1" and that its "BCA (Baseline Credit Assessment) rating ha[d] been raised to baa1 from baa2," with "Moody's . . . also chang[ing] the outlook for all of Danske Bank's ratings from positive to stable."  The release quoted defendant Ramlau-Hansen as stating that Danske Bank was "'pleased to see Moody's acknowledge the continually positive development at Danske Bank,'" adding that "'[w]ith the Standard & Poor's upgrade in April and this announcement from Moody's, [the Company was] one step closer to meeting [its] strategic goals for improved ratings.'"

42.     On February 3, 2015, Danske Bank announced its fiscal 2014 financial results for the period ended December 31, 2014.  The Annual Report published that day ("Annual Report 2014") stated, in pertinent part, that Danske Bank "generated a net profit for 2014 of DKK 3.8 billion," that the "net profit was affected by goodwill impairments of DKK 9.1 billion," and that "[b]efore goodwill impairments, net profit rose 82% to DKK 12.9 billion, against DKK 7.1 billion in 2013 and DKK 4.7 billion in 2012," adding that the "increase was driven by growth in all income lines, lower expenses and lower loan impairments."  In the Annual Report 2014, defendant Borgen again attributed the results to Danske Bank's purported ongoing operational and strategic prowess, rather than to the money laundering that the whistleblower had already disclosed to Danske Bank's senior executives during 2013, stating in pertinent part as follows:

> "2014 was a year of considerable progress for Danske Bank.  Our focus on delivering value to our customers helped strengthen our underlying business and our results. . . .
> Although we still have some way to go to meet our ambitions and realise the full potential of Danske Bank, the progress confirms that we are on track to deliver on our targets.  We will continue to diligently execute our strategy to become a more

customer-centric, simple and efficient bank for the benefit of both customers and shareholders."

43.     The Annual Report 2014 also contained a letter signed by defendants Andersen and Borgen that continued to highlight the Company's operational and strategic successes, stating that the performance justified the Company's strong financial guidance, while concealing the money laundering, stating in pertinent part as follows:

We are pleased to report that 2014 was a year of significant progress for Danske Bank.

The macroeconomic environment did not offer much support as the year saw a continuation of low interest rate levels and slow growth. Despite this, we managed to increase the topline across our business as a result of a firm focus on delivering value to customers.

The combination of an improved topline, lower costs and lower loan impairments resulted in a net profit before goodwill impairments of DKK 12.9 billion and a return on equity before goodwill impairments of 8.5%. These are the best results since 2007 and give us confidence that we are on track to deliver on our targets. As a result of expected weaker long-term macroeconomic developments, we made goodwill impairments of DKK 9.1 billion.

\*       \*       \*

With these achievements, we believe that 2014 marks the end of a string of challenging years. As confirmed by both Danish and European stress tests, Danske Bank is today a strong, well-capitalised bank with a solid platform and the capacity to meet the challenges and seize the opportunities that lie ahead.

\*       \*       \*

We also decided to refocus our business in the Baltics towards our corporate customers and we will invest in strengthening our platform and product offering in these markets.

44.     Specifically addressing the Company's Estonian operations, the Annual Report 2014 disclosed that Danske Bank had taken a substantial impairment charge on the goodwill attributed to the Estonian operations, stating in pertinent part as follows:

**Business Banking, Estonia**

At the beginning of 2007, Danske Bank acquired the Baltic activities of the Sampo Bank group.  The activities form part of the business structure of Danske Bank Group.  With the acquisition, the Group established a presence in the Baltic markets, primarily in Estonia and, to a lesser extent, in Lithuania.  The Group's operations in Latvia are very modest.  The Group recognised goodwill impairment charges against the banking units in Latvia and Lithuania in 2009, reflecting the economic crisis in the Baltic countries.  Only the goodwill allocated to the Estonian operations remained capitalised.  In 2013, goodwill at Banking Activities Baltics was reallocated to Business Banking Estonia as a result of the new organisational structure.    In 2014, the Group recognised a goodwill impairment charge corresponding to the full amount of the goodwill *owing to a worsening of the long-term economic outlook in Estonia and the planned repositioning of the personal banking business in 2015*.

45.    The Annual Report 2014 also emphasized that, "[i]ndicating confidence in [Danske Bank's] progress, Standard & Poor's and Moody's upgraded [the Company's] credit ratings," allowing Danske Bank in April 2014 to "repa[y] the hybrid capital raised from the Danish state in 2009 at the height of the financial crisis."

46.    The Annual Report 2014 further emphasized Danske Bank's then strong corporate governance and reporting strengths, again claiming the Company was very transparent with investors about these matters, stating in pertinent part as follows:

Corporate responsibility (CR) remains an important part of Danske Bank's strategy.  We want our customers and other stakeholders to feel confident that we manage our business with proper attention to environmental, social, ethical and governance issues.  This applies to credit granting, investing, responsible sourcing, and our contribution to financial stability in society and the economy in general.  We consider responsible business conduct a precondition for longterm value creation.

**Reporting on corporate responsibility**

Under the Danish FSA's Executive Order on Financial Reports for Credit Institutions and Investment Firms etc. (section 135 and section 135a), large companies are required to report on corporate responsibility and diversity at management level.  As a signatory to the UN Global Compact, Danske Bank prepares a Communication on Progress in the form of our Corporate Responsibility 2014 report.  With this report, which is available at danskebank.com/crreport, we fulfil the requirements.

The report is supplemented by additional data and indicators in our Corporate Responsibility Fact Book 2014 and 2014 Global Reporting Initiative (GRI G4) index and combined, our reporting offer a comprehensive and balanced view of material corporate responsibility matters relating to our business activities. The reporting and information about Danske Bank's other CR initiatives and projects are available at danskebank.com/responsibility.

47.     Danske Bank further claimed that its Annual Report 2014 was "prepare[d] in accordance with the International Financial Reporting Standards (IFRSs), issued by the International Accounting Standards Board (IASB), as adopted by the EU."

48.     On February 11, 2015, Danske Bank announced it would issue and sell bonds in the amount of DKK 5.6 billion (€750 million), which the Company announced having completed on February 11, 2015. According to Danske Bank, the bonds would "be perpetual . . . with an option to prepay the bonds on 6 April 2022, at the earliest," would "have a Coupon of 5.875% per annum, payable semi-annually in arrear on 6 April and 6 October in each year, commencing on 6 October 2015," and would "be listed on the Irish Stock Exchange."

49.     On June 17, 2015, Danske Bank issued a release announcing that "Moody's [had] upgraded Danske Bank's long-term rating to A2 from A3 and Danske Bank's short-term rating to P-1 from P-2," quoting defendant Ramlau-Hansen as stating in pertinent part that "'[t]he upgrade [was] a recognition of Danske Bank's continued progress and improved financial results,'" and that the "'upgrade also underline[d] that [Danske Bank] continue[d] to deliver on [its] strategic targets for 2015.'"

50.     On November 19, 2015, Danske Bank announced that defendant Ramlau-Hansen was "resign[ing] from his position" and would be replaced by defendant Aarup-Andersen effective April 1, 2016. In the release, defendant Borgen lauded defendant Ramlau-Hansen's performance at the Company without disclosing the Estonian money laundering, stating in pertinent part that, in "'the past five years [Ramlau-Hansen had] taken part in creating a solid foundation for [Danske Bank] in

terms of ratings, capital position and liquidity,'" and that he would "'hand[] over a strong organisation and a bank in good shape.'"

51.     On February 2, 2016, Danske Bank announced its fiscal 2015 financial results for the period ended December 31, 2015.  The Annual Report  published that day ("Annual Report 2015") stated, in pertinent part, that Danske Bank's "net profit for 2015 was DKK 13.1 billion," and that, but for "reported goodwill impairments of DKK 4.6 billion," its "[n]et profit before goodwill impairments rose 36% to DKK 17.7 billion, against DKK 13.0 billion in 2014."  In the Annual Report 2015, defendant Borgen again attributed the results to Danske Bank's purported ongoing operational and strategic prowess, rather than to the money laundering that the whistleblower had already disclosed to Danske Bank's senior executives during 2013, stating in pertinent part as follows:

> "***In 2015, Danske Bank continued to progress and delivered strong results despite a challenging environment.  The results are testament to the strength of our diversified business model as a Nordic universal bank and reflect our firm focus on executing our strategy of becoming a more customer-centric, simple and efficient bank***. . . .
>
> "***We continued to strengthen relations with our customers and launched a number of initiatives aimed at making daily banking and important financial decisions easier for our customers.  We have a sound platform and a strong position in the marketplace as well as a clear strategic direction for the next part of our journey towards realising the full potential of Danske Bank***."

52.     The Annual Report 2015 also contained a letter signed by defendants Andersen and Borgen that continued to highlight the Company's operational and strategic successes, stating that the performance justified the Company's strong financial guidance, while concealing the money laundering, stating in pertinent part as follows:

> 2015 was another year of significant progress for Danske Bank.  We are well on track to becoming a more customer-centric, simple and efficient bank to the benefit of all our stakeholders.

- 19 -

Net profit before goodwill impairments was DKK 17.7 billion for 2015 and the return on shareholders' equity before goodwill impairments was 11.6%, and we have thus delivered on the financial targets we have pursued since 2013. We maintained a strong capital position, and our credit ratings were improved.

\*       \*       \*

In recent years, we have strengthened Danske Bank's leadership, in particular the leadership of support and staff functions. This work continued during 2015 with the overall objective of increasing our customer focus and becoming a more simple and efficient business. We have increased our focus on leadership development, succession planning and talent development. We have also initiated a cultural transformation process, which on the basis of value-based leadership promotes customer-centricity, performance management and empowerment of staff.

**The journey ahead**

Our 2015 results bring us a significant step closer to delivering on our target of a return on shareholders' equity above 12.5% by 2018 at the latest.

53. The Annual Report 2015 also emphasized that Danske Bank had "reached [its] rating targets when Moody's upgraded [its] long-term rating to A2 and [its] short-term rating to P-1 in June, and S&P changed its outlook for [its] long-term A rating to stable in July," emphasizing that "[t]his was a very important milestone that is testament to the sustained effect of [the Company's] strategic initiatives," and that the "improvement in [its] ratings mean[t] that [it was] able to do more business with specific customer groups and that [it could] further optimise [its] funding."

54. The Annual Report 2015 further emphasized Danske Bank's then strong corporate governance and reporting strengths, again claiming the Company was very transparent with investors about these matters, stating in pertinent part as follows:

**Corporate responsibility**

Corporate responsibility is an important part of Danske Bank's strategy. We want to create long-term value for all our stakeholders, and we want them to feel confident that we manage our business with proper attention to environmental, social, ethical and governance issues. This applies to credit granting, investing, responsible sourcing, and our contribution to financial stability and economic growth. We consider responsible business conduct a precondition for long-term value creation.

- 20 -

**Reporting on corporate responsibility**

We report on our corporate responsibility activities and performance in the independently assured Corporate Responsibility Report 2015.  The report serves as our Communication on Progress as required by the UN Global Compact and ensures compliance with the requirements of the Danish FSA's Executive Order on Financial Reports for Credit Institutions and Investment Firms etc. (sections 135 and 135a) on corporate responsibility reporting.  The report is available at danskebank.com/ crreport.

The report is supplemented by our Corporate Responsibility Fact Book 2015. Our combined reporting offers a comprehensive and balanced view of material corporate responsibility matters relating to our business activities.  These reports and further information about our CR initiatives and projects are available at danskebank.com/ responsibility.

55.    Danske Bank further claimed that its Annual Report 2015 was "prepare[d] . . . in accordance with the International Financial Reporting Standards (IFRSs) . . . issued by the International Accounting Standards Board (IASB), as adopted by the EU."

56.    On March 16, 2016, the DFSA announced that, beginning in 2015, it had "conducted an inspection to establish whether Danske Bank was in compliance with the current rules in the anti-money laundering (AML) area," which disclosed the DFSA's investigation into Danske Bank's compliance with AML rules, including commenting briefly on its Estonian operations, though it did not disclose the full extent of the misconduct.  The DFSA's disclosure stated in pertinent part as follows:

**Risk assessment**

Danske Bank is the largest financial institution in Denmark. Danske Bank Group conducts a large volume of financial business, including transactions in the fields of asset management, investment, pensions, mortgage finance, insurance, real estate brokerage and leasing.  The bank has a substantial number of personal, business and institutional customers, and many have a complex group structure.  A large number of customers reside or are domiciled outside Denmark, and a large number of physical customers are distance customers.

Transaction volumes, including cross-border funds transfers, are substantial. A great many customer transactions are made online or by means of cash handling in connection with account deposits, foreign exchange and funds transfers.  The bank

has a significant number of correspondent banks throughout the world.  In keeping with international guidelines, cross-border correspondent bank relationships are considered to involve a high risk of money laundering and terrorism financing.

Against the background of the extent and nature of these activities, the FSA considers Danske Bank's inherent risk of being exploited for money laundering or terrorism financing purposes to be high compared with the risk to which the average Danish financial institution is exposed.

**Conclusions of the inspection**

Danske Bank has implemented a series of initiatives to strengthen its risk-mitigating measures in the AML area since the FSA's previous inspection in 2011-12.  The FSA notes in particular that, with effect from October 2014, the bank introduced measures entailing a compulsory pre-check of obtained customer information by a special control unit.  This means that new customers cannot carry out transactions until the control unit has approved the proof of identity etc.

Moreover, the bank has generally focused on combating money laundering and terrorism financing.  The bank has regularly added resources to comply with the rules set out in the Danish Act on the Prevention of Money Laundering and Financing of Terrorism (the Danish Anti-Money Laundering Act or the Danish AML Act), and, especially since the FSA embarked on its inspection in February 2015, the bank has added resources to meet the requirements of special checks of correspondent banks.

However, the FSA finds that, at the time of the inspection, the bank still faced considerable challenges and, in a number of areas, could not be considered to be in compliance with the requirements of the Danish AML Act.  The inspection has therefore resulted in material supervisory reactions in the following areas:

*Risk assessment and risk management*

The bank was ordered to make adequate assessments of the risk that the individual business units could be exploited for money laundering and terrorism financing purposes.

*Know Your Customer (KYC) – business customers classified as high-risk customers*

The bank was ordered to ensure adequate knowledge about business customers classified by the bank as customers involving a relatively high risk of money laundering or terrorism financing.

*Correspondent banks outside the EU/EEA*

In connection with the FSA's inspection in 2012, the bank was ordered to introduce satisfactory procedures with a view to ensuring compliance with the rules on cross-border correspondent bank relationships set out in the Danish AML Act.

- 22 -

The FSA also ordered the bank to ensure that, at the establishment of correspondent bank relationships and in the ongoing monitoring of such relationships, the bank obtains sufficient information about the purpose and expected business volume of the individual business relationship, the quality of the supervision of the institution by the local authority and details to ensure that the individual institution has sufficient and effective control procedures in place in the AML area. This information must form part of the bank's basis for deciding whether or not to approve the establishment of a business relationship with the individual institution. Furthermore, the bank is ordered to ensure adequate monitoring of transactions carried out on behalf of these correspondent banks.

*The bank's branch in Estonia*

The bank received a reprimand pursuant to the Danish Financial Business Act for having failed in time to identify material money laundering risks at its branch in Estonia and for having failed in time to introduce risk-mitigating measures in this respect. In theory, the supervision of the bank's foreign subsidiaries and branches in the AML area is the responsibility of the local authorities, but the FSA finds that circumstances identified at the branch constitute such a material reputational risk to the bank that the FSA is looking into the matter. The FSA notes that the bank has drawn up a plan to mitigate risks, which the bank is discussing with the Estonian financial supervisory authority.

**Police report against Danske Bank**

On the basis of the conclusions of the inspection, the FSA has reported the bank to the police for violation of the provisions on correspondent bank relationships of the Danish AML Act, including for non-compliance with the FSA's order issued in the area in 2012.

57.     Because the significance of the money laundering at the Estonian operations remained concealed, the price of Danske Bank ADRs remained artificially inflated.

58.     On October 12, 2016, the Company disclosed that Moody's had upgraded Danske Bank's long-term deposit rating from A2 to A1 and changed its outlook on Danske Bank from stable to positive as a result of the continued improvements in earnings, capitalization and credit quality.

59.     On November 14, 2016, Danske Bank announced it would issue and sell bonds in the amount of DKK 3 billion, which the Company announced having completed on November 17, 2016. According to Danske Bank, the bonds would have "a variable interest rate of 3M CIBOR + 4.75% per annum," would "be perpetual, but the bank ha[d] the option to prepay the bonds at par on the

interest payment date in November 2021 and on any interest payment date following that date," and would be "listed on Nasdaq Copenhagen."

60.     On February 2, 2017, Danske Bank announced its fiscal 2016 financial results for the period ended December 31, 2016.  The Annual Report published that day ("Annual Report 2016") stated, in pertinent part, that Danske Bank had reported "a net profit of DKK 19.9 billion, up from DKK 17.7 billion before goodwill impairment charges in 2015, and a return on shareholders' equity after tax of 13.1%, against 11.6% before goodwill impairment charges in 2015," and that Danske Bank had "delivered a satisfactory result for 2016."   Again, the Annual Report 2016 quoted defendant Borgen as attributing the results to Danske Bank's purported ongoing operational and strategic prowess, rather than to the money laundering that the whistleblower had already disclosed to Danske Bank's senior executives during 2013, stating in pertinent part as follows:

> "*The year 2016 was another year of solid progress for Danske Bank.  In a challenging environment, we delivered satisfactory financial results, while at the same time strengthening our market position.  With a return on equity of 13.1%, we delivered on our long-term target*. . . .
>
> "*The results reflect our diversified business model and our efforts to become a more customer-centric, simple and efficient bank.  We kept a high innovation pace and launched a number of new advisory products and easy-to-use solutions.  We also saw a continued improvement in customer satisfaction and managed to attract new customers and grow our volume, while maintaining high credit quality and reducing costs*.
>
> "*We are satisfied with the progress and remain committed to continuing the execution of our strategy and to realising the full potential of Danske Bank on our journey to become recognised as the most trusted financial partner*."

61.     The Annual Report 2016 also contained a letter signed by defendants Andersen and Borgen that continued to highlight the Company's operational and strategic successes, stating that the performance justified the Company's strong financial guidance, while concealing the impact of the money laundering and the extent of Danske Bank's potential culpability, stating in pertinent part as follows:

- 24 -

We are pleased to report that 2016 was another year of solid progress for Danske Bank.  In a challenging environment of slow economic growth and low interest rates, we managed to deliver satisfactory financial results, strengthen our market position and lay the foundation for future success.

With a net profit of DKK 19.9 billion and a return on equity of 13.1%, we reached our target of at least 12.5% two years ahead of time.  The results once again reflect the strength of our diversified business model and demonstrate that our efforts to become a more customer-centric, simple and efficient bank continue to yield results.

62.     Danske Bank further claimed that its Annual Report 2016 was "prepare[d] . . . in accordance with the International Financial Reporting Standards (IFRSs) . . . issued by the International Accounting Standards Board (IASB), as adopted by the EU."

63.     On March 20, 2017, Danske Bank issued a press release responding to and downplaying the significance of certain media rumors circulating about its Estonian bank operations, stating in pertinent part as follows:

### Comments on media coverage of transactions at Danske Bank in connection with money laundering case

Several media today report on a case of possible international money laundering, and Danske Bank is mentioned as *one of the banks that may have been used*.  For Danske Bank, the transactions involved are almost exclusively transactions carried out at our Estonian branch in the 2011-2014 period.

"The transactions involved are transactions that we already know about and have discussed with both the Danish and the Estonian authorities," says Flemming Pristed, Group General Counsel.  "At the time, our systems and procedures in Estonia were insufficient to ensure that we could not be used for money laundering.  We have taken the measures necessary to remedy this.  We have also closed the accounts of all customers who could not document a legitimate reason for maintaining an account in Estonia.  As a result, business relations with all but one customer involved in the transactions in question have been terminated.  We have introduced new systems and control procedures and put a new management in place in Estonia.

We do not want in any way to be used for money laundering or other criminal activity.  We take our responsibility for combating money laundering and other financial crime very seriously and have stepped up our efforts in this area considerably in recent years.  We cannot guarantee that attempts to launder money

through Danske Bank will be unsuccessful, but it has never been harder than it is now, and we are doing everything we can to prevent it from happening."

The situation in Estonia caused the Danish Financial Supervisory Authority to issue a reprimand to Danske Bank, as disclosed in March 2016.

The measures taken at Danske Bank in recent years include improving the IT systems to enhance monitoring, introducing tighter control, adding more resources to anti-money laundering activities and training staff.

Facts at Group level about Danske Bank's anti-money laundering activities:

- More than 550 employees are dedicated to the combating of financial crime.

- Every month, we screen three million customer transactions.

- Every week, we screen 16 million customer numbers against international sanction lists.

- Every year, 120,000 warnings are registered concerning unusual customer behaviour in relation to money laundering and the financing of terrorism.

- In the past year, Danske Bank submitted 5,404 reports to the authorities.

Yours faithfully,

Danske Bank

64.     The statements in ¶¶33-56 and 58-63 above were materially false and misleading at the time they were made and omitted to state required material information because they failed to disclose the following adverse information that was then known to defendants or recklessly disregarded by them:

(a)     that Danske Bank's Estonian branch had continued facilitating money laundering through at least March 15, 2016;

(b)     that a whistleblower had reported the Estonian money laundering to Danske Bank in 2013;

(c)      that the DFSA had been investigating the Estonian money laundering since 2014 and Danske Bank was concealing the results of its own internal investigation from those regulators, further exposing it to regulatory action and fines;

(d)      that Danske Bank had been overstating its historical profits by including the profits derived from its illicit Estonian operations;

(e)      that Danske Bank lacked effective internal and reporting controls; and

(f)      that, as a result of the foregoing, defendants' statements about Danske Bank's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

65.      As news of Danske Bank's involvement in the Estonian money-laundering allegations began leaking out beginning in September 2017, the prices of Danske Bank ordinary shares trading in Europe and its ADRs trading in the United States began to decline.

66.      On September 5, 2017, *Reuters* reported that Danske Bank had hired the former head of Denmark's intelligence agency and fraud squad to help it in its effort to counter money-laundering claims.  The announcement came after media reports that the Company's Estonian branch had been exploited for money laundering and other illegal activities between 2012 and 2014.  Danske Bank initially disclosed to *Reuters* that its own internal investigation had shown that it had inadequate measures in place in Estonia to prevent money laundering in the period up to 2014 and that it was cooperating with government regulators in a money-laundering investigation involving its Estonian branches.  After further media reports, Danske Bank broadened its probe to examine customer transactions from 2007 onward.

67.      On September 21, 2017, Danske Bank issued a press release disclosing, among other things, that it had "expand[ed] its ongoing investigation into the situation at its Estonian branch"

- 27 -

following "a root cause analysis concluding that several major deficiencies led to the branch not being sufficiently effective in preventing it from potentially being used for money laundering in the period from 2007 to 2015," and that the "expanded investigation cover[ed] customers and transactions at the Estonian branch in that period." The release went on to state in pertinent part as follows:

> The analysis points to three major deficiencies, which in combination meant that Danske Bank was not sufficiently effective in preventing the Estonian branch from potentially being used for money laundering:

> **The lack of a proper culture for and focus on anti-money laundering at the Estonian branch**

> In general, the Estonian branch had insufficient focus on the risk that it could be used for activities such as money laundering. In addition, there was insufficient attention to ensuring that the branch had the necessary controls and ongoing monitoring. As a result, earlier opportunities to investigate the activities at the branch were missed. Both the culture at the branch and management were inadequate during the relevant period.

> **Inadequate governance in relation to compliance and risk**

> The Group Executive Board and the Board of Directors based their risk assessments on reporting from the Estonian control functions, Compliance and Internal Audit.

> The Estonian control functions did not have a satisfactory degree of independence from the local organisation.

> Danske Bank's cross-organisational risk assessment methods were not strong enough.

> **Management follow-up and control were highly dependent on local country management**

> The branch in Estonia, acquired as part of the purchase of Sampo Bank in 2007, operated very much as an independent unit, with its own systems, procedures and culture regarding anti-money laundering measures. This meant that follow-up by Group control functions and reporting to the Executive Board and the Board of Directors was highly dependent on reporting from local management in Estonia.

68.    In October 2017, the French Financial Authority placed Danske Bank under formal investigation.

- 28 -

69.     On December 21, 2017, *Reuters* reported that Danske Bank "had been fined 12.5 million Danish crowns ($2 million)" by the DFSA "for violating anti-money laundering rules in relation to the monitoring of transactions to and from correspondent banks," and that Danske Bank was "examining whether its Lithuanian and Latvian branches had been involved in money laundering, expanding an investigation beyond its Estonian operations."  According to *Reuters*, "Denmark's financial regulator reported Danske Bank to the police last year for violating anti-money laundering rules and reprimanded the bank for not identifying or reducing 'significant money laundering risks' in its Estonia branch."  According to *Reuters*, "[t]he fine, which Danske Bank accepted, relates to that charge by the financial regulator but is unrelated to its activities in Estonia," while "Danish newspaper Berlingske had reported that the bank's Lithuanian branch had been used in 2012 as part of money laundering and other illegal activities in Estonia."  Describing the status of the ongoing regulators' investigation of money laundering at Danske Bank's Baltic Branches, *Reuters* stated in pertinent part as follows:

> Danske Bank head of compliance Anders Meinert Jorgensen said in an email the Estonia case had prompted the bank to "look at the other Baltic markets," and said this could prompt a deeper investigation depending on its initial findings.
>
> "The challenges around money laundering and non-resident customers are linked to a certain portfolio we had in Estonia at that time," he said, adding that issues in Lithuania and Latvia could "not be equated with those in the Estonian branch."
>
> A spokesman said Danske Bank began looking into activities in Lithuania and Latvia after the Estonian investigation started in September, adding it would take nine months to a year.
>
> French authorities placed Danske Bank under an anti-money laundering investigation in October based on suspicions over transactions by customers of Danske Bank Estonia from 2008 to 2011.

70.     That same day, Danske Bank issued a press release describing the charges it had been fined for, stating:

- 29 -

The fine notice reads as follows: Danske Bank A/S is charged with having violated section 78(3), cf. (1), cf. section 11(1)(5), of Danish Act No. 651 of 8 June 2017 on Measures to Prevent Money Laundering and Financing of Terrorism (the Danish Anti-Money Laundering Act) (formerly section 37(7), cf. (1), cf. section 12(5), of Danish Consolidation Act No. 1022 of 13 August 2013) by, in the period from November 2012 to the issuing of an order on 15 March 2016 to be implemented by 1 August 2016, in the financial institution Danske Bank A/S, CVR No. 61126228, Holmens Kanal 2-12, Copenhagen, not having monitored transactions executed as part of business relations to ensure that the transactions matched the undertaking's or the person's knowledge of the customer and the customer's business and risk profile, including, where necessary, the origin of the funds, since Danske Bank, in relation to transactions executed in connection with its correspondent bank relationships, did not monitor transactions where the transactions did not involve a customer of Danske Bank.  The fine is set at DKK 12,500,000 (twelve million, five hundred thousand Danish kroner).

71.    On February 27, 2018, *Reuters* reported that "Estonia's financial regulator said on Tuesday it would launch an investigation into Danske Bank's local branch after media reports said the lender had been aware of money laundering allegations at the unit as far back as 2013." According to *Reuters*, Estonia's "Financial Supervisory Authority (FSA) said it would look at whether Danske [Bank] . . . knowingly withheld information from the regulator during a series of inspections it conducted at the bank's Estonian branch in 2014."  Citing Livia Vosman, head of communications at Estonia's FSA, *Reuters* reported that the FSA would "'immediately start a new investigation and [would] be asking for the information that was not provided to [it] earlier.'" Describing the status of regulators' ongoing investigation of money laundering at Danske Bank's Baltic Branches, *Reuters* stated in pertinent part as follows:

The Estonian investigation follows a report in the Danish newspaper Berlingske and Britain's Guardian on Tuesday, as well as other international media outlets, that said a whistleblower had alerted the bank in December 2013 about money laundering linked to Russia through its Estonian branch.

The reports allege that those activities involved UK-registered companies that had accounts with Danske in Estonia.  They said the whistleblower told Danske's management that one of the companies, Lantana Trade LLP, was making suspicious payments and appeared to be linked to Russian personalities.

Lantana was dissolved in 2015. Danske Chief Executive Thomas Borgen said in an emailed statement that he could not comment on specific customers, "but the entire portfolio in question (non-residents) has been closed down."

Kremlin spokesman Dmitry Peskov did not immediately respond to a request for comment.

The FSA said its 2014 inspections at Danske's Estonian branch had uncovered "large-scale, long-term and systematic violations of anti-money laundering standards."

It said, however, that the bank at the time had not revealed the existence of an internal review in which questions were raised about who were the beneficial owners behind Lantana.

"The possible misleading of financial supervisors during the monitoring procedure is a serious breach, if Danske Bank itself had additional information about this client that was not submitted at the on-site inspection," the FSA said.

72.     On April 5, 2018, *Reuters* reported that Danske Bank's Head of Business Banking, Lars Morch ("Morch"), then overseeing the Baltic Branches, had resigned as a result of the lack of effective controls over its Estonian branches.  *Reuters* quoted defendant Andersen as stating that the money-laundering claims at the Estonian branch should have been investigated earlier and more thoroughly.

73.     On April 7, 2018, Danske Bank's Head of Baltic Business Banking, Tonu Vanajuur, posted on social media that he had left the Company.

74.     In April 2018, Danske Bank also informed Lithuanian citizens through the media that it would leave the Lithuanian banking market.

75.     On April 26, 2018, in connection with reporting its first quarter 2018 financial results, Danske Bank stated it was scaling down its Baltic operations and would serve only subsidiaries of its Nordic customers in the Baltic states and global companies with business interests in the Nordics.

76.     On May 3, 2018, *Reuters* reported the DFSA issued a report stating that it had identified "serious weaknesses" in Danske Bank's governance after investigating its management

and senior employees as part of the ongoing anti-money laundering probe into the bank's Estonian branch.  The DFSA found that Danske Bank "was exposed 'to significantly higher compliance and reputational risks than previously assessed,'" that the regulator had "'uncovered serious weaknesses in the bank's governance in a number of areas,'" and stated that as a result it "would assess the bank's capital requirements."  The DFSA said it initially "estimated the increase to Danske Bank's Pillar II capital requirements should amount to 5 billion Danish crowns ($805 million), which would increase its capital ratio for ensuring solvency to 11.2 percent from 10.5 percent."  The investigation had apparently resulted in eight orders for reforms at Danske Bank and eight reprimands.  In a *Reuters* report issued that day, defendant Borgen conceded that Danske Bank "'should have understood the depth and scope of the problems in Estonia at an earlier stage and should have reacted faster and more forcefully.'"  *Reuters* further reported that defendant Ramlau-Hansen, who had joined the DFSA as its chairman after resigning his positions at Danske Bank, "had decided to step down as he did not think he should play any further role in the discussion of Danske Bank's handling of the case."

77.     On May 3, 2018, *Bloomberg* published a report stating that defendant Borgen had "apologized for management's failure to prevent criminals from using his firm to launder billions of dollars in illicit funds over several years," and that the "Danish government" had characterized "management's failings" as "'unforgivable,'" with the "central bank warn[ing] that the reputation of the whole country was at risk."

78.     The DFSA stated that returns on allocated capital at Danske Bank's Estonian non-resident portfolio of around 400% in 2013 should have raised red flags. It ordered Danske Bank to set aside an additional DKK 5 billion in regulatory capital in response to the money-laundering allegations.

79.     On May 25, 2018, citing reports by Estonia's Financial Intelligence Unit, *Reuters* reported that "[m]ore than $13 billion (11 billion euros) were laundered through banks in the small Baltic state of Estonia from 2012-2016, with at least 7.3 billion euros in assets through non-resident bank accounts."  According to the *Reuters* report, Danske Bank "could face further legal steps in Denmark, its justice minister and business minister made clear at a session of the Danish parliament's business committee on Friday," adding that "Denmark's State Prosecutor for Serious Economic and International Crime [was also then] looking into the case," citing Justice Minister Soren Pape Poulsen ("Poulsen").  *Reuters* further cited Poulsen as stating: "'There is a case now in Estonia. We've offered our assistance, but we would need help from the Estonian authorities regardless of what our next steps would be.'"

80.     On June 15, 2018, *Reuters* reported that Danske Bank's reputation had been significantly damaged by the money-laundering charges.

81.     On June 25, 2018, *Reuters* reported that "Denmark's new business minister ha[d] signaled he [would] take a tough line on the country's largest lender Danske Bank, describing its admission of past failings in anti-money laundering controls in Estonia as 'a disgrace and a scandal.'"  Citing a report alleging Danske Bank had laundered up to $8.3 billion through its Estonian branch between 2007 and 2015, the incoming business minister, Rasmus Jarlov, said it could prompt the DFSA to open a new investigation.

82.     On July 11, 2018, Danske Bank's Head of Compliance since 2014, Anders Meinert Jorgensen, resigned citing an "intense" period of work due in large part to the ongoing investigation into money laundering at the Estonian branch.

83.     On July 12, 2018, Bill Browder, once the biggest foreign money manager in Russia, filed a criminal complaint against Danske Bank arising out of the alleged money laundering at its

Estonian branch.  According to a *Reuters* report that day, "Browder, who leads a campaign against Russian officials he blames for the 2009 death of his Russian lawyer Sergei Magnitsky while investigating fraud, said on Twitter that he had filed a complaint with the Danish law enforcement authorities."  *Reuters* further reported that "[t]he criminal complaint was also sent to Denmark's business minister Rasmus Jarlov, a picture of the letter on Browder's Twitter profile showed."

84.    On July 13, 2018, *Reuters* reported that Standard & Poor's had advised it that the Estonian money-laundering scandal could force a downgrade of Danske Bank's corporate debt ratings, stating in pertinent part that, "'[a]lthough unlikely, [the rating agency] could revise the outlook to negative or even lower the issuer credit rating if Danske Bank comes under significant market pressure,'" and that "'[t]his could result from continued charges with regards to the AML (anti-money laundering) investigation, a drop in market confidence, or unexpected events that weaken its credit profile.'"

85.    Also on July 13, 2018, *Reuters* reported that "[a] large Danish pension fund said on Friday it ha[d] temporarily frozen investments in Danske Bank . . . piling further pressure on the bank over its involvement in money laundering in Estonia."  According to *Reuters*, "MP Pension, which holds shares in Danske Bank worth around 570 million Danish crowns ($89 million), said the bank's actions in Estonia collide with its responsible investing policy" and that, "[a]s a result, it will no longer buy or sell any Danske shares."  "The move by MP Pension comes after David Helgason, an Icelandic entrepreneur and co-founder of one of Denmark's biggest recent start-ups, Unity Technologies, last week pulled his accounts from Danske Bank, stating that he was 'disgusted' by its activities in Estonia."

86.    On July 18, 2018, Danske Bank announced that it would forgo profits on all "'suspicious transactions'" in its Estonian branch, forcing it to lower its second quarter 2018

financial guidance.  Danske Bank further disclosed that the money laundering occurred throughout 2007 to 2015 and that it was "'Danske Bank's intention to make the gross income generated from such transactions in the period from 2007 to 2015 available for efforts that support the interest of the societies in which we operate, such as combating international financial crime.'"  Danske Bank reported that gross profits from its non-resident portfolio in Estonia between 2007 and 2015 amounted to DKK 1.5 billion ($234 million), but defendant Borgen stated that it was not clear how much of that amount Danske Bank would waive.  Danish business minister Rasmus Jarlov tweeted in response: "'I completely agree with Danske Bank that the bank can't keep that money. Good that they recognise this.'"  Jarlov told *Reuters* in an interview that day that "'[t]he sin is not erased because they now acknowledge that they can't keep the money,'" and that Danske Bank could still face regulatory action.  According to another July 18, 2018 *Reuters* report, "[t]he potential fine Danske Bank could face depends on whether the U.S. regulators take action," and "[w]hile the bank doesn't have a banking license in the United States, it has a bond programme in dollars, which could prompt U.S. regulators to open a case."  According to *Reuters*, "[f]or now, analysts on average put estimates for potential fines at roughly 4 billion crowns."

87.    On August 6, 2018, *The Wall Street Journal* ("*WSJ*") disclosed that "Denmark's public prosecutor for special economic crime ha[d] begun a criminal investigation against Danske Bank . . . for potential money-laundering offenses," noting that the "Danish Public Prosecutor for Serious Economic and International Crime's investigation announced Monday relates to transactions carried out through the bank's Estonian branch."

88.    On September 7, 2018, the *WSJ* published a report entitled "Russia-Linked Money-Laundering Probe Looks at $150 Billion in Transactions - Transactions uncovered at Danske's Estonian branch highlight the growing concern about illicit money flows from the former Soviet

Union."  Citing anonymous sources, the *WSJ* reported that Danske Bank was "examining $150 billion in transactions that flowed through a tiny branch in Estonia," emphasizing that "[t]he $150 billion figure, covering a period between 2007 and 2015, has been presented to the bank's board of directors and would [be] equal to more than a year's worth of the corporate profits for the entire country of Russia at the time."  Citing additional confidential sources, the *WSJ* also reported that "[t]he flows would have stayed in the branch for only a short time before leaving Estonia . . . so they might not show up in deposit statistics, which reflect the balance at the end of month and not from day to day," and that "such a large flow of money suggests that roughly $8 billion of suspected money-laundering transactions previously reported by a Danish newspaper could grow higher."

89.    On September 14, 2018, the *WSJ* published a report entitled "U.S. Probes Danske Bank Over Russian Money Laundering Allegations – Probes are ongoing and are related to transactions at Danske's tiny Estonian branch over several years through 2015," which disclosed that U.S. law enforcement agencies had begun investigating the scandal, following a tip to the SEC from a whistleblower, at least two years earlier.  The *WSJ* report, emphasizing the potential crippling penalties Danske Bank faced, disclosed in pertinent part as follows:

> The Justice Department, Treasury Department and Securities and Exchange Commission are each examining Danske Bank . . . after a confidential whistleblower complaint was filed to the SEC more than two years ago, the person familiar said. The probes are ongoing and related to transactions at Danske's tiny Estonian branch over several years through 2015.  The Journal reported earlier this month that the bank is studying $150 billion that flowed through accounts of non-Estonian account holders at the branch.

> The whistleblower complaint identified Deutsche Bank AG DB -6.54% and Citigroup Inc., both overseen by U.S. regulators, as involved with transactions into and out of Danske Bank's Estonian branch.  Deutsche Bank acted as a correspondent bank for Danske, handling dollar wire transfers.  Citigroup's Moscow office was involved in some of the transfers through Danske Bank's Estonian branch, the person familiar with the probes said.

*      *      *

Danish and Estonian authorities have shared information with U.S. counterparts, according to several European officials familiar with the matter. "There is cooperation, they are watching it very closely," one of these people said.

Estonian officials are investigating 26 former Danske employees, from low-level staff to the former branch CEO.  They are accused of helping to launder $230 million in money from an alleged fraud committed in Russia.

"In this particular case, it's clearly dirty money from crime," said Marek Vahing, Estonia's state prosecutor.

Treasury Assistant Secretary for Terrorist Financing Marshall Billingslea visited Estonia in May. Russian illicit transactions into Europe were a particular concern, according to people aware of those discussions.  Danske was mentioned only in passing.  Mr. Billingslea and other top administration officials have jetted around Europe, pressing regulators to more aggressively police financial flows out of Russia.  He visited Denmark in August.

"It is critical that they shore up their anti-money laundering regimes and that they clamp down and tighten down on how they regulate money coming out of Russia," Mr. Billingslea told a Senate panel last month.

"There's an enormous amount of money that is still being exfiltrated from Russia by both organized crime and cronies surrounding Putin," he told senators, many of whom are seeking to levy new sanctions against Moscow.

U.S. involvement in the case greatly raises the stakes for Danske Bank.  It is already facing investigations in Denmark and Estonia over the allegations.

Danske's share price has dropped sharply this year as the extent of the money laundering probe has emerged.  Costs to insure against Danske's debt, some of which is issued in U.S. markets, has jumped in recent weeks.

The U.S. Treasury can restrict the supply of U.S. dollars to foreign banks who are accused of laundering money, a rarely-used penalty known as the "death blow sanction" because it can send a lender into collapse.  So far, the Treasury has mostly used that cudgel against small lenders, including a now-liquidating Latvian bank accused of handling billions of dollars for Russian arms traders and North Korea's missile program.

The Treasury and Justice Department can also choose to fine banks, punishing the company but sparing its customers, who could lose their deposits if the bank collapsed.

90.     On September 19, 2018, Danske Bank published its "Findings of the investigations relating to Danske Bank's branch in Estonia" and announced that defendant Borgen was resigning. The findings stated in pertinent part as follows:

The investigations comprise a thorough examination of customers and transactions in the period from 2007 to 2015 and an investigation of the course of events, including whether managers and employees, members of the Executive Board or the Board of Directors have sufficiently fulfilled their obligations. ***Danske Bank has previously concluded that it was not sufficiently effective in preventing the branch in Estonia from being used for money laundering in the period from 2007 to 2015.***

The investigations have been led by the Bruun & Hjejle law firm, and their 'Report on the Non-Resident Portfolio at Danske Bank's Estonian branch' is enclosed with this press release.

In this connection, the Chairman of the Board of Directors, Ole Andersen, says:

"***The Bank has clearly failed to live up to its responsibility in this matter. This is disappointing and unacceptable*** and we offer our apologies to all of our stakeholders – not least our customers, investors, employees and society in general. We acknowledge that we have a task ahead of us in regaining their trust.

***There is no doubt that the problems related to the Estonian branch were much bigger than anticipated when we initiated the investigations. The findings of the investigations point to some very unacceptable and unpleasant matters at our Estonian branch, and they also point to the fact that a number of controls at the Group level were inadequate in relation to Estonia.***"

\*          \*          \*

**Key findings – causes and accountability**

Based on the conclusions from the investigations we are presenting today, as well as the root cause analysis conducted last year, ***it seems clear that there were several reasons why the case developed as it did. Those include***

- ***a series of major deficiencies in the bank´s governance and control systems made it possible to use Danske Bank's branch in Estonia for suspicious transactions***

- ***for a long time, from when we acquired Sampo Bank in 2007 until we terminated the customer portfolio in 2015, we had a large number of non-resident customers in Estonia that we should have never had, and that they carried out large volumes of transactions that should have never happened***

- 38 -

- *only part of the suspicious customers and transactions were historically reported to the authorities as they should have been*

- *in general, the Estonian branch had insufficient focus on the risk of money laundering, and branch management was more concerned with procedures than with identifying actual risk*

- *the Estonian control functions did not have a satisfactory degree of independence from the Estonian organisation*

- *that the branch operated too independently from the rest of the Group with its own culture and systems without adequate control and management focus from the Group*

- *there is suspicion that there have been employees in Estonia who have assisted or colluded with customers*

- *there have been breaches at management level in several Group functions*

- *there were a number of more or less serious indications during the years, that were not identified or reacted on or escalated as could have been expected by the Group*

- *as a result, the Group was slow to realise the problems and rectify the shortcomings. Although a number of initiatives were taken at the time, it is now clear that it was too little and too late*

Of the investigation into customers in Estonia, the following can be highlighted:

- The investigation identified a total of around 10,000 customers as belonging to the non-resident portfolio. To ensure that all relevant aspects are covered the investigation covers a total of around 15,000 customers with non-resident characteristics (that is, a further 5,000 customers).

- The around 10,000 customers carried out a total of around 7.5 million payments.

- The around 15,000 customers carried out a total of around 9.5 million payments.

- For all of the customers covered by the investigation, that is, around 15,000 customers, the total flow of payments amounted to around EUR 200 billion.

- At the present time, the investigation has analysed a total of some 6,200 customers found to have hit the most risk indicators. Of these, the vast majority have been found to be suspicious. That a customer has been found to have suspicious characteristics does not mean that there is a basis for

considering all payments in which the customer in question was involved to be suspicious.  Overall, we expect a significant part of the payments to be suspicious.

**Accountability and consequences**

*When it comes to individual accountability, it has been established that a number of former and current employees, both at the Estonian branch and at Group level, have not fulfilled their legal obligations forming part of their employment with the bank.*

\*     \*     \*

**Gross earnings to be transferred to an independent foundation**

As the bank is not able to provide an accurate estimate of the amount of suspicious transactions made by non-resident customers in Estonia during the period, *the Board of Directors has decided to donate the gross income from the customers in the period from 2007 to 2015, which is estimated at DKK 1.5 billion.*

To the extent not confiscated by the authorities, the gross earnings will be transferred to an independent foundation, which will be set up to support initiatives aimed at combating international financial crime, including money laundering, including in Denmark and Estonia.  The foundation will be set up independently from Danske Bank with an independent board.

\*     \*     \*

The findings of the investigations that we are presenting today are in line with the criticism and conclusions announced by the Danish FSA in its decision of May 2018. *We agree with the conclusions of the FSA.*

\*     \*     \*

Danske Bank

91.     That same day, the *WSJ* published a report entitled "Money-Laundering Probe Tied to Russia Expands to $230 Billion in Transactions - Danske Bank CEO resigns following report on role of Estonian branch in moving money into Europe."  Noting that the amount of transactions that had gone through the Estonian branch had now grown to $230 billion, the *WSJ* reported that "[t]he sheer size of the cited sums – much larger than previously reported – points to Danske Bank being the nexus of a colossal pipeline for carrying illicit money out of Russia and other former Soviet states,"

and that "[i]t has drawn scrutiny from U.S. criminal investigators, as well as European authorities, who suspect the remote outpost branch, which fell between the regulatory cracks, was used to help funnel billions in ill-gotten gains into the West."  The *WSJ* report further noted that "[t]he sum of €200 billion, while not all labeled as illicit, is a significant amount, equal to nearly half of all Russian central government spending in 2015, or 26 times the rate of overall government spending in Estonia in 2015, the year most of the accounts were shut.  It is also equivalent to two years of exports from Denmark."

92.     On or about October 17, 2018, the DFSA rejected Danske Bank's selection of defendant Aarup-Andersen as its new CEO, stating he lacked the necessary experience.  As reported by *Bloomberg* that day: "It's rare such decisions are made public since vetting of top bank jobs is usually done behind the scenes."  According to *Bloomberg*, "[t]he scandal cost the bank's previous CEO his job and the shares have plunged more than 40 percent this year," noting that "[i]nsider Jesper Nielsen [would] continue to serve as interim CEO after Thomas Borgen was relieved of his duties on Oct. 1."  *Bloomberg* further stated that Danske Bank "[s]hares ha[d] plunged as news of the dirty money case unnerve[d] investors and anger[ed] politicians," and that the "bank may face a fine of about $630 million in Denmark alone, while estimates for a total penalty run as high as $7.7 billion."

93.     On October 23, 2018, the *WSJ* published a report entitled "How One Stubborn Banker Exposed a $200 Billion Russian Money-Laundering Scandal," which finally disclosed the full extent of the information the whistleblower had alerted Danske Bank's senior executives to back in 2013.  The *WSJ* report detailed how "Danske's excellent returns from Estonia were helping power the rise of a tall and elegant gray-haired banker," defendant Borgen, who it said "championed the Estonian branch's business before the board of directors."  It further detailed how the CEO of Danske Bank in

2010, Peter Straarup, "grew concerned about the high level of Russian transactions going through the branch" when "Barron's magazine . . . contacted the bank about the possible involvement of its Estonian branch in a North Korean arms-smuggling case in Thailand, although the ensuing article didn't identify the bank." According to the *WSJ*, "[m]onths later, Mr. Straarup asked Mr. Borgen: Was he comfortable with the exposure to nonresident clients? Mr. Borgen, according to a person who attended the meeting, said he hadn't come across any cause for concern." The report also detailed how "[t]he Estonian regulators, despite their limited jurisdiction and resources, raised red flags, mailing about six letters to Denmark's FSA between 2007 and 2014," adding that the "complaints became caustic as years went by." Citing copious internal communications reviewed by the *WSJ*, the report went on to state that Danske Bank's own "anti-money-laundering chief later emailed colleagues about issues at the Estonian branch" and that, nonetheless, defendant Borgen was promoted to CEO in 2013 because he was "'producing these enormous results.'" According to the *WSJ*, "[a]t a meeting that year of the European Banking Authority, with top officials from across the Continent present, a shouting match erupted, said people familiar with the session," "[t]he Estonians yelled across the room that criminal Russian money was washing through their country, and Denmark, a founding member of NATO, was doing little to stop it."

94. The *WSJ*'s October 23, 2018 report further detailed how Danske Bank – in a charge led by defendant Borgen – endeavored to silence the whistleblower for years. According to the *WSJ*, in late December 2013, the whistleblower "emailed four Danske officials in Copenhagen, with the subject 'Whistleblowing disclosure – knowingly dealing with criminals in Estonia branch,'" writing: "'Dear Sirs, . . . The bank may itself have committed a criminal offence. . . . There has been a near total process failure.'" Citing confidential sources, the *WSJ* reported that while the Danske Bank Executive Board took up the issue at its January 2014 meeting, "board members weren't provided a

copy and it didn't cause much alarm." Instead, defendant Borgen suggested they sell the Estonian Branch and that, while Estonian regulators stormed the Estonian branch and sent "Danske Bank a scathing, 340-page report listing lengthy violations," the "report was in Estonian" and "wasn't translated into English or Danish for another three years." Even then, when an internal audit team investigated the alleged misconduct, their report was "watered down under pressure" and would never be finalized, which would have required that it be produced to Denmark's banking supervisor.

95.     According to the *WSJ*'s October 23, 2018 report, when the whistleblower found out in April 2014 that management at the Estonian branch "had been listening to recordings of his calls with auditors," the whistleblower resigned, emailing to "Danske's chief risk officer: If Danske didn't report the false accounts to Estonian police, then he would." Over the trepidation of certain members of the Danske Bank Board, defendant Borgen kept trying to sell the Estonian branch with no success. In early 2017, Danish newspaper *Berlingske* published reports describing Danske Bank's Estonian money-laundering schemes. It was not until September of that year that Danske Bank open its own internal investigation. According to the *WSJ*, citing confidential sources, even then defendant "Borgen dismissed notions he would have to resign," noting that "[h]e told an investor as recently as June [2018] there was nearly zero chance Danske would have to pay a significant fine" and that "[h]e expected to stay on after the investigation."

96.     Between February 16, 2018, when Danske Bank ADRs traded at their Class Period high of $20.90 per share in intraday trading, and October 23, 2018, when Danske Bank ADRs traded as low as $9.50 per share after the *WSJ* report was published, Danske Bank ADRs lost $11.40 per share in value, or 54%, erasing more than $2.793 billion in market value.

**POST CLASS PERIOD DISCLOSURES**

97.     In November 2018, whistleblower Howard Wilkinson, who served as head of Danske Bank's trading unit in the Baltic region until 2014, testified before the European and Danish

parliaments, telling them that other lenders were involved in processing billions of dollars of suspicious payments with links to Danske Bank's Estonian branch.  According to Wilkinson, he "'would guess that $150bn (£117bn) went through this particular [large European] bank in the US,'" though he stopped short of naming any of the lenders involved.  According to a November 19, 2018 report by the *Guardian*, "Deutsche Bank, JP Morgan and Bank of America were all reportedly involved in clearing dollar transactions for Danske's Estonian branch in Tallinn."  Wilkinson further reportedly testified that Danske Bank had offered him hush money to keep quiet, though the bank had reportedly cleared him to speak to U.S. authorities in October 2018.

98.    According to an account of his testimony published by the *Guardian*, "Wilkinson said he began looking into some of the three most profitable accounts involving British limited liability partnerships (LLPs) in January 2014 but it became clear by April that year that 'the bank didn't intend to do anything.'"  According to Wilkinson, "'They were all fake.  Not just that, they all basically looked the same.  And it turned out they all had the same registered office in a suburb in north London . . . I passed those on.  By April, none of the accounts . . . had been closed down.'"  According to the *Guardian*, Wilkinson further testified that he had "'warned [Danske Bank] that if they didn't do a proper investigation and make the appropriate report to the police, then I was going to do it myself.'"

99.    On November 28, 2018, the DFSA filed preliminary criminal charges accusing Danske Bank of failing to report over €200bn ($227 billion) in suspicious transactions, not training staff in anti-money laundering procedures, having no senior manager responsible for compliance, and having inadequate internal controls to prevent the misconduct.  The Danish prosecutors reported they were also investigating whether a criminal case could be made against any Danske Bank managers but had yet to reach a conclusion.

100.    On December 19, 2018, *Reuters* reported that Estonian authorities had arrested 10 former employees of the local branch of Danske Bank as part of the international money laundering investigation, all of whom were alleged to have been part of the "network that facilitated flows of dirty money through Danske Bank's branch in Estonia."

101.    Then on December 21, 2018, *Reuters* reported that Danske Bank was cutting its 2018 profit forecast for the second time during 2018.   Danske Bank said it now expected net profits for 2018 of approximately DKK 15 billion ($2.3 billion), down from the DKK 16-17 billion it had previously reduced its forecast to in September 2018.

102.    As the U.S. SEC, DOJ and Treasury and Estonian authorities continue to investigate, Danske Bank has built a reserve of $2.7 billion – equivalent to 85% of its 2017 net profit – to cover potential fines and reportedly continues to add to that reserve.

## ADDITIONAL SCIENTER ALLEGATIONS

103.    As alleged herein, Danske Bank and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Danske Bank, their control over, and/or receipt and/or modification of Danske Bank's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Danske Bank, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

104.   During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Danske Bank securities and operated as a fraud or deceit on Class Period purchasers of Danske Bank ADRs by misrepresenting the Company's business and prospects.  Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Danske Bank ADRs fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Danske Bank ADRs during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

105.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Danske Bank ADRs during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

106.   The members of the Class are so numerous that joinder of all members is impracticable.  Danske Bank ADRs were actively traded in the United States on the OTC market. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Danske Bank, the ADR depositary bank or their transfer agents and may

be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

107.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

108.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

109.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the 1934 Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Danske Bank; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

110.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

111.    Plaintiff incorporates ¶¶1-110 by reference.

112.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

113.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)    employed devices, schemes and artifices to defraud;

    (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Danske Bank ADRs during the Class Period.

114.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Danske Bank ADRs.  Plaintiff and the Class would not have purchased Danske Bank ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

115.    Plaintiff incorporates ¶¶1-114 by reference.

116.     The Individual Defendants acted as controlling persons of Danske Bank within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Danske Bank securities, the Individual Defendants had the power and authority to cause Danske Bank to engage in the wrongful conduct complained of herein.  Danske Bank controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

<b>JURY DEMAND</b>

Plaintiff hereby demands a trial by jury.

DATED: January 9, 2019                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          MARY K. BLASY


                                          *s/Samuel H. Rudman*
                                          SAMUEL H. RUDMAN

- 49 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Plumbers & Steamfitters Local 773 Pension Fund ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8 th day of January, 2019.

Plumbers & Steamfitters Local 773 Pension Fund

By:  _____
Christopher Baxter, Administrator

DANSKE BANK

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/15/2018 | 3,139 | $16.92 |
| 06/27/2018 | 133 | $15.47 |
| 06/28/2018 | 1,203 | $15.54 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 09/12/2018 | 1,753 | $13.02 |
| 09/18/2018 | 2,722 | $13.64 |