**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

PLUMBERS & STEAMFITTERS LOCAL
773 PENSION FUND, BOSTON
RETIREMENT SYSTEM, TEAMSTERS
LOCAL 237 ADDITIONAL SECURITY
BENEFIT FUND, and TEAMSTERS
LOCAL 237 SUPPLEMENTAL FUND FOR
HOUSING AUTHORITY EMPLOYEES,
Individually and on Behalf of All Others
Similarly Situated,

              Plaintiffs,

        v.

DANSKE BANK A/S, THOMAS F.
BORGEN, HENRIK RAMLAU-HANSEN,
JACOB AARUP-ANDERSEN, and OLE
ANDERSEN,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**No. 1:19-cv-00235 (VEC)**

***ORAL ARGUMENT REQUESTED***

_____

**MEMORANDUM OF LAW IN SUPPORT OF DANSKE BANK A/S's**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

              Brian T. Frawley
              Katherine L. Bagley
              Amanda Shami
              SULLIVAN & CROMWELL LLP
              125 Broad Street
              New York, New York 10004
              frawleyb@sullcrom.com
              bagleyk@sullcrom.com
              shamia@sullcrom.com
              Telephone:  (212) 558-4000
              Facsimile:  (212) 558-3588

              *Attorneys for Defendant Danske Bank A/S*

June 18, 2019

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

ALLEGATIONS OF THE AMENDED COMPLAINT..................................................................4

    A.    The Parties. ......................................................................................................4

    B.    The American Depositary Receipts. .......................................................................5

    C.    The Estonian Branch...........................................................................................7

ARGUMENT ....................................................................................................................12

I.    ALL CLAIMS BY PURCHASERS OF UNSPONSORED ADRs ARE
IMPERMISSIBLY EXTRATERRITORIAL AND SHOULD BE DISMISSED. ............12

II.    THE COMPLAINT DOES NOT PLEAD WITH PARTICULARITY ANY
ACTIONABLE MISSTATEMENT OR OMISSION .......................................................16

    A.    The heightened pleading requirements of the PSLRA and Rule 9(b). .................16

    B.    Plaintiffs' attempt to convert DB's AML deficiencies into securities fraud alleges
only inactionable mismanagement and puffery. ...................................................17

        1.    DB's AML policy statements were truthful when made. .........................18

        2.    Plaintiffs allege only inactionable puffery................................................20

        3.    DB's AML shortcomings are not actionable under the securities
laws. ......................................................................................................21

    C.    DB misstated no facts regarding its Estonian branch. .........................................22

    D.    Defendants' truthful disclosures did not give rise to any duty to disclose any
additional details about the NRP............................................................................23

        1.    Defendants had no duty to volunteer information about ongoing
AML investigations earlier or in greater detail.........................................24

        2.    DB could not have had any duty to disclose additional details
about its Estonian branch. .......................................................................26

III.    PLAINTIFFS FAIL TO ALLEGE A COGENT AND COMPELLING
INFERENCE OF FRAUD. ............................................................................................27

    A.    Plaintiffs have not alleged any cognizable motive to defraud. .............................27

    B.    Plaintiffs fail to plead strong circumstantial evidence of fraud. ...........................29

    C.    The SAC fails to plead scienter separately for each Defendant............................32

D.      Fraud is not remotely the more compelling inference on the facts alleged. ..........34

IV.   PLAINTIFFS' "SCHEME" CLAIM SHOULD BE DISMISSED ...................................36

V.    THE COMPLAINT FAILS TO ALLEGE LOSS CAUSATION.....................................36

CONCLUSION.................................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acito* v. *IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ........................................................................25

*In re Aegon N.V. Sec. Litig.*,
2004 WL 1415973 (S.D.N.Y. June 23, 2004) ........................................33

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
2013 WL 144041 (S.D.N.Y. Jan. 14, 2013) ...........................................30

*Atlantic Gypsum Co.* v. *Lloyds Int'l Corp.*,
753 F.Supp. 505 (S.D.N.Y.1990).............................................................28

*ATSI Commc'ns* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)........................................................27, 33, 37

*In re Barclays Bank PLC Sec. Litig.*,
756 Fed. App'x. 41 (2d Cir. 2018)..........................................................25

*Barilli* v. *Sky Solar Holdings, Ltd.*,
2019 WL 2250445 (S.D.N.Y. May 23, 2019) ........................................21

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)................................................................................23

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004).....................................................20

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)....................................................................36

*C.D.T.S.* v. *UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013)*, aff'd sub nom. Westchester
Teamsters Pension Funds* v. *UBS AG*, 604 Fed. App'x. 5 (2d Cir. 2015)..............................32

*Ciresi* v. *Citicorp*,
782 F. Supp. 819 (S.D.N.Y. 1991)..........................................................22

*In re CIT Group, Inc. Sec. Litig.*,
349 F. Supp. 2d 685 (S.D.N.Y. 2004)......................................................22

*In re Citigroup, Inc. Sec. Lit.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)............................................. *passim*

*City of Brockton*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008) ..............................33

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014)..................................................................20, 21, 24, 25

*Copeland* v. *Fortis*,
   685 F. Supp. 2d 498 (S.D.N.Y. 2010)...................................................................16

*In re CRM Holdings Sec. Litig.*,
   2012 WL 1646888 (S.D.N.Y. May 10, 2012) ........................................................33

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
   2017 WL 4049253 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala* v.
   *Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) .............................. *passim*

*DiVittorio* v. *Equidyne Extractive Indus.*,
   822 F.2d 1242 (2d Cir. 1987)...............................................................................32

*In re Donna Karan Int'l Sec. Litig.*,
   No. 97-CV-2011, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998)...........................21

*Doshi* v. *General Cable Corp*, 823 F.3d 1032 (6th Cir. 2016).......................................35

*DoubleLine Capital LP*, 323 F. Supp. 3d 393 (S.D.N.Y. 2018).....................................26

*ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
   553 F.3d (2d Cir. 2009)....................................................................... *passim*

*In re Express Scripts Holdings. Co. Sec. Litig.*,
    2019 WL 2004302 (2d Cir. May 7, 2019...............................................................25

*In re FBR Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008)...................................................................24

*Gagnon* v. *Alkermes PLC*,
   2019 WL 1388700 (S.D.N.Y. Mar. 28, 2019) ..................................................4, 34

*United States* v. *Georgiou*,
   777 F.3d 125 (3d Cir. 2015)................................................................................12

*Giunta* v. *Dingman*,
   893 F.3d 73 (2d Cir. 2018).................................................................................14

*Gusinsky* v. *Barclays PLC*,
   944 F. Supp. 2d 279 (S.D.N.Y. 2013), *aff'd in relevant part*, 750 F.3d 227 (2d
   Cir. 2014) ..........................................................................................................20

*Harris* v. *AmTrust Fin. Servs., Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)...................31, 37

*Hayden* v. *Paterson*,
   594 F.3d 150 (2d Cir. 2010) ...............................................................................12

*Higginbotham* v. *Baxter Int'l Inc.*,
495 F. 3d 753 (7th Cir. 2007 .......................................................................................35

*Holbrook* v. *Trivago N.V.*,
2019 WL 948809  (S.D.N.Y. Feb. 26, 2019) ............................................................36

*IBEW Local Union No. 58 Pensions Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*,
783 F. 3d 383  (2d Cir. 2015) .....................................................................................21

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005).........................................................................20

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001)...................................................................................28, 29

*Kinra* v. *Chi. Bridge & Iron Co.*,
2018 WL 2371030 (S.D.N.Y. May 24, 2018) ...........................................................33

*Lipow* v. *Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)........................................................................31

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
332 F. Supp. 3d 885 (S.D.N.Y. 2018).............................................................13, 15, 16

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
2004 WL 376442 (S.D.N.Y. Feb. 27, 2004)...............................................................29

*Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015).......................................................................................34

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)....................19, 37

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
26 F. Supp.3d 278 (S.D.N.Y. 2014)......................................................................30, 34

*In re Manulife Fin. Corp. Sec. Litig.*,
276 F.R.D. 87 (S.D.N.Y.2011) ...................................................................................31

*Marcus* v. *Frome*,
275 F. Supp. 2d 496 (S.D.N.Y. 2003).........................................................................31

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011)......................................................................................................23

*Menaldi* v. *Och-Ziff Capital Mgmt. Grp., LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016)...................................................................26, 36

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)................................................................................24

*Morrison* v. *National Australia Bank Ltd.*,
    561 U.S. 247 (2010) ................................................................................ *passim*

*Nguyen* v. *New Link Genetics Corp.*,
    2019 WL 591556 (S.D.N.Y. Feb. 13, 2019) ........................................................37

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...................................................................... *passim*

*Oklahoma Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*,
    300 F.Supp.3d 551, 580 (S.D.N.Y. 2018) ...........................................................23

*Parkcentral Global Hub Ltd.* v. *Porsche Automobile Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)...................................................................... *passim*

*Pa. Pub. Sch. Emps' Ret. Sys.* v. *Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012) .................................................................30

*In re PetroChina Company Ltd. Sec. Litig.*, 120 F. Supp. 3d 340 (S.D.N.Y. 2015) ...................18

*Pinker* v. *Roche Holdings Ltd.*,
    292 F.3d 361 (3d Cir. 2002)...............................................................................15

*Pipefitters Union Local 537* v. *American Express Co.*,
    2019 WL 2023621 (2d Cir. 2019) .......................................................................25

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of
    Commerce*
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)..................................................................35

*In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp.2d 510, 536 (S.D.N.Y. 2009) ...........................30

*Ressler* v. *Liz Claiborne, Inc.*,
    75 F. Supp. 2d 43 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 460 (2d Cir. 1999)................................17

*Ret. Bd. of the Policemen's Annuity and Benefit Fund of Chi.* v. *FXCM, Inc.*,
    2019 WL 1749025 (2d Cir. Apr. 17, 2019) .........................................................29

*In re Rockwell Medical, Inc. Sec. Litig.*,
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ......................................................29

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)...............................................................................17

*Santa Fe Indus., Inc.* v. *Green*,
    430 U.S. 462 (1977)..........................................................................................21

*SEC* v. *Steadman*,
   967 F.2d 636 (D.C. Cir. 1992) ...................................................................35

*In re Sec. Capital Assurance. Ltd. Sec. Litig.*,
   729 F. Supp. 2d 569 (S.D.N.Y. 2013) ........................................................30

*Shields* v. *Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) .................................................................28, 29

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) ...............................................................12, 20

*Slayton* v. *Am. Exp. Co*,
   604 F. 3d 758 (2d Cir. 2010) .....................................................................35

*In re Societe Generale Sec. Litig.*,
   2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ............................................16

*S. Cherry St.* v. *Hennesse Group*,
   573 F. 3d 98 (2d Cir. 2009) ................................................................28, 32

*Stoyas* v. *Toshiba Corp.*,
   896 F.3d 933 (9th Cir. 2018) .....................................................................16

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................12

*TCS Capital Mgmt., LLC* v. *Apax Partners, L.P.*,
   2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) ................................................36

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ...........................3, 27, 34

*In re Tempur Sealy Int'l Sec. Litig.*,
    2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ...........................................26

*U.S.* v. *TEVA Pharm. USA, Inc.*,
   2016 WL 750720 (S.D.N.Y. Feb. 22, 2016) ...............................................32

*In re Time Warner Sec. Litig.*,
   9 F. 3d 259 (2d Cir. 1993) .........................................................................23

*In re Twinlab Corp. Sec. Litig.*,
   103 F. Supp. 2d 193 (E.D.N.Y.2000) .........................................................28

*Union Cent. Life Ins. Co.* v. *Ally Financial, Inc.*,
   2013 WL 2154381 (S.D.N.Y. Mar. 29, 2013) ............................................28

*Van Ormer* v. *Aspen Tech., Inc.*,
   145 F. Supp. 2d 101 (D. Mass. 2000) .........................................................22

**STATUTES**

15 U.S.C. § 78u-4(b)(1) ...................................................................................17

15 U.S.C. § 78u-4(b)(2) ...................................................................................27

15 U.S.C. § 78u-4(b)(4) ................................................................................ *passim*

American Depositary Receipts, Securities Act Release No. 6894, Exchange Act .........................6

**OTHER AUTHORITIES**

56 Fed. Reg. 24420-04 .......................................................................................6

68 Fed. Reg. 54,644 .........................................................................................15

Federal Rule of Civil Procedure 9(b)................................................................16, 17

Federal Rule of Civil Procedure 12(b) ..................................................................1

Investor Bulletin: American Depositary Receipts, *available at*
https://www.sec.gov/investor/alerts/adr-bulletin.pdf .........................................6, 14

*In Re Additional Form F-6 Eligibility Requirement* ...................................................6, 14

Defendant Danske Bank A/S respectfully submits this memorandum of law in support of its motion to dismiss with prejudice the Second Amended Complaint ("SAC") (Dkt. No. 56) pursuant to the Federal Rules of Civil Procedure 12(b)(1) and (b)(6).

## PRELIMINARY STATEMENT

The federal securities laws were not created to provide "an umbrella cause of action for the review of management practices."  *In re Citigroup, Inc. Secs. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006).  Congress enacted the Private Securities Litigation Reform Act, 15 U.S.C. §§ 78u-4 (the "PSLRA"), to "deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries."  *Novak* v. *Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  In just the sort of blunderbuss pleading ruled out by the PSLRA, Plaintiffs' 310-paragraph SAC wrongly seeks to transform deficiencies in Danske Bank's ("DB" or the "Bank") anti-money laundering ("AML") controls into allegations of fraud.  Indeed, despite pleading securities fraud, Plaintiffs begin their SAC with the pronouncement that "[t]his case is about one of the world's largest money laundering scandals to date."  (SAC ¶ 3.)  It is not.  This case has little to do with securities, and nothing to do with any fraud of DB investors.  It should be dismissed.

This action was filed in the wake of widely publicized revelations of regrettable lapses in AML procedures at a small DB branch in Estonia, which for several years allowed substantial suspicious cash flows through certain accounts at the branch owned by non-Estonian residents— referred to in the SAC as the "Non-Resident Portfolio," or "NRP."  After learning of AML deficiencies associated with the NRP, Defendants ceased opening new NRP accounts in 2014, and later closed the entire NRP by the end of 2015.  In March 2016—less than halfway through the purported Class Period here, and ***years*** before any Plaintiff purchased DB American Depositary Receipts ("ADRs")—DB published the results of an AML inspection by Danish

authorities that censured DB for violations of Danish law in respect of AML deficiencies in Estonia.  There is no allegation that any Defendant ever ***mentioned*** the Estonian branch, its business prospects, or its financial results prior to DB's public acknowledgment of Estonian AML deficiencies, beyond announcing in December 2014 a write-off of goodwill associated with the branch.  DB later commissioned external counsel to investigate the AML issues at its Estonian branch, and the resulting 87-page detailed, written report of that investigation (the "BH Report") finding widespread AML compliance failures with respect to the NRP was released publicly by DB in September 2018.  This lawsuit predictably followed.

While DB does not dispute the significance of these AML issues, those matters are being addressed in the appropriate fora.  They do not remotely support an opportunistic United States securities claim concerning five-year old AML failures in Estonia against a Danish bank, whose common stock trades only in Denmark, and European citizens living in Denmark.

***First***, this Court lacks subject matter jurisdiction over any claims prior to January 28, 2016, when DB first authorized the issuance of ADRs in respect of its *Danish* securities.  Prior to issuing these so-called "sponsored ADRs," the only ADRs traded in the United States did so without DB's involvement, through financial institutions that unilaterally purchased DB common stock in Copenhagen, and deposited the Danish shares in trusts they created to later issue ADRs. Any transactions in these pre-2016 unsponsored ADRs are "so predominantly foreign as to be impermissibly extraterritorial" and therefore outside the scope of Section 10(b).  *Parkcentral Global Hub Ltd.* v. *Porsche Automobile Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014).

***Second***, the SAC comes nowhere close to pleading any material misstatement or omission with the particularity required by the PSLRA.  Indicative of Plaintiffs' legally defective tactic in seeking to transform compliance shortcomings into securities fraud, the first assertion of any alleged misstatement appears 196 paragraphs deep into the SAC.  The misstatement theories

suffer from the same flaws found fatal by this Court in *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018), including impermissibly placing the burden on the Court to "search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements are false." Beyond this, Plaintiffs' attempt to transform AML deficiencies into fraud fails for at least four reasons:  (i) the statements about DB's firm-wide compliance policies are not shown to have been false when made; (ii) the challenged statements are inactionable puffery; (iii) the allegations assert only corporate mismanagement; and (iv) Defendants had no obligation to disclose the existence or results of investigations earlier than they did.  Moreover, Plaintiffs nowhere establish that investors were misled regarding the insignificant historical financial contribution of the Estonian branch to DB's overall financial results.

*Third*, the SAC is bereft of particularized allegations supporting a strong inference of scienter under the PSLRA, which the Supreme Court has held must include facts demonstrating a "cogent" and "compelling" inference of fraud.  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).  Plaintiffs do not allege any cognizable motive to defraud.  And, as with the scienter allegations that the Second Circuit agreed were deficient in *Deutsche Bank*, Plaintiffs nowhere allege any specific facts known to any Defendant that conflicted with an alleged statement at the time it was made.  *Sfiraiala*, 729 F. App'x at 58-59.  Far from demonstrating the requisite strong inference of scienter, the far more plausible inference on these facts is that AML issues at a small foreign subsidiary were investigated, the suspect customers terminated, and Defendants updated investors as additional investigations revealed more information about the problems.

**Finally**, the SAC is deficient because it fails to specify what constitutes the supposed scheme supporting their conclusory claim under Rule 10b-5(a) and (c), and it does not properly link any of its supposed more than **16 corrective disclosures** over two years to their alleged loss, failing to plead a plausible theory of loss causation.  Indeed, Plaintiffs fail even to attempt to articulate any loss causation theory that would apply to **them**, each of whom purchased DB ADRs **no earlier than** March 6, 2018, and sold them all **no later than** September 18, 2018.

## ALLEGATIONS OF THE AMENDED COMPLAINT[1]

### A.    The Parties.

**Plaintiffs:**  The three "co-lead plaintiffs" ("Plaintiffs") purport to have purchased DB ADRs between March 6 and June 28, <u>2018</u>, and sold them all between August 8 and September 18, <u>2018</u> (Dkt. 33-1; 37-2).  Plaintiffs nevertheless seek to represent a putative class of ADR purchasers between January 9, <u>2014</u> through April 29, <u>2019</u>.  (SAC ¶ 1.)

**Danske Bank:**  DB is the largest financial institution in Denmark.  (SAC ¶ 18.)  DB has no branches or facilities in the United States, and it has not issued or sold its common stock in the United States, which trades exclusively on the Copenhagen stock exchange.  (SAC ¶ 19.)

**Jacob Aarup-Andersen:**  Aarup-Andersen was the CFO of DB from April 1, 2016 through May 2, 2018 and a member of its Executive Board.  Plaintiffs mention Aarup-Andersen only five times in the SAC.  (SAC ¶¶ 22, 106, 160, 231, 246.)  Only one of these allegations contains anything remotely substantive:  In July 2016, Aarup-Andersen commented truthfully on DB's commitment to ending fraudulent activity on an earnings call.  (SAC ¶ 246.)

---

[1]    On this motion, the Court may consider, in addition to well-pleaded allegations of the Complaint, documents attached to, or referenced in, or integral to the Complaint, or any other document "upon which [Plaintiffs] relied in bringing the suit."  *Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 762 (S.D.N.Y. 2019) (quoting *Kleinman* v. *Elan Corp PLC*, 706 F. 3d 145, 152 (2d Cir. 2013)).  Defendants include as Exhibits ("Ex.") to the accompanying Declaration of Brian T. Frawley certain public statements and public filings relied upon in the Complaint that the Court may consider on this motion.

*Ole Andersen:*  Andersen was the Chairman of the Board of Directors from March 23, 2010 until December 7, 2018.  Other than citing a few unremarkable public statements by Andersen, he is barely mentioned in the SAC beyond noting that he signed aspirational letters appended to DB's Annual Reports containing either forward-looking statements or mere puffery but having nothing to do with Estonia.  *See, e.g.*,  SAC ¶¶ 190 (forward-looking statements that bank "expect[ed] 2013 to show material improvements, in comparison with 2012" and that bank "expect[ed] to advance in the achievement of [its] 2015 goals"), 201 (aspirational statements regarding execution of strategy and continued focus on customer needs), 220 (same), 252 (noting 2016 was year of "solid progress" in a "challenging environment of slow economic growth").

*Thomas Borgen:*  Borgen was CEO from September 16, 2013 through October 1, 2018 and a member of the Executive Board from September 2009 to October 2018.  Plaintiffs claim, without support, that the Estonian branch profits caused Borgen to be promoted from Head of International Banking to CEO.  (SAC ¶ 4.)  As the CEO of DB, Borgen made public statements about DB's financial results, including in letters appended to DB's Annual Reports (SAC ¶¶ 201, 220.)  Only *one* such statement is alleged to have related to the Estonian branch (SAC ¶ 85.)

*Henrik Ramlau-Hansen:*  Ramlau-Hansen was the CFO of DB from 2011 through April 1, 2016, three years before the end of the putative class period.  Plaintiffs refer sporadically in the SAC to press releases including comments by Ramlau-Hansen regarding DB's progress unrelated to any matter at issue here.  (SAC ¶¶ 207, 212, 228.)  Plaintiffs likewise allege that he referenced the Estonian branch *once*.  (SAC ¶¶ 83, 214; *see* § II(C), *infra*.)

### B.  The American Depositary Receipts.

Various ADRs in respect of DB common stock have been issued in the United States. (SAC ¶ 19.)  These ADRs do not trade on a United States exchange but are purchased and sold "over the counter."  (*Id.*)  Between 2005 and 2014, several third parties, including J.P. Morgan,

Citibank, and Convergex Depositary, Inc., filed with the Securities and Exchange Commission ("SEC") various Forms F-6 proposing collectively to issue up to 195 million "unsponsored" ADRs, each equivalent to 0.5 or one ordinary DB share, for sale in the U.S. (Ex. 2 (8/4/2005 Form F-6); Ex. 3 (1/10/2008 Form F-6); Ex. 4 (12/18/2009 Form F-6); Ex. 5 (8/30/2011 Form F-6); Ex. 8 (11/12/2014 Form F-6).) These unsponsored ADRs, only a tiny fraction of which ever issued, were issued and transacted without the consent or participation of DB.[2]

On January 28, 2016, DB filed a Form F-6 that for the first time established a "sponsored" Level 1 ADR for DB. (Ex. 11 (1/28/2016 Form F-6).) Pursuant to this program, no more than 50 million ADRs, each also equivalent to 0.5 DB ordinary shares, could be issued, sold and managed by J.P. Morgan in accordance with a depositary agreement with DB. At that time, in compliance with longstanding SEC policy, all prior unsponsored ADRs were retired. *See* American Depositary Receipts, Securities Act Release No. 6894, Exchange Act Release No. 29,226 (May 23, 1991), *available at* 56 Fed. Reg. 24420-04. Specifically, the SEC has long "taken the position that an unsponsored facility could not co-exist with a sponsored ADR facility for the same deposited securities because of resulting market disorder or confusion." *Id*. at 24423. This means that, "if a sponsored facility were created after the establishment of one or more unsponsored ADR facilities, the depositaries of the unsponsored facilities would effect a transfer of the deposited securities and the related ADR holders to the new sponsored facility and terminate their unsponsored facilities." *Id*. Thus, on February 9, 2016, J.P. Morgan instructed

---

[2]     Investor Bulletin: American Depositary Receipts, *available at* https://www.sec.gov/investor/alerts/adr-bulletin.pdf ("An unsponsored ADR is set up without the cooperation of the non-U.S. company and may be initiated by a broker-dealer wishing to establish a U.S. trading market."); *see also In Re Additional Form F-6 Eligibility Requirement*, Release No. 1273 (Sept. 11, 2003) ("An unsponsored facility is established by the depositary acting on its own, usually in response to a perceived interest among U.S. investors in a particular foreign security that is not traded on a U.S. exchange or quotation system.").

holders of unsponsored ADRs to surrender their unsponsored ADRs for sponsored ADRs.  *See* (Ex. 12 (2/9/2016 J.P. Morgan Market Announcement).)  Since early 2016, only sponsored ADRs, in modest amounts,[3] have been issued and outstanding in the U.S.

### C.    The Estonian Branch

In 2007, DB acquired Finnish-based Sampo Bank, including one of its subsidiaries, AS Sampo Pank in Estonia, which became a branch of DB in 2008 (the "Estonian branch"), at the outset of the financial crisis.  (SAC ¶¶ 26–28, 46.)  By any measure, the Estonian branch was a miniscule part of DB's operations.  During the Class Period, the Estonian branch accounted for about 0.5% of DB's total assets (Ex. 1 (BH Report), at § 5.4) and between 0.8% and 1.7% of the Bank's total profits.[4]  (SAC ¶ 33.)  Prior to the closure of this business, the Estonian branch served a number of customers who resided outside of Estonia, referred to in the SAC as the "Non-Resident Portfolio" or "NRP."  (SAC ¶ 30.)  After becoming aware of increasing AML issues associated with the NRP, in early 2014, DB decided to cease opening "new accounts at the Estonian branch, closed all intermediary business, and instructed a consultant to look at AML procedures and controls at the Estonian Branch."  (SAC ¶ 75.)  DB later determined to shut down the NRP business, and ultimately closed all NRP accounts by the end of 2015.  (SAC ¶¶ 80, 87.)  Later investigations into the NRP's activities revealed significant AML compliance deficiencies and substantial suspicious transaction activity through the NRP at the Estonian branch.

---

[3]    The SAC's assertion that "[a]n estimated 245 million Danske Bank ADRs are issued, outstanding and trading in the United States" is wrong by a wide margin.  (SAC ¶ 19.)  In fact, since the launch of the sponsored program in January 2016, no more than about 8 million ADRs have been outstanding at any time, and less than 4 million ADRs were outstanding when this suit was filed.  At such time, if ever, that Plaintiffs file a class certification motion, Defendants will address this deficiency, among others, in their proposed class.

[4]    The SAC states that the Estonian branch generated "outsized" profits equal to 0.8% to 1.7% of DB's overall profits "despite the fact that [the Estonian branch] was comprised of just 14 branch offices . . . out of a total of 627 [worldwide] branch offices," ignoring that Estonia thus comprised an "outsized" *2.2%* of DB's branches.  (SAC ¶ 33.)

The SAC nowhere contends that Defendants said anything, positive or negative, about the Estonian branch, its customers or financial performance, until DB disclosed in **March 2016** the results of a regulatory inspection of its AML procedures, which included a finding that DB previously was not in compliance with Danish AML laws with respect to its Estonian branch. Indeed, beyond a 2014 write-down of goodwill associated with the Estonian branch (*see* § II(C), *infra*), the SAC does not allege that any Defendant uttered the word "Estonia" during the first 26 months of the Class Period. Nor do Plaintiffs allege that any reported financial metric for DB was inaccurate during this period, or that any historical financial statement was or should have been restated as a result of any AML issues in Estonia.

***Events Prior to Purported Class Period:*** Plaintiffs spill much ink on events regarding the Estonian branch years before the purported Class Period, and even longer before January 2016, when DB first issued sponsored ADRs and the earliest date on which this Court might have subject matter jurisdiction. Prior to 2014, issues were raised periodically regarding AML compliance and procedures at the Estonian branch. The Bank's staff investigated the matters and undertook remediation efforts. For example:

- In 2007, the Estonian Financial Supervisory Authority ("EFSA") identified potential Know-Your-Customer ("KYC") and other risks associated with the NRP (SAC ¶ 52), but the EFSA's 2009 inspection reported that compliance had "improved considerably" and that the branch had "changed or updated its internal procedures in line with the legal amendments made in 2008 (albeit with some deficiencies)." (Ex. 1 (BH Report), at § 9.3.3.)

- DB Internal Audit noted documentation deficiencies in AML compliance at the Estonian branch in August 2011 (SAC ¶ 60), but in another report three months later found that "shortcomings detected in the course of the controls were mostly fixed." (Ex. 1 (BH Report), at § 9.3.6.)

- After a correspondent bank sought to terminate its DB relationship due to AML concerns in June 2013, the Bank launched a review of the NRP at the initiative of Executive Board members.  (SAC ¶ 68.)

***Class Period Events Relating to Estonian Branch:***  On December 27, 2013, shortly before the start of the Class Period, an employee at the Estonian branch filed a whistleblower report concerning the NRP.  (SAC ¶ 70.)  Responding to the allegations, and in compliance with DB's whistleblower policy, Group Internal Audit commenced an investigation.  (SAC ¶ 71.)  In two interim reports on January 13, 2014 and February 7, 2014, Group Internal Audit found certain allegations to be credible and substantiated, and "recommended 'a full independent review of all non-resident customers.'"  (SAC ¶ 74.)  Immediately thereafter—just a few weeks into the putative Class Period—"Defendants decided to permit no new accounts at the Estonian branch, closed all intermediary business, and instructed an independent consultant to look at AML procedures and controls at the Estonian branch."  (SAC ¶ 75.)

Later, DB focused its efforts on "how to best wind down the operations of the Estonian branch."  (SAC ¶ 80.)  DB decided to terminate all NRP accounts, while it explored the potential ability to continue "to support Nordic corporate clients" operating in the Baltic region, "but a closer review of the business case needed to be undertaken."  (*Id.*)  By the end of 2015, the NRP was closed.  (SAC ¶ 87; Ex. 1 (BH Report), at § 9.4.22.)  In other words, before DB first issued any sponsored ADRs, DB had closed the NRP.  Indeed, Plaintiffs do not allege that ***any*** AML issues existed during 2016 and thereafter.

***Defendants Update Investors About Investigations Into Historical AML Compliance:***
In its 2015 Annual Report, DB disclosed that "[t]he Danish FSA has pending investigations regarding compliance with applicable anti-money laundering laws, which could lead to supervisory actions against Danske Bank." (Ex. 10, at 106.)  On March 16, 2016, the DFSA issued its "Statement on inspection of Danske Bank (AML area)." (Ex. 13; SAC ¶ 97.)  The DFSA indicated that, "[i]n 2015, the [DFSA] conducted an inspection to establish whether

Danske Bank was in compliance with the current rules in the anti-money laundering (AML) area," and reported on the results of that inspection.

In its March 2016 Report, the DFSA noted that DB "has implemented a series of initiatives to strengthen its risk-mitigating measures in the AML area since the FSA's previous inspection in 2011-12." (SAC ¶ 97.)  It also found that "the bank has generally focused on combating money laundering and terrorism financing," and it "has regularly added resources to comply with the [anti-money laundering] rules . . . especially since the FSA embarked on its inspection in February 2015."  Nevertheless, the DFSA found serious shortcomings, and concluded that, "in a number of areas, [the Bank] could not be considered to be in compliance with the requirements of the Danish AML Act."  In particular, the DFSA issued a reprimand to DB for having "failed in time to identify material money laundering risks at its branch in Estonia . . . [and] to introduce risk-mitigating measures in this respect." (*Id.*)

In accordance with Danish law, the 2016 DFSA Report was published by DB to a separate section of its website, along with all other "statements, decisions, supervisory reactions and the like" issued by the DFSA, together with any response from the Bank. (Ex. 14.)  On March 21, 2016, DB commented in writing on the DFSA's inspection.  DB did not dispute any DFSA finding, and confirmed that the Danish police would investigate whether "[DB] has complied with AML legislation regarding correspondent bank relationships, and we will of course cooperate with the police." (Ex. 15.)  In subsequent public announcements and quarterly and annual reports, DB updated investors about AML issues regarding Estonia, including:

- On March 20, 2017, DB acknowledged discussions with Danish and Estonian regulators about potential money laundering transactions between 2011 and 2014 at the Estonian branch, and conceded that, "[a]t the time, our systems and procedures in Estonia were insufficient to ensure that we could not be used for money laundering." (SAC ¶ 259.)

- On September 5, 2017, DB announced that it had hired the former head of Denmark's intelligence agency to oversee its Compliance Incident Management, and announced that the Bank "ha[d] started various investigations to establish exactly what took place during that period [prior to 2014] and to learn from what happened then." (SAC ¶ 273.)

- On September 21, 2017, DB announced the results of a "root cause analysis" performed by Promontory Financial Group, a regulatory consulting firm. (SAC ¶ 102.) The Promontory "analysis point[ed] to three major deficiencies" that led DB to be "not sufficiently effective in preventing the Estonian branch from potentially being used for money laundering," including (i) "The lack of a proper culture for and focus on anti-money laundering at the Estonian branch;" (ii) "Inadequate governance in relation to compliance and risk"; and (iii) "Management follow-up and control were highly dependent on local country management." The same release (Ex. 17) announced a broader investigation was underway but would take a year to complete, which culminated in the BH Report.

- In its 2017 Annual Report, DB disclosed its settlement with the Danish Public Prosecutor for Serious Economic and International Crime and DB's role as an assisted witness in an investigation by the French Tribunal de Grande Instance de Paris. (Ex. 18, at 11.)

- DB devoted two full pages of its 2018 Annual Report to a description of the Estonian branch investigation. (Ex. 19, at 12–13.)

***The BH Report***. On September 19, 2018, DB published the BH Report, thoroughly detailing the results of a year-long investigation by Danish law firm Bruun & Hjejle into AML compliance issues in Estonia. The report includes detailed findings about the NRP, and the historical compliance failures at the Estonian branch in overseeing the NRP. The BH Report reveals that DB management proactively addressed issues with the NRP by terminating the accounts, but misunderstood the scope of the prior problems and misjudged the severity of the issue as a historical matter. (Ex. 1 (BH Report), at 10, 81.) The BH Report is relied upon extensively (and misleadingly) throughout the SAC. (SAC ¶ 1 & n.1.)

***The Supposed Misstatements and Omissions***: Plaintiffs contend that virtually every public statement concerning DB during the class period, without regard to time frame, and whether or not the NRP was still in operation in Estonia, was "false and misleading and/or

lacked a reasonable basis" (SAC ¶ 265(g)) because each did not contemporaneously reveal that: (a) DB's Estonian branch facilitated money laundering until 2016; (b) a whistleblower had reported Estonian AML defects to DB in December 2013; (c) ongoing internal and external investigations into Estonian AML deficiencies; (d) DB's financial results included profits from illicit Estonian operations; (e) DB lacked effective internal and reporting controls; and (f) DB "did not comply with applicable financial reporting standards." (SAC ¶¶ 194; 265.)

## ARGUMENT

"To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: '(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation.'" *Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (quoting *Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013)).  At a minimum, "the 'well-pleaded factual allegations,' assumed to be true, [must] 'plausibly give rise to an entitlement to relief.'"  *Hayden* v. *Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009)).  "[T]he materials properly before the court must provide grounds for more than mere speculation or suspicion that a plaintiff is entitled to the requested relief."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008).  The SAC does not do so.

## I.   ALL CLAIMS BY PURCHASERS OF UNSPONSORED ADRs ARE IMPERMISSIBLY EXTRATERRITORIAL AND SHOULD BE DISMISSED.

Under *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247, 267 (2010), the jurisdiction of Section 10(b) is limited to (i) "transactions in securities listed on domestic exchanges," or (ii) "domestic transactions" in unlisted securities.  DB's ADRs were not listed on any exchange, but traded "over-the-counter."  (SAC ¶ 19.)  Over-the-counter "markets" are not domestic securities exchanges under *Morrison*.  *United States* v. *Georgiou*, 777 F.3d 125, 135

(3d Cir. 2015).  While the purchase of an ADR within the United States may qualify as a
"domestic transaction," under clear Second Circuit law a transaction in unsponsored ADRs lacks
any sufficient United States nexus "to state a properly domestic claim" under Section 10(b).
*Parkcentral*, 763 F.3d at 215.  Because DB did not have a sponsored ADR program until at least
January 28, 2016, all claims for events prior to this date must be dismissed.

A "domestic claim" can encompass a transaction entered into in the United States, so
long as the transaction at issue is not so "predominantly foreign as to be impermissibly
extraterritorial."  *Id*. at 216.  As this Court explained in the related context of the federal
commodities laws, the extraterritoriality analysis "has two parts: at step one the Court must
determine whether the plaintiff's claim involves a 'domestic transaction.' Assuming this
requirement is satisfied, the Court must proceed to step two and consider whether the claims are
'so predominantly foreign as to be impermissibly extraterritorial.'"  *In re London Silver Fixing,
Ltd., Antitrust Litig*., 332 F. Supp. 3d 885, 915–16 (S.D.N.Y. 2018) (quoting *Parkcentral*, 763
F.3d at 216).  Transactions in unsponsored ADRs plainly fail step two.

In *Parkcentral*, the Second Circuit held that *Morrison* bars application of Section 10(b) to
swap transactions entered into in the United States but linked to the prices of Volkswagen stock
on European exchanges.  Although the claims clearly involved a "domestic transaction," the
Second Circuit ruled that the Supreme Court "unmistakably made a domestic securities
transaction . . . necessary to a properly domestic invocation of § 10(b), [but] such a transaction is
not alone sufficient to state a properly domestic claim under the statute."  *Parkcentral*, 763 F.3d
at 215.  Where, as here, the domestic transaction is nevertheless "predominantly foreign," to
permit "liability under § 10(b) on . . . foreign defendants with no alleged involvement in
plaintiffs' transactions, on the basis of the defendants' largely foreign conduct, for losses
incurred by the plaintiffs in securities-based swap agreements based on the price movements of

-13-

foreign securities would constitute an impermissibly extraterritorial extension of the statute." *Id*. at 201, 216.  The Circuit reasoned that, to hold otherwise, "would require courts to apply the statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it."  *Id*. at 215.

The Second Circuit in *Parkcentral* did not "purport to proffer a test" as to the specific characteristics that "will be deemed appropriately domestic or impermissible extraterritorial," other than to note that it is a situation-specific inquiry.  *Id*. at 217.  The Second Circuit more recently re-affirmed *Parkcentral*, and set out specifically the circumstances that led the domestic transaction in *Parkcentral* to be "impermissibly extraterritorial":

> *Parkcentral* involved securities-based swap agreements and the foreign company defendant was not a party to the agreements.  The swaps were pegged to the price of shares traded only on European exchanges.  The allegedly fraudulent conduct involved statements made primarily in Germany with respect to stock in a German company, and such misconduct was already the basis of several foreign investigations and enforcement actions.  Accordingly, we found that the application of section 10(b) to the *Parkcentral* defendants so obviously implicate[d] the incompatibility of U.S. and foreign laws that Congress could not have intended it in a manner consistent with the presumption against extraterritoriality.

*Giunta* v. *Dingman*, 893 F.3d 73, 82 (2d Cir. 2018) (internal quotation marks omitted).

Each of these criteria found dispositive by the Second Circuit in *Giunta* apply equally to DB's unsponsored ADRs.  Here, as in *Parkcentral*:

- Plaintiffs do not allege that DB "was a party" to any domestic transactions in unsponsored ADRs "referencing [DB] stock, or that it participated in the market for [unsponsored ADRs] in any way,"[5] 763 F.3d at 207;

---

[5]     An unsponsored ADR program is a bilateral agreement between the depositary bank and the ADR purchasers, done without the input or participation of the issuer.  *See* Investor Bulletin: American Depositary Receipts, *available at* https://www.sec.gov/investor/alerts/adr-bulletin.pdf  ("An unsponsored ADR is set up without the cooperation of the non-U.S. company").  DB had no right to review or approve the unsponsored ADR program.  *See* Additional Form F-6 Eligibility Requirement Related to the Listed

- Each ADR represents 0.5 DB share that was purchased by the depositary bank in Denmark without any involvement of DB, and Plaintiffs allege expressly that the DB stock and the ADR it represents "trade in tandem" (SAC ¶ 19);

- Although the ADR transactions "may have been concluded domestically, the [DB] shares they referenced" traded exclusively on a foreign exchange in Denmark, and not on U.S. exchanges, 763 F.3d at 207;

- All Defendants are Danish residents, and the Exchange Act claims here only "concern statements made primarily in [Denmark] with respect to stock in a [Danish] company traded only on exchanges in [Denmark]," *id*. at 216; and

- "[T]he fraudulent acts alleged in the complaint" is "the subject of investigation by [Danish] regulatory authorities," *id*.

As this Court observed, "*Parkcentral* recognizes the possibility that a claim based on a technically 'domestic' transaction can be so rooted in foreign conduct that the claim itself is an extra-territorial application of the statute." *London Silver*, 332 F. Supp. 3d at 918. This is so, Your Honor recognized, because "the motivating concern in *Morrison* was that application of U.S. securities laws to foreign conduct where it was not intended by Congress is likely to run the risk of incompatibility with foreign law and unduly intrude upon the sovereignty of foreign nations." *Id*. Because "'the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case,'" this Court ruled that *Morrison* does not allow Plaintiffs to challenge a "course of conduct that is entirely foreign—undertaken by foreign actors, executed in foreign transactions, and intended to have an impact primarily on foreign interests[—] . . . simply because it had an effect on a U.S.-based transaction." *Id*. (quoting *Morrison*, 561 U.S. at 266).

Although neither *Parkcentral* nor *London Silver* dealt with ADRs, applying Section 10(b) to transactions in unsponsored ADRs of a foreign issuer "would raise exactly the same concern

---

Status of Deposited Securities Underlying American Depositary Receipts, 68 Fed. Reg. 54,644, 54,645 (proposed Sept. 17, 2003); *see also Pinker* v. *Roche Holdings Ltd*., 292 F.3d 361, 367 (3d Cir. 2002) ("An unsponsored ADR is established with little or no involvement of the issuer of the underlying security.").

that animated the Circuit's decision in *Parkcentral*."  *Id.*  Even before *Morrison*, this Court ruled

under the Second Circuit's previous "conduct or effects" test for extraterritoriality that a "[t]rade

in ADRs is considered to be a 'predominantly foreign securities transaction'" outside the reach

of Section 10(b).  *Copeland* v. *Fortis*, 685 F. Supp. 2d 498, 506 (S.D.N.Y. 2010).  And, prior to

*Parkcentral*, this Court held that, under *Morrison*, because "[t]rade in ADRs is considered to be a

predominantly foreign securities transaction, Section 10(b) is inapplicable."  *In re Societe*

*Generale Sec. Litig.*, 2010 WL 3910286, at *6 (S.D.N.Y. Sept. 29, 2010).

In *Stoyas* v. *Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018), the Ninth Circuit rejected the

reasoning of *Parkcentral*, and concluded that a plaintiff might plausibly plead a Section 10(b)

claim in respect of unsponsored ADRs.[6]  Contending that *Parkcentral* is "contrary to Section

10(b) and *Morrison* itself," the Ninth Circuit stated that *Morrison* sought to impose a "clear,

administrable" rule as to which there were no exceptions, even if that would lead to Section

10(b) applying to "claims of manipulation of share value from afar."  *Id.* at 950.  This is wrong.

As Your Honor observed, "the facts in *Morrison* did not require the Supreme Court to address

this scenario because in that case the underlying bad conduct was primarily domestic, while the

transaction was foreign.  Like *Parkcentral*, this case raises the opposite fact-pattern: a domestic

transaction and a claim based primarily on foreign bad acts."  *London Silver*, 332 F. Supp. 3d at

918.  Under *Parkcentral*, the pre-2016 claims here are impermissibly extraterritorial.

## II.     THE COMPLAINT DOES NOT PLEAD WITH PARTICULARITY ANY ACTIONABLE MISSTATEMENT OR OMISSION

### A.     The heightened pleading requirements of the PSLRA and Rule 9(b).

Under the PSLRA, a plaintiff pleading a violation of Section 10(b) must "specify each

statement alleged to have been misleading, the reason or reasons why the statement is

---

[6]     A petition for *certiorari* from this decision is pending before the U.S. Supreme Court.

misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). A complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were *false when made*." *Rombach* v. *Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (alteration in original) (emphasis added) (internal quotation marks omitted). "[T]he PSLRA requires courts to dismiss complaints that fail to meet the pleading requirements" in the statute.[7] *Novak* v. *Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

### B. Plaintiffs' attempt to convert DB's AML deficiencies into securities fraud alleges only inactionable mismanagement and puffery.

The SAC here challenges only the sufficiency of Defendants' management practices and DB's truthful statements its AML practices and procedures that proved inefficient in hindsight. This pleads no actionable misstatement or omission.

Plaintiffs' inability to transform inadequate AML practices into fraud perhaps explains why their blunderbuss pleading fails to contain "a short and plain statement of the claim," as required by Rule 8(a)(2). Plaintiffs regurgitate 80 paragraphs (30 pages) of truncated statements from various public statements and corporate responsibility reports. (SAC ¶¶ 185–265.) They purport to have bolded and italicized those portions of "[s]tatements alleged to be false and misleading" (*see* SAC ¶ 185 n.8)—including statements by the DFSA (SAC ¶ 243)—acknowledging their inclusion of dozens of pages of apparently superfluous un-emphasized text.

---

[7]     Rule 9(b) also imposes a heightened pleading requirement on plaintiffs alleging fraud. "Rule 9(b) serves to 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.'" *Rombach*, 355 F.3d at 171 (citation omitted). "The Second Circuit has instructed that 'these salut[a]ry purposes' are to be 'rigorously enforce[d],'" and "has emphasized that Rule 9(b)'s particularity requirement demands specific factual allegations demonstrating that a statement was false or misleading when made." *Ressler* v. *Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1998) (citation omitted), *aff'd, sub nom. Fishbaum* v. *Liz Clairborne, Inc.* 189 F.3d 460 (2d Cir. 1999).

Rather than explain why any particular statement is actionable, Plaintiffs simply declare them all—over more than five years—"materially false and misleading" for the same rote reasons. (SAC ¶¶ 194, 265.)  The Court "should not have to 'search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false.'"  *Deutsche Bank*, 2017 WL 4049253, at *5 (citation omitted).  The SAC should be dismissed for this reason alone.  *Id.*; *see In re PetroChina Co. Sec. Litig.*, 120 F. Supp. 3d 340, 356 (S.D.N.Y. 2015) (disapproving similar complaint).

Beyond this, for the reasons explained by this Court when rejecting analogous claims in *Deutsche Bank*, 2017 WL 4049253, at *5, Plaintiffs' attempt to transform DB's AML issues into securities fraud fails for at least three reasons.

### 1.    DB's AML policy statements were truthful when made.

"[A]lthough there is evidence that the Bank's AML and KYC procedures were deficient at identifying the [Estonia AML issues], statements concerning the adequacy of the Bank's internal controls are not actionable."  *Deutsche Bank*, 2017 WL 4049253, at *7.  As in *Deutsche Bank*, "[t]hese statements are not actionable because 'Plaintiff alleges neither facts showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, nor facts showing that the processes were not followed.'"  *Id.* (quoting *Citigroup*, 330 F. Supp. 2d at 379).  As detailed in Exhibit 20, the statements at issue here are indistinguishable from those rejected in *Deutsche Bank*.  For example:

- Statements in the Bank's 2014 Corporate Responsibility Report that the Bank "conduct[s] business in accordance with the laws and regulations of the countries where we operate, and we follow international guidelines and recognised principles for corporate responsibility . . . " and that "The Group condemns money laundering and terrorist financing and takes the steps necessary to comply with internationally recognised standards in these areas . . . ."  (SAC ¶¶ 215–16);

- Statements in the 2015 Corporate Responsibility Report that "Knowing our customers is also important in preventing money laundering and the financing of

terrorism . . . we keep abreast of the regulations and frequent developments in the area and work continually to improve our safeguards.  We are implementing measures to prevent money laundering and the financing of terrorism . . . ."  (SAC ¶ 232);

- Statements in the 2015 Annual Report that "we continue to invest in anti–money laundering measures, cyber security and fraud prevention. . . . During 2015, we increased our resources within the antimoney-laundering area as part of our continuous effort to promote and ensure compliance with regulation and industry standards."  (SAC ¶ 239);

- The 2016 Annual Report's statement that "Danske Bank focuses on having a strong compliance culture to ensure that compliance is conducted at all levels of the Group and that we thus act with integrity"  (SAC ¶ 253); and

- Statements in the 2016 Corporate Responsibility report that, "To ensure that our services are not abused for illegal purposes like money laundering and other criminal activities, we seek continuously to improve our processes and systems and to train our employees thoroughly" and that the Bank "made substantial efforts to comply with regulation."  (SAC ¶ 257.)

Plaintiffs do not explain how any DB statement was false or misleading.  The failure of one small foreign branch to adhere to AML laws and procedures prior to 2015 does not render inaccurate the Bank's general statements about its worldwide policies, which Plaintiffs have not otherwise challenged here.  *Deutsche Bank*, 2017 WL 4049253, at *6 ("[M]any of the statements alleged in the complaint may be true despite the existence of the Russia mirror-trade scheme, and the complaint does not indicate how or why these statements are false.")

Moreover, the SAC ignores entirely its own timeline.  At the time of the challenged statements, DB was at the very least in the *active process* of remediating the AML issues in Estonia and ultimately closing the NRP, which is entirely consistent with its statements about AML practices.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 577 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (pleading falsity requires plaintiff to allege that identified statements were false "at the time they were made.").  Indeed, for most of the putative Class Period—including *the entire period after 2016*, when Plaintiffs might conceivably have a viable

claim—the NRP had been closed, and the deficiency of Estonian AML compliance was acknowledged publicly.  Thus, Plaintiffs do not have any theory at all as to the supposed inaccuracy of any AML policy or compliance statement since 2016.

### 2.       Plaintiffs allege only inactionable puffery.

"It is well settled that a complaint alleging violations of the securities laws may not rely upon statements that . . . constitute puffery or ordinary expressions of corporate optimism."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004).  It is equally "well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'"  *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (citation omitted).

As the Second Circuit ruled in *Singh*, Defendants' statements about their AML policies and practices, as well as its compliance and social responsibility goals, "which amount to general declarations about the importance of acting lawfully and with integrity, fall squarely within this category."  918 F.3d at 63.  They are not actionable because "these statements did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices."  *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see Singh*, 918 F.3d at 63 ("representation of satisfactory compliance" not actionable).  This Court has routinely rejected similar efforts to transform a bank's compliance policies into a guaranty that those policies are adhered to invariably or will prove effective in practice.  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632–33 (S.D.N.Y. 2005) (rejecting allegations that the defendant "misrepresented itself as an institution of integrity with sound risk-management procedures"); *see Gusinsky* v. *Barclays PLC*, 944 F. Supp. 2d 279, 288 (S.D.N.Y. 2013), *aff'd in relevant part sub nom. Carpenters Pension Tr. Fund of St. Louis* v.

*Barclays PLC*, 750 F.3d 227 (2d Cir. 2014).  Whether or not some AML compliance statements allegedly "were knowingly and verifiably false when made . . . their generality . . . prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."  *City of Pontiac*, 752 F.3d at 183; *see Barilli* v. *Sky Solar Holdings, Ltd.*, 2019 WL 2250445, *11 (S.D.N.Y. May 23, 2019) ("codes of ethics are . . . aspirational").

Likewise, various other aspirational statements about the financial progress of the Bank as a whole are not actionable.[8]  "Statements of general corporate optimism, such as these, do not give rise to securities violations."  *IBEW Local Union No. 58 Pensions Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC,* 783 F. 3d 383, 392 (2d Cir. 2015).  "No investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every [] bank makes these statements."  *ECA*, 553 F.3d at 206.

### 3.    DB's AML shortcomings are not actionable under the securities laws.

To the extent that Plaintiffs attempt to convert the failure of the Bank's Estonian branch to adhere to AML policies or laws into a misstatement, this theory alleges only mismanagement that is not actionable under the federal securities laws.  *See Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 479 (1977).  Because the Exchange Act affords no "cause of action for the review of management practices," these claims must be dismissed.  *Citigroup*, 330 F. Supp. 2d at 377; *see In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998) (claims that "assail the conduct, judgment, and abilities" of management are not actionable).

---

[8]     *See*, *e.g.*, SAC ¶ 186 (new "strategy is based on a strong mission and vision to set new standards in financial services . . ."); ¶ 220 ("2014 was a year of significant progress for [DB]" which "marks the end of a string of challenging years"); ¶ 231 (CFO Ramlau-Hansen created a solid foundation for DB and upon his departure is "hand[ing] over a strong organisation and a bank in good shape"); ¶ 245 (the Bank's "profits" reflect a "solid business model and demonstrate our ability to operate in a low-growth environment").

The SAC here details efforts taken by Defendants to investigate and remediate AML and KYC deficiencies in Estonia, virtually all of which occurred prior to the putative Class Period. Plaintiffs' apparent contention that Defendants failed adequately or timely to understand or investigate those issues states only a claim for mismanagement that is not actionable under the federal securities laws. *See In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004) ("[P]laintiffs' claim that loan loss reserves were inadequate is nothing more than an assertion that CIT was incorrect or unskillful in determining exactly what amount of reserves would be adequate."); *Ciresi* v. *Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (same); *see Van Ormer* v. *Aspen Tech., Inc.*, 145 F. Supp. 2d 101, 106 (D. Mass. 2000) (claim that business lacked adequate infrastructure asserts claim of mismanagement).

### C.   DB misstated no facts regarding its Estonian branch.

Plaintiffs for the most part never contend that Defendants said anything at all about the Estonian branch, its business, financial results, or customers. Plaintiffs do not contend that the Bank ever said anything positive about its operations in Estonia or their contribution, if any, to the Bank's overall financial results.

Instead, the only statements in the SAC that mention Estonia prior to March 2016 (when DB acknowledged AML deficiencies in its by-then closed NRP accounts) relate to the goodwill allocated to the Estonian branch. Two statements only note the existence of such goodwill; Plaintiffs do not contend that the statements are untrue. (SAC ¶¶ 188, 203.) The ***only*** other Estonia-related statements concern a December 15, 2014 disclosure by the Bank that, following periodic goodwill impairment testing, the Bank would write down goodwill associated with four of its eight business units in Finland, Northern Ireland, and Estonia in the total amount of around DKK 9 billion, with the Estonian branch accounting for approximately DKK 2.062 billion (about US $310 million) of this write-down. (SAC ¶¶ 85, 213, 221.) As the Bank explained, the write-

down was "primarily a technical accounting exercise based on our ordinary annual goodwill impairments test, a change in the macroeconomic condition, and also coinciding with the dialogue we have had with the Danish FSA. . . . The goodwill calculation is not related to expected short-term performance of the affected business areas."  (SAC ¶ 214.)

Plaintiffs allege this statement was false because, at the time of this statement, the Bank was "secretly winding down its main profit center in Estonia because of AML concerns."  (SAC ¶ 214.)  This ignores the plain words in the Bank's statements.  The Bank's statement related to four business units in three countries, of which Estonia accounted for a quarter in number and less than that in magnitude.  *Oklahoma Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*, 300 F.Supp.3d 551, 580 (S.D.N.Y. 2018) (statement that "company's healthcare segment as a *whole* was improving" not misleading even though California was not), *aff'd sub nom. Arkansas Pub. Employees Ret. Sys.* v. *Xerox Corp.*, 2019 WL 2394302 (2d Cir. June 6, 2019).  Plaintiffs do not dispute that periodic, routine impairment testing revealed that the goodwill associated with several businesses was impaired, or that the impairment was the result of long-term business expectations.  The Bank explained in over three pages of its 2014 annual report how it conducted its impairment test (Ex. 9, at 87-90), which Plaintiffs do not contend was inaccurate.

### D.    Defendants' truthful disclosures did not give rise to any duty to disclose any additional details about the NRP.

"Silence, absent a duty to disclose, is not misleading."  *Basic Inc.* v. *Levinson,* 485 U.S. 224, 239 n.17 (1988).  There is no duty to disclose information simply because it is material, or of potential interest.  *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011); *see also In re Time Warner Inc. Sec. Litig.*, 9 F. 3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.").  A duty to disclose arises under the federal securities laws only when particular

information is subject to an "affirmative legal disclosure obligation," or when necessary "to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360–66 (2d Cir. 2010). Nothing of the sort has been alleged here.

### 1.    Defendants had no duty to volunteer information about ongoing AML investigations earlier or in greater detail.

Plaintiffs allege that virtually every DB statement on a host of unrelated topics over more than five years was false and misleading because the statements did not simultaneously confess to AML violations, and volunteer information about whistleblower allegations and ongoing investigations. (SAC ¶¶ 194, 265.) The federal securities laws imposed no duty on Defendants to disclose pending investigations or uncharged alleged misconduct. *See, e.g.*, *City of Pontiac*, 752 F.3d at 184; *Citigroup*, 330 F. Supp. 2d at 377. "[C]ompanies are not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the [conduct] were discovered, disclosed or terminated." *In re FBR Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008) (internal quotation marks omitted). Once DB disclosed the DFSA investigation, it was not required to speculate about the outcome of that inquiry, other investigations that might follow, or the consequences that might befall the Bank.

Here, as in *Deutsche Bank*, DB was not under any duty to volunteer information about any investigation sooner or in greater detail under the guise that such disclosure was necessary to avoid rendering existing statements misleading. *Deutsche Bank*, 2017 WL 4049253, at *7. Beyond noting the goodwill write-down associated with the Estonian branch in December 2014, DB is not alleged to have said anything at all about its Estonian business prior to the time the DFSA and other investigations were disclosed. DB's 2013 and 2014 Annual Reports noted that, "[o]wing to its business volume, [DB] is continually a party to various lawsuits and disputes and has an ongoing dialogue with public authorities such as the Danish FSA." (Ex.7, at 111; Ex. 9,

-24-

at 103.)  DB had no obligation to say more about the DFSA investigation.  *City of Pontiac*, 752

F. 3d at 182 (UBS disclosure of "involvement in multiple legal proceedings" and potential

consequences sufficient without referencing the bank's involvement in tax evasion scheme under

investigation by the U.S. Department of Justice).  As DB's primary prudential regulator, DFSA

may launch an inspection for any numbers of reasons and Defendants are not required to reveal

each such inquiry.  *In re Barclays Bank PLC Sec. Litig.*, 756 Fed. App'x. 41, 51 (2d Cir. 2018)

(No duty to disclose "a regulator's expressions of concerns about a bank's financial status.")

In its 2015 Annual Report (Ex. 10, at 106), DB disclosed specifically that the DFSA "has

pending investigations regarding compliance with applicable anti-money laundering laws, which

could lead to supervisory actions against" the Bank.[9]  DB was not required to say anything more,

or sooner.  *Pipefitters Union Local 537* v. *American Express Co.*, 2019 WL 2023621, at *2 (2d

Cir. 2019) ("no duty to update . . .  existing facts that were not forward looking").  As these and

other investigations developed and intensified, DB adequately updated investors.  It had no "duty

to disclose more about the uncertain state" of those ongoing matters, *In re Express Scripts*

*Holdings. Co. Sec. Litig.*, 2019 WL 2004302, at *3 (2d Cir. May 7, 2019), or predict the

consequences of an adverse outcome, *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995).

Nothing that Defendants said was rendered misleading by failing to disclose AML

investigations, all of which concerned historical events and were disclosed by early 2016.

*Deutsche Bank*, 2017 WL 4049253, at *7 (Defendants had no "duty to disclose the Bank's

internal control deficiencies" because plaintiffs "failed to identify any existing statements that

would be rendered misleading by failing to disclose a material fact.").

---

[9]     Plaintiffs allege inconsistently that the DFSA investigation began in 2014 (SAC ¶ 96), while
elsewhere acknowledging that the DFSA's own inspection report says that its investigation started in
2015 (SAC ¶ 97).

2.     **DB could not have had any duty to disclose additional details about its Estonian branch.**

Plaintiffs' speculation that DB "had been overstating" its firm-wide "historical profits by including the profits derived from its illicit Estonian operations" and that it had "not compl[ied] with applicable financial reporting standards" is supported by nothing.  (SAC ¶ 265(d), (f).)  This falls miles short of particularized facts pleading some material misstatement.

Ordinarily, "accurately reported income that is obtained from an unlawful source may not be actionable only on the grounds that the unlawful source is not disclosed."  *DoubleLine Capital LP* v. *Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442 (S.D.N.Y. 2018).  A "duty to disclose uncharged wrongdoing can arise when a corporation puts the reasons for its success at issue, but 'fails to disclose that a material source of its success is the use of improper or illegal business practices.'"  *Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016).  Here, Defendants are not alleged to have ever once cited Estonia as having anything to do with DB's success or financial results.  *In re Tempur Sealy Int'l Sec. Litig.*, 2019 WL 1368787, at *13 (S.D.N.Y. Mar. 26, 2019) (unrelated comments about relations with distributor imposed no duty to disclose "state of negotiations" of supply agreement).

Moreover, Plaintiffs nowhere allege that Estonia had any material contribution to DB's financial results.  Both "quantitative and qualitative factors must be considered in determining materiality."  *ECA*, 553 F.3d at 204.  Although "bright-line numerical tests for materiality are inappropriate . . . an alleged misrepresentation relating to less than two percent of defendant's assets, when taken in context, could be immaterial as a matter of law."  *Id.*  Here, the entire Estonian branch amounted to 0.5% of DB's assets, and contributed just 1.7% of DB's profits in

2014, 0.8% in 2015, and zero thereafter.[10]  By any measure, "Plaintiff[s] fail[] to proffer facts

supporting an inference that the transactions complained of were material in the context of

[DB's] overall business."  *Citigroup*, 330 F. Supp. 2d at 378.

## III.   PLAINTIFFS FAIL TO ALLEGE A COGENT AND COMPELLING INFERENCE OF FRAUD.

Under the PSLRA, Plaintiffs must, "with respect to each act or omission alleged to

violate [the Exchange Act], state with particularity facts giving rise to a strong inference that the

defendant acted with the requisite state of mind."  15 U.S.C. § 78u-4(b)(2).  To allege scienter,

Plaintiffs must plead "facts to show either (1) that defendants had the motive and opportunity to

commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."

*ECA,* 553 F.3d at 198.  For an inference of scienter to be "strong," the Supreme Court has ruled

that "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing

inference one could draw from the facts alleged."  *Tellabs,* 551 U.S. at 324.  Moreover, "in

determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must

take into account plausible opposing inferences."  *Id.* at 323.  Put differently, where, as here, a

"plausible nonculpable explanation[]" is more likely than fraud, Plaintiffs have failed to establish

scienter.  *Id.* at 324; *ATSI Commc'ns* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 104 (2d Cir. 2007).

### A.   Plaintiffs have not alleged any cognizable motive to defraud.

The Second Circuit has made clear that "litigants and lower courts need and should not

employ or rely on magic words such as 'motive and opportunity'" to establish scienter.  *Novak*,

216 F.3d at 311.  "Motives that are generally possessed by most corporate directors and officers

---

[10]   Recognizing this lack of materiality, Plaintiffs resort to subterfuge, contending that DB's "financial statements made a mockery" of accounting rules by not "reporting the flow of hundreds of billions of dollars of transactions in its financial statements that were illegal in nature."  (SAC ¶ 265(i).) Plaintiffs naturally nowhere explain how fund transfers in customer accounts of a bank branch would appear in the financial statements of its parent.

do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

The SAC is bereft of any allegations of motive. Tellingly, the SAC offers no allegations of financial self-interest of the sort courts consider probative of scienter, such as suspicious trading or contingent compensation. *See, e.g.*, *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009). Here, the best Plaintiffs can muster is the vacuous allegation that the "conduct was driven by Defendants' desire to report outsized profits at all costs." (SAC ¶ 4.) Yet, "the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation" are insufficient to plead motive. *ECA*, 553 F.3d at 198. "Plaintiffs' allegation that [DB] had a motive to grow its profits, is also totally insufficient to demonstrate scienter." *Union Cent. Life Ins. Co*. v. *Ally Fin., Inc*., 2013 WL 2154381, at *1 (S.D.N.Y. Mar. 29, 2013).

The supposed "desire to report outsized profits" also makes no sense. Estonia was an insignificant source of "profit" in 2014 and 2015, and it has been only a source of losses since that time. *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y.2000) ("At a minimum, the alleged purpose must be in the informed economic self-interest of the defendant."). If profit were the goal, the scheme alleged in the SAC was not a rational path to achieve it. *Atlantic Gypsum Co.* v. *Lloyds Int'l Corp.*, 753 F.Supp. 505, 514 (S.D.N.Y.1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent."). Plaintiffs' bizarre speculation that these imaginary "outsized profits" of the Estonian branch fueled Borgen's "ascension" within the Bank (SAC ¶ 4) is supported by nothing. Plaintiffs allege no "unique connection" between any Estonia profits and Borgen's desire to succeed, and none exists. *ECA*, 553 F. 3d at 201 n.6; *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("a plaintiff must do more than merely charge

that executives aim to prolong the benefits of the positions they hold").[11]  This theory pleads no

motive for fraud because "[i]t would be difficult to find a corporate officer who does not wish to

protect his or her professional reputation."  *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004

WL 376442, at *7 (S.D.N.Y. Feb. 27, 2004).

   **B.     Plaintiffs fail to plead strong circumstantial evidence of fraud.**

   "Where motive is not apparent . . . [plaintiffs must] plead scienter by identifying

circumstances indicating conscious behavior by the defendant, though the strength of the

circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142; *see Ret.

Bd. of the Policemen's Annuity and Benefit Fund of Chi.* v. *FXCM, Inc.*, 2019 WL 1749025 (2d

Cir. Apr. 17, 2019).  Conscious behavior under the securities laws is "a state of mind

approximating actual intent, and not merely a heightened form of negligence."  *Novak*, 216 F.3d

at 311 (internal quotations and citations omitted).  At a minimum, Plaintiffs must show that each

Defendant engaged in "conduct which is highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was known to the

defendant or so obvious that the defendant must have been aware of it."  *Id*; *see also In re

Rockwell Medical, Inc. Sec. Litig.,* 2018 WL 1725553, at *13 (S.D.N.Y. Mar. 30, 2018).

Plaintiffs come nowhere close to alleging scienter.

   *First*, because Plaintiffs have no valid claim prior to 2016 (*see* § I, *supra*), they have no

viable theory of scienter.  The NRP at issue in the SAC was closed by 2016.  DB disclosed the

existence of the DFSA investigation into AML issues in its 2015 Annual Report, and, in March

---

[11]     In fact, Plaintiffs' theory is directly contradicted by the BH Report, which found that "Thomas Borgen was instrumental in the decision to initiate the full investigations into the Estonian branch" and that the facts alleged in that report "do not . . . raise questions as to Thomas Borgen's fitness and propriety as CEO of Danske Bank." (Ex. 1 (BH Report), at 86.)  The BH Report likewise found that Ole Andersen "took the initiative" to initiate an accountability investigation into DB's failure to address the NRP at DB's Estonian branch.  (*Id.* at 83.)

2016, DB published the DFSA inspection report that found DB's AML governance in Estonia legally deficient, which DB publicly acknowledged.  No intent to defraud remotely could be alleged from and after 2016.  *In re Magnum Hunter Res. Corp. Secs. Litig.*, 26 F. Supp.3d 278, 298–99 (S.D.N.Y. 2014) (no scienter after "defendants disclosed in November 2012 and afterwards that the company had material accounting weaknesses in the core internal control areas of staffing and financial reporting").

   *Second*, "[t]o determine whether a plaintiff has 'specifically alleged defendants' knowledge of facts or access to information contradicting their public statements,' 'Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements.'"  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp.2d 510, 536 (S.D.N.Y. 2009) (citations omitted) (emphases in original). Plaintiffs have alleged neither.  At most, Plaintiffs identify some reports of potential AML issues in Estonia that are untethered to any public statement by any Defendant. *Pa. Pub. Sch.* v. *Bank of Am. Corp.*, 874 F. Supp. 2d 341, 360 (S.D.N.Y. 2012) (reported mortgage risks established "only that [Defendants] were aware of risks, not that they knew that their disclosures were false or misleading").  Plaintiffs nowhere allege any facts to suggest that any Defendant was aware of ongoing AML issues at the time of any statement, much less knowledge of any issues of sufficient consequence to contradict some public statement.  *In re Sec. Capital Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 596 (S.D.N.Y. 2010) ("Plaintiffs' own allegations reveal that prior to [a certain date], Defendants were woefully unaware of the true risk . . . and did not know the facts or have the information necessary to know that their statements might be inaccurate."); *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *19 (S.D.N.Y. Jan. 14, 2013) ("knowing of problems, which are common, differs from knowing" the problems would turn out much worse).  These hindsight allegations come nowhere

close to pleading securities fraud. *Harris* v. *AmTrust Fin. Servs., Inc*., 135 F.Supp.3d 155, 176 (S.D.N.Y. 2015) (contradictory "raw data" does not plead scienter unless "the raw data had been collected into reports that demonstrated the difference"), *aff'd*, 649 F. App'x 7 (2d Cir. 2016); *Marcus* v. *Frome*, 275 F. Supp. 2d 496, 502 (S.D.N.Y. 2003) (dismissing complaint that did "not mention any particular document or information that the defendants had access to, and does not allege the information contained in those documents, whatever they were, was inconsistent or contradicted the information that formed the basis of the defendants' public statements").

*Third*, investigations into potential wrongdoing do not establish knowledge about what is later uncovered in those investigations. The existence of such investigations "cannot bolster allegations of scienter that do not exist," and Plaintiffs cannot allege that Defendants knew the extent of the problems at the Estonian branch because they knew about these investigations. *See Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y.2011) ("the fact that a regulator is fulfilling [its] role cannot be sufficient to allege scienter"). "[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309.

*Fourth*, Plaintiffs' claim that Defendants ignored "rampant AML deficiencies at the Estonian branch," and that Estonian regulators in 2014 "issued DB a scathing 340-page report" (SAC ¶ 5), is contradicted by their own pleadings. Although allegations that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud" might be probative of recklessness, *Novak*, 216 F. 3d at 308, Plaintiffs here plead the opposite. They concede that those reports were investigated, and remedial measures were taken, including, ultimately terminating the NRP business. (SAC ¶¶ 71–72; 75; Ex. 1 (BH Report), at 83–84.) This pleads no scienter.

* * * *

Plaintiffs' scienter theory is indistinguishable from the scienter allegations rejected by the Second Circuit in affirming *Deutsche Bank*.  There, plaintiffs relied upon various, after-the-fact investigations and enforcement proceedings, including one in which Deutsche Bank admitted its "serious compliance deficiencies" allowed more than $10 billion to be laundered out of Russia. *Sfiraiala*, 729 F. App'x at 58.  The Second Circuit found that plaintiffs had "fail[ed] to establish, however, that any of the individual defendants were aware of these deficiencies at the time of their alleged misrepresentations, or that the deficiencies were 'so obvious' that the individual defendants 'must have been aware' of them."  *Id.* (quoting *S. Cherry St.*, 573 F.3d at 109). Because, as here, "the individual defendants 'were at the apex of Deutsche Bank's corporate hierarchy,'" they "therefore were several layers removed from the illegal trading activities."  *Id.* Here, as in *Deutsche Bank*, Plaintiffs have not established that Defendants knew about AML issues with material consequences for DB at the time of any statement.

## C.        The SAC fails to plead scienter separately for each Defendant.

When multiple defendants are alleged to have engaged in fraud, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio* v. *Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *see also United States* v. *TEVA Pharms. USA, Inc.*, 2016 WL 750720, at *12 (S.D.N.Y. Feb. 22, 2016).  Allegations of scienter in particular are "not amenable to group pleading."  *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013)*, aff'd sub nom. Westchester Teamsters Pension Funds* v. *UBS AG*, 604 Fed. App'x. 5 (2d Cir. 2015).

The SAC names DB and four Individual Defendants and describes events over a time period of more than five years, yet dedicates a paltry four paragraphs to allegations of scienter. (SAC ¶¶ 266–69.)  None of these allegations are attributable to any particular Defendant, who

individually served in different roles at different points in time, and are alleged to have stated different things (or nothing at all), while one (Aarup-Andersen) took his CFO role only *after* the NRP was closed down.  It makes absolutely no sense for Plaintiffs to group these Defendants together, and seek to plead scienter by reference to their supposed "knowledge of operations at the Estonian Branch," "obligations associated with DB's disclosure controls," or topics "about which several [unspecified] Individuals Defendants" were "questioned and spoke."  (SAC ¶ 267.)  These sort of "entirely conclusory" and unspecific group allegations are rejected routinely. *See Kinra* v. *Chi. Bridge & Iron Co.*, 2018 WL 2371030, at *6 (S.D.N.Y. May 24, 2018); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) ("[P]laintiffs fail to allege facts that adequately address the scienter element with respect to each of the Individual Defendants—an element that cannot be satisfied through group pleading.").

Beyond group pleading, Plaintiffs allege no specific information provided to each Defendant at or before the time of a particular statement, as required by the PSLRA.  Allegations that "Defendants had access to adverse undisclosed information because of their senior positions with the company . . . are insufficient to establish scienter." *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004).  "It is not enough for a post-*Tellabs* plaintiff to allege that, because executives like the Individual Defendants were 'closely involved' in [the] business, one can strongly infer that they 'were furnished with financial data which contained the 'errors.'" *City of Brockton Ret. Sys*. v. *Shaw Group Inc*., 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) (citations omitted).  Plaintiffs may not "sufficiently plead fraud by simply providing a method for the defendant to discover the underlying details." *ATSI*, 493 F.3d at 106.

Corporate scienter may be alleged by "pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials

-33-

sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotations omitted).  Plaintiffs' failure to plead scienter on the part of the Individual Defendants defeats any theory of fraud as to DB.  *Id.*  Plaintiffs do not purport to plead the requisite intent by any other individual who made a statement.  *See Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 776 (S.D.N.Y. 2019) (absent scienter by individual defendants, plaintiff must show the statement was "approved by corporate officials" with the required intent).

### D.   Fraud is not remotely the more compelling inference on the facts alleged.

"A complaint will survive . . .  only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegations, scrutinized in isolation, meets that standard." *Id.* at 323–24.  On this record, the competing inferences give rise to no cogent and compelling inference of fraud.

*First*, it is clear that Defendants "were in a constant game of 'Catch up'—acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them only to learn of yet more," which does not support an inference of fraudulent intent.  *Magnum Hunter*, 26 F. Supp. 3d at 297.  Throughout 2014, for example, DB management was assured that steps were being taken to address the identified risks, and the suspect accounts were terminated.  (Ex. 1 (BH Report), at §§ 9.4.7-9, 13.)  When, after-the-fact, new information came to light about those terminated NRP accounts, it arose through "a process which was chaotic in part, and which did not leave much time for analysis."  (*Id.* at 10.)

*Second*, the SAC describes the efforts undertaken in response to each AML issue that was brought to DB's attention, and acknowledges that the breadth of the AML failures became

known only after extensive investigations into the conduct in Estonia.  This defeats any inference of fraudulent intent.  *Slayton* v. *American Exp. Co,* 604 F. 3d 758, 777 (2d Cir. 2010) (a "prudent course of action . . . weakens rather than strengthens an inference of scienter") (internal quotations omitted).  The Bank's remedial actions are inconsistent with any notion of defrauding investors.  *Sfiraiala,* 729 F. App'x at 58 (when AML issues "became sufficiently elevated within Deutsche Bank's investigation function . . . the Bank commenced an internal investigation designed to identify the background of the suspicious trades"); *see also Doshi* v. *Gen. Cable Corp.*, 823 F.3d 1032, 1044 (6th Cir. 2012) ("remedial measures counsel against inferring" scienter).  It does not matter that Plaintiffs' hindsight critique of Defendants' remedial actions suggests that improvements should have been implemented more swiftly or broadly.  *Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce,* 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) ("That [defendants] chose an incremental measured response, while erroneous in hindsight, is as plausible an explanation for the losses as an inference of fraud.")

*Third*, Defendants devoted significant resources to investigating the Estonia issues and thereafter issued publicly the BH Report detailing the critical findings of its year-long review.  This is "hardly the sort of behavior one would expect from the perpetrator of securities fraud." *SEC* v. *Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992).  Far from inferring fraud, the Bank's investigation into and disclosure of these issues reflects proper governance.  "Taking the time necessary to get things right is both proper and lawful."  *Higginbotham* v. *Baxter Int'l Inc.*, 495 F. 3d 753, 761 (7th Cir. 2007).   The "cascade of disclosures" on this subject in "inconsistent" with fraud.  *Holbrook* v. *Trivago N.V.*, 2019 WL 948809, *21 (S.D.N.Y. Feb. 26, 2019).

*Finally*, the non-existent personal or corporate benefit from the Estonia business counsels strongly against finding some strong inference of financial fraud here.  The Estonian branch accounted for about 0.5% of DB's total assets (Ex. 1 (BH Report), at § 5.4) and between 0.8%

and 1.7% of the Bank's total profits.  (SAC ¶ 33.)  The Individual Defendants gained nothing.

The notion that Defendants perpetrated an immaterial scheme to defraud investors is illogical.

## IV.      PLAINTIFFS' "SCHEME" CLAIM SHOULD BE DISMISSED

Plaintiffs purport to allege a separate "scheme" claim under Rule 10b-5(a) and (c).  This

claim is not referenced anywhere in the body of the SAC, and Plaintiffs nowhere explain the

basis for this claim in their Count II (SAC ¶¶ 300–08.)  They do not specify what constitutes the

supposed "scheme," or how that unspecified scheme "deceive[d] the investing public."  (SAC ¶

302.)  This claim fails for at least two reasons.  *First*, Plaintiffs do not allege that any "scheme"

communicated some misstatement to the market.  *See TCS Capital Mgmt., LLC* v. *Apax*

*Partners, L.P.,* 2008 WL 650385, at *25 (S.D.N.Y. Mar. 7, 2008) (no liability for deceptive acts

not communicated to the public and "not relied upon by investors").  Second, scheme liability

claims remain subject to the heightened PSLRA scienter standard, *Menaldi*, 164 F. Supp. 3d at

577, which is not met here.

## V.       THE COMPLAINT FAILS TO ALLEGE LOSS CAUSATION.

Plaintiffs have not pled adequately "that the act or omission of the defendant[s] . . .

caused the loss for which the plaintiff[s] seek[] to recover damages."  15 U.S.C. § 78u-4(b)(4).

In the SAC, Plaintiffs attempt to plead a "corrective disclosure theory," claiming that "the

available public information regarding the company's financial condition [was] corrected, and

. . . the market reacted negatively to the corrective disclosure."  *Carpenters Pension Tr. Fund of*

*St. Louis* v. *Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (internal quotations omitted).

Plaintiffs fail entirely to link any purported corrective disclosures to their alleged loss.

Plaintiffs recite 17 news reports over two years—between April 2017 and April 2019—as

purported "corrective" disclosures. (SAC ¶¶ 271–87.)  Five of these reports were issued before

any Plaintiffs purchased ADRs, and six were released after Plaintiffs sold all of their ADRs.

Plaintiffs' "corrective" disclosures do no more than catalog any DB statement since 2017 that negatively affected DB's stock price.  Plaintiffs do not explain how any purported disclosure— ***much less one issued while they owned DB ADRs***—"corrects" any prior DB statement, or discloses any facts that existed and were known, but were unlawfully omitted, ***on the date of some prior statement***.  Instead, these allegations "merely show that the market reacted to adverse news."  *Nguyen* v. *New Link Genetics Corp.*, 2019 WL 591556, at *8 (S.D.N.Y. Feb. 13, 2019).  The disclosure of the results of investigations, or adverse consequences from those investigations, in 2017–2019 concerning AML issues that have been publicly known since 2016, does not "reveal to the market" that Defendants' "prior statements were not entirely true or accurate."  *Harris*, 135 F. Supp. 3d at 173, n.30.  "The number of dots" Plaintiffs ask the Court "to connect to produce an adequate theory of loss causation are too numerous and attenuated to succeed."  *Lululemon*, 14 F. Supp. 3d at 587.[12]

---

[12]     Plaintiffs allege that the Individual Defendants are liable under Section 20(a) of the Exchange Act.  (SAC ¶ 310.)  Having failed to plead a primary violation of the federal securities laws, Plaintiffs have failed to plead control person liability under Section 20(a).  *See ATSI*, 493 F.3d at 108.

## **CONCLUSION**

For the foregoing reasons, Danske Bank respectfully requests that this Court dismiss this action in its entirety, with prejudice.

Dated:  June 18, 2019

Respectfully submitted,

 */s/ Brian T. Frawley*
Brian T. Frawley
Katherine L. Bagley
Amanda Shami
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendant Danske Bank A/S*