UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLUMBERS & STEAMFITTERS LOCAL 773 PENSION FUND, BOSTON RETIREMENT SYSTEM, TEAMSTERS LOCAL 237 ADDITIONAL SECURITY BENEFIT FUND AND TEAMSTERS LOCAL 237 SUPPLEMENTAL FUND FOR HOUSING AUTHORITY EMPLOYEES, Individually and on Behalf of All Others Similarly Situated, <br><br>                Plaintiff, <br><br>   vs. <br><br>DANSKE BANK A/S, THOMAS F. BORGEN, HENRIK RAMLAU-HANSEN, JACOB AARUP-ANDERSEN, and OLE ANDERSEN, <br><br>                Defendants. | Civil Action No. 1:19-cv-00235-VEC <br><br>CLASS ACTION <br><br>THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br><br>DEMAND FOR JURY TRIAL |

# <u>TABLE OF CONTENTS</u>

**Page**

I.    SUMMARY OF THE ACTION ...................................................................2

II.   JURISDICTION AND VENUE ..................................................................5

III.  PARTIES ..................................................................................................6

    A.    Plaintiffs ..........................................................................................6

    B.    Defendants and Relevant Entities ...................................................7

        1.    Danske Bank and Its ADR Program ......................................7

        2.    The Individual Defendants ...................................................15

IV.   SUBSTANTIVE ALLEGATIONS ...........................................................17

    A.    The Origin of Danske Bank's Estonian Branch.............................17

    B.    Danske Bank's Estonian Operations Were Material to the Company's
        Overall Financial Performance and Generated Outsized Profits ............18

    C.    Danske Bank Violated International Financial Reporting Standards ..................21

    D.    Applicable Anti Money Laundering Regulation.............................22

    E.    Danske Bank's AML Compliance and General Reporting Structures .................24

    F.    AML Violations and Red Flags .....................................................27

    G.    Defendants Utterly Failed to Comply with AML Regulations.............................42

    H.    The B&H Report Tepidly Addresses "Legal Obligations" of Danske Bank
        Employees......................................................................................45

    I.    The Extent of the AML Violations Begin to Be Revealed ...................46

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED PRIOR
    TO THE CLASS PERIOD THAT REMAINED ALIVE AND UNCORRECTED
    DURING THE CLASS PERIOD ........................................................87

VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING
    THE CLASS PERIOD........................................................................93

VII.  ADDITIONAL SCIENTER ALLEGATIONS.............................................124

VIII.   LOSS CAUSATION/ECONOMIC LOSS ....................................................................126

IX.   NO SAFE HARBOR ..........................................................................................136

X.   APPLICATION OF THE PRESUMPTION OF RELIANCE..........................................137

XI.   CLASS ACTION ALLEGATIONS .............................................................................138

COUNT I For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All
Defendants .................................................................................................140

COUNT II Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c)
Promulgated Thereunder Against All Defendants ...........................................141

COUNT III For Violation of §20(a) of the 1934 Act Against the Individual Defendants ..........142

XII.   PRAYER FOR RELIEF ........................................................................................143

XIII.   JURY DEMAND ................................................................................................143

Lead Plaintiffs Boston Retirement System, Teamsters Local 237 Additional Security Benefit Fund, Teamsters Local 237 Supplemental Fund for Housing Authority Employees, and Plumbers & Steamfitters Local 773 Pension Fund (together "Plaintiffs") allege the following based upon the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Danske Bank A/S ("Danske Bank" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements and reports issued by the Company or its attorneys, including the Bruun & Hjejle report (the "B&H Report"),[1] and media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

---

[1] The B&H Report, which is relied upon, cited to, and quoted herein, was commissioned by Defendants and produced by the Bruun & Hjejle law firm ("B&H") and titled "Report on the Non-Resident Portfolio at Danske Bank's Estonian branch," published on September 19, 2018. The report purports to present an "examination of customers and transactions [at the Estonian branch of Danske Bank] in the period from 2007 to 2015 and an investigation of the course of events, including whether managers and employees, members of the Executive Board or the Board of Directors have sufficiently fulfilled their obligations."  B&H's investigation was formally launched in the fall of 2017 and mandated by Danske Bank's Board of Directors on December 8, 2017.  This was years after the events at issue and only after critical media coverage began to implicate Defendants in the money laundering scheme.  The B&H investigation remains ongoing, and the B&H Report is based on a review of fewer than 7,000 of the 15,000 accounts deemed to have been "suspicious" at the Estonian Branch.  Investors, concerned that the B&H Report is "grossly biased" and "insufficient to answer shareholders' concerns," have demanded an impartial investigation.  *Danske Bank: Deminor has filed a motion to launch an independent investigation of senior executives' responsibility*, *available at* https://drs.deminor.com/en/danske-bank-deminor-filed-motion-launch-independent-investigation-senior-executives-responsibility.  Indeed, the B&H Report specifically concedes that it is not considered "impartial" or "independent" under the guidelines of the Association of Danish Law Firms.  B&H Report at 15, *available at* https://danskebank.com/-/media/danske-bank-com/file-cloud/2018/9/report-on-the-non-resident-portfolio-at-danske-banks-estonian-branch-.-la=en.pdf.

## I.      SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Danske Bank American Depositary Receipts ("ADRs") during the period from January 9, 2014 through April 29, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.      During the Class Period, Danske Bank was the largest financial institution in Denmark.  It conducted a large volume of financial business, including transactions in the fields of asset management, investment, pensions, mortgage finance, insurance, and real estate brokerage and leasing, including with customers who reside or are domiciled outside of Denmark.

3.      This case is about one of the world's largest money laundering scandals to date, facilitated by Danske Bank and its local banking branch in Estonia (the "Estonian Branch").  In total, between 2008 and 2016, *an astounding $230 billion* was illegally laundered through Danske Bank.

4.      This illegal conduct was driven by Defendants' desire to report outsized profits at all costs, and was facilitated by deficient anti-money laundering ("AML") controls at Danske Bank's Estonian Branch and at its Danish headquarters.  The outsized profits of the Estonian Branch fueled Defendant Thomas Borgen's ascension during the Class Period from Head of International Banking (heading the Estonian Branch) and a member of the Executive Board to CEO of Danske Bank.

5.      Defendant Borgen and the other Defendants not only ignored rampant AML deficiencies at the Estonian Branch, but also ignored the outcry of Estonian financial regulators who, after repeated warnings, stormed the Estonian Branch in 2014 and subsequently issued

Danske Bank a scathing 340-page report that listed a multitude of violations – which the Company did not even bother to translate for three years.

6.     The introduction of the Estonian regulator's report dated September 11, 2014, was translated into English by the Estonian Branch in 2017.  It stated, in pertinent part, that "***Danske Bank systematically established business relationships with persons in whose activities it is possible to see the simplest and most common suspicious circumstances***," and that "[w]e have therefore systematically identified situations during our on-site inspection where Danske Bank's system for monitoring transactions and persons is effectively not working."  In a draft of the report, the Estonian Financial Supervisory Authority voiced that "***economic interests prevail over the obligation to apply enhanced due diligence measures***."

7.     Separate and apart from the Estonian regulators, as early as December 2013, a whistleblower also brought the illegal money laundering to the attention of the Company's senior executives, but these allegations were only cursorily investigated or blatantly ignored by Danske Bank and the Individual Defendants.  For instance, in response to the whistleblower, Danske Bank's Group Internal Audit (the internal audit function located at Danske's headquarters) conducted an on-site audit at the Estonian Branch and presented its draft conclusions in an email forwarded to two members of the Executive Board and the CEO.  The email stated "***we cannot identify actual source of funds or beneficial owners***" despite the requirement that sources and owners be identified.  Further, an employee at the branch had "***confirmed verbally (in the presence of all 3 auditors) that the reason underlying beneficial owners … [were] not [being] identified is that it could cause problems for clients if Russian authorities requests information***."  Moreover, it was stated that "***[t]he branch has entered into highly profitable agreements with a range of Russian intermediaries where underlying clients are unknown***" –

an alarming finding.  As part of the overall conclusions, Group Internal Audit recommended "a full independent review of all non-resident customers."  Incredulously, and despite these findings, "***it was decided that there was no reason to inform 'the FSA [Estonian regulators] or others' of 'whistle blower findings' because 'we do not yet have any suspicion of money laundering***.'"

8.     Danish financial regulators had also been investigating the misconduct since at least 2014, but Danske Bank was intentionally less than forthcoming with those investigating its misconduct, and throughout the Class Period concealed the extent and severity of its culpability from such regulators, as well as from its investors.  The impact that the Company's illicit business practices had on its previously reported financial results, and the full extent of its impending regulatory culpability, remained concealed while Danske Bank ADRs traded at artificially inflated prices.  In the meantime, the Company sought and obtained several corporate debt rating increases to facilitate Danske Bank's raising of hundreds of millions of dollars by issuing and selling bonds in the European bond markets.

9.     The money laundering scheme, the extent of which ***still*** has not been fully exposed, is now being investigated or actively prosecuted by regulators in at least five countries – including by the U.S. SEC, Treasury Department, and Department of Justice ("DOJ").  Indeed, Defendant Borgen's home has been raided by Danish prosecutors who have charged him and at least nine other managers of Danske Bank, including Defendant Ramlau-Hansen, for their involvement in the money laundering scheme.  In the wake of the scandal, Danske Bank now faces billions of dollars in potential fines and penalties, with some analysts estimating that the ***fines could reach $8 billion***.

10.     In its own recently published yet incomplete internal review – which was not even started until September 2017 – Danske Bank found that the scheme was much larger than initially anticipated and had been facilitated by a lack of internal controls in its operations, ultimately demonstrating that more than $230 billion had flowed from Russia and other countries through the Company's tiny Estonian Branch – more than all the profits generated by corporations in Russia in a year.

11.     As the following graph illustrates, the market price of Danske Bank ADRs plummeted, as the market learned the extent of the Company's prior reliance on illicit profits to prop up the share price, and its resulting exposure to regulatory action, erasing billions of dollars in market capitalization and injuring investors.



## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Section 1331

and Section 27 of the 1934 Act.  Defendants expressly agreed to subject themselves to this Court's personal jurisdiction in connection with registering Danske Bank's ADRs for sale in the United States and/or otherwise availed themselves of the American capital markets.

13.     Venue is proper in this District pursuant to Section 27 of the 1934 Act, because certain of the acts and practices complained of herein occurred in this District and because Defendants expressly agreed to subject themselves to this Court's personal jurisdiction in connection with registering Danske Bank's ADRs for sale in the United States and/or otherwise availed themselves of the American capital markets.

14.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## III.     PARTIES

### A.     Plaintiffs

15.     On March 22, 2019, this Court appointed the Boston Retirement System and the New York Labor Funds (defined below) to serve as co-Lead Plaintiffs in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  ECF No. 46.

16.     Lead Plaintiff Boston Retirement System purchased Danske Bank ADRs as set forth in its previously filed certification, incorporated herein by reference, and has been damaged thereby.  *See* ECF No. 33-1.  Each of its Danske Bank ADRs was purchased in the United States by a U.S. based investment manager through a U.S. based broker and/or market maker.  The Boston Retirement System is an institutional investor that provides retirement benefits for the employees of the City of Boston, Massachusetts.  It had approximately 46,000 active and retired participants, representing approximately $6.8 billion in assets, as of January 1, 2018.

17.     Lead Plaintiffs Teamsters Local 237 Additional Security Benefit Fund, Teamsters Local 237 Supplemental Fund for Housing Authority Employees, and Plumbers & Steamfitters Local 773 Pension Fund (collectively, the "New York Labor Funds") purchased Danske Bank ADRs as set forth in their previously filed certification, incorporated herein by reference, and have been damaged thereby.  *See* ECF No. 37-2.  Each of its Danske Bank ADRs was purchased in the United States by a U.S. based investment manager through a U.S. based broker and/or market maker.  Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees are welfare funds benefiting approximately 24,000 New York public employees who work in New York City government agencies and in municipalities, libraries, and schools on Long Island.  Plumbers & Steamfitters Local 773 Pension Fund is a pension fund benefiting over 450 union trained plumbers, pipe fitters, steam fitters, refrigeration fitters, and service technicians in the Adirondack Region of New York.

### B.     Defendants and Relevant Entities

#### 1.     Danske Bank and Its ADR Program

18.     Defendant Danske Bank, headquartered in Copenhagen, Denmark, provides various personal banking, business banking, corporate and institutional, and wealth management products and services, along with mortgage finance, real-estate brokerage, foreign exchange and equity services, and also trades in fixed income products.  The Company currently operates 237 branches in sixteen countries, with operations in Denmark, Finland, Sweden, Norway, Ireland, the United Kingdom, and internationally.  Danske Bank is the largest bank in Denmark and a major retail bank in the northern European region with over 5 million retail customers.  Danske Bank is also the 100% owner and operator of Danske Markets Inc. in New York, a FINRA and SEC registered broker-dealer which purports to provide "U.S. institutional investors with access

to a broad range of opportunities to invest in securities listed on exchanges and markets in the

Nordic Region and other European countries by using the execution and settlement capabilities

of our affiliate, Danske Bank A/S."

19.     Danske Bank ADRs traded in an efficient market throughout the Class Period,

with its ordinary shares trading on the OMX in Copenhagen under the ticker symbol

"DANSKE.CO" and its ADRs trading largely in tandem on the U.S. over-the-counter ("OTC")

market under various ticker symbols such as "DNKEY."  An estimated 245 million Danske Bank

ADRs were registered for trading in the United States at various times during the Class Period.

ADRs "allow U.S. investors to invest in non-U.S. companies and give non-U.S. companies

easier access to the U.S. capital markets."  SEC Office of Investor Education and Advocacy,

"Investor Bulletin: American Depository Receipts," at 1 (August 2012).  Specifically, ADRs are

negotiable certificates issued by a United States depositary institution, typically a bank, and they

represent a beneficial interest in, but not legal title to, a specified number of shares of a non-

United States company.  A depositary institution itself maintains custody over the foreign

company's shares.  There were five depositary institutions for Danske Bank ADRs throughout

the Class Period, all headquartered in New York: Bank of New York Mellon ("Bank of New

York"), Citibank N.A. ("Citibank"), Deutsche Bank Trust Company Americas ("Deutsche

Bank"), J.P. Morgan Chase Bank N.A. ("J.P. Morgan") and Convergex Depositary, Inc.

("Convergex").

20.     Danske Bank ADRs were and are registered with the SEC through the filing of

Form F-6.  Danske Bank ADRs were unsponsored until February 9, 2016 at 9:00 a.m, which

means that the depositary institutions each filed Forms F-6 without Danske Bank's "formal

participation."  However, the Forms F-6 filed until the sponsored ADR listing do not evidence

any objections by Danske Bank to their registration.  Further, until October 2008, an issuer had

to apply to the SEC for a Rule 12g3-2(b) exemption and then provide information to the SEC on

an ongoing basis in order to maintain the exemption.  This requirement meant that an issuer

could prevent an unsponsored ADR program from being launched simply by not applying for the

exemption.  And, after 2008, "in practice, depositary banks typically obtain[ed] the issuer's

consent before establishing an unsponsored ADR facility."[2]  Further, Danske Bank made it

possible for depositary institutions to issue unsponsored Danske Bank ADRs by meeting the

requirements of 17 C.F.R. § 240.12g3-2(b), including posting its annual report in English on its

website, and periodically submitting voluntary supplemental material to the SEC pursuant to

Section 11(a) of the Securities Act, which included annual reports and press releases, among

other things.[3]

21.     Throughout the Class Period, Danske Bank's ADRs shared many of the five

significant characteristics typically associated with common stock.

(a)     First, depositary institutions transferred the dividends they received on

deposited Danske Bank common stock to the corresponding Danske Bank ADR owner.

(b)     Second, Danske Bank ADRs are negotiable: they are traded through U.S.

broker-dealers; collectively, the depositary institutions registered 245 million Danske Bank

ADRs during the Class Period; Danske Bank common stock, and presumably its ADRs, are

owned by many thousands of investors; and Danske Bank ADR holders may split or combine the

ADRs into new instruments as they see fit.  In effect, Danske Bank ADRs are tradeable in the

same manner as any other registered American security.

---

[2] *See, e.g.*, 2008 SEC ADR Rulemaking, 73 Fed. Reg. 52.752, 52.762 n.113 (Sept. 10, 2008).

[3] *See* 1991 SEC ADR Release, 56 Fed. Reg. 24.420, 24.422–23 (May 30, 1991).

(c)     Third, nothing in the Danske Bank ADRs restricts pledging or hypothecation.

(d)     Fourth, each of the Danske Bank ADR depositary institutions is or was willing to exercise the voting rights associated with the deposited Danske Bank common stock as directed by the Danske Bank ADR owners.

(e)     Fifth, Danske Bank ADRs have the same interest in the management, profit and assets of Danske Bank as investors in Danske Bank common stock because ADR value is directly linked to the value of Danske Bank common stock; Danske Bank ADRs decreased in value "in tandem" with the decrease in Danske Bank common stock price.

(f)     Thus, more broadly, the economic reality of Danske Bank ADRs is closely akin to stock.  They are designed to allow seamless investment in foreign companies akin to owning shares of U.S. companies—ADRs are denominated in U.S. dollars, cleared through U.S. settlement systems, and are listed alongside U.S. stocks.  Prospective investors in Danske Bank ADRs have electronic access to English translations of "information that is material to an investment decision" in Danske Bank's common stock, including annual reports, financial statements, and press releases.  17 C.F.R. § 240.12g3-2(b)(3)(i).  And Danske Bank ADR owners can obtain legal ownership of Danske Bank common stock in exchange for their ADRs at any time.  Accordingly, ADRs are consistently referred to and treated as securities by the parties, depositary institutions, the SEC, courts, and scholars.

22.     On August 10, 2005, J.P. Morgan filed a registration statement on Form F-6 for 20,000,000 ADRs, each representing one share of Danske Bank.  The registration statement certified that Danske Bank "furnishes the Commission with certain public reports and documents required by foreign law or otherwise under Rule 12g3-2(b) under the Securities Exchange Act of

1934 and that such reports can be inspected by holders of American Depositary Receipts and copied at public reference facilities maintained by the Commission in Washington, D.C." As part of the registration, J.P. Morgan also undertook "to make available at the principal office of the Depositary in the United States, for inspection by holders of the Receipts, any reports and communications received from the issuer of the deposited securities which are both (1) received by the Depositary as the holder of the deposited securities; and (2) made generally available to the holders of the underlying securities by the issuer." The registration statement was signed by a duly authorized representative of J.P. Morgan in New York. The transfer of the ADRs was also registerable "on the transfer books of the Depositary at the Depositary's Office in the City of New York," located at 4 New York Plaza, New York, New York 10004. The receipt also stated that "the issuer of the Shares currently furnishes the Securities and Exchange Commission . . . with certain public reports and documents required by foreign law or otherwise pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934." The ADRs purported to be governed by the laws of the State of New York. On February 9, 2006, J.P. Morgan filed an amendment to the earlier-filed Form F-6 which was identical except that each ADR would represent one-half of one share of Danske Bank.

23.     On March 3, 2006, both the Bank of New York and Deutsche Bank filed a registration statement on Form F-6 containing substantially the same terms as those previously filed by J.P. Morgan on Form F-6 on August 10, 2005, with each ADR representing one-half of one share of Danske Bank.

24.     On January 10, 2008, Citibank filed a registration statement on Form F-6 registering 100,000,000 ADRs containing substantially the same terms as those previously filed

by J.P. Morgan on Form F-6 on August 10, 2005, with each ADR representing one-half of one share of Danske Bank.

25.     On December 18, 2009, J.P. Morgan filed a registration statement on Form F-6 registering 20,000,000 ADRs containing substantially the same terms as those that it previously filed on Form F-6 on August 10, 2005, with each ADR representing one-half of one share of Danske Bank.

26.     On August 30, 2011, Citibank filed a registration statement on Form F-6 registering 50,000,000 ADRs containing substantially the same terms as those previously filed by J.P. Morgan on Form F-6 on August 10, 2005, with each ADR representing one-half of one share of Danske Bank.

27.     On November 12, 2014, Convergex filed a registration statement on Form F-6 for 5,000,000 ADRs.  The registration statement certified that Danske Bank published information in English on its website http://www.danskebank.dk/en-dk/Personal/Investment/Pages/Investment.aspx.  Around that time, on September 14, 2015, Danske Bank's website boasted that approximately 18% of the Company's shares were held by shareholders in the United States and Canada.[4]

28.     On January 28, 2016, Danske Bank filed a registration statement on Form F-6 with the SEC and registered 50,000,000 ADRs establishing a sponsored ADR program.  The registration statement listed J.P. Morgan as depository.  The registration statement certified that Danske Bank published information in English on its website http://danskebank.com.  Pursuant to the registration statement, J.P. Morgan undertook to "make available at the principal office of

---

[4] *See* https://web.archive.org/web/20150914021822/http://danskebank.com/en-uk/ir/Share/ownership/Pages/international-owners.aspx.

the Depositary in the United States, for inspection by holders of the American Depositary

Receipts, any reports and communications received from the issuer of the deposited securities

which are both (1) received by the Depositary as the holder of the deposited securities, and

(2) made generally available to the holders of the underlying securities by the issuer."

29.     Defendant Borgen certified on the registration statement, on behalf of Danske

Bank, that "[p]ursuant to the requirements of the Securities Act of 1933, Danske Bank A/S

certifies that it has reasonable grounds to believe that all the requirements for filing on Form F-6

are met and has duly caused this Registration Statement on Form F-6 to be signed on its behalf

by the undersigned, thereunto duly authorized, on January 28, 2016."  The registration statement

further appointed "Thomas F. Borgen and Henrik Ramlau-Hansen, and each of them, his or her

true and lawful attorneys-in-fact and agents, each with full power of substitution and

resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to

sign any or all amendments (including post-effective amendments) to this Registration Statement

and any and all related registration statements pursuant to Rule 462(b) of the Securities Act, and

to file the same, with all exhibits thereto, and other documents in connection therewith, with the

Securities and Exchange Commission, hereby ratifying and confirming all that said attorneys-in-

fact and agents, or any of them, or their substitute or substitutes, may lawfully do or cause to be

done by virtue hereof."  Defendants Ole Anderson, Thomas Borgen, Henrik Ramlau-Hansen, as

well as all members of the Danske Bank Board, executed the appointment.

30.     Further, pursuant to the deposit agreement filed in connection with the registration

statement, Danske Bank irrevocably agreed "that any legal suit, action or proceeding against the

Company brought by the Depositary or any Holder, arising out of or based upon this Deposit

Agreement or the transactions contemplated hereby, may be instituted in any state or federal

court in New York, New York, and irrevocably waives any objection which it may now or

hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the non-

exclusive jurisdiction of such courts in any such suit, action or proceeding.  The Company also

irrevocably agrees that any legal suit, action or proceeding against the Depositary brought by the

Company, arising out of or based upon this Deposit Agreement or the transactions contemplated

hereby, may only be instituted in a state or federal court in New York, New York.  The Company

has appointed Law Debenture Corporate Services Inc., 400 Madison Avenue, 4th Fl., New York,

New York 10017, as its authorized agent (the 'Authorized Agent') upon which process may be

served in any such action arising out of or based on this Deposit Agreement or the transactions

contemplated hereby which may be instituted in any state or federal court in New York, New

York by the Depositary or any Holder, and waives any other requirements of or objections to

personal jurisdiction with respect thereto."

   31. The registration statement was declared effective on February 9, 2016 at 9:00 a.m.

In a press release that same day, J.P. Morgan announced a forced conversion from the

unsponsored to the sponsored program, stating that "[t]he holders of the unsponsored ADRs of

Danske Bank . . . are being advised to surrender their old ADRs for new sponsored Danske Bank

ADRs issued by JPMorgan."

   32. According to the investor relations portion of Danske Bank's website (visited

August 1, 2019), the Company has "a sponsored level 1 ADR programme with J.P. Morgan as

depositary bank," through which "[t]wo ADRs represent one ordinary Danske Bank share and

are publicly traded over-the-counter (OTC) in the US."

   33. In its February 6, 2014, annual financial report (detailed below), Danske Bank

noted that its shares then traded both on the OTC in the United States and on the OTX in

Denmark, stating that it then "estimate[d] that shareholders outside Denmark, mainly in the UK and the US, [held] almost 48% of its share capital."  As of December 31, 2018, Danske Bank boasted that approximately 17% of its shareholders are based in the United States and Canada.

34.     According to Danske Bank, its ADRs traded on the OTC trading platform in the United States.  Danske Bank ADRs were and are quoted and/or traded on the OTC Bulletin Board ("OTCBB") and/or the Pink OTC Markets Inc. ("Pink Sheets" or "OTC Pink") during the Class Period.  The OTCBB is "[a]n interdealer quotation system for unlisted, over-the-counter securities.  The OTC Bulletin Board or 'OTCBB' allows Market Makers to display firm prices for domestic securities, foreign securities, and [American Depository Receipts] that can be updated on a real-time basis."  *OTCBB Glossary,* Financial Industry Regulatory Authority ("FINRA"), http://www.finra.org/Industry/Compliance/MarketTransparency/OTCBB/Glossary/ (last visited August 1, 2019).  The Pink Sheets are run by OTC Link.  OTC Link is an electronic inter-dealer quotation and trading system developed by OTC Markets Group.  It is registered with the SEC as a broker-dealer and an alternative trading system ("ATS").  OTC Link allows broker-dealers not only to post and disseminate their quotes but also to negotiate trades through the system's electronic messaging capability.  This feature enabled it to generally replace the OTCBB, which was a quotation-only system.

### 2.     The Individual Defendants

35.     Defendant Thomas F. Borgen ("Borgen") was, until he tendered his resignation on September 19, 2018, Danske Bank's Chief Executive Officer ("CEO") and a member of its Executive Board since September 2009.[5]  Critically, until June 2012, his areas of responsibility

---

[5] The Executive Board is tasked with ensuring "that the organizational structure . . . is robust and transparent and has effective lines of communication and reporting" and "that Danske Bank

*(continued . . . )*

included the Baltic banking activities.  Thereafter, from June 2012 to September 2013, Borgen

was Head of Corporates & Institutions.  Finally, on September 16, 2013, Borgen was appointed

CEO, which included supervisory obligations over day-to-day management at the Company.

Defendant Borgen resigned from his position as CEO on the same day the Company released its

report on the money laundering scheme at the Estonian Branch – September 19, 2018.

Throughout the Class Period, Defendant Borgen presented at a number of conferences in the

United States touting Danske Bank and its business, including: (1) June 2-3, 2015: New York

Deutsche Bank Global Financial Services Investor Conference; (2) February 9-10, 2016: New

York Roadshow Q4 2015; (3) July 26-29, 2016: New York Roadshow Q2 2016; (4) July 27,

2016: Boston Roadshow Q2 2016; and (5) July 26-27, 2017: USA Roadshow Q2 2017.

   36. Defendant Henrik Ramlau-Hansen ("Ramlau-Hansen") was, between 2011 and

April 1, 2016, the Chief Financial Officer ("CFO") of Danske Bank and a member of the

Executive Board.  Ramlau-Hansen served as the CEO of Danica, the life insurance subsidiary of

Danske Bank from 2000 to 2010.  Throughout the Class Period, Defendant Ramlau-Hansen

presented at a number of conferences in the United States touting Danske Bank and its business,

including: (1) September 8-9, 2014: New York Barclays Global Financial Services Conference;

(2) September 16-18, 2015: New York Barclays Global Financial Services Conference; (3)

February 9-10, 2016: New York Roadshow Q4 2015; and (4) February 11, 2016: San Francisco

Roadshow Q4 2015.

---

*( . . . continued)*
complies with all applicable governance requirements and that Danske Bank satisfies all local
governance standards, including relevant reporting requirements." Also, "[t]he Executive Board
is responsible for ensuring that Danske Bank has adequate procedures ensuring compliance with
applicable anti-money laundering and similar requirements."

37.     Defendant Jacob Aarup-Andersen ("Aarup-Andersen") was, between April 1, 2016 and May 2, 2018, the CFO of Danske Bank and a member of its Executive Board. Throughout the Class Period, Defendant Aarup-Andersen presented at a number of conferences in the United States touting Danske Bank and its business, including: (1) February 8, 2017: New York Roadshow Q4 2016; and (2) September 11-13, 2017: Barclays Global Financial Conference.

38.     Defendant Ole Andersen ("Andersen") was, until December 7, 2018, the Chairman of the Danske Bank Board of Directors (the "Board").

39.     Defendants Borgen, Ramlau-Hansen, Aarup-Andersen and Andersen are referred to herein as the "Individual Defendants."  Danske Bank and the Individual Defendants are referred to herein, collectively, as "Defendants."

40.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Danske Bank; and/or (iii) for knowingly or recklessly facilitating the money laundering scheme and AML violations at the Company's Estonian Branch.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Danske Bank ADRs was a success, as it: (i) deceived the investing public regarding Danske Bank's prospects and business; (ii) artificially inflated the price of Danske Bank ADRs; (iii) permitted Danske Bank to raise hundreds of millions of dollars issuing and selling bonds on more favorable terms due to its higher corporate debt ratings; and (iv) caused Plaintiffs and other members of the Class to purchase Danske Bank ADRs at inflated prices.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Origin of Danske Bank's Estonian Branch

41.     On November 9, 2006, Danske Bank announced its acquisition of Finnish-based Sampo Bank, which Danske Bank, in its public announcement to the market, described as "the

third largest bank in Finland with an extensive branch network, subsidiaries in Estonia, Latvia and Lithuania, and a recently acquired bank in Russia." The purchase price was just above €4 billion, with a little more than half allocated to goodwill in Danske Bank's subsequent annual report for 2006. The completion of the acquisition was announced on February 1, 2007. In addition to the activities in Finland, Sampo Bank had three smaller subsidiaries in the Baltics: AS Sampo Pank in Estonia, AB Sampo Bankas in Lithuania and AS Sampo Banka in Latvia.

42. Sampo Pank in Estonia traced its origin back to two Estonian banking entities established in 1992, in the immediate aftermath of the collapse of the Soviet Union, namely Eesti Forekspank and Eesti Investeerimispank, at a time when there were strong economic ties between Estonia and the Russian Federation. Following its establishment, Eesti Forekspank prioritized and developed a significant client base of retail and corporate customers from Russia, with a focus on cross-border payments and foreign exchange transactions (involving conversion of currencies). The Russian customers were principally from the Moscow region, where the bank opened an office in 1997, as well as the Saint Petersburg region.

43. In 1998, Estonia experienced a banking crisis caused in part by a deteriorating Russian economy. Later that same year, the Estonian Central Bank acquired the majority of the shares of both Eesti Forekspank and Eesti Investeerimispank, and the banks were merged under the name Optiva Pank, by then the third largest bank in Estonia. This was ultimately the bank that, in 2000 and 2002, Finnish-based Sampo Bank acquired and renamed Sampo Pank. Prior to 2007, Danske Bank had not been operating out of the Baltic countries.

**B.      Danske Bank's Estonian Operations Were Material to the Company's Overall Financial Performance and Generated Outsized Profits**

44. Between 2010 and 2012, Defendant Borgen, then head of the International Banking unit at Danske Bank, oversaw the Baltic Branch operations, which included

responsibility over the Estonian Branch.  Both during and after Borgen's direct oversight, the

Estonian Branch of Danske Bank prioritized its profits over AML compliance.

45.     Further, according to the B&H Report, by the end of 2013, the Non-Resident

Portfolio within Danske Bank's Estonian Branch held 44% of the total deposits from non-

resident customers in Estonian banks (up from 27% in 2007) and 9% of the total deposits from

non-resident customers in Baltic banks (up from 5% in 2007).  The Non-Resident Portfolio

customers were principally from Russia, the U.K., and the British Virgin Islands, as illustrated in

the graph below:



46.     The value of the deposits held by the approximately 10,000 customers in the Non-

Resident Portfolio increased from €0.4 billion at the end of 2007 to €1.0 billion at the end of

2014.  Compared to the total deposits of non-residents in Estonian banks, the percentage held by

the approximately 10,000 customers in the Non-Resident Portfolio at Danske Bank's Estonian

Branch increased from 27% at the end of 2007 to 44% at the end of 2013 and then dipped

slightly to 40% at the end of 2014.

47.    In the period from 2007 through 2015, customers in the Non-Resident Portfolio generated an increasing part of the profits in Danske Bank's Estonian Branch.  As shown below, the Non-Resident Portfolio generated up to 99% of profits for the Estonian Branch in 2013 before credit losses,[6] and up to 76% on a pre-tax basis[7]:

| Share in per cent | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Profits before credit losses | 49 % | 52 % | 50 % | 50 % | 69 % | 94 % | 99 % | 95 % | 47 % |
| Profits before tax | 51 % | 79 % | n/a | 67 % | 42 % | 51 % | 76 % | 71 % | 40 % |

48.    The Estonian Branch's share of the total profits generated by all of Danske Bank (excluding certain IT migration costs incurred in 2014 and 2015) was similarly impressive for such a relatively small operation.  At its peak in 2011, the branch generated more than 10 percent of the Company's profits before taxes:

| Share in per cent | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Profits before credit loss | 1.6 % | 2.4 % | 1 % | 1.5 % | 1.6 % | 1.3 % | 2.1 % | 1.7 % | 0.8 % |
| Profits before tax | 1.6 % | 9.9 % | n/a | 3.5 % | 10.7 % | 6.0 % | 4.2 % | 3.5 % | 0.9 % |

The Estonian Branch generated these outsized profits despite the fact that it was comprised of just 14 branch offices as of first quarter of 2012 out of a total of 627 branch offices across Denmark, Finland, Sweden, Norway, Northern Ireland, Ireland, and the Baltics.

---

[6] Profits before credit losses: total revenues, including internal costs, internal income and operating costs and expenses in general (except credit losses and tax).

[7] Profits before tax: total revenues, including internal costs, internal income and operating costs and expenses in general (except tax).

49.     The total gross income received directly by Danske Bank from non-resident customers in the Estonian Branch, including customers in the Non-Resident Portfolio, in the period from 2007 through 2015, was approximately DKK 1.5 billion or $226.6 million under current exchange rates.

### C.     Danske Bank Violated International Financial Reporting Standards

50.     Danske Bank improperly recognized revenue from payments it received from the aforementioned illegal transactions in violation of International Financial Reporting Standards ("IFRS").  The International Accounting Standards Board's ("IASB") Conceptual Framework for Financial Reporting requires that, for revenue to be recognized by an entity, it must be earned.[8]  Revenue is considered to have been earned when an entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.  As the illegal nature of the aforementioned transactions meant that Danske Bank was not entitled to certain profits it received from the Estonian branch that were recognized as revenue in its financial statements, such financial statements were misstated.

51.     Additionally, IFRS 15, *Revenue from Contracts with Customers* ("IFRS 15"),[9] states that revenue from contracts, such as interest, shall be recognized if the contract creates enforceable rights and obligations.  IFRS 15, ¶ 10.  IFRS 15 further states that "enforceability of the rights and obligations in a contract is a matter of law."  IFRS 15, ¶ 10.  As the transactions that gave rise to revenue recognized by Danske Bank were not enforceable by law (as they were illegal), such transactions did not meet the standards of revenue recognition as defined by IFRS 15.  Therefore, in the financial statements it issued during the Class Period, Danske Bank

---

[8] IASB Conceptual Framework for Financial Reporting, ¶ 93.

[9] IFRS 15 replaced International Accounting Standard 18, *Revenue* ("IAS 18"), on January 1, 2018.  IAS 18 was effective during the Class Period until January 1, 2018.

should not have recognized any revenue resulting from illegal transactions it participated in, and by doing so, it violated IFRS.

52.     Further, Danske Bank was required to record (or, at a minimum, disclose) the obligations it had to pay as restitution to various government regulators in its financial statements in accordance with IAS 37, *Provisions, Contingent Liabilities and Contingent Assets* ("IAS 37"). IAS 37 states that an entity shall recognize a provision as a liability when:

>   (a) an entity has a present obligation (legal or constructive) as a result of a past event;
>   (b) it is probable that an outflow of resources embodying economic benefits will be required to settle an obligation; and
>   (c) a reliable estimate can be made of the amount of the obligation. IAS 37, ¶ 14.

53.     The restitution that Danske Bank was aware it was or would be obligated to make to various government regulators met all the requirements above, as the then-present obligations (a) resulted from prior events, (b) would have resulted in an outflow of resources (cash), and (c) could have been estimated.  If, however, Danske Bank could not determine a reliable estimate in connection with its obligations, it was required to disclose the nature of the obligations as a contingent liability, including "an indication of the uncertainties relating to the amount or timing of any outflow" and "the possibility of any reimbursement."  IAS 37, ¶¶ 26, 86.

**D.     Applicable Anti Money Laundering Regulation**

54.     EU Directive 2005/60 ("Third AML Directive") was implemented into Estonian law on January 28, 2008, in the form of the Money Laundering and Terrorist Financing Prevention Act ("MLTFPA").

55.     Pursuant to this regulation, financial institutions had to perform customer due diligence, for example, when establishing a business relationship with a customer or when there was a suspicion of money laundering (or terrorist financing), regardless of any derogation,

exemption or threshold.  The customer due diligence measures included an obligation to establish the customer's identity (and, where applicable, the beneficial owner) and to obtain information on the purpose and intended nature of the business relationship.  The customer due diligence obligation is also referred to as "Know Your Customer" ("KYC").  Financial institutions had an obligation to conduct enhanced customer due diligence in situations which, by their nature, presented a higher risk of money laundering (or terrorist financing).

56.     Financial institutions were to conduct ongoing monitoring of the business relationship with every customer, including a scrutiny of the transactions.  The aim was to ensure that the transactions conducted were consistent with the institution's knowledge of the customer, the customer's business and risk profile, including, where necessary, the source of funds.

57.     Yet another important part of the regulation consisted of reporting obligations. For example, if a financial institution knew of, suspected, or had reasonable grounds to suspect a customer was engaging in money laundering (or terrorist financing), this information had to be reported to the Financial Intelligence Unit of the relevant state, which is a public law enforcement agency, in the form of a suspicious activity report ("SAR").

58.     According to advisory guidelines regarding the characteristics of transactions with a money laundering suspicion, issued by the Estonian Financial Intelligence Unit in January 2008 in connection with the regulation, typical grounds for suspicion warranting reporting included, *inter alia*:

- "cash payments to the client's account which will be used for purchasing securities or derivatives";

- "single unusually large [national or cross-border] payment not conforming to normal turnover and/or not sufficiently justified"; and

- "large payments of EUR 15,000 and/or smaller periodic payments with the clients of the banks located in the territories with higher money laundering risks."

59.     In addition, financial institutions were obligated to keep records of information and documents obtained during customer due diligence and any review of business relationships and transactions for a period of at least five years.

60.     In order to forestall money laundering (and terrorist financing), financial institutions were also obligated to establish adequate and appropriate policies and procedures of customer due diligence, reporting, record keeping, internal control, risk assessment, risk management, compliance management and communication.

61.     Principles similar to those described above also applied in Estonia prior to the implementation of the Third AML Directive in January 2008, although to a lesser extent.  With the implementation of the Third AML Directive into Estonian law, the obligations for financial institutions were significantly strengthened.

**E.      Danske Bank's AML Compliance and General Reporting Structures**

62.     During the relevant period, Danske Bank's risk management structure was organized in a "three-lines-of-defense" model.  The first line of defense consisted of the day-to-day operational management, which managed risk in the business units (including the business units in the Estonian Branch).  The second line of defense was performed by the risk, compliance and AML functions, which were responsible for overseeing, monitoring and challenging the risk exposures of the Company's business units and were responsible for implementation of efficient risk management and compliance procedures.  Finally, the third line of defense was with functions that provided independent assurance and assessments – principally the Group Internal Audit.

63.     As a function of overseeing the compliance and AML areas in the Company's business units (first line of defense), Group Compliance & AML formed part of the second line of defense.  The name of the unit changed over time, but is generally referred to herein as Group

Compliance & AML.  Starting in September 2014, the Head of Group Compliance & AML reported directly to the CFO, as opposed to the Head of Group Legal, as was the case prior to September 2014.

64.     Group Internal Audit constituted the third line of defense and was entrusted with internally auditing all companies and certain other entities within the Danske Bank Group. Group Internal Audit was headed by the Chief Audit Executive, who was appointed by the Board of Directors.

65.     Danske Bank's entity in Estonia, Sampo Pank, became a branch of Danske Bank in 2008 and changed its name to Danske Bank in November 2012.  The Estonian Branch had its own Executive Committee.  Baltic Banking was the first level above each of the three Baltic branches (Estonia, Latvia and Lithuania), forming a link between the Baltic banking activities and Danske Bank Group in Copenhagen.  There was also a joint board of directors for the Baltic entities, the Baltic Advisory Board with members from Danske Bank Group, as well as a Baltic Executive Committee.  Prior to the new operational model introduced in June 2012, Baltic Banking reported to the Head of International Banking Activities, which formed part of Defendant Borgen's ultimate executive responsibilities as member of the Executive Board from September 2009 until June 2012.  In June 2012, the Baltic banking activities were moved to Business Banking.  Starting in June 2012, the Head of Business Banking, Lars Mørch, was a member of the Executive Board and had ultimate executive responsibility for the Estonian Branch.

66.     The line of business reporting (first line of defense) from the Estonian Branch to Danske Bank Group developed over time from a reporting line of three stages in 2007 to four stages in September 2009 to five stages in April 2014:



67.     The Board of Directors is entrusted with the overall and strategic management of

Danske Bank, including responsibilities to monitor compliance and risk management.  From

2007 to 2017, the Board of Directors consisted of eight members elected at the general meeting

and four employee representatives.  The Audit Committee is a board sub-committee with

members appointed from the Board of Directors.  It supervises accounting and auditing and,

starting in 2012, was also responsible for compliance and AML on behalf of the Board of

Directors

68.     The Executive Board is responsible for the day-to-day management of the Company and is chaired by the CEO.  Its obligations include ensuring the Company's organizational structure is robust and transparent and has effective lines of communication and reporting, including in relation to compliance and AML.

69.     Group Legal provides legal advice and services internally at Danske Bank.  The Head of Group Legal reported directly to the CEO until 2012, but starting in 2013, reported instead to the CFO, who was a member of the Executive Board.  Until September 2014, Group Legal was responsible for Group Compliance & AML.

**F.     AML Violations and Red Flags**

70.     In March and April 2007, the Estonian Financial Supervisory Authority ("Estonian FSA") carried out an inspection at Sampo Pank in Estonia, which focused on the bank's non-resident customers.  The final inspection report was issued on August 16, 2007.  On September 20, 2007, the branch sent an English translation of the summary of the inspection report to Danske Bank's Group Compliance & AML in Copenhagen, which shared it with Group Legal.  According to the English summary, actual AML practices at the branch attracted criticism, especially with respect to Know Your Customer information, as the Estonian FSA wrote that "the Bank's routine practice has not been fully in compliance with the requirements stipulated in valid legal acts and international standards."

71.     The Estonian FSA concluded that "***the Bank has underestimated potential risks, associated with providing services to legal entities registered in a low-tax area and undue compliance with relevant procedure rules***."  As for non-resident customers in particular, the Estonian FSA stressed the "additional risks" involved and found that "the actual activity of the Non-resident Customers Department aimed at examining the activities of clients ***is not in***

- 27 -

*compliance with international practice and is not sufficient, regarding the specifics of the activities of this particular client group and associated risks*."

72.     In a letter dated June 8, 2007 to the Danish Financial Supervisory Authority "Danish FSA" or "DFSA"), the Russian Central Bank expressed concern with regard to non-resident customers of Sampo Pank in Estonia.  The letter stated that "clients of Sampo Bank permanently participate in financial transactions of doubtful origin" estimated at "billions of rubles monthly."  After a description of one of these transactions, the Russian Central Bank further stated that "the mentioned transactions can be aimed at tax and custom payments evasion while importing the goods, or giving the legal form to the outflow of the capital, or *they can be connected with the criminal activity in its pure form, including money laundering*."

73.     On June 18, 2007, the Danish FSA forwarded this letter to the Executive Board of Danske Bank and asked for its comments in English.  The letter from the Russian Central Bank was on the agenda at meetings of both the Executive Board and the Board of Directors on August 7, 2007.

74.     Group Legal and Group Compliance & AML replied to the Danish FSA on behalf of the Company by letter dated August 27, 2007.  The reply made reference to the recent inspection report from the Estonian FSA and falsely stated that the Estonian FSA's "conclusion of the inspection was that the bank complies with the existing laws and regulations," and that the Estonian FSA had had no "material observations."  The reply also stated that the AML concept of Danske Bank had been implemented at its Estonian subsidiary, and that reporting lines had been set up.  The Danish FSA convened a meeting with the Company on September 3, 2007, at which Group Legal provided equally false but reassuring information.

- 28 -

75.     In 2008, Sampo Pank in Estonia was officially turned into a branch of Danske

Bank, as was planned at the time of the acquisition in November 2006.  Part of that plan had

been to migrate the Baltic subsidiaries onto the Group IT platform to secure access to

information of the business and minimize operational risks.  In August 2008, however, after

feeling the effects of the financial crisis, this plan was abandoned, as migration was thought to be

too expensive and take up too much capacity.  Because of the high-risk nature of banking

activities at the Estonian Branch, it was made clear at the time that the cancelled IT migration

instead required additional initiatives in the area of compliance.

76.     In June 2009, the Estonian FSA performed a follow-up AML inspection to its

inspection in 2007 at the Estonian Branch.  This resulted in a final inspection report of October

15, 2009, written in Estonian.  By the end of October 2009, the branch provided Group

Compliance & AML with an English summary.  According to the summary, the Estonian FSA

wrote that, "*[t]he documents and information about customers and their activities reviewed in*

*the course of the on-site inspection did not comply with the requirements of legislation and/or*

*the internal procedures of the Branch in all cases*."  The Estonian FSA stressed "the

importance of obtaining the relevant information, especially about the beneficial owners,

ownership and control structures and economic activities of customers in order to guarantee that

the Branch and the entire financial system of Estonia function in a manner that is trustworthy and

in compliance with international standards."  *See* Section IV.D., *supra*.

77.     According to the B&H Report, news reports in 2010 also raised red flags

concerning the Estonian Branch's AML compliance.  On January 4, 2010, *Barron's* published an

article linking a specific company to the Estonian Branch and a North Korean arms smuggling

case in Thailand.  Similarly, on January 25, 2010, Estonian media linked the Estonian Branch to

an alleged money laundering scheme involving a currency exchange company and a specific customer.  On January 28, 2010, this story was, in short form, reflected in Danish media when another Danish bank stated that the matter related to Sampo Pank.  This gave rise to questions at the corporate level, and the matter came up again in March 2010 among members of the Executive Board following discussions with one of Danske Bank's correspondent banks.  Subsequent media reports have identified Deutsche Bank, Bank of America, and J.P. Morgan as the correspondent banks with which Danske Bank dealt during the Class Period.  Both Deutsche Bank and J.P. Morgan issued Danske Bank ADRs during the Class Period.

79.      Also according to the B&H Report, specific AML concerns about the high number of SARs being filed by the Estonian Branch, ***representing 30% of all filed SARs in the country***, were discussed in 2010 during meetings of the Executive Board.

79.      On August 26, 2011, Group Internal Audit issued an audit report on compliance and AML at the Estonian Branch which stated that, "although the risk analyses are made, the AML procedures are done and the regular reporting to local management and Group Compliance is in place, ***there are several deficiencies in mandatory documentation***."

80.      On February 13, 2012, the Danish FSA approached Group Compliance & AML in connection with a letter from the Estonian FSA concerning "***a number of serious AML/CFT issues in the Estonian branch***."[10]  In its request, the Danish FSA made reference to a "survey within Estonian credit institutions and foreign branches," which the Estonian FSA had pointed to in its letter.  The letter further stated, about the Estonian Branch, that "***[t]he relatively big concentration of the business relationships from risk countries in Branch is not accidental***"

---

[10] AML/CFT generally refers to Anti Money Laundering and Combating the Financing of Terrorism.

and that "*the same risk patterns*" *had been identified by the Estonian FSA during its inspections in 2007 and 2009*.  On this basis, the Danish FSA requested comments from Defendants on the matters set out in the letter, as well as the lack of actions taken by the Estonian Branch.

81.     According to the B&H Report, in a letter dated April 3, 2012 to the Danish FSA, the Company stated that Group Compliance & AML planned to visit the Estonian Branch in May 2012.  This visit took place on May 7, 2012.  Observations from the visit were reflected in an appendix to the report from Group Compliance & AML for the first half of 2012, which disclosed in relevant part that, "*[a]s of today incoming payments are not screened* and this might be one of the focus areas going forward."  The report from Group Compliance & AML also mentioned the Company's reply in 2012 to the Danish FSA "regarding the high market share of high risk customers (*e.g.* offshore or Russian customers)."

82.     Similar statements to the one in the appendix about lack of screening of incoming payments were included in the Group Compliance & AML report for the first half of 2013 to the Executive Board and the Audit Committee and also in the annual Group AML report for 2013 to the Board of Directors.

83.     In connection with Danske Bank's application to open a branch in New York, the Company produced an AML action plan to the US Federal Reserve.  At a Board of Directors meeting on September 6, 2012, the Board rejected the first action plan presented to it.  According to the B&H Report, in minutes of that meeting, it was stated that "*the AML issues had been known for a long time, actually several years*" *and that the Board of Directors was not comfortable with issuing a declaration to the Federal Reserve about the AML issues* "*at the present stage*."

84.     At the end of 2012, Danske Bank's AML responsible person retired.  A new AML responsible person, as required under Danish law, was not appointed until November 7, 2013.

85.     On April 25, 2013, the Estonian Branch had a meeting with the Chairman of the Board of the Estonian FSA.  According to the B&H Report, minutes of the meeting reflect that the Estonian FSA warned that "***risk appetite in Estonian Danske A/S looks above the average comparing with Estonian banking sector in general***."  The minutes also stated that "[t]he FSA underlines that Know Your Customer Policy must be observed not only in written procedures but also in everyday business activities" and that "[i]t is important to know where and how the customer makes business and that would be in compliance with transactions in bank account."  According to the minutes, "both parties found that it is very important to realize bigger risks with non-resident customers and take all possible measures to reduce and minimize them," and the Estonian FSA stressed the high risk represented by "financial mediators."

86.     In June 2013, a member of the Executive Board was contacted by one of Danske Bank's correspondent banks[11] with a view to terminating the correspondent banking relationship specifically because of AML concerns.  Subsequent media reports have identified J.P. Morgan as the correspondent bank which terminated its correspondent banking relationship with Danske Bank because of AML concerns.  Ultimately, and in agreement with the correspondent bank in question, the Estonian Branch sent a closure notification terminating the correspondent banking relationship, effective August 1, 2013.  Following the termination, another correspondent bank accepted to expand its cooperation with Danske Bank to include the Estonian Branch.

---

[11] For purposes of clearing USD payments, the Estonian Branch had its own correspondent banks.

87.     The termination of a correspondent banking relationship with the Estonian Branch led to a business review of the Non-Resident Portfolio at the initiative of members of the Executive Board in 2013.  As part of this review, Business Banking reported that "***over-normal profit is usually a warning sign, superior service or not***," and expressed concern that "***the lack of price-sensitivity with some customers is due to other factors than good service***."  For its part, Group Compliance & AML stated that "the business volume (transactions) with non-resident customers in Estonia" was larger than expected.  Also, the presence of so-called intermediaries in the form of "non-regulated entities" was questioned.

88.     On October 23, 2013, there was a Business Banking Performance Review Meeting for the third quarter of 2013 with the CEO and three other members of the Executive Board present, at which the Non-Resident Portfolio was discussed.  According to the minutes, the "initial take" presented by a member of the Executive Board was "that the size of Danske Bank business undertaken with this category of customer is larger than DB peers, and the proportion of business needed to be reviewed and potentially reduced."  Also according to the minutes, the CEO "emphasized the need for a middle ground, and wanted to discuss this further outside of this forum," and the previously mentioned member of the Executive Board "agreed to hold a meeting when Business Banking had finalized its conclusions."  A new action point to this effect was added with a deadline in November 2013, with Business Banking listed as being responsible.  The B&H Report candidly concedes that it has not located any evidence of follow-up.

89.     On December 27, 2013, an employee with the Estonian Branch filed a whistleblower report concerning the Non-Resident Portfolio.  Over the following months, the whistleblower made further allegations and it was decided among the four recipients of the

whistleblower report that Group Internal Audit should conduct an investigation into the allegations, using employees from outside the Estonian Branch.  The Executive Board was so informed at its meeting on January 7, 2014.  The Audit Committee was also given information about the investigation by Group Internal Audit at a meeting on January 27, 2014.

90.     As a result of its investigation into the allegations by the whistleblower in early 2014, Group Internal Audit produced two audit letters in January and February 2014, which were addressed to members of the Executive Board, but not shared with the Estonian Branch.  In the audit letter of January 13, 2014, Group Internal Audit confirmed some of the allegations made by the whistleblower, including that documents provided by some customers when opening accounts were found to be insufficient.  ***Group Internal Audit also pointed to the potential risk of a customer having been "tipped off" (implying that the customers had been colluding with employees at the Estonian Branch)***.  More generally, it was noted that "ongoing monitoring" was performed manually by account managers, who were responsible for so many customers that it was "***in fact impossible to perform the monitoring in an effective and efficient way***."

91.     From February 3 through February 6, 2014, Group Internal Audit conducted an on-site audit at the Estonian Branch.  Auditors were provided with a memo from October 2013 to the Estonian Branch's executive committee titled "Solutions in the Non-resident Intermediaries customer segment using bonds" (the "OFZ memo," OFZ being Russian government bonds).  The OFZ memo was presented to members of the Executive Board on December 17, 2013, and presented a "solution" for Estonian Branch customers to use bonds "as a faster, cheaper and more reliable way . . . to transfer money overseas than making an international payment through a domestic Russian bank."  The OFZ memo elaborated that "the solution" was "highly profitable."  It further detailed two risks: (i) "We do not have full knowledge about the end-

clients of the Intermediary"; and (ii) "[t]here is potential reputational risk in being seen to be assisting 'capital flight' from Russia."

92.    According to an October 5, 2018 article from the *Financial Times* titled "Danske Bank memo shows how Russians moved money," this type of transaction is called a "mirror trade," where Russian clients buy securities in roubles and then sell identical securities for foreign currencies, such as US dollars.  Mirror trades are a red flag for money laundering. According to the *Financial Times*, the memo acknowledged that "[t]his is anyway a risk we run in other parts of our non-resident business, where the natural currency flow is always out of Russia. [ . . .] ***Given the strong income from the solution, the risk-return is seen as very attractive***."  An earlier draft on the memorandum also specifically stated that this solution "could be used for money-laundering."

93.    On February 5, 2014, Group Internal Audit presented its draft conclusions of the audit in an email forwarded to two members of the Executive Board and in turn shared with other members, including the CEO.  The draft conclusions stated that "***we cannot identify actual source of funds or beneficial owners***" and also that an employee with the branch had "***confirmed verbally (in the presence of all 3 auditors) that the reason underlying beneficial owners are not identified is that it could cause problems for clients if Russian authorities requests information***."  Moreover, the draft conclusions stated that "***[t]he branch has entered into highly profitable agreements with a range of Russian intermediaries where underlying clients are unknown***."  As part of the overall conclusions, Group Internal Audit recommended "a full independent review of all non-resident customers."

94.    Following this report, Defendants decided to permit no new accounts at the Estonian Branch, closed all intermediary business, and instructed an independent consultant to

look at AML procedures and controls at the Estonian Branch.  Despite being on the agenda for discussion, no HR matters were addressed and, incredulously, per the B&H Report, "*it was decided that there was no reason to inform 'the FSA or others' of 'whistle blower findings' because 'we do not yet have any suspicion of money laundering*.'"

95.     On February 17, 2014, an external consultant was engaged by Group Compliance & AML to evaluate internal AML procedures and controls at the Estonian Branch.  The consultant provided a draft report on March 31, 2014, and a final report on April 16, 2014, both of which were sent to Group Compliance & AML and shared with some members of the Executive Board.  In connection with its draft report, the consultant wrote that "[b]ased on our experience in conducting such engagements, you do not have as many low impact issues as some of your peers, *but your critical gaps (e.g. regarding risk assignment, transaction monitoring, level of CDD [Customer Due Diligence] applied) are greater than we've seen in other banks in the region*."  In response to a question about whether there had been breaches of AML regulations, the consultant limited itself to general remarks and a statement to the effect that "[c]ertain specific local legislation gaps do however exist."  The report also noted shortcomings in relation to insufficient monitoring of transactions and identified no less than 17 "control deficiencies" that all were assessed as "critical or significant."

96.     On April 11, 2014, the Executive Board was given a presentation by one of its members titled "Status Danske Bank Estonia Branch."  The presentation, which had been prepared by employees within Business Banking, contained three slides titled "Timeline for Whistleblower Case and Audit Reports," and listed some of the whistleblower allegations as well as findings by Group Internal Audit and the external consultant.

97.    In the spring and early summer of 2014, different work streams were tasked with conducting the whistleblower investigation.  Principally, Group Legal took over handling of the matter from Group Internal Audit.  As part of this change, Group Legal contracted with an external consultant to conduct an "inquiry into allegations of misconduct" on the basis of the whistleblower and "critical information on a number of irregularities involving senior members of staff."  "***This [investigation], however, was overturned by two members of the Executive Board***," according the B&H Report.

98.    Ultimately, while some of the whistleblower allegations were investigated by Defendants at this time, the B&H Report concluded that "[w]e have found no information about additional investigation [by Danske] into the whistleblower allegations."  In sum, many of the whistleblower allegations were ignored by Defendants.

99.    At this time, while internal audit continued to criticize operations of the Estonian Branch, the Board of Directors met to discuss the strategic direction of that branch.  The minutes of the meeting of the Board of Directors on June 26, 2014, contained the recommendation of "an exit of Personal Banking" and "off-shore business" presented by a member of the Executive Board.  The minutes also state: "[CEO (Borgen)] emphasised that the Baltic countries are important for many of the Bank's Nordic corporate clients and particularly the Finnish customers.  Further, ***[CEO (Borgen)] found it unwise to speed up an exit strategy*** as this might significantly impact any sales price.  Lastly, [CEO (Borgen)] and [name (redacted)] explained the development of the Baltic countries.  The preferred option would be to support Nordic corporate clients, but a closer review of the business case needed to be undertaken, concluded [CEO (Borgen)]."  Subsequent meetings of the Board and Defendants were confined to discussions of how to best wind down the operations of the Estonian Branch.

100.     The Estonian FSA also performed an inspection of the branch in June and July 2014, this time into performance of AML requirements.  The introduction (a summary) of the draft report of September 11, 2014 was translated into English by the Estonian Branch, and stated that "***Danske Bank systematically established business relationships with persons in whose activities it is possible to see the simplest and most common suspicious circumstances***."  A number of details were reported, which led to the observation that "[w]e have therefore systematically identified situations during our on-site inspection where Danske Bank's system for monitoring transactions and persons is effectively not working."  In the draft report, the Estonian FSA voiced its suspicion that the branch's "***economic interests prevail over the obligation to apply enhanced due diligence measures***."

101.     An employee with Group Compliance & AML stated that "***[t]he executive summary of the Estonian FSA letter is brutal to say the least and is close to the worst I have ever read within the AML/CTF area***" and that "if just half of the executive summary is correct, then this is much more about shutting all non-domestic business down than it is about KYC procedures."  The email urged that the CEO and another member of the Executive Board should be informed of the letter.

102.     Amid these revelations, on September 9, 2014, Defendant Ramlau-Hansen presented in New York at the Barclays Global Financial Services Conference.  In the presentation, Defendant Ramlau-Hansen touted Danske Bank's strong financial performance, strong market share in Estonia, the bank's mission of "openness and transparency," and the strong growth in Business Banking, of which Estonia was a part.  Defendant Ramlau-Hansen also presented on the "positive effect from [the] strong focus on cost savings," which led to a significant reduction in costs for the first half of 2014.

- 38 -

103.    Also amid these revelations, and as presented on a conference call on December 15, 2014, by Defendant Ramlau-Hansen, Danske Bank announced that it was taking a write-down on goodwill related to its "business activities in Finland, Northern Ireland, and Estonia." Defendant Ramlau-Hansen falsely stated, as the Company was secretly winding down its main profit center in Estonia because of AML concerns, that "this is primarily a technical accounting exercise based on our ordinary annual goodwill impairments test, a change in the macroeconomic condition, and also coinciding with the dialogue we have had with the Danish FSA.  The dialogue with the FSA has concerned what longer-term model assumptions to base goodwill impairments test upon.  ***The goodwill calculation is not related to expected short-term performance of the affected business areas.***"  Defendant Ramlau-Hansen falsely added that "[t]he write-down of goodwill will not affect our capital ratios and ***will not affect Danske Bank's ongoing business or the strategy for the involved units***."

104.    The presentation accompanying the conference call provided more detail on the portion of the goodwill impairment attributable to "Business Banking Estonia" at DKK 2,058,000.  The slide reiterated the false statement that "[t]he goodwill impairments do not reflect the expected short-term developments at the individual business units."



Financial results for 2014

## Goodwill impairments: Goodwill write-down of DKK 9.1 bn for Finland, Northern Ireland and Estonia



**Goodwill impairment charge by business area (DKK m)**

| Business area | Charge |
|---|---|
| Personal Banking Finland | 3,493 |
| Business Banking Finland | 1,501 |
| Personal Banking Northern Ireland | 2,046 |
| Business Banking Estonia | 2,058 |
| Total goodwill impairment charge | 9,099 |

**Goodwill drivers**

- The goodwill impairments are the result of assumptions about weaker long-term macroeconomic developments
- More conservative model assumptions for future income streams concern deposit margins, interest rates, growth and impairment levels
- The goodwill impairments do not reflect the expected short-term developments at the individual business units
- Remaining goodwill amounts to DKK 9.5 bn

**Goodwill, end-Q4 2014 (DKK bn)**

| PB Finland | BB Finland | PB N.Ireland | C&I Banking | C&I Markets | Danske Capital | Others | Total |
|---|---|---|---|---|---|---|---|
| 2.8 | 1.2 | 0.1 | (0.5) | 2.9 | 1.8 | 0.1 | 9.5 |

105.     On a February 3, 2015, conference call with analysts, Defendant Borgen reiterated the same false statement, noting that "[f]inally, in the last quarter of 2014, we took an impairment charge of DKK9.1 billion on goodwill related to our activities in Finland, Northern Ireland and Estonia. ***The charge was based on assumptions of weaker long-term macroeconomic developments, and it does not reflect our short-term expectations for the business units***."

106.     On May 6, 2015, Danske Bank was contacted at the Group level by a correspondent bank clearing USD transactions for the Estonian Branch. The correspondent bank requested that "all payments on behalf any Shell Company does not get routed" via the correspondent bank. On July 16, 2015, Danske Bank at the Group level was approached by another correspondent bank, which cleared most USD transactions out of the Estonian Branch.

- 40 -

According to the B&H Report, "internally at Danske Bank, it was stated that the correspondent bank 'did not want to go into detail, but *made it clear that they had found some payments that they were not comfortable with*.'"  Further, as relayed by the B&H Report, at this time, Group Compliance & AML also stressed that "we should be mindful that we have a really bad case in Estonia, where . . . *all lines of defence failed*.  (1st line: too much risk and not being in control, 2nd line: lack of robust monitoring and overview of SARs [suspicious activity reports]; 3rd: Green audit reports all the time until a new auditor from Group stopped by)."

107.    On September 16, 2015, Defendant Ramlau-Hansen presented in New York at the Barclays Global Financial Services Conference.  In the presentation, Defendant Ramlau-Hansen touted Danske Bank's strong financial performance, recent credit ratings upgrades, the bank's "vision . . . to be recognized as the most trusted financial partner," and the bank's "core value[]" of integrity.  Defendant Ramlau-Hansen also touted the 40 percent growth in business banking compared to 2014, of which the Estonian branch was a part, and the ongoing cost management initiatives.  Defendant Ramlau-Hansen also presented on "strengthening business banking activities" as a result of the bank's recent business review.

108.    On February 9, 2016, Danske Bank held an "Investor Day" in New York during which Defendants Borgen and Ramlau-Hansen presented.  The presentation by Defendant Borgen in New York highlighted that Danske Bank's vision was to "be recognized as the most trusted financial partner" and that one of the bank's "core values" was "Integrity."  The presentation by Defendant Borgen also highlighted the performance of the Business Banking segment and touted ratings upgrades received by Danske Bank since 2013, as well as the bank's strong CET1 capital ratios.

109.    At the meeting of the Board of Directors on May 26, 2016, a member of the
Executive Board explained that "a thorough compliance clean-up had been performed by the
Bank with respect to the former non-resident business in Estonia."  Prior to the meeting, the
Board of Directors had received a document dated May 18, 2016 and titled "Baltic banking
overview and repositioning update," which stated that "[t]he non-resident customer business was
fully closed at the end of 2015, addressing a significant compliance and reputational risk for the
Group."

### G.    Defendants Utterly Failed to Comply with AML Regulations

110.    As this sordid chronology reveals, Defendants utterly failed at implementing
effective AML measures in the face of not just red flags, but of glaring violations of AML
procedures, repeated reports by domestic and foreign regulators highlighting critical deficiencies
in AML compliance, and specific whistleblower allegations related to ongoing criminal activity
by Estonian Branch clients.  As the B&H Report concluded:

> AML procedures at the Estonian branch in relation to the Non-Resident Portfolio
> ***were manifestly insufficient and inadequate and in breach of international
> standards as well as Estonian law***.  This was so even though the non-resident
> customers were categorized as high risk. Shortcomings included the following, ***as
> established in 2014*** by Group, the external consultancy and the Estonian FSA:

| Obligations for a financial institution | AML failings re the Non-Resident Portfolio |
|---|---|
| **Due diligence measures.** Identify and verify the customer (and (ultimate) beneficial owners where applicable) and obtain information on the purpose and nature of the business relationship | • Lacking knowledge of customers<br><br>• Lacking identification of (ultimate) beneficial owners and "controlling interests"<br><br>• Customers included so-called intermediaries, which were unregulated and represented unknown end-customers |
| **Monitoring of transactions and screening.** Scrutiny of transactions to ensure that the transactions are consistent with the information on the customer and the business and risk profile | • Insufficient attention to customer activities<br><br>• Lacking identification of the source and origin of funds used in transactions<br><br>• No screening of customers against lists of politically exposed persons<br><br>• No screening of incoming payments against sanctions or terror lists<br><br>• In general, no automatic screening of incoming payments |
| **Reporting.** Notification to authorities in case of reasonable grounds to suspect money laundering | • Lack of response to suspicious customers and transactions |

111.    The B&H investigation also established that at least 177 customers received payments from two banks involved in the "Russian Laundromat" scandal and from 21 "core companies" mentioned by the media related thereto.  The Russian Laundromat was a scheme to move up to $80 billion out of Russia from 2010 to 2014 through a network of global banks.  *The Guardian* reported that around 500 people were suspected of being involved, many of whom

were "wealthy Russians."  Danske Bank was featured prominently in leaked records with 1,567 transactions, accounting for a cash flow of approximately $1.2 billion.

112.    Similarly, the B&H investigation also established that 75 customers of the Estonian Branch made payments with private persons and corporate entities outside of the Estonian Branch that, according to media, were involved in the €2.5 billion "Azerbaijani Laundromat."  The Azerbaijani Laundromat was a complex money-laundering operation and slush fund that handled $2.9 billion over a two-year period through four shell companies registered in the UK.  From 2012 to 2014, even as the Azerbaijani government arrested activists and journalists wholesale, members of the country's ruling elite were using this secret slush fund to pay off European politicians, buy luxury goods, launder money, and otherwise benefit themselves.

113.    The failures in AML procedures were so severe that Danske Bank has filed SARs for 42 employees and agents that it deems suspicious for (1) involvement in payments with suspicious counterparties, (2) significant cash deposits that seem suspicious, (3) involvement in suspicious payments with other employees, and (4) relationships with one or more customers.  In accordance with AML regulation, employees or agents are deemed to be suspicious only if a suspicion has been identified and it has not been possible for the investigation to disprove the suspicion.

114.    The information available through the portfolio investigation has also led to reports to the Estonian police in relation to eight former employees, where the investigation has identified suspicious behavior to such an extent that criminal activities is rendered probable – a higher threshold than that which applies to an SAR.

### H.      The B&H Report Tepidly Addresses "Legal Obligations" of Danske Bank Employees

115.     The B&H Report also claimed to assess whether individuals at Danske Bank complied with their legal obligations, concluding that "*a number of former and current employees in leading positions have not complied with their legal obligations under their employment terms and contracts with Danske Bank*."  While laying the bulk of the blame on the first line of defense at the branch level, the B&H Report nonetheless acknowledged that "[e]lsewhere in Group, we have found breaches of legal obligations with respect to a number of more specific matters . . . ."  The B&H Report elaborated:

> In 2007, 2012 and 2013, the Danish FSA requested information from Group about the Non-Resident Portfolio at the Estonian branch. In response, Group provided comforting information also including AML procedures at the Estonian branch. The reply from 2007 in response to information from the Russian Central Bank gives rise to particular criticism as, in its reply in 2007, Danske Bank stated that a recent inspection by the Estonian FSA had not given rise to "any material observations." It would have been more correct to conclude the opposite.
>
> *                *                *
>
> *As a whole, there was a complete break-down in all three lines of defence*. The lack of involvement from Group meant that the Estonian branch was left on its own, and that Group did not have sufficient oversight of the activities at the branch. This was further impaired by the lack of migration of the Baltics branches onto the Group IT platform. Following the whistleblower report of 27 December 2013 and Group Internal Audit's audit letters of 13 January and 7 February 2014, it was clear that actions were needed, and certain initiatives were taken through the working group set up by Group. Many of the action points defined by the working group were sound, but actions taken turned out to be insufficient with a number of processes not brought to an end.
>
> *                *                *
>
> *For one thing, the whistleblower allegations were not properly investigated, concluded and reported upon*. Moreover, the Danish FSA was not informed until January 2015 about the fact that information provided to the Danish FSA in 2012 and 2013 (leaving aside 2007) had proven to be incorrect. Branch management had provided information about "resilient" AML procedures prior to 2014, which turned out to be flatly wrong. Yet, in 2014 no steps were taken against the branch management.

*     *     *

We note that the presence of a severe AML risk had been acknowledged by one department at Group level, but no appropriate steps were taken to assess and mitigate the risk. We also note that, irrespective of a legal obligation to look back into past customers and their transactions and trading activities, this had neither been explored by Group nor advised upon.

116.    The B&H Report also acknowledged that "it is clear that problems were reported to the Board of Directors and the Audit Committee."

117.    The B&H Report also specifically addressed Defendant Borgen's compliance with his legal obligations, noting that Defendant Borgen advocated for expansion of the non-resident portfolio based on its profitability and had assured the Executive Board in March 2010 that he had not "come across anything that could give rise to concern" with respect to AML compliance at the Estonian Branch.

**I.      The Extent of the AML Violations Begin to Be Revealed**

118.    In 2014, the DFSA began investigating money-laundering linked to Russia through Danske Bank's Estonian Branch.  The Company concealed the existence of the ongoing DFSA investigation from investors, and when the existence of the investigation was finally disclosed, Defendants downplayed its significance.  Danske Bank also compounded its reporting problems by concealing facts learned internally from its own review of the whistleblower claims from the DFSA in connection with its investigation.

119.    On or about February 9, 2016, amid this backdrop, Defendants Borgen and Ramlau-Hansen presented in New York at the Danske Bank Investor Day on the "state of the business."  Defendant Borgen's presentation touted Danske Bank's strong financial performance, recent credit ratings upgrades, the bank's "vision . . . to be recognized as the most trusted financial partner," and the bank's "core value[]" of integrity.  The presentation also listed "continued increase in regulation" as a "driver of change" and touted Danske Bank's ROE

growth trajectory from 2012 through 2015 and increasing dividend payments. Defendant

Ramlau-Hansen also touted the bank's strong net profits, reduced expenses, and the

implementation of a share buyback program. Defendant Ramlau-Hansen also touted the ratings

upgrades received by Danske Bank since 2013, the bank's strong capital structure, and the

significant increase in payouts compared to peers.

120.    On March 16, 2016, the DFSA announced that, beginning in 2015, it had

"conducted an inspection to establish whether Danske Bank was in compliance with the current

rules in the anti-money laundering (AML) area." This announcement disclosed the DFSA's

investigation into Danske Bank's compliance with AML rules, including commenting briefly on

its Estonian operations, though it did not disclose the full extent of the misconduct. The DFSA's

disclosure stated, in pertinent part, as follows:

**Risk assessment**

Danske Bank is the largest financial institution in Denmark. Danske Bank
Group conducts a large volume of financial business, including transactions in the
fields of asset management, investment, pensions, mortgage finance, insurance,
real estate brokerage and leasing. The bank has a substantial number of personal,
business and institutional customers, and many have a complex group structure.
A large number of customers reside or are domiciled outside Denmark, and a
large number of physical customers are distance customers.

Transaction volumes, including cross-border funds transfers, are
substantial. A great many customer transactions are made online or by means of
cash handling in connection with account deposits, foreign exchange and funds
transfers. The bank has a significant number of correspondent banks throughout
the world. In keeping with international guidelines, cross-border correspondent
bank relationships are considered to involve a high risk of money laundering and
terrorism financing.

Against the background of the extent and nature of these activities, the
FSA considers Danske Bank's inherent risk of being exploited for money
laundering or terrorism financing purposes to be high compared with the risk to
which the average Danish financial institution is exposed.

**Conclusions of the inspection**

Danske Bank has implemented a series of initiatives to strengthen its risk-mitigating measures in the AML area since the FSA's previous inspection in 2011-12.  The FSA notes in particular that, with effect from October 2014, the bank introduced measures entailing a compulsory pre-check of obtained customer information by a special control unit.  This means that new customers cannot carry out transactions until the control unit has approved the proof of identity etc.

Moreover, the bank has generally focused on combating money laundering and terrorism financing.  The bank has regularly added resources to comply with the rules set out in the Danish Act on the Prevention of Money Laundering and Financing of Terrorism (the Danish Anti-Money Laundering Act or the Danish AML Act), and, especially since the FSA embarked on its inspection in February 2015, the bank has added resources to meet the requirements of special checks of correspondent banks.

However, the FSA finds that, at the time of the inspection, the bank still faced considerable challenges and, in a number of areas, could not be considered to be in compliance with the requirements of the Danish AML Act.  The inspection has therefore resulted in material supervisory reactions in the following areas:

*Risk assessment and risk management*

The bank was ordered to make adequate assessments of the risk that the individual business units could be exploited for money laundering and terrorism financing purposes.

*Know Your Customer (KYC) – business customers classified as high-risk customers*

The bank was ordered to ensure adequate knowledge about business customers classified by the bank as customers involving a relatively high risk of money laundering or terrorism financing.

*Correspondent banks outside the EU/EEA*

In connection with the FSA's inspection in 2012, the bank was ordered to introduce satisfactory procedures with a view to ensuring compliance with the rules on cross-border correspondent bank relationships set out in the Danish AML Act.

The FSA also ordered the bank to ensure that, at the establishment of correspondent bank relationships and in the ongoing monitoring of such relationships, the bank obtains sufficient information about the purpose and expected business volume of the individual business relationship, the quality of the supervision of the institution by the local authority and details to ensure that

the individual institution has sufficient and effective control procedures in place in the AML area.  This information must form part of the bank's basis for deciding whether or not to approve the establishment of a business relationship with the individual institution.  Furthermore, the bank is ordered to ensure adequate monitoring of transactions carried out on behalf of these correspondent banks.

*The bank's branch in Estonia*

***The bank received a reprimand pursuant to the Danish Financial Business Act for having failed in time to identify material money laundering risks at its branch in Estonia and for having failed in time to introduce risk-mitigating measures in this respect.***  In theory, the supervision of the bank's foreign subsidiaries and branches in the AML area is the responsibility of the local authorities, but ***the FSA finds that circumstances identified at the branch constitute such a material reputational risk to the bank that the FSA is looking into the matter.  The FSA notes that the bank has drawn up a plan to mitigate risks, which the bank is discussing with the Estonian financial supervisory authority***.

**Police report against Danske Bank**

On the basis of the conclusions of the inspection, the FSA has reported the bank to the police for violation of the provisions on correspondent bank relationships of the Danish AML Act, including for non-compliance with the FSA's order issued in the area in 2012.

121.    As news of Danske Bank's involvement in the Estonian money-laundering allegations began leaking out, the prices of Danske Bank ordinary shares trading in Europe and its ADRs trading in the United States began to decline through a series of partial revelations of the truth.

122.    On March 20, 2017, in response to press reports, Danske Bank issued a press release in which its General Counsel stated that systems in Estonia were "insufficient to ensure that we could not be used for money laundering" but that Defendants had "taken the measures necessary to remedy this."  On March 21, 2017, in a headline titled "Danish banks in gigantic money-laundering scandal," *CPH Post* reported that Danske Bank had been used for money laundering according to an investigation by authorities in Moldova and Latvia.  *CPH Post*

reported that "[a]ccording to *Berlingske*, the amount in question is more than 7 billion kroner. The money has mainly been transferred to British shell companies through Danish banks and ended up in the Seychelles and Panama."

123.     On April 18, 2017, *ERR* published an article titled "Italian politician received illicit funds through Estonian bank."  The article reiterated the allegations disclosed on April 7, 2017, but added that "[m]illions paid to an Italian politician through an Estonian bank were just the tip of the iceberg, a small part of very large amounts of money that flowed through local banks between 2012 and 2014, Postimees wrote on Tuesday."  The article also added that "[t]he Italian prosecutor in Volonté's case believes that the total amount of money that moved through Estonia in connection with such schemes exceeds a billion euros."

124.     On September 5, 2017, *Reuters* reported that Danske Bank had hired the former head of Denmark's intelligence agency and fraud squad to help it in its effort to counter money-laundering claims.  The announcement came after media reports that the Company's Estonian Branch had been exploited for money laundering and other illegal activities between 2012 and 2014.  Danske Bank initially disclosed to *Reuters* that its own internal investigation had shown that it had inadequate measures in place in Estonia to prevent money laundering in the period leading up to 2014 and that it was cooperating with government regulators in a money-laundering investigation involving its Estonian Branch.  After further media reports, Danske Bank broadened its probe to examine customer transactions from 2007 onward.

125.     On or about September 11, 2017, Defendant Aarup-Andersen presented in New York at the Barclays Global Financial Services Conference.  In the presentation, Defendant Aarup-Andersen touted Danske Bank's 2-7 % market share in the Baltics, customer satisfaction

in the Nordic market, the bank's "strong capital position," and forecasted flat expenses for the year compared with the prior year.

126.    On September 21, 2017, Danske Bank issued a press release disclosing, among other things, that it had "expand[ed] its ongoing investigation into the situation at its Estonian branch" following "a root cause analysis concluding that several major deficiencies led to the branch not being sufficiently effective in preventing it from potentially being used for money laundering in the period from 2007 to 2015," and that the "expanded investigation cover[ed] customers and transactions at the Estonian branch in that period."  The release went on to state, in pertinent part, as follows:

> The analysis points to three major deficiencies, which in combination meant that Danske Bank was not sufficiently effective in preventing the Estonian branch from potentially being used for money laundering:
>
> **The lack of a proper culture for and focus on anti-money laundering at the Estonian branch**
>
> In general, the Estonian branch had insufficient focus on the risk that it could be used for activities such as money laundering.  In addition, there was insufficient attention to ensuring that the branch had the necessary controls and ongoing monitoring.  As a result, earlier opportunities to investigate the activities at the branch were missed.  Both the culture at the branch and management were inadequate during the relevant period.
>
> **Inadequate governance in relation to compliance and risk**
>
> The Group Executive Board and the Board of Directors based their risk assessments on reporting from the Estonian control functions, Compliance and Internal Audit.
>
> The Estonian control functions did not have a satisfactory degree of independence from the local organisation.
>
> Danske Bank's cross-organisational risk assessment methods were not strong enough.

**Management follow-up and control were highly dependent on local country management**

The branch in Estonia, acquired as part of the purchase of Sampo Bank in 2007, operated very much as an independent unit, with its own systems, procedures and culture regarding anti-money laundering measures.  This meant that follow-up by Group control functions and reporting to the Executive Board and the Board of Directors was highly dependent on reporting from local management in Estonia.

127.    During the earnings call following the release, Defendants downplayed the significance of the matter, with Defendant Borgen merely stating that "We have a continuous dialogue with supervisor authorities in the markets where the bank is active" and "our own investigation will not have any material impact on the cost issue."

128.    In October 2017, the French Financial Authority placed Danske Bank under formal investigation.

129.    Reporting on the scope of the money laundering scheme following a "CFO Meeting," financial analyst firm Jefferies reported on November 6, 2017, that "so far, the only legal case pending is in France, where the fine is capped at 50% of exposure (€15m).  Danske is not a $ clearer, and has not had any interaction with the DoJ yet."

130.    On November 8, 2017, following "feedback from London Roadshow" with CFO Jacob Aarup-Andersen, J.P. Morgan reported that the Company "mentioned that it is not aware of any US investigation into its AML issue.  The group is being investigated by Estonian FSA and has 1 lawsuit filed against them in Paris related to the AML issues.  We note that the group does not have litigation provisions and a large fine may pose downside risk to capital return expectations."

131.    On November 15, 2017, Deutsche Bank AG reiterated its hold recommendation on Danske Bank and noted that "[t]he 3Q17 result offers only limited new information and details on the potential money laundering and breach of US sanction offences committed through

the Estonian Branch between 2007 and 2015."  The report reproduced a portion of Danske

Bank's third quarter 2017 report, which stated under "Contingent Liabilities" that: "***Danske***

***Bank does not expect the outcomes of pending lawsuits and disputes or its dialogue with***

***public authorities to have any material effect on its financial position***."  Deutsche Bank further

stated that "[w]e continue to see the Estonian money laundering case as a potential liability for

Danske Bank.  Based on historical published fines, we estimate that the potential fine range is

most likely to be 1-2% of Danske Bank's market cap."

132.     On December 21, 2017, *Reuters* reported that Danske Bank "had been fined 12.5

million Danish crowns ($2 million)" by the DFSA "for violating anti-money laundering rules in

relation to the monitoring of transactions to and from correspondent banks," and that Danske

Bank was "examining whether its Lithuanian and Latvian branches had been involved in money

laundering, expanding an investigation beyond its Estonian operations."  According to *Reuters*,

"Denmark's financial regulator reported Danske Bank to the police last year for violating anti-

money laundering rules and reprimanded the bank for not identifying or reducing 'significant

money laundering risks' in its Estonia branch."  According to *Reuters*, "[t]he fine, which Danske

Bank accepted, relates to that charge by the financial regulator but is unrelated to its activities in

Estonia," while "Danish newspaper *Berlingske* had reported that the bank's Lithuanian branch

had been used in 2012 as part of money laundering and other illegal activities in Estonia."

Describing the status of the ongoing regulators' investigation of money laundering at Danske

Bank's Baltic Branches, *Reuters* stated, in pertinent part, as follows:

> Danske Bank head of compliance Anders Meinert Jorgensen said in an email the
> Estonia case had prompted the bank to "look at the other Baltic markets," and said
> this could prompt a deeper investigation depending on its initial findings.
>
> "The challenges around money laundering and non-resident customers are linked
> to a certain portfolio we had in Estonia at that time," he said, adding that issues in
> Lithuania and Latvia could "not be equated with those in the Estonian branch."

A spokesman said Danske Bank began looking into activities in Lithuania and Latvia after the Estonian investigation started in September, adding it would take nine months to a year.

French authorities placed Danske Bank under an anti-money laundering investigation in October based on suspicions over transactions by customers of Danske Bank Estonia from 2008 to 2011.

133.    That same day, Danske Bank issued a press release describing the charges it had

been fined for by the DFSA, stating:

> The fine notice reads as follows: Danske Bank A/S is charged with having violated section 78(3), cf. (1), cf. section 11(1)(5), of Danish Act No. 651 of 8 June 2017 on Measures to Prevent Money Laundering and Financing of Terrorism (the Danish Anti-Money Laundering Act) (formerly section 37(7), cf. (1), cf. section 12(5), of Danish Consolidation Act No. 1022 of 13 August 2013) by, in the period from November 2012 to the issuing of an order on 15 March 2016 to be implemented by 1 August 2016, in the financial institution Danske Bank A/S, CVR No. 61126228, Holmens Kanal 2-12, Copenhagen, not having monitored transactions executed as part of business relations to ensure that the transactions matched the undertaking's or the person's knowledge of the customer and the customer's business and risk profile, including, where necessary, the origin of the funds, since Danske Bank, in relation to transactions executed in connection with its correspondent bank relationships, did not monitor transactions where the transactions did not involve a customer of Danske Bank.  The fine is set at DKK 12,500,000 (twelve million, five hundred thousand Danish kroner [or $1,800,000]).

134.    On January 19, 2018, Deutsche Bank reiterated its hold rating in anticipation of

Danske Bank's fourth quarter 2017 results. Deutsche Bank reported, "[w]e believe that the

market focus in relation to the results release will be on any potential changes in the outlook for

Danish mortgage margins, the outlook for lending volume growth in the Danish market and

potential new information about the money laundering case in Estonia."

135.    In the annual report for fiscal year 2017, which was published on February 2,

2018, a somewhat more focused disclosure was made.  Danske Bank stated "[d]uring the year,

serious questions were raised regarding events that took place in our Estonian branch in the now

terminated non-resident portfolio in the period between 2007 and 2015.  It appears that our

Estonian branch may have been used for money laundering. . . . Consequently, in collaboration

with independent experts, we have launched thorough investigations into the matter."

136.    Later in the report, Danske Bank stated:

On the basis of suspicions that Danske Bank in Estonia may have been used for
money laundering, the Group launched investigations into the nonresident
portfolio at our Estonian branch between 2007 and 2015.  The conclusion of a
root cause analysis was that several deficiencies in the period from 2007 to 2015
led to the Estonian branch not being sufficiently effective in preventing it from
potentially being used for money laundering.  As a result, the Group chose to
expand its investigation to cover all customers and transactions in the non-
resident portfolio at the Estonian branch in that period.  The purpose is to report
any previously unreported suspicious activity to the authorities and to get a full
understanding of historical activity in the portfolio.

137.    In effect, Danske Bank down-played any concerns regarding the AML issues and,

even in its annual report published in February 2018 (after the press release in September 2017

which had, for the first time, addressed specifically issues in Estonia), was seeking to diminish

its significance – by using the words "may," "suspicions" and "potentially."

138.    On February 27, 2018, *Reuters* reported that "Estonia's financial regulator said on

Tuesday it would launch an investigation into Danske Bank's local branch after media reports

said the lender had been aware of money laundering allegations at the unit as far back as 2013."

According to *Reuters*, the Estonian "Financial Supervisory Authority (FSA) said it would look at

whether Danske [Bank] . . . knowingly withheld information from the regulator during a series of

inspections it conducted at the bank's Estonian branch in 2014."  Citing Livia Vosman, head of

communications at the Estonian FSA, *Reuters* reported that the Estonian FSA would

"'immediately start a new investigation and [would] be asking for the information that was not

provided to [it] earlier.'"  Describing the status of regulators' ongoing investigation of money

laundering at Danske Bank's Baltic Branches, *Reuters* stated, in pertinent part, as follows:

The Estonian investigation follows a report in the Danish newspaper Berlingske
and Britain's Guardian on Tuesday, as well as other international media outlets,

that said a whistleblower had alerted the bank in December 2013 about money laundering linked to Russia through its Estonian branch.

The reports allege that those activities involved UK-registered companies that had accounts with Danske in Estonia.  They said the whistleblower told Danske's management that one of the companies, Lantana Trade LLP, was making suspicious payments and appeared to be linked to Russian personalities.

Lantana was dissolved in 2015. Danske Chief Executive Thomas Borgen said in an emailed statement that he could not comment on specific customers, "but the entire portfolio in question (non-residents) has been closed down."

Kremlin spokesman Dmitry Peskov did not immediately respond to a request for comment.

The FSA said its 2014 inspections at Danske's Estonian branch had uncovered "large-scale, long-term and systematic violations of anti-money laundering standards."

It said, however, that the bank at the time had not revealed the existence of an internal review in which questions were raised about who were the beneficial owners behind Lantana.

"The possible misleading of financial supervisors during the monitoring procedure is a serious breach, if Danske Bank itself had additional information about this client that was not submitted at the on-site inspection," the FSA said.

139.     On March 7, 2018, Deutsche Bank reiterated its hold recommendation with a DKK 271 price target.  Despite positive developments, Deutsche Bank kept its price target stable because of risks related to the Estonian investigation, stating, in pertinent part, that:

There is clearly a risk that the offences committed might result in legal action against Danske Bank as well as reputational damage for the group and potentially for management.  The average historic fine for money laundering and sanction breaches for regional banks (i.e. excluding global banks) is around USD 500m, amounting to around 1.4 % of Danske Bank's market cap or DKK 3.3 per share. Our DKK 271 target price for Danske Bank excludes potential fines.  However, although we see around 10% upside potential from the current price to our target price, we maintain our Hold recommendation partly because we believe the potential litigation risk will continue to negatively impact sentiment until we get more clarity about the size of the risk hopefully later in 2018.

140.     On March 22, 2018, *KYC360* published an article titled "EU: Parliament appoints chief for new money laundering, tax evasion committee."  The article reported on comments by

German Member of European Parliament Sven Giegold who said: "We will put the recent money laundering scandals in Denmark, Estonia and Latvia at the top of the agenda.  Danske Bank . . . and the national anti-money laundering authorities have to explain to Parliament their recent failure to prevent money laundering."

141.    On April 5, 2018, *Reuters* reported that Danske Bank's Head of Business Banking, Lars Morch ("Morch"), then overseeing the Baltic Branches, had resigned as a result of the lack of effective controls over its Estonian Branch.  *Reuters* quoted Defendant Andersen as stating that the money-laundering claims at the Estonian Branch should have been investigated earlier and more thoroughly.

142.    On April 7, 2018, according to *Reuters*, Danske Bank's Head of Baltic Business Banking, Tonu Vanajuur, posted on social media that he had left the Company.

143.    In April 2018, Danske Bank also informed Lithuanian citizens, through the media, that it would leave the Lithuanian banking market.

144.    On April 26, 2018, in connection with reporting its first quarter 2018 financial results, Danske Bank stated it was scaling down its Baltic operations and would serve only subsidiaries of its Nordic customers in the Baltic states and global companies with business interests in the Nordics.

145.    Commenting on the news, Barclays noted that "[t]he Danish FSA orders a reassessment of Danske's solvency requirement; our view - this change will not affect Danske's payout ability."  The report from Barclays further commented that "[t]he biggest risk we see is to potential restrictions on payout ratios.  There has been no discussion of this and we see this risk as low, as we see no rationale for placing restrictions on payout if capital requirements are met, this would nonetheless represent the biggest risk to Danske Bank's share price, in our view."

146.    On April 27, 2018, also following Danske Bank's release of its first quarter 2018 financial results, Credit Suisse reiterated its outperform rating partly on the basis that "Danske offer c.9.0% yield, and the cash return story is solid, with c.200bp buffer (equal to c.DKK15bn) to mgmt. CET1 target, which suggest the bank can absorb a meaningful fine for the Estonian AML issue."  Credit Suisse further explained: "**Capital solid enough for buy-backs and any AML fine.** . . . The buffer is equal to DKK15bn and we estimate the market has already priced in a c.DKK5bn AML fine, based on the c.3% share price drop, as news was reported in February on the connection to Russia (Berlingske, 27 February)."

147.    On May 3, 2018, *Reuters* reported that the DFSA issued a report stating that it had identified "serious weaknesses" in Danske Bank's governance after investigating its management and senior employees as part of the ongoing anti-money laundering probe into the bank's Estonian Branch.  The DFSA found that Danske Bank "was exposed 'to significantly higher compliance and reputational risks than previously assessed,'" that the regulator had "'uncovered serious weaknesses in the bank's governance in a number of areas,'" and stated that as a result it "would assess the bank's capital requirements."

148.    The DFSA said it initially "estimated the increase to Danske Bank's Pillar II capital requirements should amount to 5 billion Danish crowns ($805 million), which would increase its capital ratio for ensuring solvency to 11.2 percent from 10.5 percent."  The investigation had apparently resulted in eight orders for reforms at Danske Bank and eight reprimands.  In a *Reuters* report issued that day, Defendant Borgen conceded that Danske Bank "'***should have understood the depth and scope of the problems in Estonia at an earlier stage and should have reacted faster and more forcefully***.'"  *Reuters* further reported that Defendant Ramlau-Hansen, who had joined the DFSA as its chairman after resigning from his positions at

Danske Bank, "had decided to step down as he did not think he should play any further role in the discussion of Danske Bank's handling of the case."

149.    On May 3, 2018, *Bloomberg* published a report stating that Defendant Borgen had "apologized for management's failure to prevent criminals from using his firm to launder billions of dollars in illicit funds over several years," and that the "Danish government" had characterized "management's failings" as "'unforgivable,'" with the "central bank warn[ing] that the reputation of the whole country was at risk."

150.    The DFSA stated that returns on allocated capital[12] (massive profitability) at Danske Bank's Estonian non-resident portfolio of around 400% in 2013 should have raised red flags.  It ordered Danske Bank to set aside an additional DKK 5 billion in regulatory capital in response to the money-laundering allegations.

151.    On May 24, 2018, *Bloomberg* published an article titled "Bankers May Have Moved $13 Billion Through Baltic Laundromat."  The article elaborated that banks operating in the Baltic nation of Estonia may have laundered considerably larger sums than first thought, based on interviews with Estonian authorities.  "Estonian police now estimate that bankers in their country were involved in suspicious transfers of money and securities, mainly from Russia, totaling more than $13 billion from 2011 to 2016."

152.    On May 25, 2018, citing reports by Estonia's Financial Intelligence Unit, *Reuters* reported that "[m]ore than $13 billion (11 billion euros) were laundered through banks in the

---

[12] Return on invested capital is a calculation used to assess a company's efficiency at allocating the capital under its control to profitable investments.  The return on invested capital ratio gives a sense of how well a company is using its money to generate returns. Comparing a company's return on invested capital with its weighted average cost of capital (WACC) reveals whether invested capital is being used effectively.  This measure is also known simply as "return on capital."

small Baltic state of Estonia from 2012-2016, with at least 7.3 billion euros in assets through non-resident bank accounts." According to the *Reuters* report, Danske Bank "could face further legal steps in Denmark, its justice minister and business minister made clear at a session of the Danish parliament's business committee on Friday," adding that "Denmark's State Prosecutor for Serious Economic and International Crime [was also then] looking into the case," citing Justice Minister Soren Pape Poulsen ("Poulsen"). *Reuters* further cited Poulsen as stating: "'There is a case now in Estonia. We've offered our assistance, but we would need help from the Estonian authorities regardless of what our next steps would be.'"

153.    On May 30, 2018, Credit Suisse issued a report titled "Putting a number on conduct risk: Market already pricing an unlikely scenario." The report purported to perform "an in-depth analysis of 1) the risk of a fine and 2) the size of a potential fine," and stated:

> **The risk of an outsized fine looks remote.** In Denmark, Danske was in 2017 fined DKK12.5m for violating AML rules, which was then a record amount. In Estonia, under old rules, the max fine for breaching AML rules was EUR32,000. The UK could potentially claim jurisdiction if funds stemming from suspicious transactions were placed in UK banks. There is a remote risk the US could claim jurisdiction if any suspicious dollar transactions were cleared via a US correspondent bank, we argue.
>
> **Sizing a potential fine: Manageable and below 3% of TBV, 2018E.** Based on data from Estonian authorities and the OCCRP, we estimate Danske's Estonian branch could have transactions amounting to USD2.5-9.2bn, and fines for violating AML/Sanction laws range between 2.1%-6.3% of the transacted amount. **We estimate a potential fine for Danske could be USD0.1-0.6bn (DKK0.3-3.7bn), taking only 0.2-2.6% off TBV, 2018E.** This assumes the US can claim jurisdiction, which we argue is a remote risk. The buy-back program should not be impacted and the market has already priced in a fine of c.DKK5bn, based on the c.3% share price drop, as news was reported on a Russian connection (Berlingske, 27 February).

On the basis of this analysis, Credit Suisse reiterated its outperform rating.

154.    On June 15, 2018, *Reuters* reported that Danske Bank's reputation had been significantly damaged by the money-laundering charges.

- 60 -

155.    On June 25, 2018, *Reuters* reported that "Denmark's new business minister ha[d] signaled he [would] take a tough line on the country's largest lender Danske Bank, describing its admission of past failings in anti-money laundering controls in Estonia as 'a disgrace and a scandal.'"

156.    On July 4, 2018, Jeffries published a report titled "First View: New Leak Adds to Overhang Until Laundering Findings Released."  The report stated that "Danish newspaper Berlingske, where the bulk of the press leaks have so far surfaced, report laundering transactions now total DKK 53bn ($8.3bn), twice the previous estimate, with Danske's Estonian branch potentially routing cash for Russian oligarchs/officials.  While management have indicated the level of suspicious transactions could have been higher than previously disclosed, the case will remain an overhang on the shares until Danske release[s] the findings of their internal investigation."

157.    On July 10, 2018, RBC published a report noting that "[i]n Q1, Danske reiterated its FY outlook, which is well captured in consensus.  The ongoing AML investigation remains an overhang."  The report elaborated, "Despite continued progress and good execution on its dual strategy of defending the home market and growing in its 'challenger' footprint, Danske has de-rated most among European banks on a year to date basis.  We believe the ever-expanding AML investigation along with limited additional catalysts remain the key drivers behind this dynamic."  The report also elaborated that "[u]sing the latest estimate of USD8.3bn in ML (FT, July 6th, 2018), this could result in an 85bps CET1 impact using the 'median' estimate, as shown in exhibit 5.  We note that this would be an exceptionally harsh outcome."

158.     On July 11, 2018, Danske Bank's Head of Compliance since 2014, Anders

Meinert Jorgensen, resigned citing an "intense" period of work due in large part to the ongoing

investigation into money laundering at the Estonian Branch.

159.     On July 12, 2018, Bill Browder, once the biggest foreign money manager in

Russia, filed a criminal complaint against Danske Bank arising out of the alleged money

laundering at its Estonian Branch.  According to a *Reuters* report that day, "Browder, who leads

a campaign against Russian officials he blames for the 2009 death of his Russian lawyer Sergei

Magnitsky while investigating fraud, said on Twitter that he had filed a complaint with the

Danish law enforcement authorities."  *Reuters* further reported that "[t]he criminal complaint

was also sent to Denmark's business minister Rasmus Jarlov, a picture of the letter on Browder's

Twitter profile showed."

160.     On July 13, 2018, *Reuters* reported that Standard & Poor's had advised it that the

Estonian money-laundering scandal could force a downgrade of Danske Bank's corporate debt

ratings, stating, in pertinent part, that, "'[a]lthough unlikely, [the rating agency] could revise the

outlook to negative or even lower the issuer credit rating if Danske Bank comes under significant

market pressure,'" and that "'[t]his could result from continued charges with regards to the AML

(anti-money laundering) investigation, a drop in market confidence, or unexpected events that

weaken its credit profile.'"

161.     Also on July 13, 2018, *Reuters* reported that "[a] large Danish pension fund said

on Friday it ha[d] temporarily frozen investments in Danske Bank . . . piling further pressure on

the bank over its involvement in money laundering in Estonia."  According to *Reuters*, "MP

Pension, which holds shares in Danske Bank worth around 570 million Danish crowns ($89

million), said the bank's actions in Estonia collide with its responsible investing policy" and that,

"[a]s a result, it will no longer buy or sell any Danske shares."  "The move by MP Pension comes after David Helgason, an Icelandic entrepreneur and co-founder of one of Denmark's biggest recent start-ups, Unity Technologies, last week pulled his accounts from Danske Bank, stating that he was 'disgusted' by its activities in Estonia."

162.    On July 18, 2018, Danske Bank announced that it would forgo profits on all "'suspicious transactions'" in its Estonian Branch, forcing it to lower its second quarter 2018 financial guidance.  Danske Bank further disclosed that the money laundering occurred throughout 2007 to 2015 and that it was "'Danske Bank's intention to make the gross income generated from such transactions in the period from 2007 to 2015 available for efforts that support the interest of the societies in which we operate, such as combating international financial crime.'"

163.    Danske Bank further reported that gross profits from its non-resident portfolio in Estonia between 2007 and 2015 amounted to DKK 1.5 billion ($234 million), but Defendant Borgen stated that it was not clear how much of that amount Danske Bank would waive.  Danish business minister Rasmus Jarlov tweeted in response: "I completely agree with Danske Bank that the bank can't keep that money.  Good that they recognize this."  Jarlov told *Reuters* in an interview that day that "[t]he sin is not erased because they now acknowledge that they can't keep the money," and that Danske Bank could still face regulatory action.

164.    According to another July 18, 2018 *Reuters* report, "[t]he potential fine Danske Bank could face depends on whether the U.S. regulators take action," and "[w]hile the bank doesn't have a banking license in the United States, it has a bond programme in dollars, which could prompt U.S. regulators to open a case."  According to *Reuters*, "[f]or now, analysts on average put estimates for potential fines at roughly 4 billion crowns."

165.     Commenting on the news, Jefferies reported that "[t]he money laundering investigation is still due by Sept, but Danske is committed to paying cDKK 1.5bn, the gross income generated from Estonia between 2007-2015, to support society.  While potential fines may exceed this, we have a DKK 2bn provision in our numbers, with consensus at cDKK 4bn."

166.     In a report dated July 19, 2018, UBS added that it believed the market "has drawn incorrect conclusions from the AML update" and that "[w]e actually found the contingent liability footnote rather reassuring as Danske reiterated that it '***does not expect the outcomes of pending lawsuits and disputes, the dialogue with public authorities or the inspection of compliance with antimony laundering legislation to have any material effect on its financial position***.'"  Defendants' contingent liability footnote, and all substantially similar contingent liability footnotes issued during the Class Period, were false and misleading when made.

167.     On July 20, 2018, Jefferies published a Flash Note describing its "CEO Meeting Takeaways."  Therein, Jefferies noted:

>  **Elephant in the room** - With the market eager to know if any US agency is investigating, the CEO pointed out that anything that has a material impact on the business would have to be disclosed in the financials or as a contingent liability, as was the case in France in relation to suspicions of money laundering.  Multiple contacts with US and other authorities were also noted as a normal course of business.  Therefore, any disclosure, albeit small, would leave Danske cornered in the way they communicate to the market. On the potential US class action brewing from the AML case, ***the CEO noted he was not worried by this, given it was a natural reaction to the planned donation + share price drop on the day***.

168.     On July 31, 2018, *Reuters* published an article titled "Estonia to investigate Danske Bank over money laundering allegations."  The article disclosed "Estonia's general prosecutor . . . had begun a criminal investigation of Danske Bank over allegations that Denmark's largest bank was involved in money laundering through the Baltic country in the past."  The article disclosed that "[t]he investigation is based on a complaint filed last week by Bill Browder of asset manager Hermitage Capital."

169.     In a report dated August 2, 2018, Barclays noted its view that Danske Bank shares were "oversold on AML worries."  The report elaborated that "share price performance relative to Nordic peers suggests a discount of USD 6.5bn."  Based on its view, Barclays noted a "+29% upside" potential.  The report added that "recent news suggests that the total amount of money laundered through Danske Bank Estonia branch could be as high as $8.3bn (*Bloomberg*, 4 July 2018)."  The report also added that based on recent reporting, there were now also "reasons to believe sanctions may have been breached, but it is not confirmed in this case."

170.     On August 6, 2018, *The Wall Street Journal* ("*WSJ*") disclosed that "Denmark's public prosecutor for special economic crime ha[d] begun a criminal investigation against Danske Bank . . . for potential money-laundering offenses," noting that the "Danish Public Prosecutor for Serious Economic and International Crime's investigation announced Monday relates to transactions carried out through the bank's Estonian Branch."

171.     In a report published on September 5, 2018, Jefferies noted that "we see limited US fine potential + expect CEO continuity post-event, staving off concerns of a strategy revamp."  The report added that "[p]rice performance will remain volatile until the report is released, with mgmt, unable to provide clarity on the latest leak which has money-flows at $30bn, 3.6x the previous estimate."

172.     On September 7, 2018, the *WSJ* published a report entitled "Russia-Linked Money-Laundering Probe Looks at $150 Billion in Transactions - Transactions uncovered at Danske's Estonian Branch highlight the growing concern about illicit money flows from the former Soviet Union."  Citing anonymous sources, the *WSJ* reported that Danske Bank was "examining $150 billion in transactions that flowed through a tiny branch in Estonia," emphasizing that "[t]he $150 billion figure, covering a period between 2007 and 2015, has been

presented to the bank's board of directors and would [be] equal to more than a year's worth of the corporate profits for the entire country of Russia at the time."  Citing additional confidential sources, the *WSJ* also reported that "[t]he flows would have stayed in the branch for only a short time before leaving Estonia . . . so they might not show up in deposit statistics, which reflect the balance at the end of month and not from day to day," and that "***such a large flow of money suggests that roughly $8 billion of suspected money-laundering transactions previously reported by a Danish newspaper could grow higher.***"

173.    On September 14, 2018, the *WSJ* published a report entitled "U.S. Probes Danske Bank Over Russian Money Laundering Allegations – Probes are ongoing and are related to transactions at Danske's tiny Estonian branch over several years through 2015," which disclosed that U.S. law enforcement agencies had begun investigating the scandal, following a tip to the SEC from a whistleblower, at least two years earlier.  The *WSJ* report, emphasizing the potential crippling penalties Danske Bank faced, disclosed, in pertinent part, as follows:

> The Justice Department, Treasury Department and Securities and Exchange Commission are each examining Danske Bank . . . after a confidential whistleblower complaint was filed to the SEC more than two years ago, the person familiar said.  The probes are ongoing and related to transactions at Danske's tiny Estonian branch over several years through 2015.  The Journal reported earlier this month that the bank is studying $150 billion that flowed through accounts of non-Estonian account holders at the branch.
>
> The whistleblower complaint identified Deutsche Bank AG DB . . . and Citigroup Inc., both overseen by U.S. regulators, as involved with transactions into and out of Danske Bank's Estonian branch.  Deutsche Bank acted as a correspondent bank for Danske, handling dollar wire transfers.  Citigroup's Moscow office was involved in some of the transfers through Danske Bank's Estonian branch, the person familiar with the probes said.
>
> *                *                *
>
> Danish and Estonian authorities have shared information with U.S. counterparts, according to several European officials familiar with the matter.  "There is cooperation, they are watching it very closely," one of these people said.

Estonian officials are investigating 26 former Danske employees, from low-level staff to the former branch CEO.  They are accused of helping to launder $230 million in money from an alleged fraud committed in Russia.

"In this particular case, it's clearly dirty money from crime," said Marek Vahing, Estonia's state prosecutor.

Treasury Assistant Secretary for Terrorist Financing Marshall Billingslea visited Estonia in May.  Russian illicit transactions into Europe were a particular concern, according to people aware of those discussions.  Danske was mentioned only in passing.  Mr. Billingslea and other top administration officials have jetted around Europe, pressing regulators to more aggressively police financial flows out of Russia.  He visited Denmark in August.

"It is critical that they shore up their anti-money laundering regimes and that they clamp down and tighten down on how they regulate money coming out of Russia," Mr. Billingslea told a Senate panel last month.

"There's an enormous amount of money that is still being exfiltrated from Russia by both organized crime and cronies surrounding Putin," he told senators, many of whom are seeking to levy new sanctions against Moscow.

U.S. involvement in the case greatly raises the stakes for Danske Bank.  It is already facing investigations in Denmark and Estonia over the allegations.

Danske's share price has dropped sharply this year as the extent of the money laundering probe has emerged.  Costs to insure against Danske's debt, some of which is issued in U.S. markets, has jumped in recent weeks.

The U.S. Treasury can restrict the supply of U.S. dollars to foreign banks who are accused of laundering money, a rarely-used penalty known as the "death blow sanction" because it can send a lender into collapse.  So far, the Treasury has mostly used that cudgel against small lenders, including a now-liquidating Latvian bank accused of handling billions of dollars for Russian arms traders and North Korea's missile program.

The Treasury and Justice Department can also choose to fine banks, punishing the company but sparing its customers, who could lose their deposits if the bank collapsed.

174.    On September 17, 2018, UBS published a report which stated that the "**AML case has dominated the investment case for Danske Bank.**  Since the launch of the investigation into the Estonian non-dom portfolio last fall this has dominated the investment case.  Reports in the media have indicated that the scope of potentially suspicious transactions is larger than was

originally thought (as confirmed by Danske Bank here).  Over the past year Danske Bank's

market capitalisation has fallen by €6.6 bn (adjusted for dividends and buybacks), in our view

largely as a result of the ongoing AML issues."

175.    On September 19, 2018, Danske Bank published its "Findings of the

investigations relating to Danske Bank's branch in Estonia."  Danske Bank also announced that

Defendant Borgen was resigning.  The findings stated in pertinent part as follows:

> For a long time, it was believed within Group that the high risk represented by
> nonresident customers in the Estonian branch was mitigated by appropriate anti-
> money laundering ("AML") procedures.  In early 2014, following a report from a
> whistleblower and audit letters from Group Internal Audit, it became clear that
> AML procedures at the Estonian branch had been manifestly insufficient and
> inadequate.  This caused a number of initiatives on the part of Group.  AML
> procedures also became subject to harsh criticism from the FSA in Estonia, and
> Danske Bank was met with regulatory sanctions from both the Estonian FSA in
> July 2015 and the Danish FSA in March 2016.  The Non-Resident Portfolio was
> terminated in 2015 with the last accounts being closed in early 2016.
>
> *        *        *
>
> In press release of 21 September 2017, Danske Bank acknowledged that it was
> "major deficiencies in controls and governance that made it possible to use
> Danske Bank's branch in Estonia for criminal activities such as money
> laundering".
>
> *        *        *
>
> According to the same press release, Danske Bank had expanded its ongoing
> investigation into the situation at its Estonian branch, which was expected to be
> completed in the course of nine to twelve months.  This expanded investigation,
> here referred to as the Portfolio Investigation, examines the customers in the
> terminated Non-Resident Portfolio and their historical activities, that is payments
> and other transactions and trading activities.  It also investigates possible
> cooperation between customers and employees with the Estonian branch (internal
> collusion).  Part of the purpose of the Portfolio Investigation has been to
> understand, to the extent possible, the activity and to report to the Financial
> Intelligence Unit ("FIU") in Estonia customers found to be "suspicious" as
> required under Estonian law.  By now, the investigation finds to have a good
> general understanding of the portfolio.
>
> In addition to the Portfolio Investigation, there has been a separate investigation
> into accountability.  Part of its purpose has been to understand how Danske Bank

ended up in this situation.  In addition to analysing the bank's own exposure and legal responsibility as an institution, the investigation has assessed whether individuals in leading positions at Group level and also in the Estonian branch failed to comply with legal obligations forming part of their employment or position.  This investigation, which is here referred to as the Accountability Investigation, has been completed.

176.    Defendants, commenting on the report, stated as follows:

The investigations comprise a thorough examination of customers and transactions in the period from 2007 to 2015 and an investigation of the course of events, including whether managers and employees, members of the Executive Board or the Board of Directors have sufficiently fulfilled their obligations. ***Danske Bank has previously concluded that it was not sufficiently effective in preventing the branch in Estonia from being used for money laundering in the period from 2007 to 2015.***

The investigations have been led by the Bruun & Hjejle law firm, and their 'Report on the Non-Resident Portfolio at Danske Bank's Estonian branch' is enclosed with this press release.

In this connection, the Chairman of the Board of Directors, Ole Andersen, says:

"***The Bank has clearly failed to live up to its responsibility in this matter.  This is disappointing and unacceptable*** and we offer our apologies to all of our stakeholders – not least our customers, investors, employees and society in general.  We acknowledge that we have a task ahead of us in regaining their trust.

***There is no doubt that the problems related to the Estonian branch were much bigger than anticipated when we initiated the investigations.  The findings of the investigations point to some very unacceptable and unpleasant matters at our Estonian branch, and they also point to the fact that a number of controls at the Group level were inadequate in relation to Estonia.***"

\*       \*       \*

**Key findings – causes and accountability**

Based on the conclusions from the investigations we are presenting today, as well as the root cause analysis conducted last year, ***it seems clear that there were several reasons why the case developed as it did***.  Those include

- ***a series of major deficiencies in the bank´s governance and control systems made it possible to use Danske Bank's branch in Estonia for suspicious transactions***

- ***for a long time, from when we acquired Sampo Bank in 2007 until we terminated the customer portfolio in 2015, we had a large number of non-***

> *resident customers in Estonia that we should have never had, and that they carried out large volumes of transactions that should have never happened*

- *only part of the suspicious customers and transactions were historically reported to the authorities as they should have been*

- *in general, the Estonian branch had insufficient focus on the risk of money laundering, and branch management was more concerned with procedures than with identifying actual risk*

- *the Estonian control functions did not have a satisfactory degree of independence from the Estonian organisation*

- *that the branch operated too independently from the rest of the Group with its own culture and systems without adequate control and management focus from the Group*

- *there is suspicion that there have been employees in Estonia who have assisted or colluded with customers*

- *there have been breaches at management level in several Group functions*

- *there were a number of more or less serious indications during the years, that were not identified or reacted on or escalated as could have been expected by the Group*

- *as a result, the Group was slow to realise the problems and rectify the shortcomings.  Although a number of initiatives were taken at the time, it is now clear that it was too little and too late*

Of the investigation into customers in Estonia, the following can be highlighted:

- The investigation identified a total of around 10,000 customers as belonging to the non-resident portfolio.  To ensure that all relevant aspects are covered the investigation covers a total of around 15,000 customers with non-resident characteristics (that is, a further 5,000 customers).

- The around 10,000 customers carried out a total of around 7.5 million payments.

- The around 15,000 customers carried out a total of around 9.5 million payments.

- For all of the customers covered by the investigation, that is, around 15,000 customers, the total flow of payments amounted to around EUR 200 billion.

- At the present time, the investigation has analysed a total of some 6,200 customers found to have hit the most risk indicators.  Of these, the vast majority have been found to be suspicious.  That a customer has been found to have suspicious characteristics does not mean that there is a basis for considering all payments in which the customer in question was involved to be suspicious.  Overall, we expect a significant part of the payments to be suspicious.

**Accountability and consequences**

> *When it comes to individual accountability, it has been established that a number of former and current employees, both at the Estonian branch and at Group level, have not fulfilled their legal obligations forming part of their employment with the bank.*

*        *        *

**Gross earnings to be transferred to an independent foundation**

As the bank is not able to provide an accurate estimate of the amount of suspicious transactions made by non-resident customers in Estonia during the period, ***the Board of Directors has decided to donate the gross income from the customers in the period from 2007 to 2015, which is estimated at DKK 1.5 billion.***

To the extent not confiscated by the authorities, the gross earnings will be transferred to an independent foundation, which will be set up to support initiatives aimed at combating international financial crime, including money laundering, including in Denmark and Estonia.  The foundation will be set up independently from Danske Bank with an independent board.

*        *        *

The findings of the investigations that we are presenting today are in line with the criticism and conclusions announced by the Danish FSA in its decision of May 2018. ***We agree with the conclusions of the FSA.***

177.    During a conference call on September 19, 2018, to discuss the report, Defendant Andersen added that, "[i]n terms of our accountability, our investigation clearly shows that our AML procedures and setup in Estonia were seriously flawed and that the group supervision of the Estonian branch failed.  We failed to react properly to warnings over the years and a number of employees did not live up to their responsibility. . . .  Finally, our investigation shows that the bank has failed to live up to its obligations and responsibility."  In response to analyst questions,

- 71 -

Andersen added that there was currently no plan from management or the board to scale back share buybacks because of the potential fines to be levied against Defendants related to the AML violations.  Defendant Andersen also disclosed that the investigation, which still needed to analyze over 8,800 customers, had cost the Company DKK 200 million, or approximately $30 million.  Analyst repeatedly questioned the expected length of the remaining investigation and potential fines as "obviously, it's weighing pretty heavily on [Danske Bank's] stock price and also your credit spreads."  Nevertheless, Defendants repeatedly refused to provide a timeline as to when their investigation would conclude.

178.    That same day, the *WSJ* published a report entitled "Money-Laundering Probe Tied to Russia Expands to $230 Billion in Transactions - Danske Bank CEO resigns following report on role of Estonian branch in moving money into Europe."  Noting that the amount of transactions that had gone through the Estonian Branch had now grown to $230 billion, the *WSJ* reported that "[t]he sheer size of the cited sums – much larger than previously reported – points to Danske Bank being the nexus of a colossal pipeline for carrying illicit money out of Russia and other former Soviet states," and that "[i]t has drawn scrutiny from U.S. criminal investigators, as well as European authorities, who suspect the remote outpost branch, which fell between the regulatory cracks, was used to help funnel billions in ill-gotten gains into the West."  The *WSJ* report further noted that "[t]he sum of €200 billion, while not all labeled as illicit, is a significant amount, equal to nearly half of all Russian central government spending in 2015, or 26 times the rate of overall government spending in Estonia in 2015, the year most of the accounts were shut.  It is also equivalent to two years of exports from Denmark."

179.    Commenting on the news, analysts, such as Credit Suisse, generally viewed the "higher-than-expected 'suspicious' flows of EUR200bn" as additional negative information.

Echoing this view, Jefferies noted that "[f]ailure to quantify suspicious transactions is an overhang," and that "Danske note[d] no sanctions violations have been found, which is a relief given concerns of a US/OFAC investigation.  It is unclear what the basis for any fine is at present, with the market pricing in a hit of DKK 36bn (c$6bn)."  RBC similarly noted "**Impact: A less-than-conclusive report leaves unanswered questions on potential capital hits, add-ons & returns and further consensus headwinds.**"

180.    On October 4, 2018, in a press release, Danske Bank disclosed that it was "in a dialogue with the US authorities regarding the Estonian case."  The release provided, in relevant part, that "Danske Bank has also now received requests for information from the U.S. Department of Justice (DOJ) in connection with a criminal investigation relating to the bank's Estonian branch conducted by the DOJ."  That same day, Danske Bank announced that it had decided to discontinue its share buyback program.  Commenting on the announcement, the *WSJ* reported that "[o]n Thursday, the bank also canceled a share buyback program, after Danish authorities ordered it to build up capital in case of a pending fine or financial trouble.  The Justice Department has the power to fine foreign banks—often hundreds of millions of dollars—for money laundering violations, in addition to similar fines the bank could face in Denmark or elsewhere."

181.    That same day, *Reuters* reported that "[s]hares in Danske Bank fell by 4.6 percent to 158.70 Danish crowns, their lowest level since January 2015 as its investors and customers digested the U.S. inquiry and the bank's decision to halt share buybacks to bolster its capital."

182.    Reacting to the news, Jefferies noted that "US DoJ probe clearly unhelpful + will remain an overhang on the stock given timing/scope is uncertain, although Danske has no US business/license + is not a $-clearer.  We think a fine of $6bn, unlikely in our view given no

sanctions/terror violations have been uncovered as yet after investigating high-risk customers, is already reflected in the price."  Credit Suisse observed that "Danske's board has unexpectedly discontinued the DKK10bn buy-back program, despite committing to this only two weeks ago."

183.    On October 12, 2018, Moody's announced that it was downgrading long-term deposit and senior unsecured debt ratings of Danske Bank and maintaining its negative outlook, disclosing that "[t]he key driver for today's ratings downgrade . . . is the recent news of money laundering investigations by US authorities, which 1) heighten the risk of material monetary penalties; and 2) will exert pressure on both financial and human resources and managerial time, given the complexity and scope of the investigations and related remedial actions."

184.    On or about October 17, 2018, the DFSA rejected Danske Bank's selection of Defendant Aarup-Andersen as its new CEO, stating he lacked the necessary experience.  As reported by *Bloomberg* that day: "It's rare such decisions are made public since vetting of top bank jobs is usually done behind the scenes."  According to *Bloomberg*, "[t]he scandal cost the bank's previous CEO his job and the shares have plunged more than 40 percent this year," noting that "[i]nsider Jesper Nielsen [would] continue to serve as interim CEO after Thomas Borgen was relieved of his duties on Oct. 1."  *Bloomberg* further stated that Danske Bank "[s]hares ha[d] plunged as news of the dirty money case unnerve[d] investors and anger[ed] politicians," and that the "bank may face a fine of about $630 million in Denmark alone, while estimates for a total penalty run as high as $7.7 billion."

185.    On October 23, 2018, the *WSJ* published a report entitled "How One Stubborn Banker Exposed a $200 Billion Russian Money-Laundering Scandal," which disclosed for the first time the extent of the information the whistleblower had alerted Danske Bank's senior executives to back in 2013.  The *WSJ* report detailed how "Danske's excellent returns from

Estonia were helping power the rise of a tall and elegant gray-haired banker," Defendant Borgen, who it said "championed the Estonian branch's business before the board of directors."  It further detailed how the CEO of Danske Bank in 2010, Peter Straarup, "grew concerned about the high level of Russian transactions going through the branch" when "Barron's magazine . . . contacted the bank about the possible involvement of its Estonian branch in a North Korean arms-smuggling case in Thailand, although the ensuing article didn't identify the bank."  According to the *WSJ*, "[m]onths later, Mr. Straarup asked Mr. Borgen: Was he comfortable with the exposure to nonresident clients?  Mr. Borgen, according to a person who attended the meeting, said he hadn't come across any cause for concern."  The report also detailed how "[t]he Estonian regulators, despite their limited jurisdiction and resources, raised red flags, mailing about six letters to Denmark's FSA between 2007 and 2014," adding that the "complaints became caustic as years went by."

186.    Citing copious internal communications reviewed by the *WSJ*, the report went on to state that Danske Bank's own "anti-money-laundering chief later emailed colleagues about issues at the Estonian branch" and that, nonetheless, Defendant Borgen was promoted to CEO in 2013 because he was "'producing these enormous returns.'"  According to the *WSJ*, "[a]t a meeting that year of the European Banking Authority, with top officials from across the Continent present, a shouting match erupted, said people familiar with the session," as "[t]he Estonians yelled across the room that criminal Russian money was washing through their country, and Denmark, a founding member of NATO, was doing little to stop it."

187.    The *WSJ*'s October 23, 2018 report further detailed how Danske Bank – in a charge led by Defendant Borgen – endeavored to silence the whistleblower for years.  According to the *WSJ*, in late December 2013, the whistleblower "emailed four Danske officials in

Copenhagen, with the subject 'Whistleblowing disclosure – knowingly dealing with criminals in Estonia branch,'" writing: "'Dear Sirs, . . . 'The bank may itself have committed a criminal offence. . . .  There has been a near total process failure.'"  Citing confidential sources, the *WSJ* reported that while the Danske Bank Executive Board took up the issue at its January 2014 meeting, "board members weren't provided a copy and it didn't cause much alarm."  Instead, Defendant Borgen suggested they sell the Estonian Branch and that, while Estonian regulators stormed the Estonian Branch and sent "Danske Bank a scathing, 340-page report listing lengthy violations," the "report was in Estonian" and "wasn't translated into English or Danish for another three years."  Even then, when an internal audit team investigated the alleged misconduct, their report was "watered down under pressure" and would never be finalized, which would have required that it be produced to Denmark's banking supervisor.

188.    According to the *WSJ*'s October 23, 2018 report, when the whistleblower found out in April 2014 that management at the Estonian Branch "had been listening to recordings of his calls with auditors," the whistleblower resigned, emailing "Danske's chief risk officer: If Danske didn't report the false accounts to Estonian police, then he would."  Over the trepidation of certain members of the Danske Bank Board, Defendant Borgen kept trying to sell the Estonian Branch with no success.  In early 2017, Danish newspaper *Berlingske* published reports describing Danske Bank's Estonian money-laundering schemes.  It was not until September of that year that Danske Bank opened its own internal investigation.  According to the *WSJ*, citing confidential sources, even then Defendant "Borgen dismissed notions he would have to resign," noting that "[h]e told an investor as recently as June [2018] ***there was nearly zero chance Danske would have to pay a significant fine***" and that "***[h]e expected to stay on after the investigation***."

189.    On November 1, 2018, Danske Bank held a conference call to discuss its third

quarter 2018 results.  During the call, Interim CEO Nielsen stated:

> [T]he Estonia case gave rise to considerable attention as evidenced by intense
> media coverage and turbulence in the financial markets, but we also have a very
> intensive dialogue with all our stakeholders.  Let me talk about that and what
> we're doing.  We're being investigated by Danish, Estonian and U.S. authorities.
> In Denmark, the Danish FSA and the Danish State Prosecutor for Serious
> Economic and International Crime are investigating us.  In Estonia, the FSA and
> the Estonian Office of the Prosecutor General are looking into the case.  And last,
> but not least, we've had an information request from the U.S. Department of
> Justice in connection with a criminal investigation in relation to our Estonian
> branch.  We cannot comment on our dialogue with the authorities or speculate
> regarding any potential fines."

Interim CEO Nielsen also added that "[t]he Danish FSA has ordered us to reassess our solvency

need, suggesting a minimum Pillar II add-on of DKK 10 billion.  We have complied with this,

and we have reassessed our total capital and common equity Tier 1 capital targets, increasing

them to above 20% and around 16%, respectively. . . .  Our share price, our funding spreads and

our ratings have also suffered from the Estonia case.  Not surprisingly, our stakeholders are

worried about the long-term impact."  CFO Christian Boris Baltzer added that "expenses were up

2% as regulatory compliance cost remained high."  Nielsen also forecasted increase litigation

costs in 2019 as a result of "authorities starting up examinations."

190.    In November 2018, whistleblower Howard Wilkinson, who served as head of

Danske Bank's trading unit in the Baltic region until 2014, testified before the European and

Danish parliaments, telling them that other lenders were involved in processing billions of

dollars of suspicious payments with links to Danske Bank's Estonian Branch.  According to

Wilkinson, he "would guess that $150bn (£117bn) went through this particular [the large

European bank] in the US," though he stopped short of naming any of the lenders involved.

(Alteration in original).  According to a November 19, 2018 report by the *Guardian*, "Deutsche

Bank, JP Morgan and Bank of America were all reportedly involved in clearing dollar transactions for Danske's Estonian branch in Tallinn."

191.   Wilkinson further reportedly testified that Danske Bank had offered him hush money to keep quiet, though the bank had reportedly cleared him to speak to U.S. authorities in October 2018.

192.   According to an account of his testimony published by the *Guardian*, "Wilkinson said he began looking into some of the three most profitable accounts involving British limited liability partnerships (LLPs) in January 2014 but it became clear by April that year that 'the bank didn't intend to do anything.'"  According to Wilkinson, "'They were all fake.  Not just that, they all basically looked the same.  And it turned out they all had the same registered office in a suburb in north London . . . I passed those on.  By April, none of the accounts . . . had been closed down.'"  (Omissions in original).  According to the *Guardian*, Wilkinson further testified that he had "'warned [Danske Bank] that if they didn't do a proper investigation and make the appropriate report to the police, then I was going to do it myself.'"

193.   On November 27, 2018, the *Financial Times* published an article titled "*How Estonia Became Centre of Danske Money-Laundering Scandal*."  Therein, the *Financial Times* reported that "[The head of the Estonian FSA] does not pull his punches when it comes to describing Danske's behaviour throughout the scandal from failing to disclose information to insisting it had good risk controls."  The article cited the head of the FSA as stating that "***[t]he bank has misled us.  Both in 2014-15 and earlier, during the whole process***."

194.   On November 28, 2018, the Danish state prosecutor filed preliminary criminal charges accusing Danske Bank of violating the Danish Anti-Money Laundering Act, failing to report over €200bn ($227 billion) in suspicious transactions, not training staff in anti-money

laundering procedures, having no senior manager responsible for compliance, and having inadequate internal controls to prevent the misconduct.  The Danish prosecutors reported they were also investigating whether a criminal case could be made against any Danske Bank managers but had yet to reach a conclusion.

195.    On December 19, 2018, *Reuters* reported that Estonian authorities had arrested 10 former employees of the local branch of Danske Bank as part of the international money laundering investigation, all of whom were alleged to have been part of the "network that facilitated flows of dirty money through Danske Bank's branch in Estonia."

196.    Then, on December 21, 2018, *Reuters* reported that Danske Bank was cutting its 2018 profit forecast for the second time during that year.  Danske Bank said it now expected net profits for 2018 of approximately DKK 15 billion ($2.3 billion), down from the DKK 16-17 billion it had previously reduced its forecast to in September 2018.

197.    On January 29, 2019, the Danish regulatory authority published its "report on the Danish FSA's supervision of Danske Bank as regards the Estonia case," the Executive Summary provided in relevant part that:

> *In Danske Bank's Estonian branch, there have been significant violations of the European and Estonian money laundering rules*.  In December 2018, ten former employees in the branch were arrested in Estonia.  By all accounts, for a number of years employees in the Estonian branch actively carried out and covered up the violations both to the bank's senior management in Copenhagen and to the Estonian Financial Supervisory Authority (EFSA).
>
> A major reason that the violations were not identified by the bank in a timely manner was *the inadequate overall control environment in Danske Bank in the head office in Copenhagen*.  Thus, in the period 2007-2015, the bank has made a number of wrong decisions or failed to make necessary decisions, which did not prevent money laundering of a potentially very large amount through the bank's Estonian branch.  The bank opted not to integrate IT systems in the branch with those of the rest of the group, which impeded the effective monitoring of the business in Estonia.  This decision was not compensated for through stronger risk management.  *The control system did not adequately and timely detect signs of violations of the law*.

In the course of 2015 and until January 2016, Danske Bank closed the International Banking department in the Estonian branch, which was the department where the violations of the money laundering regulations primarily took place.  The closing down occurred following orders issued by the EFSA in 2015 after the EFSA's two money laundering inspections in 2014.  However, in that connection the bank failed to examine transactions and customer relationships back in time to determine whether there had been previous transactions that were suspicious, and which should thus be reported to the Estonian FIU.  The bank did not decide to carry out such an examination until the autumn of 2017.

\*     \*     \*

***In 2007, the Russian central bank warned the Danish FSA about money laundering risks related to a number of Russian clients in Danske Bank's newly acquired Estonian subsidiary***.  On the basis of this inquiry, the Danish FSA asked Danske Bank for a report and discussed the matter with Danske Bank's head of the Legal department (who was also the person responsible for AML) and the bank's Chief Audit Executive.  The feedback received from both was that there were no problems in relation to money laundering risks in the Estonian subsidiary.  The Danish FSA informed the EFSA of this and in that context also took into consideration that the EFSA was aware of the area, as that year the EFSA had completed an AML inspection of the Estonian subsidiary.  Here, the EFSA found deficiencies in relation to the subsidiary's management of money laundering risks and on that basis issued an order for the subsidiary on further measures to investigate new non-Baltic customers (non-resident customers) and to strengthen internal procedures to prevent money laundering…

\*     \*     \*

In 2012, the EFSA contacted the Danish FSA regarding the Estonian branch, as the EFSA had become concerned about the number of non-resident customers in the branch.  On that background, the Danish FSA made contact with Danske Bank and asked the bank to address the EFSA's concerns.  The head of the Legal department and the head of Compliance and AML replied that they were very aware of the risks associated with the branch's non-resident customers. . . .

\*     \*     \*

Regardless, the Danish FSA found that it might be relevant to conduct an AML inspection in the branch, and offered the EFSA to participate in such an inspection, should the EFSA consider it appropriate.  The Danish FSA repeated the offer several times.  Subsequently, the EFSA conducted two AML inspections in 2014.  The Danish FSA was not asked to attend.  The inspections showed significant weaknesses in the branch's AML procedures and led to orders from the EFSA and the replacement of the branch's local management.  They also contributed to the bank in 2015 closing down the branch's International Banking department.

\*     \*     \*

When it became clear in 2017 that the extent of suspicious transactions in the Estonian branch was significantly higher than the bank had previously told the Danish FSA, the FSA launched an investigation into the banks overall management and governance in relation to the money laundering risks in the branch.  On that basis, the Danish FSA made a decision in May 2018 and issued eight orders and eight reprimands to the bank for deficiencies in the bank's overall governance in relation to the Estonian branch. . . .

\*     \*     \*

In the media, it has been criticised that the decision from May 2018 does not mention a meeting at Danske Bank in October 2013, where it was discussed whether the bank should scale down the International Banking department of the Estonian branch as a result of money laundering risks.  In the meeting, the CEO requested that a middle ground was found and that the topic should be debated in another forum.  The Danish FSA was aware of the statement, and it was thus also part of the basis for the decision.  However, the Danish FSA considered it more appropriate to include a similar quote from the Board of Director's strategy seminar in June 2014, where the strategy in the Baltic countries was discussed.  At this time, the CEO had much more extensive knowledge than in October 2013 regarding the shortcomings of AML in the Estonian branch.  Therefore, it was considerably more significant that the CEO warned against a quick phase-out of Baltic activities in June 2014, than it was when he did it in October 2013.

\*     \*     \*

**[T]he Danish FSA's decision contains significant criticism of the FSA's chairman at the time for his work in the role as the bank's CFO and executive responsible for compliance and AML.**

\*     \*     \*

The Danish FSA has also reopened its investigation into the bank and is investigating if the bank's own investigations supervised and directed by a law firm provides new information compared with the information which was the basis for the Danish FSA's decision in May 2018.  In addition, the case is being investigated by the State Prosecutor for Serious Economic and International Crime (SØIK) and by both the Estonian as US authorities. . . .

A number of other official investigations of the specific case, as well as the Danish FSA's AML supervision in general, will be or have been launched.  The European Banking Authority (EBA) is thus in the process of investigating i.a. the Danish FSA's actions in relation to the specific case.  The Public Accounts Committee has also asked the National Audit Office (Rigsrevisionen) to examine the Danish AML supervision at the more general level.  Finally, the Danish FSA has agreed with the IMF that later this year, the IMF will benchmark both

regulation and supervision in the AML area against other, relevant countries. These investigations may lead to further proposals to strengthen the money laundering supervision and the money laundering regulation in Denmark.

198.     On February 1, 2019, Danske Bank held a press conference to discuss its financial year 2018 earnings.  Interim CEO Nielsen began the call by stating that "[t]he heading for 2018, obviously, was that it was a challenging year for us.  You're not going to be very surprised when I say that.  That was the heading for 2018 for us.  There was the Estonia case.  It's been taking up a lot of attention in regard to communication, but the work to be carried out at the bank, and also when it came to how we could handle our customers and society in general.  Our costs, our expenses went up, I'll come back to that.  That's one of the lines in the accounts that we are working on."

199.     Discussing Danske Bank's substantially increased costs, Nielsen noted that "if you take a look at the costs, the expenses in the financial statements . . . there are specific reasons why our costs, our expenses, went up in 2018.  There was the donation to fight money laundering. . . . And handling of the examinations and studies and surveys in Estonia and the increase in our competencies and resources when it comes to AML and compliance, well, they have been taking up more space and more expenses.  So these are the 3 items.  The . . . DKK 2.3 billion increase in expenses are best explained by these numbers."  Nielsen also conceded during the call that the bank was reducing its dividend in order to build up its capital in order to ensure that the bank could "cope with any sanctions" that will result from the ongoing investigations. Nielsen elaborated:

> So Estonia, let me spend a bit of time on that case.  It's been very -- taken a lot of our energy, obviously.  We presented our own findings on the 19th of September. There have been a number of consequences.  One of them is the reason why I'm in front of you today.  And as you know, in the Baltic states or in Denmark, there's no one involved in the top – there's no one left in the top management, who has been involved sort of -- in some sort of way with this case.  That attracts attention, obviously, but there are also lots of people who are getting new

positions with the bank.  There are examinations looking at the bank in Denmark, Estonia, the U.S. and France, where authorities are looking at our bank.  And obviously, we are completely committed to finalizing the investigation in Estonia. We will review all customers.  If you remember, the 19th of September, we talked about 6,200 customers.  We will finalize that investigation.  We will report to the authorities whatever we have to report in regard to our Estonian portfolio.

Furthermore, it's important for me to say that as regards the undergoing investigations, the bank cooperates fully with the authorities when it comes to creating transparency about the databases and the investigations made by the bank, but also in regard to any questions that may popup in regard to who knew what, when.

Now this whole case has had a huge impact on our image, the way society views us, and obviously, also an impact on customer satisfaction.  We understand that. There is no doubt that we have a huge task ahead of us, trying to change the trust the customers have in us, to improve that, but also actually, all stakeholders in society, we want to convince that we are now at a completely different place than we were when those things were happening in our Estonian business.  And that's why in 2019, we will be strengthening our AML efforts considerably.  There are a number of initiatives, primarily concerning the Baltics, new management, new strategy, where primarily, or actually only, we will only be serving Nordic customers who actually do business in those 3 Baltic states.  So we have reduced the risk in our Baltic business in 2018 considerably, and we will continue that exercise in 2019.

Now when we try to look at the question of recreating trust in our bank, we find that it becomes more important for us to be strong when it comes to anti-money-laundering initiatives.  So we will be investing up to DKK 2 billion kroner over the next 3 years to ensure we get even better in the field of AML.  There are 2 things concerned here.  One is it's extremely important that we make it easier for our customers, and we can do that by making it digital.  But when things are digital, they are also easier to check, to monitor, to have oversight, to be able to analyze what's actually going on.  So when we talk about digital monitoring and digital checks, they will be enhanced to a much higher level.  Now furthermore, we will increase our staffing level.  There will be 600 extra people that will be engaged in 2019 to cope with our obligations vis-à-vis authorities in regard to reporting to the authorities and monitoring of our customers.  And as and when we digitalize this area, we hope that fewer resources will be required, and we could be much more efficient and effective when this area has become digitalized. I think it's fair to say, on the basis of the Estonia case, our customers deserve and stakeholders deserve, that we take the lead in this field.

Now 2019, what areas are going to be our focus areas?  The Estonia issue and the case there will still be an important one.  We need to finalize examinations and investigations.  There are things that are being looked into, but we need to have the resources to be able to interact with the authorities.  I think it's also fair to say

that if you look at communication, the fight to win back trust from customers, you can win -- I think, we can win if our customers are affected as little as possible.

200.    Reacting to the news, Credit Suisse underlined the fact that "Danske flags customer numbers and satisfaction has been negatively impacted by Estonian case.  Seen 11k net outflow (vs 1.5k 9M18) in Denmark retail customers.  Satisfaction declined among retail clients in Denmark and seen negative impact among corporates mainly in Denmark."  Jefferies reported that "[n]o material update on AML situation, which is a positive given continued concerns on sanctions breaches + ongoing US litigation."  Analysts also highlighted that the Company's 2019 guidance implied a consensus earnings cut in part because of "higher AML related costs," and that "[c]ompliance costs cloud near-term outlook."

201.    On February 5, 2019, UBS reported that "Q4 provided little news in terms of the ongoing AML investigations.  We estimate that the current share price implies a fine of around USD 4.3 bn, similar to the level of excess capital we see Danske Bank holding at the end of this year."

202.    On February 20, 2019, *The New York Times* reported Estonian regulators ordered Danske Bank to leave the country within eight months.  The article also reiterated comments from Danish regulators observing that "the evidence shows that the bank did not always provide the FSA with accurate information."  The article concluded by noting that while the scandal's full size is not yet known, "***at one point, in 2008, the tiny Estonian branch delivered close to 10 percent of Danske Bank's annual profit seemingly without attracting scrutiny from the bank's Danish headquarters***."

203.    On February 21, 2019, Danske Bank announced its annual general meeting ("AGM") would be scheduled for March 18, 2019, and made available a list of proposals to be voted on at the AGM.  A number of these proposals, including proposals 10, 11, 12, and 13

related to the Estonian Branch and sought to expand the investigation, appoint an independent and unbiased consultant to investigate the matter, prevent further AML violations, and even to break up Danske Bank.  Also on February 21, 2019, Danske Bank announced that "[i]n addition to dialogue with the DOJ Danske Bank has received an inquiry from the U.S. Securities and Exchange Commission (SEC), which is also carrying out an investigation."  On this news, Danske Bank ADRs fell by 5.06 percent, to close at $9.10.

204.    On April 30, 2019, Danske Bank issued its interim report for the first quarter of 2019.  In the report, Interim CEO Nielsen disclosed that "the considerable investments we are making, in the compliance area . . . affected costs" and that "[t]he Estonia case continues to require considerable management attention, including the ongoing investigations and our efforts to restore trust in us."  Danske Bank also disclosed that customer satisfaction scores "are still unsatisfactory and below the levels seen before the Estonia case," and further that higher liquidity costs, which were dragging down profits, were "a consequence of the Estonia case."  Similarly, the Company disclosed that "[e]xpenses were 9% higher than in the year-earlier period, due primarily to investments in regulatory requirements and compliance and further anti-money laundering efforts."  Significantly, the Company also lowered its outlook for 2019 based on continued "higher funding costs and margin pressure" and continued high costs associated with AML compliance.  Danske Bank also disclosed that "[d]ue to continued uncertainty regarding the consequences of the Estonia case," it would not initiate a share buy-back program in 2019.

205.    In the presentation accompanying the interim report, Danske Bank disclosed that it had more than doubled the number of full time employees allocated to AML from 820 in 2017 to 1,700 in 2019 and that it would be investing DKK 2 billion over the next three years towards

AML digitalization efforts.  The Company also disclosed that it had spent around DKK 450 million on the Estonia investigation to date.

206.    During the conference call to discuss the results, Interim CEO Nielsen disclosed that "[l]ooking at our franchise, the impact of the Estonia case on our retail business in Denmark seen last year continued in the first quarter, however, at a slightly slower pace.  On a net basis, some 8,500 core retail customers, the so-called NemKonto customers, left Danske Bank in the first quarter, against an outflow of 9,900 customers in the preceding quarter.  During the last month, inflow and outflow data indicate a better balance between customer inflow and outflow, hopefully a sign that the outflow that we have seen in the last couple of quarters has peaked."  On this news, and in response to continued uncertainty surrounding the AML investigation and its impact on Danske Bank's costs, revenues, reputation, and prospects, Danske Bank ADRs fell by 8.25 percent, to close at $9.01.

207.    On May 7, 2019, *Reuters* published an article disclosing that Defendant Borgen had been charged by Danish prosecutors "over his involvement in one of the world's biggest money laundering scandals." The article further highlighted the fact that Defendant Borgen "had been in charge of Danske Bank's international operations, including Estonia, between 2009 and 2012" and disclosed that prosecutors had raided Defendant Borgen's home on March 12, 2019. Citing the newspaper *Borsen*, *Reuters* added that "the Danish prosecutor had charged at least two other former managers at Danske Bank in relation to the money laundering case, but did not give any names." On May 8, 2019, *Reuters*, citing *Berlinske*, added that Danish prosecutors had charged a total of 10 former Danske Bank managers, including Defendant Borgen, over their suspected involvement in the scandal.

208.    On May 14, 2019, *Reuters* published an article disclosing that Defendant Ramlau-Hansen had been charged by Danish prosecutors.  The article noted that "Ramlau-Hansen was finance director from 2001 to 2015.  He then chaired the Danish financial regulator from 2016 until he stepped down in May last year as he did not think he should play any further role in the discussion of Danske's handling of the case."

209.    As the U.S. SEC, DOJ and Treasury and Estonian authorities continue to investigate, Danske Bank has built a reserve of $2.7 billion – equivalent to approximately 120% of its 2018 net profit – to cover potential fines and reportedly continues to add to that reserve.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED PRIOR TO THE CLASS PERIOD THAT REMAINED ALIVE AND UNCORRECTED DURING THE CLASS PERIOD[13]

210.    On February 7, 2013, Danske Bank announced its fiscal 2012 financial results for the period ended December 31, 2012.  The Annual Report published that day ("Annual Report 2012") stated, in pertinent part, that Danske Bank's "***net profit was [Danish Krone ("DKK")] 4.7 billion, up DKK 3.0 billion from the level in 2011***" and "***generally in line with expectations***."  The Management Report included in the Annual Report 2012 attributed those results to Danske Bank's purported ongoing operational and strategic prowess rather than to money laundering, stating, in pertinent part, as follows:

> ***The 2012 financial result for Danske Bank Group of DKK 4.7 billion, compared with DKK 1.7 billion in 2011, is in line with our expectations. Several initiatives to improve profitability more than mitigated the effects of declining and low interest rate levels.  Our underlying cost levels are on level with those of 2011, partly as a result of the staff reduction of 1,000 FTEs, about 5% of the total.  Impairments saw a declining trend throughout 2012, and although the level is still elevated, in Q4 they were at their lowest level since the financial crisis began.***

---

[13] Statements alleged to be false and misleading are indicated in bold and italics.

> *Danica Pension and our capital market businesses, Danske Markets and Danske Capital, performed better than expected and above the level in 2011.*
>
> *Our lending volume is marginally lower, reflecting partly our efforts to optimise our portfolio and strengthen the capital and liquidity ratios and partly generally lower demand for loans.  We have accommodated our customers' need for funding and overall kept our market share.*

211.    The Management Report contained a "New Strategy" section that claimed Danske Bank had adopted new operational and governance standards that would elevate Danske Bank amongst its customers and investors alike, stating, in pertinent part, as follows:

> **New strategy**
>
> Danske Bank launched a new strategy, New Standards, in 2012.
>
> Considering that conditions for financial services business have changed fundamentally since the financial crisis and that we operate in a new normal, *the strategy is based on a strong mission and vision to*
>
> - *set new standards in financial services* and
>
> - become our customers' most trusted financial partner
>
> With New Standards, Danske Bank will be a bank for all customers in our home markets.  We will provide market-leading advisory services and innovative digital and automated solutions for financial transactions.  Our digital and mobile platforms enable customers to do their banking business anywhere and at any time.  We render our services at fair and competitive prices, and maintain a focus on balancing income and costs in all customer segments.
>
> In January 2013, we launched a new customer programme for personal customers in Denmark to provide a simple and transparent overview of all our offerings and the benefits of using Danske Bank.  The programme will subsequently be launched in our other markets.  We have also responded to the rapid decline in the use of our branch network for transactions by reducing the number of branches.  Moreover, we are opening a number of state-of-the-art advisory centres.
>
> For our business and institutional customers, we strive to develop our product offerings and advisory services.  We aim to automate financial transactions for business customers to the greatest extent possible, thereby freeing up customers' resources for other priorities.  We will focus more on individual customer segments and develop expertise tailored to each segment.

In the capital markets area, we aim to maintain our leading position as confirmed by independent market observers.

212.    The Management Report expressly emphasized that Danske Bank's financial reporting would lower its costs of capital by increasing its corporate debt ratings, stating, in pertinent part, as follows:

**Ratings and funding**

In May 2012, Danske Bank was downgraded by Moody's and Standard & Poor's.  The downgrade from Moody's was part of a general reassessment of the European financial sector.  Danish banks in particular were affected as Moody's considers Denmark's level of systemic support, even to systemically important banks, to be lower than in neighbouring countries.  The downgrades resulted in higher funding costs for Danske Bank in relation to our peers and did to a minor extent limit our access to certain wholesale funding sources.

***We have taken two major steps to enhance our access to funding and improve our ratings.***

First, in dialogue with the Danish FSA, Danske Bank agreed to accelerated compliance in 2012 with the expected EU rules on the Liquidity Coverage Ratio (LCR), which will take effect gradually from 2015 to 2019, and to take other measures.  It is, however, important to emphasise that Danske Bank's liquidity level remained strong throughout the year and vastly exceeded regulatory requirements.

Second, in October 2012, we completed a share issue with the aim of accelerating the achievement of a rating upgrade.  Following the share issue, Standard & Poor's put Danske Bank on positive outlook, and the funding cost gap to our peer group was significantly reduced in the last quarter of 2012.  Danske Bank's capital levels are strong, with a significant buffer above existing regulatory requirements.  We are therefore positioned very well for the stress tests conducted by European authorities.

213.    Specifically addressing the Company's Estonian operations, the Annual Report 2012 stated, in pertinent part, as follows:

**Banking Activities Baltics**

At the beginning of 2007, Danske Bank acquired the Baltic activities of the Sampo Bank group.  The activities form part of the business structure of Danske Bank Group and are reported under Banking Activities Baltics.  With the acquisition, the Group established a presence in the Baltic markets, primarily in

Estonia and, to a lesser extent, in Lithuania.  The Group's operations in Latvia are very modest.  The Group recognised goodwill impairment charges against the banking units in Latvia and Lithuania in 2009, reflecting the economic crisis in the Baltic countries.  ***Only the goodwill allocated to the Estonian operations remains capitalised***.

214.    The Management Report further emphasized Danske Bank's then strong

corporate governance and reporting strengths, claiming the Company was very transparent with

investors about these matters, stating, in pertinent part, as follows:

**Corporate Responsibility**

As a financial institution, Danske Bank plays an important role in society through its obligation to provide well-functioning financial infrastructure as needed in a modern economy, and to support growth and economic stability. ***Danske Bank Group has come a long way in integrating environmental, social and ethical considerations into our business.  New Standards will maintain this as a key focus area***.

*                *                *

**Corporate responsibility**

***Corporate responsibility remains an important part of Danske Bank Group's strategy.  The Group wants to set new standards for social responsibility.  This applies to the areas of credit granting, investing, the environment and climate, responsible sourcing, and the Group's contribution to financial stability in society and to the economy in general.  The Group considers responsible corporate governance a precondition for long-term value creation***.  In 2012, the Group merged its policies on corporate responsibility, the environment and responsible investing into a single Responsibility Policy.

215.    The Management Report of the Annual Report 2012, which was signed by

Defendant Andersen, concluded that Danske Bank would "continue to execute New Standards in

2013 and progress towards [its] 2015 ambition," stating that it then "***expect[ed] 2013 to show***

***material improvements, in comparison with 2012, and [it] expect[ed] to advance in the***

***achievement of [its] 2015 targets***."

216.    Danske Bank further claimed that its Annual Report 2012 had been "*prepare[d]*

*. . . in accordance with the International Financial Reporting Standards (IFRSs), issued by*

*the International Accounting Standards Board (IASB), as adopted by the EU*."

217.    On February 7, 2013, Danske Bank also published a report entitled Risk

Management 2012, which emphasized that the Company had put in place strong risk oversight

protections that were buttressing its corporate debt ratings and thus lowering its capital costs,

stating, in pertinent part, as follows:

> In 2012, Danske Bank Group implemented a new strategy and organisational changes. With these initiatives, the Group confirmed its role as a universal bank in the regions where it operates. The strategy entails clear segmentation choices and customer propositions based on industry-leading advisory services. The Group will bring digitalisation and automation in banking to new levels. A resolute focus on process optimisation and operational excellence is intended to significantly improve customer satisfaction and reduce costs. Combined with improved capital efficiency, this will ensure higher returns on a stable capital base. **The risk profile is intended to be conservative**.

> The organisational changes included the delegation of risk management responsibilities to dedicated risk teams in the new business units: Personal Banking, Business Banking and Corporates & Institutions. In 2012, the Group made a substantial effort to clarify the risk governance processes as part of the consolidation of the new organisation. A new unit – Group Risk Management – was set up to guide, monitor and consolidate risk management. The unit is headed by the Group chief risk officer, who is a member of the Executive Board.

> **The Group's recently launched strategy also entails an ambition to attain a better balance between earnings and risks in business activities.** This ambition requires the enhancement of differentiated systems, processes and policies for the individual business units, a development that was in focus in 2012 and will also be so going forward.

> The year 2012 also presented a difficult macroeconomic environment, with volatile markets and high impairment charges for the Group in Denmark and Ireland. A significant part of the Group's lending book in Ireland – much of it related to commercial property – was singled out as being incompatible with the business strategy. This portfolio was the main source of losses in Ireland, and it will be wound up or divested as soon as market conditions permit. Until then, the portfolio will be managed so as to optimise collections.

Uncertainty about the recovery of the European and global economies continued, with massive public debt problems still unresolved and consumer confidence stubbornly low.  The sovereign debt crisis increased the divergence among European yields that began in 2011.  In this financially divided Europe, the Scandinavian countries and Germany continued to function as safe havens, where interest rates were pushed down to levels near zero and even below zero at times, whereas interest rates in Spain and Italy especially rose to previously unseen levels.  The announcement of a new bond purchase programme by the European Central Bank at its September meeting, however, succeeded in driving rates back down to the levels from the beginning of 2012 in the peripheral countries.

Despite considerable uncertainty and high volatility, the capital markets functioned reasonably well.  Credit spreads narrowed, and strong banks – including Danske Bank – had opportunities to issue senior debt.  Investor sentiment remained fragile, though.

Danske Bank's ratings from external rating agencies are essential for the Group's access to capital markets.  Despite negative actions from the agencies in the first half of 2012 due to growing concerns over general business conditions for Nordic banks, Danske Bank had reasonable access to funding and liquidity markets, albeit at higher prices than those of its main Nordic peers.

***Danske Bank has taken major steps to enhance its access to funding and improve its ratings.***  To accelerate the achievement of our rating targets, we issued new shares for an amount of DKK 7.1 billion in October 2012.  Shortly afterwards, Standard & Poor's changed its outlook for Danske Bank from stable to positive.

Furthermore, in dialogue with the Danish Financial Supervisory Authority (FSA), Danske Bank agreed to accelerate compliance in 2012 with the forthcoming EU rules on the Liquidity Coverage Ratio (LCR), which is expected to take effect gradually from 2015 to 2019, and to take other measures.  It is, however, important to emphasise that Danske Bank's liquidity level remained strong throughout the year and vastly exceeded regulatory requirements.  At the end of 2012, the Group's LCR was 121%, and the Group therefore achieved compliance with the forthcoming rules.

***The Group will continue to make considerable efforts to prepare for the massive regulatory changes that will be implemented in the financial services industry in the coming years.***

Danske Bank expects that it will be designated a SIFI in Denmark and that it will be subjected to stricter requirements than Danish banks that are not designated as SIFIs.  Danske Bank's position is that any requirements placed upon SIFIs in Denmark must be based on a clear set of international standards in order to avoid distortions of competition because of local differences in the treatment of SIFIs.

218.    On May 10, 2012, August 7, 2012, and October 30, 2012, Danske Bank issued Interim Reports for the First Quarter of 2012, First Half of 2012, and First Nine Months of 2012, respectively.  Each report contained the Company's net profits for the relevant period.  Also on those days, the Company held earnings calls with analysts, which reiterated the net profit numbers.

219.    The statements in ¶¶210-218 above were materially false and misleading at the time they were made and/or omitted to state required material information because they failed to disclose the following adverse information that was then known to Defendants or recklessly disregarded by them:

(a)    that Danske Bank's Estonian Branch was then engaged in money laundering;

(b)    that Danske Bank had been overstating its historical profits by including the profits derived from its illicit Estonian operations;

(c)    that Danske Bank lacked effective internal and reporting controls;

(d)    that Danske Bank did not comply with applicable financial reporting standards; and

(e)    that, as a result of the foregoing, Defendants' statements about Danske Bank's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

220.    The Class Period commences on January 9, 2014.  On that day the price of Danske Bank ADRs closed at $11.72 per share.

221.     On February 3, 2014, Danske Bank issued its Corporate Responsibility 2013 report, which provided information regarding the Company's corporate governance, policies and performance.  The report stressed that the Company "*strive[s] to conduct our business in accordance with internationally recognised principles in the areas of human rights, employee rights, the environment and anti-corruption as formulated in the UN Global Compact's 10 principles and the UN Guiding Principles on Business and Human Rights*."

222.     Specifically, with regard to anti-money laundering measures, the report stated that:

> *We have specific policies on dealing with corruption and preventing money laundering.  The Group condemns corruption and money laundering activities and takes the steps necessary to comply with internationally recognised standards, including Know Your Customer procedures.  The Group anti-money laundering policy includes procedures for customer due diligence, reporting, record keeping, internal controls, risk management and communications that are intended to prevent illegal activities.*

223.     With regard to whistle-blowers, the report touted:

> *Danske Bank strives to be an open and honest business, and we value the free flow of information.  All employees are obligated by our Code of Conduct to report any suspicion or knowledge of breaches of the Group's policies or any other unethical or unlawful behaviour to the head of Compliance or the head of Internal Audit.*  In 2013, we implemented a new system for reporting that enables employees to report suspicions online.
>
> To ensure that critical information is not withheld, the Group treats all reports and questions received through the whistleblower system as confidentially as possible within legal constraints.  Danske Bank will protect employees and ensure that they are treated with respect, and we do not tolerate retribution against such employees.  *Reports are passed on to the Group Chief Auditor, the Group General Counsel and the Board of Directors' Audit Committee for further action*.  In 2013, four cases were reported through the whistleblower system.  They occurred both in and outside Denmark.  *Three cases that were concluded led to changes in procedures or increased management attention.  One case is still under investigation.*

224.     On February 6, 2014, Danske Bank announced its fiscal 2013 financial results for the period ended December 31, 2013.  The Annual Report published that day ("Annual Report

2013") stated, in pertinent part, that Danske Bank's "*net profit [rose] 51% to DKK 7.1 billion, against DKK 4.7 billion in 2012 and DKK 1.7 billion in 2011*" and that "*Danske Bank report[ed] net profit of DKK 7.1 billion (EUR 953.7 million) for 2013*." These financial results were reiterated on an earnings call with analysts the same day.

225.    In the Annual Report 2013, Defendant Borgen attributed the results to Danske Bank's purported ongoing operational and strategic prowess, rather than to the money laundering that the whistleblower had already been disclosed to Danske Bank's senior executives during 2013, stating, in pertinent part, as follows:

> *The year 2013 was a time of progress for Danske Bank. . . . We took steps to strengthen our position in the market, accelerated the execution of our strategy and contained costs. Our financial results improved, but they were still unsatisfactory.*
>
> *We still have a way to go to realise the full potential of Danske Bank, but we are confident that we are moving in the right direction.* Understanding and meeting our customers' increasingly differentiated and complex demands are key to our success. We have a strong combination of skills, expertise and innovative solutions, and we will continue to strengthen our relationship with our customers.

226.    The Annual Report 2013 also contained a letter signed by Defendants Andersen and Borgen that continued to highlight the Company's operational and strategic successes, stating that the Company's performance justified the strong financial guidance, stating, in pertinent part, as follows:

> The year 2013 was a year of change and progress for Danske Bank. *We took important steps towards executing our strategy aimed at fulfilling our vision to become the most trusted financial partner*. We will continue to focus relentlessly on meeting customer needs, simplifying operations and becoming more efficient. Over the past year, we took steps to relieve customer-facing employees of administrative tasks and empower them to make decisions on the basis of their competencies and their day-to-day interaction with customers. We will accelerate these efforts in coming years, as we seek to strengthen our market position by setting new standards for advisory services.

*        *        *

*The financial results improved significantly at most of our business units despite the challenging market environment.  Net profit increased about 50% to DKK 7.1 billion, and the return on equity rose 1.4 percentage points to 5.0%.*  Despite the improvement, profitability is not at a satisfactory level.  We remain committed to our intermediate target of a return on equity of 9% in 2015 and our long-term target of above 12%.  We aim to be among the top three in the Nordic peer group on return on equity.

227.    The Annual Report 2013 specifically emphasized that the Company was "pleased to see evidence of increased confidence in Danske Bank as Moody's and Fitch raised their credit rating outlook for Danske Bank."

228.    Specifically addressing the Company's Estonian operations, the Annual Report 2013 stated, in pertinent part, as follows:

**Business Banking, Estonia**

At the beginning of 2007, Danske Bank acquired the Baltic activities of the Sampo Bank group.  The activities form part of the business structure of Danske Bank Group.  With the acquisition, the Group established a presence in the Baltic markets, primarily in Estonia and, to a lesser extent, in Lithuania.  The Group's operations in Latvia are very modest.  The Group recognised goodwill impairment charges against the banking units in Latvia and Lithuania in 2009, reflecting the economic crisis in the Baltic countries.  *Only the goodwill allocated to the Estonian operations remains capitalised.  In 2013, goodwill in Banking Activities Baltics was reallocated to Business Banking Estonia as a result of the new organisational structure.*

229.    The Annual Report 2013 further emphasized Danske Bank's then strong corporate governance and reporting strengths, claiming that the Company was very transparent with investors about these matters, stating, in pertinent part, as follows:

*Corporate responsibility (CR) remains an important part of Danske Bank's strategy.  We want our customers and other stakeholders to feel confident that we manage our business with proper attention to environmental, social and governance (ESG) issues.  This applies to credit granting, investing, responsible sourcing, and our contribution to financial stability in society and the economy in general.  We consider responsible corporate governance a precondition for long-term value creation.*  In 2012, Danske Bank combined its policies on corporate responsibility, the environment and responsible investing into a single Responsibility Policy.

Corporate Responsibility 2013, the statutory report on corporate responsibility issued in accordance with section 99 (a) of the Danish Financial Statements Act, is published at the same time as the annual report and is available at danskebank.com/crreport.

\*       \*       \*

**Whistleblower system**

*Danske Bank wants to be an open and honest business, and we value the free flow of information.  All employees are obliged by our Code of Conduct to report suspicious behaviour through our whistleblower system.  All reports and questions are treated confidentially, and Danske Bank does not tolerate retribution against employees who report suspicious activity.*  A description of the whistleblower system is available in Corporate Responsibility 2013.

**Reporting on Corporate Responsibility**

Every year, we publish a separate report with detailed information about our CR initiatives and performance.  As part of *our ongoing commitment to transparent accountability*, this year's CR report was reviewed by an independent external audit firm.  Responsibility reporting comprises Corporate Responsibility 2013, CR Fact Book 2013, the Communication on Progress to the UN Global Compact (COP), and a Global Reporting Initiative (GRI G4) index.  All the reports are available at danskebank.com/responsibility.

*Danske Bank has a comprehensive portfolio of CR initiatives and projects.  More information about them is available at danskebank.com/responsibility*.

230.    Danske Bank further claimed that its Annual Report 2013 was "*prepare[d] . . . in accordance with the International Financial Reporting Standards (IFRSs), issued by the International Accounting Standards Board (IASB), as adopted by the EU*."

231.    Also on February 6, 2014, Danske Bank issued its Risk Management 2013 report, which described its risk management efforts.  The report stated, in pertinent part, that:

*[R]isk management practices are organised in three lines of defence.  This organisation ensures a segregation of duties between (1) units that enter into business transactions with customers or otherwise expose the Group to risk, (2) units in charge of risk oversight and control, and (3) the internal audit function.*

*The first line of defence is represented by the business units and the operations and service organisations.  Each unit operates in accordance with risk policies*

*and delegated mandates and has its own independent risk function.  The units are responsible for having adequate skills, operating procedures, systems and controls in place to comply with policies and mandates and to exercise sound risk management.*

*The second line of defence is represented by group-wide functions that monitor whether the business units and the operations and services organisations adhere to the general policies and mandates.  These functions are located in Group Risk Management and Group Finance & Legal.*

*The third line of defence is represented by Internal Audit, as described above in the section on the Board of Directors*

232.     On April 29, 2014, Danske Bank issued a press release announcing that Standard & Poor's had raised its "long-term rating to A from A- and its short-term rating to A-1 from A-2" and had "changed the outlook for the Group's ratings from stable to negative."  The release quoted Defendant Ramlau-Hansen as stating in pertinent part that "'[o]ne of [Danske Bank's] 2015 targets [was] to improve [its] ratings by at least one notch,'" adding that "[t]he upgrade from Standard & Poor's [was] a good step forward in [the] efforts to achieve [its] strategic goals."

233.     On May 1, 2014, Danske Bank issued its Interim Report for the First Quarter of 2014, which reported net profits of DKK 2.812 billion, representing "***an increase of 46% from the level in the fourth quarter of 2013 and an increase of 91% from the first quarter of 2013***."  These results were reiterated on an earnings call with analysts the same day.

234.     On May 12, 2014, Danske Bank announced it would issue and sell bonds in the amount of DKK 3.7 billion (€500 million), which the Company announced having completed on May 13, 2014.  According to Danske Bank, the bonds had "a maturity of 12 years," with the "coupon in effect until 19 May 2021 is set at 2.75% p.a., with annual interest payments and an issue price of 99.893%."

235.     On July 24, 2014, Danske Bank issued its Interim Report for the First Half of 2014, which reported net profits of DKK 6.859 billion, representing "***an increase of 88% from the level in the first half of 2013***."  These results were reiterated on an earnings call with analysts the same day.

236.     On October 30, 2014, Danske Bank issued its Interim Report for the First Nine Months of 2014, which reported net profits of DKK 10.131 billion, representing an "***increase of 95% from the level in the first nine months of 2013***."  These results were reiterated on an earnings call with analysts the same day.

237.     On November 27, 2014, Danske Bank issued a release announcing that Moody's had raised "Danske Bank Group's long-term rating to A3 from Baa1" and that its "BCA (Baseline Credit Assessment) rating ha[d] been raised to baa1 from baa2," with "Moody's . . . also chang[ing] the outlook for all of Danske Bank's ratings from positive to stable."  The release quoted Defendant Ramlau-Hansen as stating that Danske Bank was "***pleased to see Moody's acknowledge the continually positive development at Danske Bank***,'" adding that "[w]ith the Standard & Poor's upgrade in April and this announcement from Moody's, [the Company was] one step closer to meeting [its] strategic goals for improved ratings."

238.     On December 15, 2014, Danske Bank announced that it "expec[ed] to recognize goodwill impairments of about DKK 9 billion in its 2014 annual report."  (Company Announcement No. 26/2014).  These impairment charges were expected to reduce Danske Bank's goodwill to about 50% of the balance (18.6 DKK billion) the Company had reported as of September 30, 2014.  (Company Announcement No. 26/2014).  As part of this announcement, Danske Bank stated that these goodwill impairment charges were "***based on long-term assessments***" as opposed to "***short-term developments at the individual business units***," and

were related to its "activities in Finland, Northern Ireland and Estonia." (Company Announcement No. 26/2014).

239. In explaining the reasons driving these goodwill impairment charges, Danske Bank stated that the charges resulted from "***changed macroeconomic conditions and Danske Bank's dialogue with the Danish Financial Supervisory Authority regarding the measurement of the Bank's goodwill***." (Company Announcement No. 26/2014). Defendant Ramlau-Hansen also added that "***[t]he goodwill impairments are of a purely technical nature and do not affect our strategy or business. The impairments also will not affect our regulatory capital*** or liquidity." (Company Announcement No. 26/2014; emphasis added.).

240. Consistent with its December 15, 2014 announcement, Danske Bank reported in its 2014 financial statements that it had recognized "***goodwill impairment charges of DKK 9.1 billion***" as of December 31, 2014. Of this DKK 9.1 billion impairment, approximately DKK 2.1 billion was related to its banking operations in Estonia. After the impairment, the goodwill balance attributed to Danske's banking operations in Estonia was zero.

241. The standards describing the nature of the disclosures an entity is required to provide in its financial statements when it recognizes material goodwill impairment charges is governed by IAS 36. Along with the amount of impairment losses and other requirements, IAS 36 requires entities that recognized material goodwill impairment charges to disclose "the events and circumstances that led to the recognition…of the impairment loss." (IAS 36 ¶ 130 (a)). In line with the explanations provided in Danske Bank's December 15, 2014 announcement, the Company attributed its goodwill impairment charges to worsening market conditions in in its 2014 financial statements. Specifically, Danske Bank indicated that modest growth, low levels of short-term interest rates, and concerns expressed by economists regarding deflationary

pressures in the Eurozone, were the reasons for the goodwill impairment charges it recognized as of December 31, 2014.

242.     These disclosures concerning the goodwill write down associated with the Estonian branch were false and misleading as they failed to disclose all material facts and management assumptions that contributed to the good will write down.  Specifically, Defendants should have disclosed the whistleblower allegations regarding its money-laundering activities and the subsequent decision made by Danske Bank's Board of Directors in 2014 to wind down the operations of the Estonian Branch.  Danske Bank's omission of such information, therefore, meant that Danske Bank's 2014 financial statements were not prepared in accordance with IFRS and were false and misleading when issued.

243.     On December 15, 2014, Danske released slides regarding an expected goodwill write-down.  The presentation *revealed a goodwill write-down of around DKK 9 billion in Finland, Northern Ireland and Estonia, with the Estonia Branch accounting for approximately DKK 2.062 billion*.  The Company stated that the write-down would have "*[n]o impact on ongoing business or strategy*."

244.     Amid these revelations, and as presented on a conference call on December 15, 2014, Defendant Ramlau-Hansen falsely stated, as the Company was secretly winding down its main profit center in Estonia because of AML concerns, that "*this is primarily a technical accounting exercise based on our ordinary annual goodwill impairments test, a change in the macroeconomic condition, and also coinciding with the dialogue we have had with the Danish FSA.  The dialogue with the FSA has concerned what longer-term model assumptions to base goodwill impairments test upon.  The goodwill calculation is not related to expected short-term performance of the affected business areas.*"  Defendant Ramlau-Hansen falsely added that

"[t]he write-down of goodwill will not affect our capital ratios and *will not affect Danske Bank's ongoing business or the strategy for the involved units*."

245.   On February 2, 2015, Danske Bank issued its Corporate Responsibility 2014 report, which provided information regarding the Company's corporate governance, policies and performance.  The report stressed that the Company "*conduct[s] business in accordance with the laws and regulations of the countries where we operate, and we follow international guidelines and recognised principles for corporate responsibility, including standards for human rights, labour rights, the environment and anti-corruption*."

246.   Specifically, with regard to anti-money laundering measures, the report stated that:

> *The Group condemns money laundering and terrorist financing and takes the steps necessary to comply with internationally recognised standards in these areas, including Know Your Customer procedures.  The Group's anti–money laundering policy includes procedures for customer due diligence, reporting, recordkeeping, internal controls, risk management and communications.*
>
> *In 2014, we took new steps to prevent money laundering and the financing of terrorism.  In all three major business units, we installed a blocking system that makes it impossible for new customers without the required identification documents to transfer money.  To prevent this from having an adverse effect on customers' experience, we improved system support and training on anti–money laundering risk and documentation requirements for employees.*

247.   With regard to whistle-blowers, the report boasted:

> *We value the free flow of information, and all employees are encouraged to report any suspicion or knowledge of breaches of the Group's policies or any other unethical or unlawful behaviour to the head of Compliance.*  In 2013, we implemented a new reporting system that enables employees to report such information online anonymously.  To ensure that critical information is not withheld, we treat all reports and questions received through the whistleblower system as confidentially as possible within legal constraints, and we do not tolerate retribution against employees.  *Reports are investigated by Group Compliance, and an ad hoc whistleblower committee makes decisions on the incidents.  In 2014, three cases were reported in the whistleblower system.  All the cases were concluded, and the appropriate actions were implemented.*

248.     On February 3, 2015, Danske Bank announced its fiscal 2014 financial results for the period ended December 31, 2014.  The Annual Report published that day ("Annual Report 2014") stated, in pertinent part, that Danske Bank "*generated a net profit for 2014 of DKK 3.8 billion*," that the "*net profit was affected by goodwill impairments of DKK 9.1 billion*," and that "*[b]efore goodwill impairments, net profit rose 82% to DKK 12.9 billion, against DKK 7.1 billion in 2013 and DKK 4.7 billion in 2012*," adding that the "*increase was driven by growth in all income lines, lower expenses and lower loan impairments*."  These results were reiterated on an earnings call with analysts the same day.

249.     In the Annual Report 2014, Defendant Borgen again attributed the results to Danske Bank's purported ongoing operational and strategic prowess, rather than to the money laundering that the whistleblower had already disclosed to Danske Bank's senior executives during 2013, stating, in pertinent part, as follows:

> *2014 was a year of considerable progress for Danske Bank.  Our focus on delivering value to our customers helped strengthen our underlying business and our results*. . . .  Although we still have some way to go to meet our ambitions and realise the full potential of Danske Bank, the progress confirms that we are on track to deliver on our targets.  We will continue to diligently execute our strategy to become a more customer-centric, simple and efficient bank for the benefit of both customers and shareholders.

250.     The Annual Report 2014 also contained a letter signed by Defendants Andersen and Borgen that continued to highlight the Company's operational and strategic successes, stating that the performance justified the Company's strong financial guidance, while concealing the money laundering, stating, in pertinent part, as follows:

> *We are pleased to report that 2014 was a year of significant progress for Danske Bank*.
>
> The macroeconomic environment did not offer much support as the year saw a continuation of low interest rate levels and slow growth.  *Despite this, we managed  to increase the topline across our business as a result of a firm focus on delivering value to customers*.

The combination of an improved topline, lower costs and lower loan impairments *resulted in a net profit before goodwill impairments of DKK 12.9 billion and a return on equity before goodwill impairments of 8.5%. These are the best results since 2007 and give us confidence that we are on track to deliver on our targets.* As a result of expected weaker long-term macroeconomic developments, we made goodwill impairments of DKK 9.1 billion.

\*   \*   \*

*With these achievements, we believe that 2014 marks the end of a string of challenging years*. As confirmed by both Danish and European stress tests, Danske Bank is today a strong, well-capitalised bank with a solid platform and the capacity to meet the challenges and seize the opportunities that lie ahead.

\*   \*   \*

*We also decided to refocus our business in the Baltics towards our corporate customers and we will invest in strengthening our platform and product offering in these markets*.

251.    Specifically addressing the Company's Estonian operations, the Annual Report 2014 repeated that Danske Bank had taken a substantial impairment charge on the goodwill attributed to the Estonian operations, stating, in pertinent part, as follows:

**Business Banking, Estonia**

At the beginning of 2007, Danske Bank acquired the Baltic activities of the Sampo Bank group. The activities form part of the business structure of Danske Bank Group. With the acquisition, the Group established a presence in the Baltic markets, primarily in Estonia and, to a lesser extent, in Lithuania. The Group's operations in Latvia are very modest. The Group recognised goodwill impairment charges against the banking units in Latvia and Lithuania in 2009, reflecting the economic crisis in the Baltic countries. *Only the goodwill allocated to the Estonian operations remained capitalised. In 2013, goodwill at Banking Activities Baltics was reallocated to Business Banking Estonia as a result of the new organisational structure. In 2014, the Group recognised a goodwill impairment charge corresponding to the full amount of the goodwill owing to a worsening of the long-term economic outlook in Estonia and the planned repositioning of the personal banking business in 2015*.

252.    The Annual Report 2014 also emphasized that, "[i]ndicating confidence in [Danske Bank's] progress, Standard & Poor's and Moody's upgraded [the Company's] credit

ratings," allowing Danske Bank in April 2014 to "repa[y] the hybrid capital raised from the

Danish state in 2009 at the height of the financial crisis."

253.    The Annual Report 2014 further emphasized Danske Bank's then strong corporate

governance and reporting strengths, again claiming the Company was very transparent with

investors about these matters, stating, in pertinent part, as follows:

> Corporate responsibility (CR) remains an important part of Danske Bank's
> strategy.  ***We want our customers and other stakeholders to feel confident that
> we manage our business with proper attention to environmental, social, ethical
> and governance issues.***  This applies to credit granting, investing, responsible
> sourcing, and our contribution to financial stability in society and the economy in
> general.  ***We consider responsible business conduct a precondition for longterm
> value creation.***
>
> **Reporting on corporate responsibility**
>
> ***Under the Danish FSA's Executive Order on Financial Reports for Credit
> Institutions and Investment Firms etc. (section 135 and section 135a), large
> companies are required to report on corporate responsibility and diversity at
> management level.  As a signatory to the UN Global Compact, Danske Bank
> prepares a Communication on Progress in the form of our Corporate
> Responsibility 2014 report.  With this report, which is available at
> danskebank.com/crreport, we fulfil the requirements.***
>
> ***The report is supplemented by additional data and indicators in our Corporate
> Responsibility Fact Book 2014 and 2014 Global Reporting Initiative (GRI G4)
> index and combined, our reporting offer a comprehensive and balanced view of
> material corporate responsibility matters relating to our business activities.  The
> reporting and information about Danske Bank's other CR initiatives and
> projects are available at danskebank.com/responsibility.***

254.    Danske Bank further claimed that its Annual Report 2014 was "***prepare[d] . . . in***

***accordance with the International Financial Reporting Standards (IFRSs), issued by the***

***International Accounting Standards Board (IASB), as adopted by the EU***."

255.    Also on February 3, 2015, Danske Bank issued its Risk Management 2014 report,

which described the Company's risk management efforts.  The report stated, in pertinent part,

that:

*The Group's risk management practices are organised in three lines of defence. This organisation ensures a segregation of duties between (1) units that enter into business transactions with customers or otherwise expose the Group to risk, (2) units in charge of risk oversight and control and (3) the internal audit function.*

*The first line of defence is represented by the business units and the operations and service organisations.  Each unit operates in accordance with risk policies and delegated mandates and has its own independent risk function.  The units are responsible for having adequate skills, operating procedures, systems and controls in place to comply with policies and mandates and to exercise sound risk management.*

*The second line of defence is represented by group-wide functions that monitor whether the business units and the operations and service organisations adhere to the general policies and mandates.  These functions are located in Group Risk Management.*

*The third line of defence is represented by Internal Audit, as described above in the section on the Board of Directors.*

On 1 January 2015, the credit organisation was adjusted so that the heads of credit at the business units report to the chief risk officer, who heads Group Risk Management, while remaining part of the management teams at their business units.  *The sub-departments under Group Risk Management were adjusted to enhance execution and to maintain the principle of three lines of defence.*

256.    On February 11, 2015, Danske Bank announced it would issue and sell bonds in the amount of DKK 5.6 billion (€750 million), which the Company announced having completed on February 11, 2015.  According to Danske Bank, the bonds would "be perpetual . . . with an option to prepay the bonds on 6 April 2022, at the earliest," would "have a Coupon of 5.875% per annum, payable semi-annually in arrear on 6 April and 6 October in each year, commencing on 6 October 2015," and would "be listed on the Irish Stock Exchange."

257.    On April 30, 2015, Danske Bank issued its Interim Report for the First Quarter of 2015, which *reported net profits of DKK 4.951 billion, representing an* "*increase of 76% from the first quarter of 2014*."  These results were reiterated on an earnings call with analysts the

same day, with Defendant Borgen adding that the results were "*driven by improvements in all areas*."

258.   On June 17, 2015, Danske Bank issued a release announcing that "Moody's [had] upgraded Danske Bank's long-term rating to A2 from A3 and Danske Bank's short-term rating to P-1 from P-2," quoting Defendant Ramlau-Hansen as stating in pertinent part that "*[t]he upgrade [was] a recognition of Danske Bank's continued progress and improved financial results*," and that the "*upgrade also underline[d] that [Danske Bank] continue[d] to deliver on [its] strategic targets for 2015*.'"

259.   On July 22, 2015, Danske Bank issued its Interim Report for the First Half of 2015, which reported *net profits of DKK 9.419 billion, representing an increase of* "*36% from the level in the first half of 2014*." These results were reiterated on an earnings call with analysts the same day.

260.   On October 29, 2015, Danske Bank issued its Interim Report for the First Nine Months of 2015, which reported *net profits of DKK 13.088 billion, representing an increase of* "*28% from the level in the first nine months of 2014*." These results were reiterated on an earnings call with analysts the same day, with Defendant Borgen adding that the results were "*driven by improvements in fee income, lower expenses and a significant drop in loan impairment charges*."

261.   On November 19, 2015, Danske Bank announced that Defendant Ramlau-Hansen was "resign[ing] from his position" and would be replaced by Defendant Aarup-Andersen effective April 1, 2016. In the release, Defendant Borgen lauded Defendant Ramlau-Hansen's performance at the Company without disclosing the Estonian money laundering, stating in pertinent part that, in "*the past five years [Ramlau-Hansen had] taken part in creating a solid*

*foundation for [Danske Bank] in terms of ratings, capital position and liquidity*," and that he

would "*hand[] over a strong organisation and a bank in good shape*.'"

262.    On February 1, 2016, Danske Bank issued its Corporate Responsibility 2015

report, which provided information regarding the Company's corporate governance, policies and

performance.  Specifically, with regard to anti-money laundering measures, a section entitled

"preventing money laundering" stated that:

> A key element in establishing and maintaining customer relationships and
> providing the best possible advice is knowing our customers.  **Knowing our
> customers is also important in preventing money laundering and the financing
> of terrorism.**  We must prevent criminals and terrorists from using our products
> and services for illicit fund flows, and to do so, **we keep abreast of the
> regulations and frequent developments in the area and work continually to
> improve our safeguards**.
>
> **We are implementing measures to prevent money laundering and the financing
> of terrorism.  Our Policy on Anti–Money Laundering and Countering Terrorist
> Financing includes procedures for customer due diligence, reporting,
> recordkeeping, internal controls and risk management.  In 2014, we installed a
> blocking system that improved the verification of customer identity and risk
> management.**
>
> **In 2015, we continued to allocate more resources to the area, and we
> reorganised the Compliance organisation to make the governance of these
> activities more effective.  We also aligned requirements across business units
> and market areas.**

263.    With regard to whistle-blowers, the report stated:

> All employees must comply with our Code of Conduct and are expected to live
> our core values.  The Code helps employees in their daily decision making in
> situations that involve confidential or inside information or conflicts of interest.
> We have an eLearning Code of Conduct programme that all employees must
> complete every year.
>
> **In 2015, we developed clear guidelines for employees on giving and receiving
> gifts and registering them.  We also improved our internal communications on
> the whistleblower system, and in 2016 we will further strengthen our training
> and eLearning.**

264.     On February 2, 2016, Danske Bank announced its fiscal 2015 financial results for the period ended December 31, 2015.  The Annual Report published that day ("Annual Report 2015") stated, in pertinent part, that Danske Bank's "***net profit for 2015 was DKK 13.1 billion***," and that, but for reported "***goodwill impairments of DKK 4.6 billion***," its "***[n]et profit before goodwill impairments rose 36% to DKK 17.7 billion, against DKK 13.0 billion in 2014***."  These results were reiterated on an earnings call with analysts the same day, with Defendant Borgen adding that the results were, "***based on solid underlying customer activity, particularly in the beginning of the year***."  Defendant Borgen also stated that:

> 2015 was a year of satisfactory progress for Danske Bank from both a financial and a strategic perspective.  We made steady progress on our strategy of becoming a more cosmocentric, simple and efficient bank, and we saw good developments in our underlying business.  And despite the challenging environment caused by very low interest rates, ***we delivered strong financial results as we benefited from our diversified business model and high customer activity***.

265.     In the Annual Report 2015, Defendant Borgen attributed the results to Danske Bank's purported ongoing operational and strategic prowess, rather than to the money laundering that the whistleblower had already disclosed to Danske Bank's senior executives during 2013, stating, in pertinent part, as follows:

> ***In 2015, Danske Bank continued to progress and delivered strong results despite a challenging environment.  The results are testament to the strength of our diversified business model as a Nordic universal bank and reflect our firm focus on executing our strategy of becoming a more customer-centric, simple and efficient bank. . . .***
>
> ***We continued to strengthen relations with our customers and launched a number of initiatives aimed at making daily banking and important financial decisions easier for our customers.  We have a sound platform and a strong position in the marketplace as well as a clear strategic direction for the next part of our journey towards realising the full potential of Danske Bank.***

266.     The Annual Report 2015 also contained a letter signed by Defendants Andersen and Borgen that continued to highlight the Company's operational and strategic successes,

stating that the performance justified the Company's strong financial guidance, while concealing

the money laundering, stating, in pertinent part, as follows:

> 2015 was another year of significant progress for Danske Bank.  We are well on
> track to becoming a more customer-centric, simple and efficient bank to the
> benefit of all our stakeholders.
>
> ***Net profit before goodwill impairments was DKK 17.7 billion for 2015 and the
> return on shareholders' equity before goodwill impairments was 11.6%, and we
> have thus delivered on the financial targets we have pursued since 2013***.  We
> maintained a strong capital position, and our credit ratings were improved.
>
> *      *      *
>
> In recent years, we have strengthened Danske Bank's leadership, in particular the
> leadership of support and staff functions.  This work continued during 2015 with
> the overall objective of increasing our customer focus and becoming a more
> simple and efficient business.  We have increased our focus on leadership
> development, succession planning and talent development.  ***We have also
> initiated a cultural transformation process, which on the basis of value-based
> leadership promotes customer-centricity, performance management and
> empowerment of staff***.
>
> **The journey ahead**
>
> ***Our 2015 results bring us a significant step closer to delivering on our
> target of a return on shareholders' equity above 12.5% by 2018 at the latest***.

267.    The Annual Report 2015 also emphasized that Danske Bank had "reached [its]

rating targets when Moody's upgraded [its] long-term rating to A2 and [its] short-term rating to

P-1 in June, and S&P changed its outlook for [its] long-term A rating to stable in July,"

emphasizing that "***[t]his was a very important milestone that is testament to the sustained effect***

***of [the Company's] strategic initiatives***," and that the "improvement in [its] ratings mean[t] that

[it was] able to do more business with specific customer groups and that [it could] further

optimise [its] funding."

268.     The Annual Report 2015 further emphasized Danske Bank's then strong corporate governance and reporting strengths, again claiming the Company was very transparent with investors about these matters, stating, in pertinent part, as follows:

### Corporate responsibility

Corporate responsibility is an important part of Danske Bank's strategy.  *We want to create long-term value for all our stakeholders, and we want them to feel confident that we manage our business with proper attention to environmental, social, ethical and governance issues.*  This applies to credit granting, investing, responsible sourcing, and our contribution to financial stability and economic growth.  *We consider responsible business conduct a precondition for long-term value creation*.

### Reporting on corporate responsibility

*We report on our corporate responsibility activities and performance in the independently assured Corporate Responsibility Report 2015.  The report serves as our Communication on Progress as required by the UN Global Compact and ensures compliance with the requirements of the Danish FSA's Executive Order on Financial Reports for Credit Institutions and Investment Firms etc. (sections 135 and 135a) on corporate responsibility reporting.  The report is available at danskebank.com/ crreport.*

*The report is supplemented by our Corporate Responsibility Fact Book 2015. Our combined reporting offers a comprehensive and balanced view of material corporate responsibility matters relating to our business activities.  These reports and further information about our CR initiatives and projects are available at danskebank.com/ responsibility.*

269.     With respect to compliance, the Annual Report 2015 stated:

As part of our ongoing work to ensure simplicity, efficiency and effectiveness in the operational risk management and compliance areas, *we continue to invest in anti–money laundering measures, cyber security and fraud prevention.  The supervisory authorities conduct ongoing inspections of Danske Bank's compliance with anti-money laundering legislation that could lead to supervisory actions.  During 2015, we increased our resources within the antimoney-laundering area as part of our continuous effort to promote and ensure compliance with regulation and industry standards.*

270.     Danske Bank further claimed that its Annual Report 2015 was "*prepare[d] . . . in accordance with the International Financial Reporting Standards (IFRSs) . . . issued by the International Accounting Standards Board (IASB), as adopted by the EU*."

271.     Also on February 2, 2016, Danske Bank issued its Risk Management 2015 report, which described its risk management efforts.  The report stated, in pertinent part, that:

> *The Group's risk management practices are organised according to the principles of three lines of defence.  The three lines of defence segregate duties between (1) units that enter into business transactions with customers or otherwise expose the Group to risk, (2) units in charge of risk oversight and control and (3) the internal audit function.*
>
> *The first line of defence is represented by the business units and the operations and service organisations.  Each unit operates in accordance with the risk policies and delegated mandates.  The units are responsible for having adequate skills, operating procedures, systems and controls in place to comply with policies and mandates and to exercise sound risk management.*
>
> *The second line of defence is represented by group-wide functions that monitor whether the business units and the operations and service organisations adhere to the general policies and mandates.  These functions are located in Group Risk Management.*
>
> *The third line of defence is represented by Internal Audit, as described above in the section on the Board of Directors.*

272.     The Risk Management 2015 report, also stated, in pertinent part, that:

> *[W]e also increased our attention on internal control processes and compliance*.  In January 2015, we centralised a number of functions in Group Compliance in order to ensure integrity and a better alignment in our compliance processes.  *We launched several initiatives across the Group in an ongoing effort to promote and ensure compliance with regulation and industry standards.  Notably, we increased our resources in the anti–money laundering (AML) area.  Our efforts in the compliance area will support a better customer experience, lead to greater efficiency, and reduce operational and reputational risks.*

273.     On March 16, 2016, the DFSA announced that, beginning in 2015, it had "conducted an inspection to establish whether Danske Bank was in compliance with the current rules in the anti-money laundering (AML) area," which disclosed the DFSA's investigation into

Danske Bank's compliance with AML rules, including commenting briefly on its Estonian

operations, though it did not disclose the full extent of the misconduct.  The DFSA's disclosure

stated, in pertinent part, as follows:

**Risk assessment**

> Danske Bank is the largest financial institution in Denmark.  Danske Bank Group conducts a large volume of financial business, including transactions in the fields of asset management, investment, pensions, mortgage finance, insurance, real estate brokerage and leasing.  The bank has a substantial number of personal, business and institutional customers, and many have a complex group structure. A large number of customers reside or are domiciled outside Denmark, and a large number of physical customers are distance customers.

> Transaction volumes, including cross-border funds transfers, are substantial.  A great many customer transactions are made online or by means of cash handling in connection with account deposits, foreign exchange and funds transfers.  The bank has a significant number of correspondent banks throughout the world.  In keeping with international guidelines, cross-border correspondent bank relationships are considered to involve a high risk of money laundering and terrorism financing.

> Against the background of the extent and nature of these activities, the FSA considers Danske Bank's inherent risk of being exploited for money laundering or terrorism financing purposes to be high compared with the risk to which the average Danish financial institution is exposed.

**Conclusions of the inspection**

> Danske Bank has implemented a series of initiatives to strengthen its risk-mitigating measures in the AML area since the FSA's previous inspection in 2011-12.  The FSA notes in particular that, with effect from October 2014, the bank introduced measures entailing a compulsory pre-check of obtained customer information by a special control unit.  This means that new customers cannot carry out transactions until the control unit has approved the proof of identity etc.

> Moreover, the bank has generally focused on combating money laundering and terrorism financing.  The bank has regularly added resources to comply with the rules set out in the Danish Act on the Prevention of Money Laundering and Financing of Terrorism (the Danish Anti-Money Laundering Act or the Danish AML Act), and, especially since the FSA embarked on its inspection in February 2015, the bank has added resources to meet the requirements of special checks of correspondent banks.

However, the FSA finds that, at the time of the inspection, the bank still faced considerable challenges and, in a number of areas, could not be considered to be in compliance with the requirements of the Danish AML Act.  The inspection has therefore resulted in material supervisory reactions in the following areas:

*Risk assessment and risk management*

The bank was ordered to make adequate assessments of the risk that the individual business units could be exploited for money laundering and terrorism financing purposes.

*Know Your Customer (KYC) – business customers classified as high-risk customers*

The bank was ordered to ensure adequate knowledge about business customers classified by the bank as customers involving a relatively high risk of money laundering or terrorism financing.

*Correspondent banks outside the EU/EEA*

In connection with the FSA's inspection in 2012, the bank was ordered to introduce satisfactory procedures with a view to ensuring compliance with the rules on cross-border correspondent bank relationships set out in the Danish AML Act.

The FSA also ordered the bank to ensure that, at the establishment of correspondent bank relationships and in the ongoing monitoring of such relationships, the bank obtains sufficient information about the purpose and expected business volume of the individual business relationship, the quality of the supervision of the institution by the local authority and details to ensure that the individual institution has sufficient and effective control procedures in place in the AML area.  This information must form part of the bank's basis for deciding whether or not to approve the establishment of a business relationship with the individual institution.  Furthermore, the bank is ordered to ensure adequate monitoring of transactions carried out on behalf of these correspondent banks.

*The bank's branch in Estonia*

The bank received a reprimand pursuant to the Danish Financial Business Act for having failed in time to identify material money laundering risks at its branch in Estonia and for having failed in time to introduce risk-mitigating measures in this respect.  In theory, the supervision of the bank's foreign subsidiaries and branches in the AML area is the responsibility of the local authorities, but the FSA finds that circumstances identified at the branch constitute such a material reputational risk to the bank that the FSA is looking into

the matter.  The FSA notes that the bank has drawn up a plan to mitigate risks, which the bank is discussing with the Estonian financial supervisory authority.

**Police report against Danske Bank**

On the basis of the conclusions of the inspection, the FSA has reported the bank to the police for violation of the provisions on correspondent bank relationships of the Danish AML Act, including for non-compliance with the FSA's order issued in the area in 2012.

274.     Because the significance of the money laundering at the Estonian operations remained concealed, the price of Danske Bank ADRs remained artificially inflated.

275.     On April 29, 2016, Danske Bank issued its Interim Report for the First Quarter of 2016, ***which reported net profits of DKK 4.945 billion***.  These results were reiterated on an earnings call with analysts the same day, with Defendant Borgen adding that the results were, "good evidence of our ***solid business model and demonstrate our ability to operate in a low-growth environment*** with more widespread negative rates."

276.     On July 21, 2016, Danske Bank issued its Interim Report for the First Half of 2016, which ***reported net profits of DKK 9.363 billion***.  The executive summary of the report stated that, "We continued to execute our strategy of becoming an even more customer-focused, simple and efficient bank.  Our clear ambition is to be number one in customer experience by making daily banking and important financial decisions as easy as possible."  The results were reiterated on an earnings call with analysts the same day, with Defendant Borgen adding that the results demonstrated, "***the strength of our diversified business model, however, and show that the continued execution of our strategy of becoming a more customer centric, simple and efficient Bank, is yielding results***."  On the same call, Defendant Aarup-Andersen commented on the Company's commitment to ending fraudulent activity, stating, "***We also had some extra expenses related to the ramp up of our efforts on the regulatory front, especially for anti-money laundering activities, which remains a key focus area for the Group***."

277.    On October 12, 2016, the Company disclosed that Moody's had upgraded Danske Bank's long-term deposit rating from A2 to A1 and changed its outlook on Danske Bank from stable to positive as a result of the continued improvements in earnings, capitalization and credit quality.

278.    On October 28, 2016, Danske Bank issued its Interim Report for the First Nine Months of 2016, which ***reported net profits of DKK 14.268 billion, up from DKK 13.1 billion in the first nine months of 2015***.  The executive summary of the report stated that, "our strategy of becoming an even more customer-focused, simple and efficient bank continues to yield results." The results were reiterated on an earnings call with analysts the same day, with Defendant Borgen adding that the results demonstrated, "***that we continue to benefit from the strength of our diversified business model***, however, and the execution of our strategy of becoming a more customer-centric, simple and efficient bank is now yielding good results."

279.    On November 14, 2016, Danske Bank announced it would issue and sell bonds in the amount of DKK 3 billion, which the Company announced having completed on November 17, 2016.  According to Danske Bank, the bonds would have "a variable interest rate of 3M CIBOR + 4.75% per annum," would "be perpetual, but the bank ha[d] the option to prepay the bonds at par on the interest payment date in November 2021 and on any interest payment date following that date," and would be "listed on Nasdaq Copenhagen."

280.    On February 2, 2017, Danske Bank announced its fiscal 2016 financial results for the period ended December 31, 2016.  The Annual Report published that day ("Annual Report 2016") stated, in pertinent part, that Danske Bank had reported "***a net profit of DKK 19.9 billion, up from DKK 17.7 billion before goodwill impairment charges in 2015, and a return on shareholders' equity after tax of 13.1%, against 11.6% before goodwill impairment charges in***

*2015*," and that Danske Bank had "***delivered a satisfactory result for 2016***."  The net profit results were reiterated on an earnings call with analysts the same day, with Defendant Borgen adding that the results demonstrated, "***the strength of our diversified business model and also show that we have successfully executed our strategy of becoming a more customer-centric simple and efficient bank***."

281.    Again, the Annual Report 2016 quoted Defendant Borgen as attributing the results to Danske Bank's purported ongoing operational and strategic prowess, rather than to the money laundering that the whistleblower had already disclosed to Danske Bank's senior executives during 2013, stating, in pertinent part, as follows:

> *The year 2016 was another year of solid progress for Danske Bank.  In a challenging environment, we delivered satisfactory financial results, while at the same time strengthening our market position.  With a return on equity of 13.1%, we delivered on our long-term target. . . .*
>
> *The results reflect our diversified business model and our efforts to become a more customer-centric, simple and efficient bank.  We kept a high innovation pace and launched a number of new advisory products and easy-to-use solutions.  We also saw a continued improvement in customer satisfaction and managed to attract new customers and grow our volume, while maintaining high credit quality and reducing costs.*
>
> *We are satisfied with the progress and remain committed to continuing the execution of our strategy and to realising the full potential of Danske Bank on our journey to become recognised as the most trusted financial partner.*

282.    The Annual Report 2016 also contained a letter signed by Defendants Andersen and Borgen that continued to highlight the Company's operational and strategic successes, stating that the performance justified the Company's strong financial guidance, while concealing the impact of the money laundering and the extent of Danske Bank's potential culpability, stating, in pertinent part, as follows:

> *We are pleased to report that 2016 was another year of solid progress for Danske Bank.*  In a challenging environment of slow economic growth and low

interest rates, we managed to deliver satisfactory financial results, strengthen our market position and lay the foundation for future success.

*With a net profit of DKK 19.9 billion and a return on equity of 13.1%, we reached our target of at least 12.5% two years ahead of time. The results once again reflect the strength of our diversified business model and demonstrate that our efforts to become a more customer-centric, simple and efficient bank continue to yield results.*

283.    With respect to compliance, the Annual Report 2016 stated:

*Danske Bank focuses on having a strong compliance culture to ensure that compliance is conducted at all levels of the Group and that we thus act with integrity.*  In 2016, we continued to allocate significant resources to anti-money laundering measures and to the compliance organisation.

We want regulatory requirements to be a natural part of our interaction with customers.  We therefore have projects in place to ensure that customers are always treated fairly, for example, by designing new and sustainable processes.

*In 2016, the compliance organisation was strengthened by the establishment of a global function responsible for group-wide transaction monitoring to identify possible money laundering, financing of terrorism, customer tax evasion and market abuse activities.  This enabled us to ensure proper awareness and understanding of compliance throughout the Group and thereby to meet the standards of the European banking industry.*

*The Group makes extensive efforts to comply with regulations and prevent criminals from abusing its services to commit financial crimes.  In 2016, we focused on developing existing Know Your Customer systems and processes, increasing transaction monitoring, improving employee training and updating the customer database.*

In March 2016, after an on-site anti-money laundering inspection, the Danish FSA issued eight orders to Danske Bank, and in September 2016, we submitted a statement to the effect that, in our assessment, *we were in compliance with the orders*.  The final statement from the Danish FSA included a notification to the Danish Public Prosecutor for Serious Economic and International Crime, and we were reported to the police for non-compliance with AML legislation on correspondent banks.  *At the end of 2016, the authorities had not yet approached us to instigate further investigations*.

*In 2016, Danske Bank implemented arrangements to comply with the new Market Abuse Regulation and ensure integrity and transparency throughout the organisation*.  The new setup includes a robust system of insider lists and investment recommendations and a surveillance system.

284.    Danske Bank further claimed that its Annual Report 2016 was "***prepare[d] . . . in accordance with the International Financial Reporting Standards (IFRSs) . . . issued by the International Accounting Standards Board (IASB), as adopted by the EU***."

285.    Also on February 2, 2017, Danske Bank issued its Risk Management 2016 report, which described its risk management efforts.  The report stated, in pertinent part, that:

> ***The Group's risk management practices are organised according to the principle of three lines of defence.  These lines of defence segregate duties between (1) units that enter into business transactions with customers or otherwise expose the Group to risk, (2) units in charge of risk oversight and control, and (3) the internal audit function.***
>
> The heads of the business units, operations areas and service areas are responsible for all business-related risks.  ***The segmented organisation allows risk management processes to be tailored to the various customer segments and to be aligned across borders.***

286.    The Risk Management 2016 report, in a section entitled "Operational Risk," discussed the Company's anti-money laundering efforts, stating, in pertinent part, that:

> ***As in previous years, we focused on anti-money-laundering measures in 2016 in our ongoing efforts to ensure compliance with regulations and industry standards.  We continued to increase resources and launched new initiatives.***  In 2016, we strengthened the compliance organisation by establishing the Global Monitoring & Financial Crime Compliance function, which is responsible for group-wide transaction monitoring to identify possible money laundering, terrorism financing, customer tax evasion and market abuse.  ***We focused on developing our existing Know Your Customer systems and processes and also increased transaction monitoring, improved employee training, and coordinated an extensive update of the Group's customer database.***

287.    On February 6, 2017, Danske Bank issued its Corporate Responsibility 2016 report, which provided information regarding the Company's corporate governance, policies and performance.  Specifically, with regard to anti-money laundering measures, a section entitled "[p]reventing financial crime" stated that:

> Financial crime is a major problem for society.  Estimates for the Nordic countries alone suggest that money laundering involves billions of euro every year in each country.  ***To ensure that our services are not abused for illegal purposes like***

*money laundering and other criminal activities, we seek continuously to improve our processes and systems and to train our employees thoroughly.  For example, we have automatic monitoring of transactions and screening of customers in order to check if they are on international sanctions lists.*

In March 2016, after an on-site anti-money laundering inspection, the Danish Financial Supervisory Authority (FSA) issued eight orders to Danske Bank.  The final resolution from the FSA also included a report to the Danish Prosecutor for Special Economic and International Crime for investigation related to correspondent banking.  *Throughout 2016, we have made substantial efforts to comply with regulation and in September, we submitted a statement on compliance with the orders*.

288.    With regard to whistle-blowers, the report provided:

In order to protect our integrity, employees must have easy access to a means of reporting wrongdoings to management.  For this reason, the Group has established a whistleblowing scheme.  *Any potential wrongdoing no matter its potential financial and non-financial impact for Danske Bank is suitable for being reported through our whistleblowing scheme, which applies to all employees and members of our management.*  In 2016, we updated our Whistleblowing Policy supported by further awareness activities across the Group.

289.    On March 20, 2017, Danske Bank issued a press release responding to and

downplaying the significance of certain media rumors circulating about its Estonian bank

operations, stating, in pertinent part, as follows:

### Comments on media coverage of transactions at Danske Bank in connection with money laundering case

Several media today report on a case of possible international money laundering, and Danske Bank is mentioned as *one of the banks that may have been used*.  For Danske Bank, the transactions involved are almost exclusively transactions carried out at our Estonian branch in the 2011-2014 period.

"The transactions involved are transactions that we already know about and have discussed with both the Danish and the Estonian authorities," says Flemming Pristed, Group General Counsel.  At the time, our systems and procedures in Estonia were insufficient to ensure that we could not be used for money laundering.  We have taken the measures necessary to remedy this.  We have also closed the accounts of all customers who could not document a legitimate reason for maintaining an account in Estonia.  As a result, business relations with all but one customer involved in the transactions in question have been terminated.  We

have introduced new systems and control procedures and put a new management in place in Estonia.

***We do not want in any way to be used for money laundering or other criminal activity.  We take our responsibility for combating money laundering and other financial crime very seriously and have stepped up our efforts in this area considerably in recent years***.  We cannot guarantee that attempts to launder money through Danske Bank will be unsuccessful, but it has never been harder than it is now, and we are doing everything we can to prevent it from happening."

The situation in Estonia caused the Danish Financial Supervisory Authority to issue a reprimand to Danske Bank, as disclosed in March 2016.

The measures taken at Danske Bank in recent years include improving the IT systems to enhance monitoring, introducing tighter control, adding more resources to anti-money laundering activities and training staff.

Facts at Group level about Danske Bank's anti-money laundering activities:

- More than 550 employees are dedicated to the combating of financial crime.

- Every month, we screen three million customer transactions.

- Every week, we screen 16 million customer numbers against international sanction lists.

- Every year, 120,000 warnings are registered concerning unusual customer behaviour in relation to money laundering and the financing of terrorism.

- In the past year, Danske Bank submitted 5,404 reports to the authorities.

Yours faithfully,

Danske Bank

290.    On April 28, 2017, Danske Bank issued its Interim Report for the First Quarter of 2017, ***which reported net profits of DKK 5.530 billion, against DKK 4.9 billion in the first quarter of 2016***.  These results were reiterated on an earnings call with analysts the same day.

291.    On July 20, 2017, Danske Bank issued its Interim Report for the first half of 2017, ***which reported net profits of DKK 10.321 billion, representing "an increase of 10% from the level in the first half of 2016 that was caused by positive macroeconomic developments in the Nordic markets, a continuation of low loan impairment levels, increased lending volumes and***

*high customer activity*."  These results were reiterated on an earnings call with analysts the same day.

292.    In its interim report dated July 18, 2018, Danske stated that it *'does not expect the outcomes of pending lawsuits and disputes, the dialogue with public authorities or the inspection of compliance with antimony laundering legislation to have any material effect on its financial position*.'"  Defendants' contingent liability footnotes, which may be found in all of the Danske Bank's interim and full year reports throughout the Class Period in substantially similar form until the July 18, 2018 interim report, were false and misleading when made for the reasons disclosed in ¶295.

293.    Each of the interim financial reports cited above was accompanied by a "Statement by the management" which stated "that The Board of Directors and the Executive Board (the management) have considered and approved" the financial reports.  The statement elaborated in substantially similar form for each interim financial report, that the interim financial reports had ***"been prepared in accordance with IAS 34, Interim Financial reporting, as adopted by the EU, and the Parent Company's interim financial statements have been prepared in accordance with the Danish Financial Business Act.  Furthermore, the interim report has been prepared in accordance with Danish disclosure requirements for listed financial companies.  In our opinion, the interim financial statements give a true and fair view of the Group's and the Parent Company's assets, liabilities, total equity and financial position at [the reporting period] and of the results of the Group's and the Parent Company's operations and the consolidated cash flows for the period [reporting period].  Moreover, in our opinion, the management's report includes a fair review of developments in the Group's and***

*the Parent Company's operations and financial position and describes the significant risks and uncertainty factors that may affect the Group and the Parent Company*."

294.     Each of the annual financial reports cited above was accompanied by a "Statement by the management" which stated "that The Board of Directors and the Executive Board (the management) have considered and approved" the annual financial reports.  The statement elaborated, in substantially similar form for each annual financial report, that the annual financial reports had "***been prepared in accordance with the International Financial Reporting Standards as adopted by the EU, and the Parent Company financial statements have been prepared in accordance with the Danish Financial Business Act.  Furthermore, the annual report has been prepared in accordance with Danish disclosure requirements for annual reports of listed financial institutions.  In our opinion, the consolidated financial statements and the Parent Company financial statements give a true and fair view of the Group's and the Parent Company's assets, liabilities, shareholders' equity and financial position at [reporting date] and of the results of the Group's and the Parent Company's operations and the consolidated cash flows for the financial year . . . . Moreover, in our opinion, the Management's report includes a fair review of developments in the Group's and the Parent Company's operations and financial position and describes the significant risks and uncertainty factors that may affect the Group and the Parent Company***.

295.     The statements and financial results reported in ¶¶220-272 and 274-294 above were materially false and misleading at the time they were made and omitted to state required material information because they failed to disclose the following adverse information that was then known to Defendants or recklessly disregarded by them:

(a)      that Danske Bank's Estonian Branch had continued facilitating money

laundering through at least March 15, 2016;

(b)      that a whistleblower had reported the Estonian money laundering to

Danske Bank in 2013;

(c)      that the DFSA had been investigating the Estonian money laundering

since 2014 and Danske Bank was concealing the results of its own internal investigation from

those regulators, further exposing it to regulatory action and fines;

(d)      that Danske Bank had been overstating its historical profits by including

the profits derived from its illicit Estonian operations;

(e)      that Danske Bank lacked effective internal and reporting controls;

(f)      that Danske Bank did not comply with applicable financial reporting

standards, as described in Section IV.C., *supra*;

(g)      that, as a result of the foregoing, Defendants' statements about Danske

Bank's business, operations and prospects were materially false and misleading and/or lacked a

reasonable basis at all relevant times; and

(h)      even as the truth began to be revealed to the market, Defendants continued

to downplay the extent and significance of their violations of AML/CFT regulations and

applicable financial reporting standards and the impact that those violations would have on

Danske Bank's business and prospects.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

296.    The Individual Defendants acted with scienter in that they knew or recklessly

disregarded that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading.  The Individual Defendants knowingly or

recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

297.    By virtue of their receipt of information reflecting the true facts regarding Danske Bank's conduct with regard to its Estonian Branch, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning the Company, the Individual Defendants were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the alleged false and misleading information they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or reckless complicity of personnel at the highest level of the Company, including the Individual Defendants and other senior executives.

298.    Numerous facts support a strong inference of the Individual Defendants' scienter during the Class Period, including: (a) the Individual Defendants' knowledge of operations at the Estonian Branch and the related investigations into its actions; (b) Defendants' obligations associated with Danske Bank's disclosure controls; and (c) the misstatements and omissions of material facts concerning the Company's Estonian Branch Operations about which several of the Individual Defendants were repeatedly questioned and spoke.

299.    Moreover, the Individual Defendants and/or others with authority and control over the Company authored, issued and/or approved the dissemination of the misleading statements identified herein, or otherwise caused the Company to withhold information the Company had an obligation to produce (whether such information was necessary to render certain statements non-misleading or otherwise).  Accordingly, the scienter of the individuals

who authorized, directed and carried out these business practices and disclosures is imputed to Danske Bank—even if their identities are not now known—under the corporate scienter doctrine.

300.     In addition to imputing the Individual Defendant's knowledge and information to Danske Bank, the Company is also imputed with the knowledge of its other employees which are not expressly named herein.[14]

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

301.     During the Class Period, as detailed herein, Defendants made false and misleading statements and/or engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Danske Bank securities and operated as a fraud or deceit on Class Period purchasers of Danske Bank ADRs by misrepresenting the Company's business and prospects.  Later, when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Danske Bank ADRs fell precipitously, as the prior artificial inflation came out of the price over time through a series of partial revelations of the truth and/or leaked to the market.  As a result of their purchases of Danske Bank ADRs during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

302.     On April 7, 2017, the Organized Crime and Corruption Reporting Project posted an article titled "Businessman suspected in Italian bribery case linked to Azerbaijan's first family."  The article described that payments "were made in exchange for Volonté's efforts to

---

[14] Indeed, the B&H Report expressly declines to name the individuals, including one of the Defendants named herein, when discussing them in the Report, claiming that "[w]e are not in a position to share an assessment of an individual unless requested by the individual in question." The report instead attempts to obfuscate the identity of the individuals by referring to them vaguely as "a member of the Executive Board," "employees at group level," as a redacted "[Name]," and through extensive use of the passive voice.

mute the European [Parliament]'s criticism of Azerbaijan's human rights record" and specified that "money transferred to Volonté came from accounts in the Estonia branch of Danske Bank and originated from Baktelekom MMC. The Azerbaijani company has no website or public profile, and it is not clear what its function is." On this news, Danske Bank ADRs fell by 1.75 percent, to close at $16.85.

303. On August 17, 2017, *FinTech*, relaying information in an article published by *Berlingske*, published an article titled "Nordea and Danske Bank being investigated for money laundering." The article disclosed that Nordea and Danske Bank were under investigation by the DFSA. On this news, Danske Bank ADRs fell by 1.97 percent, to close at $19.23.

304. On September 5, 2017, *Reuters* reported that Danske Bank had hired the former head of Denmark's intelligence agency and fraud squad to help it in its effort to counter money-laundering claims. The announcement came after media reports that the Company's Estonian Branch had been exploited for money laundering and other illegal activities between 2012 and 2014 in the Azerbaijani Laundromat, a general-purpose money laundering scheme and slush fund used by the ruling elite in Baku. A report by OCCRP that day specified that "[e]xperts say Danske Bank violated national and international anti-money laundering (AML) regulations by closing its eyes to the €2.5 billion (US$ 2.9 billion) that passed through four accounts." In response to the media reports, Danske Bank issued a press release titled "Comments on media coverage of transactions at Danske Bank in Estonia." In the press release, Danske Bank's General Counsel stated that "[o]n the basis of the suspicion of possible money laundering or other illegal activities, we have decided to take another look at the situation in Estonia during the period leading up to 2014. We have started various investigations to establish what exactly took place during that period and to learn from what happened then." On this news, Danske Bank

ADRs fell by 1.71 percent, to close at $19.34.  Danske Bank ADRs continued to fall by 1.55 percent the following trading day as the markets digested the news, to close at $19.04.

305.    On September 5, 2017, *Berlingske* published an article titled "New Money Laundering Case: Billions from Dictatorship channeled through Danske Bank."  The article explained that large sums of money from the dictatorship in Azerbaijan was channeled through Danske Bank for several years and ended up being channeled to high ranking politicians throughout Europe who advocated for the regime.  *Bloomberg* also reported that day that Danske Bank would re-open an investigation into its operations in Estonia.  On this news, Danske Bank ADRs fell by 1.71 percent, to close at $19.34.

306.    On October 11, 2017, Danske Bank issued a press release titled "Danske Bank placed under AML investigation in France."  The release specified that "Danske Bank A/S has today been placed under investigation by the French Tribunal de Grande Instance de Paris court in relation to suspicions of money laundering concerning transactions carried out by customers of Danske Bank Estonia from 2008 to 2011."  On this news, Danske Bank ADRs fell by 1.55 percent, to close at $19.69.

307.    On November 3, 2017, OCCRP published an article titled "Auditors Warned Danske Bank About Dodgy Clients, Money Laundering."  The article reported that "Denmark's biggest bank, Danske Bank, is alleged to have actively and knowingly helped highly questionable clients to elude the scrutiny of authorities, Danish newspaper *Berlingske* revealed on Thursday.  Reporters at *Berlingske* obtained a letter sent in February 2014 by Danske Bank's internal auditors to two members of the bank's executive board.  The letter reportedly states that the Estonian branch of the Danske Bank had acted in clear breach of money-laundering regulations."  The article added that "Hans Kristian Skibby, a spokesperson for the Danish

People's Party, said the new information was 'highly surprising' and told *Berlingske*, 'It appears the top management had more serious knowledge about these issues than what the bank has so far acknowledged in its statements to us.'"  The same day, *Ritzau Finans* also published an article titled "Danske Bank CEO: I do not comment on internal letters."  The article explained that CEO Borgen did not want to comment on whether he knew about the letter from internal auditors, that according to *Berlingske*, warned about potential money laundering in the Estonian Branch back in 2014.  The article elaborated that Danske Bank had so far stated that management was not informed about the money laundering in the Estonian Branch.  On this news, Danske Bank ADRs fell by 2.85 percent, to close at $19.10.

308.   On January 25, 2018, Danske Bank issued a press release disclosing that "the French court has changed the status of Danske Bank in [its] investigation to that of an assisted witness.  This means that Danske Bank is no longer placed under formal investigation, but still forms part of the investigation as an assisted witness ("témoin assisté")."  On this news, Danske Bank ADRs fell by 2.73 percent, to close at $19.93.

309.   Just a month later, on February 27, 2018, *Reuters* reported that "Estonia's financial regulator said on Tuesday it would launch an investigation into Danske Bank's local branch after media reports said the lender had been aware of money laundering allegations at the unit as far back as 2013."  That same day, *Berlingske* published an article titled "Danske employee alerted top management: The Putin Family and Russia's intelligence service laundered money in the bank."  Therein, *Berlingske* reported that the family of Russian President Putin and the FSB were behind the money laundering at Danske Bank, which was reported to the bank's top management in 2013.  The new information revealed that Danske Bank management was aware much earlier than disclosed of serious AML deficiencies.  Reporting on the news,

*Bloomberg* added that "For months, Danske Bank A/S investors treated revelations of money laundering at its Estonian unit with impressive equanimity.  But this week that changed. . . . Danske Bank CEO Thomas Borgen said Tuesday his bank should have reacted faster to signs the Estonian branch was being used to launder money.  Danske should have closed down the banking activities of non-residents sooner, he said."  On this news, Danske Bank ADRs fell by 3.53 percent, to close at $19.97.

310.    On April 25, 2018, *Bloomberg* published an article titled "Danske Bank May Exit Baltics, BNS Cites Sources."  The article stated that "Danske Bank A/S may announce on April 26 that it will exit its operations in Lithuania and potentially Estonia and Latvia, Baltic News Service newswire reports, citing two people it doesn't identify."  On this news, Danske Bank ADRs fell by 3.40 percent, to close at $17.89.

311.    On May 9, 2018, the DFSA reprimanded Danske Bank for "serious deficiencies" in its governance relating to money-laundering allegations at its Estonian branch and called for an increase in the bank's capital requirement by 5 billion Danish kroner to account for "substantially higher" compliance and reputational risk.  *Ritzau Finans* also reported that same day that according to a whistleblower, the report by the DFSA lacked important information.  According to *Ritzau Finans*, a whistleblower mentioned that he was never contacted by the DFSA, even though a big part of the report is about his warnings to the management team of Danske Bank.  The whistleblower also commented that the DFSA never tried to reach out to any of the central employees of the bank.  On this news, Danske Bank ADRs fell by 1.16 percent, to close at $17.11.

312.    On June 25, 2018, *Reuters* reported that "Denmark's new business minister has signalled he will take a tough line on the country's largest lender Danske Bank, describing its

admission of past failings in anti-money laundering controls in Estonia as 'a disgrace and a scandal.'" On this news, Danske Bank ADRs fell by 1.23 percent, to close at $16.03, falling an additional 2.72 percent on June 26, 2018, and 1.03 percent on June 27, 2018, as the market continued to digest the news.

313.    On July 4, 2018, after market close, *Bloomberg* published an article titled "Danske Bank's Laundering Profits Targeted by Danish Government." According to the article, "Danish Business Minister Rasmus Jarlov [said] he wants to focus more effort on finding out just how much money Danske Bank . . . made on illicit dealings amid allegations that over $8 billion flowed through its Estonian unit in the years through 2015. Once identified, he [said] that the government should confiscate those profits." On July 5, 2018, the *Financial Times* also published an article titled "Bill Browder to launch criminal complaint against Danske Bank." The article, describing the criminal complaint that would be filed against Danske Bank in Estonia by the fund manager, elaborated that "Danske is under mounting pressure over the alleged money laundering. Mr. Browder and local media claimed this week that the amount of transactions that flowed through the Estonian branch of Denmark's biggest lender may have been as much as DKr53bn ($8.3bn), more than double previous estimates." On this news, Danske Bank ADRs fell by 4.06 percent, to close at $15.12.

314.    On July 18, 2018, Danske Bank announced that it would forgo profits on all "suspicious transactions" in its Estonian Branch, forcing it to lower its second quarter 2018 financial guidance. Commenting on the news, according to *Berlingske*, the Danish Minister for Industry, Business, and Financial Affairs stressed that it appeared that the bank acted illegally and that an investigation by the authority was still necessary. *Ritzau Finans* also published an

article that same day attributing the decline principally to the pending money laundering scandal. On this news, Danske Bank ADRs fell by 9.42 percent, to close at $13.81.

315.     On August 14, 2018, Danske Bank announced that it would stop serving Baltic corporate customers, including Nordic and international customers, in the Baltic countries, and would be phasing out those operations over the course of 2018.  On this news, Danske Bank ADRs fell by 2.15 percent, to close at $13.68.

316.     On September 4, 2018, *Reuters* published an article titled "Danske Bank shares fall as Estonia crisis deepens."  The article disclosed that "[t]he Danish bank handled up to $30 billion of Russian and ex-Soviet money through non-resident accounts via its Estonian branch in 2013 alone, according to an independent investigation, the *Financial Times* reported late on Monday."  The *Financial Times* also reported that the findings raised questions for Danske's leadership about who knew, and when, about the sheer volume of foreign money passing through the Bank's small Estonian branch.  On this news, Danske Bank ADRs fell by 6.41 percent, to close at $13.73.

317.     On September 7, 2018, the *WSJ* published a report entitled "Russia-Linked Money-Laundering Probe Looks at $150 Billion in Transactions - Transactions uncovered at Danske's Estonian branch highlight the growing concern about illicit money flows from the former Soviet Union."  Citing anonymous sources, the *WSJ* reported that Danske Bank was "examining $150 billion in transactions that flowed through a tiny branch in Estonia."  That same day, Denmark's minister in charge of financial legislation said that it now seemed very likely that "illegal" acts were committed in connection with the laundering allegations.  On September 10, 2018, Danske Bank announced that it expected to publish conclusions from its investigation on September 19, 2018.  The same day, *German Collection* reported on comments

from Defendant Ole Andersen that Danske Bank was even more involved in money laundering than previously thought.  On this news, Danske Bank ADRs fell by 5.21 percent, to close at $13.65 and continued to fall over the next two trading days to close at $13.14 per share on September 11, 2018.

318.    On September 19, 2018, Danske Bank published its "Findings of the investigations relating to Danske Bank's branch in Estonia," announced that Defendant Borgen was resigning, and disclosed that it would be donating all of the profits from its Estonian operations to an independent charity.  On this news, Danske Bank ADRs fell by 4.08 percent, to close at $12.92.

319.    On October 4, 2018, Danske Bank revealed that it had been ordered by the DFSA to reassess its solvency, stating in relevant part that "[c]onsidering the current developments, the FSA finds, however, that the bank's compliance and reputational risks are higher than assumed in the FSA's decision of 3 May 2018.  As a result, the FSA has ordered Danske Bank to reassess the bank's and the Group's solvency need in order to ensure adequate capital coverage of the increase in compliance and reputational risks."  As a result, Danske Bank stated that it was discontinuing its share buyback program.  Danske Bank also disclosed that it was "in dialogue with the US authorities regarding the Estonia case."  Specifically, Danske Bank disclosed that it "has also now received requests for information from the U.S. Department of Justice (DOJ) in connection with a criminal investigation relating to the bank's Estonian branch conducted by the DOJ."  On this news, Danske Bank ADRs fell by 4.77 percent, to close at $12.19 and continued to fall over the next trading day to close at $11.42 per share on October 5, 2018.

320.    On October 8, 2018, *Reuters* announced that the DFSA "faces an inquiry by the European Union's banking supervisor into how it supervised Danske Bank, which last week said

it was being investigated by the U.S. Department of Justice over alleged money laundering." The article elaborated that "[t]he European Banking Authority has powers to make recommendations that national supervisors must follow, as it did during a probe into how Malta's supervisor oversaw one of its banks." *Reuters* observed that this marked an "escalation" in the Danske Bank case. That same day, Danske Bank announced that it would stop its share buyback program as at the request of authorities. On this news, Danske Bank ADRs fell by 3.37 percent, to close at $11.03.

321.   On October 23, 2018, the *WSJ* published a report entitled "How One Stubborn Banker Exposed a $200 Billion Russian Money-Laundering Scandal," which disclosed the extent of the information the whistleblower had alerted Danske Bank's senior executives to back in 2013. The report was based on "hundreds of pages of internal bank documents, including memos and client records, along with interviews with dozens of officials and bankers involved with Danske's Estonian operations." *See* ¶¶185-188, *supra*. That same day, *Reuters* reported comments from Danish Business Minister Rasmus Jarlov who expressed concern that the bank had provided wrong information to the Danish FSA in relation to the money laundering scandal in Estonia. On this news, Danske Bank ADRs fell by 3.2 percent, to close at $9.67.

322.   On November 15, 2018, *Berlingske* published an article titled "Danish authorities target Danske Bank's former management in money-laundering scandal." Therein, *Berlingske* reported that the State Prosecutor for Serious Economic and International Crimes investigation of one of history's biggest money-laundering case, not only aims to give Danske Bank a major fine; SØIK are also investigating the possibility of going directly after those responsible, now former top officials in Denmark's largest bank. Morten Niels Jakobsen, State Prosecutor, was quoted as saying, "We are conducting two investigations: One, which is about whether the Bank as a legal

entity can be held liable in relation to any imposed fines.  The other, is about whether we can invoke a criminal liability against individuals from the Bank."  On this news, Danske Bank ADRs fell by 2.92 percent, to close at $10.63.

323.     On February 21, 2019, Danske Bank announced its annual general meeting would be scheduled for March 18, 2019, and made available a list of proposals to be voted on at the AGM.  A number of these proposals, including proposals 10, 11, 12, and 13 related to the Estonian Branch and sought to expand the investigation, appoint an independent and unbiased consultant to investigate the matter, prevent further AML violations, and even to break up Danske Bank.  Also on February 21, 2019, Danske Bank announced that "in addition to dialogue with the DOJ Danske Bank has received an inquiry from the U.S. Securities and Exchange Commission (SEC), which is also carrying out an investigation."  That same day, *Financial News* reported that Danske Bank had been ordered to close its operations in Estonia as the fallout from a $230bn money-laundering scandal deepened.  According to *Financial News*, the Estonian regulator told Danske to shut a longstanding branch in Tallinn at the heart of the money laundering scandal within eight months and to repay, in full, the deposits of its customers.  On this news, Danske Bank ADRs fell by 5.06 percent, to close at $9.10.

324.     On April 30, 2019, Danske Bank reported interim financial results for the first quarter of 2019, which revealed the worsening impact of Defendants' AML violations and continued uncertainty surrounding the AML investigations' effects on Danske Bank's costs, revenues, reputation, and prospects.  *See* ¶¶204-06. On this news, Danske Bank ADRs fell by 8.25 percent, to close at $9.01.

325.     From a Class Period high of $20.90 on February 16, 2018, as news concerning Defendants scheme and its implications for the Company's business and prospects leaked to the

market, the price of Danske Bank ADRs fell more than 50%, to close at $9.01 on April 30, 2019.

The substantial difference between the performance of Danske Bank shares and the performance

of all peer indexes to which the Company compares itself (DJ Stoxx 50, the DJ Stoxx Bank

Index, OMX Copenhagen 25, and the Europe 600 Bank), as illustrated in the below chart, is

attributable to the prior artificial inflation coming out of the stock price over time as the

Defendants' scheme and its implications leaked to the market.



## IX.   NO SAFE HARBOR

326.   The statutory safe harbor provided for forward-looking statements under the

Private Securities Litigation Reform Act of 1995 does not apply to any of the false statements

alleged herein.  The statements alleged to be false and misleading herein all relate to then-

existing facts and conditions.  In addition, to the extent certain of the statements alleged to be

false may be characterized as forward-looking, they were not adequately identified as "forward-

looking statements" when made and there were no meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the purportedly

forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is

determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Danske Bank who knew that the statement was false when made.

## X.  APPLICATION OF THE PRESUMPTION OF RELIANCE

327.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated upon omissions of material fact which there was a duty to disclose.

328.    In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because:

(a)    Danske Bank's ADRs were actively traded on the OTC market, an informationally efficient market, throughout the Class Period;

(b)    Danske Bank's ADRs traded at high weekly volumes during the Class Period;

(c)    Danske Bank regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(d)    the market reacted promptly to public information disseminated by Danske Bank;

(e)     Danske Bank's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace.  The firms who wrote analyst reports on Danske Bank during the Class Period include, but are not limited to, the following: RBC Capital Markets; Deutsche Bank; J.P. Morgan; UBS Investment Research; Macquarie Equities Research; Credit Suisse; and Barclays;

(f)     the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Danske Bank's ADRs; and

(g)     without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of Danske Bank's ADRs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts began to be revealed.

## XI.     CLASS ACTION ALLEGATIONS

329.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Danske Bank ADRs during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are: Defendants; the officers and directors of the Company during the Class Period; members of the immediate family of any excluded person; the legal representatives, heirs, successors and assigns of any excluded person or entity; and any entity in which Defendants have or had a controlling interest.

330.     The members of the Class are so numerous that joinder of all members is impracticable.  Danske Bank ADRs were actively traded in the United States on the OTC market.  While the exact number of Class members is unknown to Plaintiffs at this time and can

only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Danske Bank, the ADR depositary bank or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

331.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

332.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

333.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the 1934 Act was violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Danske Bank; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

334.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

335.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

336.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

337.    Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Danske Bank ADRs during the Class Period.

338.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Danske Bank ADRs.  Plaintiffs and the Class would not have purchased Danske Bank ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

**COUNT II**

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5(a) and (c)
Promulgated Thereunder Against All Defendants**

339.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

340.     This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiffs need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

341.     During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of Danske Bank ADRs; and (iii) cause Plaintiffs to purchase Danske Bank ADRs at artificially inflated prices.

342.     In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Danske Bank ADRs, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

343.     Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding Danske Bank's business, and AML violations in its Estonian Branch.

344.     Plaintiffs and the Class reasonably relied upon the integrity of the market in which Danske Bank's ADRs traded.

345.     During the Class Period, Plaintiffs and the Class were unaware of Defendants'

fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme.

Had Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful

course of conduct, they would not have purchased Danske Bank ADRs, or if they had, would not

have done so at the artificially inflated prices paid for such securities.

346.     As a direct and proximate result of Defendants' scheme to defraud and such

unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their

purchases of Danske Bank ADRs during the Class Period.

347.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange

Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class

for damages suffered in connection with their purchases of Danske Bank ADRs during the Class

Period.

## COUNT III

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

348.     Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

349.     The Individual Defendants acted as controlling persons of Danske Bank within

the meaning of Section 20(a) of the 1934 Act.  By reason of their positions with the Company,

and their ownership of Danske Bank securities, the Individual Defendants had the power and

authority to cause Danske Bank to engage in the wrongful conduct complained of herein.

Danske Bank controlled the Individual Defendants and all of its employees.  By reason of such

conduct, Defendants are liable pursuant to Section 20(a) of the 1934 Act.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## XIII.   JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: August 6, 2019

Respectfully submitted,

By: *s/ Carol C. Villegas*
**LABATON SUCHAROW LLP**
Carol C. Villegas
Alec T. Coquin
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
        acoquin@labaton.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**ROBBINS GELLER RUDMAN & DOWD**
Samuel H. Rudman
David A. Rosenfeld
William J. Geddish
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile: (631) 367-117
Email: srudman@rgrdlaw.com
            drosenfeld@rgrdlaw.com
            wgeddish@rgrdlaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2019, I authorized the electronic filing of the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to all parties registered with the Court's CM/ECF system. I certify under penalty of perjury

under the laws of the United States of America that the foregoing is true and correct.

Executed on August 6, 2019

_s/Carol C. Villegas_____
CAROL C. VILLEGAS
