USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/24/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
PLUMBERS & STEAMFITTERS LOCAL 773　　　　 :
PENSION FUND, BOSTON RETIREMENT　　　　　 :
SYSTEM, TEAMSTERS LOCAL 237 ADDITIONAL　　:
SECURITY BENEFIT FUND, and TEAMSTERS　　　:
LOCAL 237 SUPPLEMENTAL FUND FOR　　　　　　 :　　19-CV-235 (VEC)
HOUSING AUTHORITY EMPLOYEES, individually :
and on behalf of all others similarly situated,　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　:　　MEMORANDUM
　　　　　　　　　　　　　　　　　　　　　　　　　　　:　　OPINION AND ORDER
　　　　　　　　　　　　　　　　　 Plaintiffs,　　　　 :
　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　 -against-　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　:
DANSKE BANK A/S, THOMAS F. BORGEN,　　　　 :
HENRIK RAMLAU-HANSEN, JACOB AARUP-　　　　 :
ANDERSEN, and OLE ANDERSEN,　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　 Defendants.　　　 :
------------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

　　　This is a putative securities fraud class action against Danske Bank ("DB" or the "Bank") and former officers and members of its Board of Directors. Plaintiffs—purchasers of DB American Depositary Receipts ("ADRs")—bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and related regulations. Their claims concern alleged misrepresentations about DB's financial condition given extensive breakdowns in anti-money laundering ("AML") controls at DB's branch in Estonia between approximately 2007 and 2015 as well as subsequent fallout from the discovery of the lapses. Plaintiffs rely heavily on an independent internal investigative report published on September 19, 2018 (the "B&H Report"). The alleged class period runs from January 9, 2014, through April 29, 2019. On August 6, 2019, Plaintiffs amended their pleadings in response to Defendants' first motion to dismiss. (Dkts. 60, 68). Defendants again moved to dismiss the Third Amended

Complaint ("TAC" or "Complaint"). (Dkt. 73). For the following reasons, Defendants' motion is GRANTED.

## BACKGROUND[1]

From around 2007 until 2015, a DB branch in Estonia derived substantial profits from accounts managed by its Non-Resident Portfolio ("NRP") department that served "non-resident depositors." TAC ¶¶ 41–48. During this period, Russian, Danish, and Estonian financial regulators, as well as auditors and internal whistleblowers, raised concerns about the effectiveness of the branch's AML controls. *Id.* ¶¶ 70–101. In 2013 and 2014 in particular, DB received several whistleblower reports about compliance failures, which its internal audit group investigated. *Id.* ¶ 89. The audit confirmed that the Estonian branch had failed to implement and follow proper AML protocols. *Id.* ¶ 93.

In response to early reports of noncompliance, DB did not immediately close the NRP department, but, by the end of 2015, DB had closed the department and all non-resident depositors' accounts. *Id.* ¶¶ 99, 109; B&H Report (Dkt. 75-1) at 58–60. In a subsequently published audit, the Danish bank regulator—DFSA—reported that the Estonian branch experienced failures in money-laundering risk mitigation and violations of local AML rules; DFSA publicly reprimanded DB in 2016. Frawley Decl. Ex. 7 (Dkt. 75-7) at 1–2. Subsequent internal and government investigations continued to uncover AML compliance issues and

---

[1] On this motion to dismiss, the Court accepts all factual allegations in the pleadings as true and draws all reasonable inferences in the light most favorable to Plaintiffs. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). The Court may also "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the [Securities and Exchange Commission], and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

failures of supervision at the Estonian branch. TAC ¶¶ 122, 128, 138, 147–50; B&H Report at 73–75. Defendants allegedly downplayed the true scope of those issues and the threat of potential penalties. TAC ¶¶ 122, 126–27, 166; Geddish Decl. Ex. C (Dkt. 79-3) at 10–12.

The disclosed estimated value of funds that had been laundered through the NRP department until its closure in 2015 grew from $8.3 billion in July 2018 to $230 billion in February 2019. TAC ¶¶ 313, 323. In July 2018, Danish regulatory authorities announced that they would move to seize all profits derived from laundered funds and ultimately brought criminal charges in November 2018 against DB and in May 2019 against Defendants Borgen and Ramlau-Hansen. *Id.* ¶¶ 194, 207–08, 313. At the same time, DB announced that it would voluntarily forego profits earned from illegal transactions that had been processed through the NRP department. *Id.* ¶¶ 162, 314. In September 2018, DB published the B&H Report, which detailed the results of an investigation by a Danish law firm into DB's AML compliance issues, and announced Defendant Borgen's resignation. *Id.* at 1 n.1; ¶ 175. In October 2018, DB confirmed that it was under investigation by United States authorities after news outlets had reported the same a month prior. *Id.* ¶¶ 178, 180.

Financial consequences were significant. When DB announced that it was under investigation in the United States, DB cancelled a share buyback program because, according to its announcement, it faced uncertain, but potentially large, monetary penalties. *Id.* ¶¶ 180–82. Credit agencies also downgraded its deposit and debt ratings. *Id.* ¶ 183. Several months later, in February 2019, DB announced that it would reduce its dividend to build up capital for potential sanctions, was ordered to exit Estonia by Estonian authorities, and lowered its 2019 outlook. *Id.*

3

¶¶ 198–202, 204, 209.  The value of DB ADRs, which Plaintiffs held, predictably declined.[2]  *Id.* ¶¶ 203, 206.

## DISCUSSION

**II.     Standard of Review and Elements of a Section 10(b) Claim**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  The Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).  The Court, is not, however, "bound to accept as true a legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555)).

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."

---

[2]     ADRs are securities mapped to a foreign company's shares that can be "sponsored" or "unsponsored."  Before February 2016, DB ADRs were unsponsored, meaning that DB had no formal participation in issuing them; instead, depositary banks in the United States purchased and maintained custody of DB's shares and issued negotiable certificates representing beneficial ownership (but not legal title) in a set number of DB shares.  TAC ¶¶ 19–27; *see also Stoyas v. Toshiba Corp.*, 896 F.3d 933, 940 (9th Cir. 2018) (discussing characteristics of ADRs).  In February 2016, DB converted the unsponsored program into a sponsored one, itself registering the ADR securities with the Securities and Exchange Commission and exchanging the unsponsored for sponsored ADRs.  TAC ¶ 20, 28.  Both the unsponsored and sponsored ADRs were traded on OTC Bulletin Board or Pink OTC Markets run by OTC Link, over-the-counter quotation and trading systems.  *Id.* ¶ 34.

15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b–5, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a claim under these provisions, a plaintiff must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

In addition, a "complaint alleging securities fraud must satisfy the heightened pleading requirements" of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") of 1995 "by stating with particularity the circumstances constituting fraud." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319-20 (2007)). To satisfy Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Further expanding the pleading requirements of Rule 9(b), the PSLRA requires that "securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity

5

facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quotations omitted).

## II. The Amended Complaint Fails Adequately to Plead Fraud with Particularity

Failing to meet Rule 9(b) and the PSLRA's pleading requirements alone is reason to dismiss a complaint. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012); *see also, e.g.*, *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16-CV-3495, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018). A complaint must heed the "exhortation that plaintiffs 'must demonstrate with specificity why and how' each statement is materially false or misleading." *Bahash*, 506 F. App'x at 38 (quoting *Rombach*, 355 F.3d at 174). If a complaint is predominantly "marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false" then it "fails to state a claim because it is insufficiently particular under the PSLRA." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (citing *Bahash*, 506 F. App'x at 37–38).

Plaintiffs' Complaint uses two terse paragraphs generically to allege why 36 pages of quotations spanning 83 paragraphs contain false or misleading statements. *Compare* TAC ¶¶ 219, 295 *with* ¶¶ 210–18, 220–41, 243–94. That is far too great a weight for sweeping explanations of fraud to bear. The Complaint purports to assist the reader by bolding statements alleged to be false and misleading, *id.* at 87 n.13, but that is not sufficient. It leaves the reader to guess exactly what in the bolded statement is false or misleading and why.

Plaintiffs' theory of fraud first crystalizes in their opposition papers to Defendants'

6

motion to dismiss. In those papers, Plaintiffs abandon any pretense that their pleadings serve a useful purpose. In discussing six claims, Plaintiffs implicate less than a third of the Complaint's 83 paragraphed quotations. In a futile attempt to demonstrate that they have in fact complied with pleading requirements, Plaintiffs point to one paragraph with a specific allegation of fraud.[3] Pls.' Opp. (Dkt. 78) at 20 n.8. That single paragraph, read liberally, describes why statements in the preceding four paragraphs are alleged to be false and misleading. TAC ¶¶ 238–42. But it does not rescue the vast majority of alleged misstatements; it reveals only that Plaintiffs know how to allege fraud with specificity and yet have chosen not to do so with the bulk of the Complaint. The Complaint is, therefore, dismissed for failing to meet the heightened pleading standards of Rule 9(b) and the PSLRA.

### III. Plaintiffs Have Not Pled a Material Misrepresentation or Omission

Plaintiffs have not, in any event, alleged a materially false or misleading statement that could sustain a securities fraud claim.[4] *See CBS Corp.*, 433 F. Supp. 3d at 532 (describing standards for materiality and falsity). Plaintiffs advance six claims in their opposition brief based on a fraction of the alleged misstatements reproduced in the Third Amended Complaint. To the extent that Plaintiffs have not even attempted to defend many of the Complaint's alleged misrepresentations against DB's motion to dismiss, the Court deems those claims to have been abandoned. *See id.* at 531 (citation omitted) (deeming undefended claims abandoned).

---

[3] The Court notes that this paragraph made its debut in the TAC.

[4] DB also argues that all claims based on pre-February 2016 statements must be dismissed as impermissibly extraterritorial. DB's Mem. of Law (Dkt. 74) at 12–16; *see Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010); *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215–16 (2d Cir. 2014). Although the Court tends to agree with DB on this issue, the Court declines to reach it in light of the Complaint's other substantial defects that independently warrant dismissal.

Plaintiffs' first claim is that Defendants improperly reported revenues from NRP accounts in violation of international accounting standards in its 2013, 2014, and 2015 financial statements. Pls.' Opp. at 16–17; *see* TAC ¶¶ 224, 233, 235–36, 248, 257, 259, 260, 264, 266. Similarly, Plaintiffs argue that Defendants falsely asserted that their financial statements were prepared in accordance with those standards. Pls.' Opp. at 18; *see* TAC ¶¶ 230, 254, 270. Plaintiffs' theory is that international accounting standards prohibit the recognition of revenue from a contract unless the contract creates "legally enforceable rights and obligations." Pl. Opp. at 16. Plaintiffs argue that, given those standards, it was improper for DB to report revenue from the NRP accounts because, "[g]iven the illicit nature of the transactions generated by the NRP, no legally enforceable contract was created." *Id.*

Putting aside the fact that Plaintiffs have not alleged that the deposit contracts between the bank and NRP customers were unenforceable,[5] Plaintiffs have not alleged that, at the time those financial statements were published, Defendants knew that those contracts were unenforceable, or even knew that revenue from Estonia included revenue derived from money laundering transactions. Without plausible allegations to that end, Plaintiffs have not plausibly alleged that the financial statements at issue reported revenue that should not have been recognized. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442 & n.8 (S.D.N.Y. 2018) (finding that "accurately reported income that is obtained from an unlawful source may not be actionable only on the grounds that the unlawful source is not disclosed" and

---

[5]   Plaintiffs have certainly alleged that depositors were using their relationship with DB to conduct unlawful transactions, but that does not necessarily mean that the deposit contracts themselves were unenforceable. The enforceability of the deposit contracts would likely depend on an analysis of foreign contract law. In their opposition brief, Plaintiffs only state *ipse dixit* that no enforceable contracts were created.

8

rejecting theory that "accurately reported financial figures may be actionable misstatements if some of the revenue derived from illegal activity")); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("A statement believed to be true when made, but later shown to be false, is insufficient.").

Plaintiffs next claim that Defendants misled investors when they reported in February 2015 in DB's Corporate Responsibility report that "[i]n 2014, three cases were reported in the whistleblower system. All the cases were concluded, and the appropriate actions were implemented." Pls.' Opp. at 18 (emphasis omitted); *see* TAC ¶¶ 247. Plaintiffs argue that this statement was misleading because the B&H Report concluded years later that whistleblower allegations reported in 2013 had been insufficiently investigated. The Court disagrees. Regardless of what the B&H Report concluded five years later, for the complained-of statements to be false or misleading there must be a plausible allegation that DB had not, in fact, concluded the three whistleblower cases in 2013 or implemented what it believed at the time were appropriate actions. There is no such allegation; the fact that an investigation five years later found that the cases were prematurely closed suggests (maybe) mismanagement, but it does not suggest fraud.

Plaintiffs' third claim is that Defendants' statement in December 2014 that a goodwill impairment charge related to its Estonian operations was "of a purely technical nature and [did] not affect [DB's] strategy or business" was misleading. Pls.' Opp. at 19–20; *see* TAC ¶¶ 103–05, 238–40, 243–44, 251. Plaintiffs argue that Defendants later admitted in DB's 2014 annual report that the impairment was related to repositioning the NRP accounts to servicing only

customers with a *bona fide* Estonian connection.[6]  Pls.' Opp. at 19.  Plaintiffs also allege that "the whistleblower allegations regarding [the Estonian branch's] money laundering activities and the subsequent decisions made by Danske Bank's Board of Directors in 2014 to wind down the operations of the Estonian branch" were "material facts and management assumptions that contributed to the goodwill write down." TAC ¶ 242.  According to Plaintiffs, Defendants omitted material information about whistleblower allegations and the Board's decision to wind down operations of the Estonian branch when DB announced the impairment charge.  *Id.*

Plaintiffs again have not adequately pled that DB's statements were false or misleading.  Even if factors that led to the goodwill write-down had an impact on DB's business strategy, Plaintiffs have not alleged that the write-down itself affected DB's strategy.  In addition, the 2014 annual report did not "admit" that the write-down was a result of a planned NRP repositioning at the Estonian branch, as Plaintiffs contend, Pls.' Opp. at 19; instead, the 2014 annual report stated that the write down was taken due to "a worsening of the long-term economic outlook in Estonia and the planned repositioning of the personal banking business in 2015" and that similar write-downs were occurring associated with business units across Estonia, Northern Ireland, and Finland.[7]  Frawley Decl. Ex. 16 (Dkt. 81-1) at 91.  That fact significantly dilutes the force of Plaintiffs' theory that Defendants' statements were misleading because they failed specifically to call out their plans to wind down a particular department in Estonia.  *See*

---

[6]  This allegation is not in the Complaint.  In any event, as discussed below, this argument misrepresents the actual contents of the annual report quoted in the Complaint.  *See* TAC ¶ 251.

[7]  "When adjudicating a Rule 12 motion to dismiss, the Court must accept as true all well-pleaded allegations of fact in the Complaint, unless they are contradicted by other allegations, attached exhibits, or documentary evidence incorporated by the Complaint." *Feibleman v. Trustees of Columbia Univ. in City of New York*, No. 19-CV-4327, 2020 WL 882429, at *8 (S.D.N.Y. Feb. 24, 2020) (collecting cases).

*Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 297 (S.D.N.Y. 2019) (holding that statements "attributing [a company's] growth to broad trends and corporate strengths, *without pointing to any specific factors or sources of revenue*" were not actionable (emphasis added)); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 580 (S.D.N.Y. 2018) (holding that statement that business "segment as *a whole* was improving" was not misleading when the plaintiff alleged that "California was not then improving"). Plaintiffs provide only a conclusory connection between the plan to wind down and close the NRP accounts and the goodwill write-down. *See* TAC ¶ 242.

Fourth, Plaintiffs claim that a contingent liability footnote in DB's 2018 second quarter financial statement and Defendant Borgen's subsequent comments regarding the footnote were misleading. Pls.' Opp. at 21–25; *see* TAC ¶¶ 127, 131, 292. The footnote stated: "Danske Bank does not expect the outcomes of pending lawsuits and disputes, its dialogue with public authorities or the inspections of compliance with anti-money laundering legislation to have any material effect on its financial position." Pls.' Opp. at 21; *see* TAC ¶ 292. In July 2018, following the release of DB's second quarter financial results, Defendant Borgen stated that he had "no insights into any potential fine" relating to the Estonian branch's AML compliance failures, and referred analysts to the contingent liability footnote.[8] Geddish Decl. Ex. C at 8. Plaintiffs advance two theories of fraud with respect to these statements.

Plaintiffs first argue that the statements were misleading because the Danish authorities had announced that they would seek to confiscate all profits from money laundering activity, and DB had announced that it would forgo all profits from suspicious activities at the branch. Pls.'

---

[8] Plaintiffs mention this alleged misrepresentation for the first time in their opposition papers.

Opp. at 21; *see* TAC ¶¶ 313–14. According to Plaintiffs, those statements "misrepresented . . . the extent of the profits derived from the Branch's [money laundering] activities." Pls.' Opp. at 21; *see* TAC ¶ 52. First, the statements do not comment on—let alone misrepresent—the extent of profits at all. They state only that the company did not expect that fines or other fallout would be material to its financial position. But more important, Plaintiffs' argument fails because the press release accompanying the financial statements disclosed the estimated extent of revenue derived from the Estonian NRP department from 2007 until its closure in 2015, presumably some (significant) subset of which was attributable to money laundering activities. Frawley Decl. Ex. 17 at 1. Plaintiffs do not allege that the disclosed amount of estimated revenue was false or misleading or that forfeiture of the disclosed amount would have a material impact on DB's financial position.[9] They allege only that the volume of laundered funds ended up being larger than what DB disclosed at the time. Pls.' Opp. at 11, 21; *see* TAC ¶¶ 169, 171–72, 176, 313, 316–17, 321, 323.

Plaintiffs next argue that the contingent liability statements were misleading because DB knew but failed to disclose the volume of laundered funds and thus omitted DB's potential

---

[9] In their opposition to Defendants' motion to dismiss, Plaintiffs assert, with no citation to any allegation in the TAC, that "Defendants knew that the forfeiture of the profits derived from their illegal conduct was likely to have a material impact on DB's operations." Pls.' Opp. at 21. It is unclear whether Plaintiffs mean that the estimate given on July 18, 2018, was knowingly false and that the Bank knew that an accurate estimate would have a material impact on its financial condition, or that the Bank was lying when it stated that it did not expect that the estimate given on July 18 would have a material financial impact.

On July 18 DB estimated that, over eight years, it had revenue of approximately DKK 1.5 billion from the NRP department, compared to revenue of DKK 410 billion for the entire bank. Frawley Decl. Ex. 17 at 1. It is simply not plausible that a forfeiture of DKK 1.5 billion (even assuming every penny of revenue from the NRP department would be subject to forfeiture) would have had a material impact on an institution the size of DB. In any event, Plaintiffs have not alleged that the estimate of revenue from the portfolio was knowingly false at the time it was made nor have they alleged any basis for the conclusory allegation that Defendants knew the forfeiture would have a material effect on DB's financial position.

12

vulnerability to a probe by authorities in the United States that could result in material fines. Pls.' Opp. at 22-23. That argument also lacks merit. Plaintiffs do not allege that DB knew in July 2018 the exact volume of laundered funds. They also do not allege that the risk of a probe by authorities in the United States meant that potential fines related to DB's AML failures would be material. Moreover, DB's statements about expectations of future fines from uncharged conduct were not misleading just because the fines that were ultimately imposed turned out to be greater than expected. *See In re Deutsche Bank*, 2017 WL 4049253, at *7 (holding that a company is not obligated to disclose uncharged illegal conduct).

Finally, Plaintiffs claim that Defendants' corporate governance and compliance statements were false and misleading. Pls.' Opp. at 25–27; *see* TAC ¶¶ 215, 222, 229, 245, 253. All of these statements are inactionable generalizations or puffery. *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) ("[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them." (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)); *CBS Corp.*, 433 F. Supp. 3d at 532–34 (finding inactionable corporate code of conduct statements); *Cemex*, 396 F. Supp. 3d at 298 (finding inactionable as puffery corporate code of ethics and anti-bribery policies). Accordingly, Plaintiffs cannot base a claim of securities fraud on these materials.

## IV. Plaintiffs Have Not Pled a Strong Inference of Scienter

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference" that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." 15 U.S.C. § 78u–4(b)(2)(A); *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  Plaintiffs have failed to do so.

Plaintiffs' theory of scienter is that Defendants acted recklessly or with conscious disregard that their statements were false or misleading.  Pls.' Opp. at 27–28.  They do not identify any motive to deceive or defraud.  "Where motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quotation omitted).

Plaintiffs' allegations do not raise a strong inference that Defendants acted recklessly or with conscious disregard of the truth.  Plaintiffs do not allege that Defendants had access to or received information contradicting their representations.  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) ("Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] at the same time they made their misleading statements." (quoting *In re Marsh &McClennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006)).  Plaintiffs allege only that the true extent of money-laundering activity at the Estonian branch trickled out to the public over time.  Although Plaintiffs allege that Defendants' responses were sluggish, sluggishness does not give rise to a strong inference of fraudulent intent.  *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (finding plausible an explanation that the defendants were in "a constant game of 'Catch up'", which supported an inference of mismanagement but not fraud).  It is just as plausible that the DB responses

Plaintiffs characterize as "sluggish" were responses given only when the Bank was comfortable that it had its arms around the facts (even if some of those facts subsequently turned out not to be entirely accurate).

Plaintiffs also fail to plead scienter with particularity. They allege in a conclusory way that Defendants and employees of DB received reports contradicting public statements, TAC ¶¶ 76, 79–82, 106, 296–300, and fail to connect any of those reports to specific representations by specific persons during the relevant time periods. Plaintiffs, in short, ask this Court to make the inferential leap that because DB failed adequately to investigate and resolve extensive AML lapses at the Estonian Branch, Defendants must have acted with scienter when they made the various statements touching on Estonia.[10]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Because Plaintiffs have had opportunity to amend their pleadings once in response to a motion to dismiss, and because the arguments made in response to the motion to dismiss give no indication that the Complaint's defects are curable, Plaintiffs are denied leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505–06 (2d Cir. 2014). The Third Amended Complaint is therefore DISMISSED with prejudice.

The Clerk of Court is respectfully directed to close all open motions and close this case.

**SO ORDERED.**

**Date: August 24, 2020**                                              **VALERIE CAPRONI**
**New York, New York**                                **United States District Judge**

---

[10] For substantially the same reasons as discussed in Sections II, III, and IV above, the Court also finds that Plaintiffs have failed to allege "scheme liability" claim under 17 C.F.R. § 240.10b–5(a) and (c). *See* TAC ¶¶ 339–47; Pls.' Opp. at 37–38.